# Exhibit 5, Part 2

(b)    Second, a firm must identify the beneficial owner, if relevant, and verify their identity.

(c)    Finally, a firm must obtain information on the purpose and intended nature of the business relationship.

### A. Customer Identification and Verification

4.52.    Regulation 20 of the Money Laundering Regulations requires that firms establish and maintain appropriate and risk-sensitive policies and procedures related to customer due diligence. SYSC 6.3.1R also requires that the policies must be comprehensive and proportionate to the nature, scale and complexity of its activities.

4.53.    TJM stated that its CDD policy was set out in its Relevant Compliance Documents during the Relevant Period.

4.54.    In respect of the Solo Clients, TJM stated that it maintained a specific client on-boarding process which detailed a step-by-step process for gathering KYC and client identification information (the "Solo Procedures") which were created to reflect that the Solo Group business was different from TJM's traditional private broking business for high net worth clients. These, however, were substantially inadequate as they were extremely high-level in nature (initially less than half a page was devoted to the entire onboarding process). As elaborated further below, the Solo Procedures did not reference or address several fundamental concepts relating to customer due diligence.

### B. Purpose and Intended Nature of a Business Relationship

4.55.    As part of the CDD process, Regulation 5(c) of the 2007 Regulations requires firms to obtain information on the purpose and intended nature of the business relationship. Firms should use this information to assess whether a customer's financial behaviour over time is in line with their expectations and to provide it with a meaningful basis for ongoing monitoring of the relationship.

4.56.    Regulation 20 of the 2007 Regulations requires that firms establish and maintain appropriate and risk-sensitive policies and procedures related to customer due diligence, and SYSC 6.3.1R requires that the policies must be comprehensive and proportionate to the nature, scale and complexity of its activities.

4.57.  In addition, the JMLSG Guideline states: "if a firm cannot satisfy itself as to the identity of the customer; verify that identity; or obtain sufficient information on the nature and intended purpose of the business relationship, it must not enter into a new relationship and must terminate an existing one."

4.58.  TJM's Compliance Manual explicitly required TJM staff to obtain "sufficient information about the nature of the business that the client expects to undertake. They should understand the purpose of the proposed business and the anticipated level and nature of activity to be undertaken. They should also where appropriate enquire as to the source of funds to be used."

4.59.  TJM's Compliance Manual and the Solo Procedures provided basic procedures to obtain and verify clients' identities. However, they:

a)  Made no reference to the broader concepts of CDD or EDD, or to the possibility that clients may pose higher risks which required enhanced enquiries or measures to mitigate such risks; and

b)  Did not set out any framework or guidance for staff to consider what might constitute a sufficient understanding of the purpose and intended nature of the business relationship with each client, or what a risk assessment should consider (indeed the Solo Procedures contained no references at all to risk assessments).

4.60.  TJM first received KYC documentation for the Solo Clients from the Solo Group on 29 January 2014. TJM stated that it had followed the process set out in the Solo Procedures. In 2014, the CDD TJM undertook for the Solo Clients was limited to carrying out identification checks. In 2015, TJM also carried out PEP and sanctions checks for the Solo Clients and for the UBOs of each of the entities being onboarded. On completion, TJM sent an "*On-boarding Pack*" to the Solo Clients for completion and signature, which involved asking them to sign TJM's terms of business, complete and sign an on-boarding questionnaire (the "Onboarding Questionnaire"), and sign a "*Loss of Protection*" letter.

4.61.  The Onboarding Questionnaire took the form of a two-page questionnaire which requested details including annual income and expenditure, total assets and liabilities, the value of the company, trading experience and objectives, and a description of source of funds. However, neither TJM's Compliance Manual nor the

25

Solo Procedures specified whether or how TJM should review the contents of KYC documents and the Onboarding Questionnaire. TJM sent its onboarding pack including the Loss of Protection letter to one client, Client J, on 15 July 2015 before it had even received its KYC documentation on 23 July 2015. TJM also did not consider how the KYC documents and the Onboarding Questionnaires affected each of the Solo Client's risk profiles.

4.62.   Despite the limited due diligence carried out when the Solo Project was introduced to the Firm, TJM failed to take adequate steps to understand the nature and limitations of the intended trading by each of the individual Solo Clients. Employees noted that "*we believed Solo was running a dividend arbitrage strategy for high net worth clients*" and that "*… we'd been given no indication as to, exactly, what size of business was coming through or which stocks they would trade or which futures they would trade.*" TJM also failed to identify the source of funds of each of the Solo Clients (see paragraphs 4.90 and 4.164 below).

4.63.   This meant that from the point of onboarding, TJM had insufficient information on which to adequately evaluate whether the purported trading by the Solo Clients was in line with expectations and as a result unable to provide it with a meaningful basis for ongoing monitoring and to be alert to transactions that were abnormal within the relationship.

4.64.   Despite the lack of information available to TJM about the nature and scale of intended trading, TJM onboarded 311 Solo Clients.

*Risk Assessment*

4.65.   As part of the onboarding and due diligence process, firms must undertake and document risk assessments for every client. Such assessments should be based on information contained in the clients' KYC documents.

4.66.   Conducting a thorough risk assessment for each client assists firms in determining the correct level of CDD to be applied, including whether EDD is warranted. If a customer is not properly assessed, firms are unlikely to be fully apprised of the risks posed by each client, which increases the risk of financial crime.

4.67.   Under Regulation 20 of the 2007 Regulations, firms are required to maintain appropriate and risk-sensitive policies and procedures related to risk assessments and management.

4.68.   The Authority has not seen any evidence that TJM carried out risk assessments for any of the Solo Clients.

4.69.   The Solo Procedures made no reference to conducting risk assessments. Furthermore, TJM's Compliance Manual did not require the Firm to undertake and document risk assessments for every client.  Rather, it merely referred to a general requirement for TJM "*to have systems and controls appropriate to [a client's] business based nature, scale and complexity of the firm's business and its customer, product and activity profile*" and that "*once the firm has identified and assessed the risks it faces in respect of money laundering, senior management must ensure that appropriate controls to manage and mitigate these risks are designed and implemented*", as part of its risk-based approach. No further guidance was provided to TJM employees as to how to conduct this risk-based approach.

4.70.   Geographical risk was the only risk factor set out in TJM's Compliance Manual which would prompt the Firm to consider additional due diligence. These measures were limited to requiring a personal applicant residing outside the UK to provide an additional certified form of ID or proof of address. For non-UK entities, TJM's Compliance Manual stated "in addition to obtaining the comparable documents applicable to those for UK companies steps should be taken to identify key directors/shareholders".

4.71.   During the Relevant Period, TJM also had a 'Compliance Monitoring Programme' in place with the stated aim of ensuring "*that the firm has identified the areas of its business which give rise to risks of non-compliance with the relevant rules and regulations and to set out a comprehensive monitoring schedule to mitigate these risks.*" However, the programme did not describe how to identify these risks and perform the monitoring function nor did any such monitoring schedule exist.

4.72.   The Authority considers that had TJM conducted basic due diligence of the Solo Client's KYC documentation and Onboarding Questionnaires, it would have identified a number of risk factors which indicated that the Solo Clients posed a

higher risk of financial crime which ought to have prompted the Firm to undertake further enquiries of the Solo Clients. These risk factors included that:

a)   The Solo Clients were a significant departure from the type of clients TJM had expected to on-board for the Solo Trading. Many of the Solo Clients had just a single director, shareholder and/or UBO and many of these were owned and managed by the same individuals. This was in contrast to TJM's expectation that it would be dealing with large, regulated institutional clients.

b)   TJM had no former business relationship with the Solo Clients and TJM lacked sufficient information regarding the nature and purpose of the intended trading by the Solo Clients. Therefore, TJM did not have a profile against which to base an assessment of their purported trading for the purposes of ongoing monitoring.

c)   The Solo Clients were introduced by the Solo Group, where there was a possibility of a conflict of interest as some UBOs were former employees of SCP. In the case of Ganymede, it was owned and controlled by Sanjay Shah, who was also the UBO of the Solo Group. Because of the Solo Group's relationship with their former employees and Sanjay Shah, they were not in a position to provide an unbiased view in onboarding and assessing the Solo Clients for due diligence purposes.

d)   Around 80% of the Solo Clients were US 401(k) Pension Plans, the beneficiaries of which were trusts. The JMSLG Guidance states "some trusts established in jurisdictions with favourable tax regimes have in the past been associated with tax evasion and money laundering, especially if set up in a non-EU/EEA country or higher risk jurisdiction" In fact, TJM stated "It will involve more compliance work to take on US clients". Additionally, TJM did not enquire how 401(k) Pension Plans operated, the rules for establishment, or the amounts which could be invested in them.

e)   None of the Solo Clients were physically present for identification purposes as the onboarding process was conducted via email. This is identified in the 2007 Regulations as being indicative of higher risk and therefore firms are

28

required to take measures to compensate for the higher risk associated with such clients.

f)     The Solo Clients purportedly sought to conduct OTC equity trading. In such cases, the JMSLG Guidance requires firms to take a more considered risk-based approach and assessment.

4.73.     As a result of failing to conduct risk assessments, TJM also could not adequately identify risk factors for the Solo Clients. TJM therefore lacked a meaningful basis to determine whether or not the Solo Clients required EDD or whether it was appropriate to onboard them.

*EDD*

4.74.     Firms must conduct EDD on customers which present a higher risk of money laundering, so they are able to assess whether or not the higher risk is likely to materialise.

4.75.     Regulation 14(1)(b) states that firms "must apply on a risk-sensitive basis enhanced *customer due diligence and enhanced ongoing monitoring in any situation which by its nature can present a higher risk of money laundering or terrorist financing*." The 2007 Regulations further require firms to implement EDD measures for any client that was not physically present for identification purposes.

4.76.     Regulation 20 of the 2007 Regulations requires firms to maintain appropriate and risk-sensitive policies and procedures related to customer due diligence measures, which includes enhanced due diligence. SYSC 6.3.1R further requires that the policies must be comprehensive and proportionate to the nature, scale and complexity of its activities.

4.77.     The JMLSG has also provided guidance on the types of additional information that may form part of EDD, including obtaining an understanding as to the clients' source of wealth and funds.

4.78.     Besides the additional measures TJM was required to consider for clients by virtue of their location, TJM's Compliance Manual stated that for non-face to face identification verification "*more stringent identification requirements need to be imposed*" which would depend on "*the specific circumstances of each case but*

*may extend to seeking notarised copies of the documents*". No further guidance was provided as to when or how EDD ought to be conducted.

4.79.   Other than those brief references, TJM's Compliance Manual and Compliance Monitoring Programme did not provide any further information nor establish procedures in relation to EDD. As a result, they were fundamentally inadequate in enabling the Firm to carry out EDD appropriate to high-risk clients.

4.80.   In view of the risk factors set out at paragraph 4.72 above, the Solo Clients presented a higher risk of money laundering. TJM therefore ought to have conducted EDD in respect of each Solo Client, however failed to do so.

4.81.   In view of the connections between some of the Solo Clients and the Solo Group, this should have included independent enquiries as to the Solo Clients' sources of funds to ensure that they were not still financially connected to the Solo Group as employees, and had sufficient funds to conduct the anticipated trading.

4.82.   The fact that TJM would act as a matched principal broker in relation to the Solo Trading in 2015 appears to have prompted TJM to commission a new review of the Solo business. This review was conducted by the Firm's Compliance Consultant on 4 March 2015. It focused on client onboarding procedures relating to the Solo Clients. Whilst only being intended to be a high-level review (as set out in paragraph 4.37 above). The review identified that:

   a)   The Solo Clients had not been formally risk classified and needed to be. All Solo Clients fell into the high-risk category and the appropriate level of due diligence had to be set. The Compliance Consultant further noted that for a sample of Solo Clients reviewed, EDD should have been conducted; and

   b)   No sanctions or PEP checks / screening had been conducted for the individuals, owners, directors or partners of the Solo Clients.

4.83.   Whilst TJM claimed that it started carrying out PEPs and sanctions checks in relation to the Solo Clients in 2015, the Firm failed to implement robust measures and adapt its approach as a result of these concerns, including undertaking a risk assessment of each Solo Client and keeping proper records of the work conducted to address these issues.

4.84.   Recognising the higher financial crime risks presented by the Solo Clients, TJM ought not only to have requested basic information in the Onboarding Questionnaires, but ought also to have substantively reviewed and assessed these to comply with EDD requirements.

4.85.   Additionally, from a substantive review of the KYC documents and completed Onboarding Questionnaires received, TJM ought to have considered what further EDD measures might have been appropriate for the ongoing monitoring of each Solo Client, keeping under review their risk profile and trading activities.

<u>Client A</u>

4.86.   An example of a Solo Client that TJM onboarded was a 401(k) Pension Plan ("Client A") where KYC documents showed that the sole beneficiary was an 18-year-old college student. This college student was also the sole beneficiary of four other 401(k) Pension Plans.

4.87.   The responses to the Onboarding Questionnaires that the Firm received from Client A's representative for each of these five 401(k) Pension Plans were nearly identical.  The exact same answers were given for the following questions: "Total Annual Income: GBP 750,000", "Net Assets: GBP 4,600,000", source of funds: derived from "20+ years of working, investing and various entrepreneurial endeavours" and traded an aggregate 145 times in various financial products during the last 12 months.

4.88.   The Authority's investigation has not identified any evidence that TJM had made any enquiries on the Onboarding Questionnaire of Client A and/or the five related 401(k) Pension Plans. As with all other Solo Clients, no enhanced due diligence was conducted on Client A despite it being required under the 2007 Regulations and a number of the answers provided appearing to be improbable given Client A was an 18-year old student.

<u>Representative of Client A</u>

4.89.   Client A's representative also appeared to be the client representative for approximately 50 other Solo Clients which requested to be onboarded with TJM. The representative provided TJM with near identical responses to Onboarding Questionnaires for 25 of the Solo Clients TJM onboarded, including identical

answers to each client's annual income, net assets, source of funds and historic trading activity. For the remaining 25 Solo Clients where this individual was the client representative, TJM did not receive Onboarding Questionnaires, but rather received AML Certificates certifying that the Solo Group had carried out all applicable CDD under the 2007 Regulations and the JMLSG Guidance. For one individual represented by Client A's representative, TJM did not receive an Onboarding Questionnaire or AML Certificate but nonetheless onboarded that Solo Client anyway.

4.90.    TJM did not make any enquiries as to whether the UBO of the respective entities in fact had net assets of £4.6 million cumulatively across each of the Solo Clients for which he sent Onboarding Questionnaires, or alternatively enquire whether and/or how the UBO of the respective entities had access to such personal wealth in order to fund all of these Solo Clients simultaneously. Nor did TJM enquire or raise concerns as to how each of these 25 Solo Clients had exactly the same income, assets and liabilities.

Client B

4.91.    The Authority has identified only one instance of a Solo Client ("Client B") being reviewed by TJM as a result of concerns identified in respect of its financial resources during the Relevant Period. This instance occurred after the commencement of the Solo Trading on 26 February 2014.

4.92.    On 26 March 2014, TJM carried out a review of Client B following receipt of KYC documentation from the Solo Group. TJM escalated Client B's onboarding internally and identified the following:

a)    Client B "*was only incorporated two weeks ago and has share capital of just 50k. They have disclosed assets of 200k so may have injected in more funds since.*"

b)    "*Although the owners have industry experience and might be able to be classified as professional in their own right, I am not sure how we can classify a 50k firm as professional.*"

32

c)    "Given that these firms will be buying and selling millions of pounds / Euros etc of shares at a time, I would have thought that the firm would need to have substantial [sic] more capital."

d)    "how would this work in practice? How much does a firm need to pay the clearer / broker? *Can a Firm with only 200k of assets purchase participate in these multi million pound give ups?"*

4.93.    On 27 March 2014, a TJM staff member was asked to "*follow up (light touch) with Solo".* It is unclear whether this follow-up occurred, but TJM appears to conclude that:

a)    "*the share capital of 50k is probably not relevant*" and "*each of these large trades in cash equities have an equal and opposing futures position which offsets margin and reduces exposure. The gain is in the arbitrage."* A further comment is made that "*The share cap issue is a little misleading* as *it only demonstrates the paid up element of the Company and not the full financial position".*

b)    "*the 200k note on the fact find is confusing especially as we are lead to understand that the minimum investment accepted by the custodian is £5M. As such I am happy they qualify on financial resource on the basis of the £5M minimum".*

4.94.    The Onboarding Questionnaire from one of three shareholders of Client B and its KYC documents contained responses that Client B had annual income of £1 million, estimated annual expenditure of £600,000 but no assets or liabilities. Client B represented to have assets of £200,000, stating that its source of funds is derived from "trading/personal" and that its trading objective was "Investing for income". This suggested that Client B's three shareholders would be trading using personal funds and savings. It also stated that Client B or its shareholders had traded in 100 futures, 100 options and 100 cash equities during the last 12 months despite being incorporated less than a month before, on 3 March 2014.

4.95.    TJM does not appear to have requested or received any further documentation or information from Client B, nor to have verified the representations made by the Solo Group regarding the requirement to have £5 million in funds to be onboarded, or how such an entity could have obtained such funds despite its

recent incorporation, limited assets and profile, and only three contributing shareholders.

4.96.  Nonetheless, Client B was on-boarded shortly thereafter on or around 31 March 2014. TJM purportedly executed Cum-Dividend Trading on behalf of Client B on three occasions during the Relevant Period to the aggregate value of approximately £2.6 billion in Danish and Belgian equities (with its largest single trade being approximately £1.86 billion). However, notwithstanding Client B's limited financial resources this extraordinary volume of trading was not identified or escalated due to the deficiencies in TJM's onboarding and on-going monitoring procedures.

Ganymede

4.97.  On 17 June 2014, Ganymede sent an onboarding request to TJM.

4.98.  The KYC documentation and the completed Onboarding Questionnaire showed that Ganymede was incorporated in the Cayman Islands on 16 June 2010. Sanjay Shah was its single UBO, it had an annual income of £5 million, total assets of £1 million, a value of £1 million and its source of funds was derived "*from savings and earnings*".

4.99.  The fact that the UBO of Ganymede was the same as the UBO of the Solo Group should to have been obvious to TJM had the KYC material been adequately reviewed and ought to have been flagged as presenting an increased risk of financial crime. The EDD process should therefore have included independent enquiries on its source of funds, connections with some of the Solo Clients and with the Solo Group, and checks should have been made that it had sufficient funds to conduct the anticipated trading.

4.100.  This would have been particularly important given the outcome of the purported trades that TJM executed on behalf of Ganymede in German stock A on 30 June 2014 and 23 October 2014, which resulted in a net loss EUR 4.7 million to. This is further detailed in the 'Ganymede Trades' section (see paragraphs 4.169 to 4.200 below).

4.101.  Notwithstanding these clear risk factors, TJM failed to conduct any EDD on Ganymede.

*Reliance on Solo for due diligence*

4.102.    The 2007 Regulations allow firms such as TJM to rely on another authorised firm's due diligence provided they consent to being relied on. However, the 2007 Regulations emphasise that liability remains on firms such as TJM for any failure to conduct appropriate due diligence measures.

4.103.    The JMLSG Guidance states that firms should take a risk-based approach when deciding whether to accept confirmation from a third party that appropriate CDD measures have been carried out on a customer and this "cannot be based on a single factor". They also state that if reliance is placed on a third party, the firm still needs to know the identity of the beneficial owner whose identity is being verified; the level of CDD carried out; and have confirmation of the third party's understanding of his obligation to make available on request copies of the verification data, documents or other information.

4.104.    JMLSG Guidance further notes that arrangements for the outsourcing of clearing and settlement processes also exist in securities markets. In this context, emphasis is placed on the execution-only broker's obligation to conduct CDD and EDD as the first point of contact to clients and their transactions. Similarly JMLSG Guidance emphasises that OTC business in wholesale markets exhibit very different AML risks as it may be less regulated than exchange-traded products and therefore require more detailed risk-based assessment.

4.105.    TJM informed the Authority that their role was an execution-only broker and that it relied upon the fact that the Solo Clients were referred to TJM from the Solo Group, which would be required to conduct its own CDD and EDD over each Client.

4.106.    However, as noted at paragraph 4.72(c) above, TJM failed to consider the apparent conflict of interest in that significant numbers of the Solo Clients had connections with the Solo Group which was relied upon to conduct CDD/EDD.

4.107.    TJM's Compliance Manual referred to circumstances whereby clients may be exempted from its identification requirements, whilst applicable versions of the Solo Procedures stated: "*Note that we rely on Solo for the US KYC (Solo sign a form confirming they've done all the checks)*" and "*On occasion Solo may send a verification of ID Form this confirms that they have done all the KYC checks and their Compliance Department has signed it off*".

35

4.108.   However, neither TJM's Compliance Manual nor the Solo Procedures set out procedures and/or guidance on its risk-based approach for conducting CDD (other than verifying clients' identities) on new clients introduced by authorised firms. Nor did they set out when reliance could be placed upon KYC documents provided by the authorised firms for the new clients or detail the circumstances when it was appropriate to do so.

4.109.   TJM appeared to have relied on the CDD carried out by the Solo Group for a number of the Solo Clients the Firm onboarded.

4.110.   On one occasion, the Solo Group provided TJM with a "Verification of ID Form" (for Client B) as described in TJM's Solo Procedures, attesting that they had carried out all appropriate AML due diligence under the 2007 Regulations in relation to the identification of the customer, however gave no detail on the due diligence carried out regarding the purpose and intended nature of the business relationship with that Solo Client.

4.111.   Separately on 6 August 2015, the Solo Group provided TJM with 'AML Certificates' for 73 Solo Clients TJM onboarded, certifying that they had carried out all applicable CDD under the 2007 Regulations and the JMLSG Guidance. This extended beyond certifying the identification of customers, as the certificates stated there had been consideration of the source of funds for transactions and the implementation of ongoing monitoring.

4.112.   In respect of these 73 Solo Clients, the Authority has not identified any evidence to suggest that TJM followed its (limited) Solo Procedures which had been applied to previously onboarded Solo Clients (this included receipt of KYC packs and TJM Onboarding Questionnaires). At least eight of the 73 clients onboarded had not provided a complete set of onboarding documentation. The Authority also notes that TJM executed purported Solo Trading on behalf of some of these clients as early as 7 August 2015 prior to the completion of onboarding process.

4.113.    TJM appears to have assumed that the Solo Group had carried out adequate due diligence on the Solo Clients and taken comfort from this assumption as mentioned in paragraph 4.105  above.

4.114.   Given the connections between the Solo Group and the introduced clients outlined in paragraph 4.72(c), TJM ought to have queried whether the Solo Group was

36

sufficiently independent to enable TJM to place reliance (or take comfort) from the Solo Group's representations as to CDD conducted on the Solo Clients. The Authority has not located any evidence of TJM querying the risk that the Solo Group might not have adequately conducted CDD, or of TJM assessing the appropriateness of relying on their AML due diligence [or of TJM ever challenging or questioning the Solo Group's representations in relation to Solo Clients. On the contrary, TJM appeared to have taken comfort from the links between the Solo Group and the Solo Clients and other broker firms were also handling Solo business.

4.115.  There is also no evidence that TJM made any enquiries as to the level of due diligence conducted by the Solo Group on the Solo Clients, or the extent of measures the Solo Group might have implemented to mitigate any perceived AML risks. The Authority has not located evidence of TJM conducting a risk-based assessment of whether it could rely on the Solo Group's due diligence, or that it sought to satisfy itself the 2007 Regulations and JMLSG Guidance had been complied with despite the fact that the Firm remained liable for any failure to apply adequate measures.

4.116.  TJM's reliance on the Solo Group in relation to AML and due diligence checks was all the more unreasonable given the limited due diligence it had initially carried out on the Solo Project as detailed at paragraph 4.27 above.

*Client Categorisation*

4.117.  Part of the onboarding process also includes categorising clients according to the COBS rules, which is an additional and separate requirement to carrying out risk assessments. Pursuant to COBS 3.3.1R, firms must notify customers of their categorisation as a retail client, professional client or eligible counterparty. Authorised firms must assess and categorise clients based on their level of trading experience, risk knowledge and access to funds in order to ensure suitable products are offered. Proper application of the rules also ensures that firms only act for clients within the scope of their permissions. Firms are required to notify clients as to the categorisation made by the Firm. Pursuant to COBS 3.8.2R, firms must also keep records in relation to each client's categorisation, including sufficient information to support that categorisation.

37

4.118.  During the Relevant Period TJM was authorised to deal as an agent for retail clients, professional clients and eligible counterparties, the latter two of which are types of clients that are considered to have experience, knowledge and expertise to make their own investment decisions. There are two types of professional clients; per se professionals and elective professionals. Each of these categories has prescriptive criteria, as described in the COBS rules.

4.119.  TJM's Compliance Manual contained its policy regarding client categorisation. The policy stated "Classifying clients correctly is extremely important as it defines what duties we owe them under FCA rules and guidance. We must therefore take reasonable steps to establish whether a client falls into one of the following categories (Eligible Counterparty; Professional client; Retail client) before conducting any investment business with them".

4.120.  TJM's Compliance Manual did provide what constitutes each category of clients and in particular with regards to elective professional clients, it stated "TJM may classify a client who would otherwise be a retail client as an professional client" if TJM undertakes the steps mentioned in the COBS rules referred to in paragraph 4.117 and also reviews the clients' status as a professional client annually.

4.121.  TJM's Compliance Manual further stated: "In order to determine that a client has sufficient experience and understanding to be classified as an Professional Client, you must have regard to the following: (i) the client's knowledge and understanding of the relevant investments and markets, and the risks involved (ii) the length of time the client has been active in these markets, the frequency of dealings and the extent to which he has relied on the advice of TJM; (iii) the size and nature of transactions that have been undertaken for the client in these markets; (iv) the client's financial standing, which may include an assessment of his net worth or of the value of his portfolio."

4.122.  TJM's Compliance Manual emphasised that "the onus is on TJM to prove that a client has sufficient experience and understanding to be treated as an [sic] professional client. It is difficult to prove that a client has the sufficient experience and understanding if TJM has to rely mostly on anecdotal evidence i.e. recalling telephone conversations etc."

4.123.   Contrary to the requirements in COBS and its own Compliance Manual, TJM did not individually assess the Solo Clients to determine their classification. Instead, TJM categorised that all the Solo Clients were elective professionals based on its belief that they met the requisite criteria regarding trading experience, even though no evidence was obtained.  TJM appears to take comfort from the fact that the Solo Clients were also existing clients of the Solo Group and assumed they would have been trading clients of the Solo Group, even though most had only been recently incorporated. On a call with a Solo Group representative on 18 February 2014, TJM staff noted that "the mere fact that they've already been trading with you or through you for x many years, so many times a day properly satisfies most of the criteria" and also stated that TJM was "trying to make the account opening as simple as possible".

4.124.   The Solo Procedures required staff to send an 'On-boarding Pack' to each Solo Client, containing a 'Loss of Protection' letter which warned the client of the consequences of being categorised as elective professional. This step was neither preceded by the receipt of any formal written requests from Solo Clients to be categorised as an elective professional, nor by an assessment of whether each of the Solo Clients in fact met the criteria to be elective professionals under the COBS rules.

4.125.   Significantly, prior to conducting any due diligence check to enable TJM to fully assess and understand the background of new clients, it assumed Solo Clients were elective professional clients and provided them with the 'Loss of Protection' letter which stated the criteria they needed to meet to be elective professionals. At the same time, the clients were asked to complete the Onboarding Questionnaire, which requested information relevant to the qualitative and/or quantitative tests prescribed by the COBS rules for client categorisation. This was despite the fact that TJM explained that "… the information on the fact find [Onboarding Questionnaire] is to assess the client sufficiently enough to understand, for example, the categorisation of the client …"

4.126.   TJM therefore did not have sufficient information on which to base a decision regarding the categorisation of the Solo Clients at the point it sent the 'Loss of Protection' letter, as the KYC documents provided by the Solo Group provided insufficient detail to enable TJM to assess whether each of the Solo Clients met the criteria for elective professionals. The Authority notes on one instance, a 'Loss

39

of Protection' letter was sent to a Solo Client prior to TJM even receiving its KYC information.

4.127.  The Solo Clients did not ultimately provide any evidence (beyond self-certification through completion of the 'Loss of Protection' letters and Onboarding Questionnaires) that they met the criteria to be categorised as elective professionals. Consequently, failure to conduct its own due diligence on the Onboarding Questionnaires properly, TJM could not reasonably have formed a view that any of the Solo Clients met the criteria set out in COBS to be elective professional clients.

**Ongoing monitoring**

4.128.  Regulation 8(1) of the 2007 Regulations requires firms to conduct ongoing monitoring of the business relationship with their customers. Ongoing monitoring of a business relationship includes:

a)  scrutiny of transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the firm's knowledge of the customer, his business and risk profile; and

b)  ensuring that the documents or information obtained for the purposes of applying customer due diligence are kept up to date.

4.129.  Monitoring customer activity helps identify unusual activity. If unusual activities cannot be rationally explained, they may involve money laundering or terrorist financing. Monitoring customer activity and transactions that take place throughout a relationship helps firms know their customers, assist them to assess risk and provides greater assurance that the firm is not being used for the purpose of financial crime.

*Transaction monitoring*

4.130.  As part of a firm's ongoing monitoring of a client relationship, Regulation 8 of the 2007 Regulations requires that firms must scrutinise transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the relevant person's

knowledge of the customer, their business and risk profile. For some clients, a comprehensive risk profile may only become evident once they have begun transacting through an account.

4.131.  Furthermore, Regulation 14(1) states that enhanced ongoing monitoring must be applied in situations which can present a higher risk of money laundering or terrorist financing.

4.132.  Regulation 20 requires firms to have appropriate risk-sensitive policies and procedures relating to ongoing monitoring. These policies must include procedures to identify and scrutinise; 1) complex or unusually large transactions; 2) unusual patterns of activities which have no apparent economic or visible lawful purpose; and 3) any other activity which the relevant person regards as likely by its nature to be related to money laundering or terrorist financing.

4.133.  As described in paragraphs 4.119 to 4.122 above , TJM had a 'Compliance Monitoring Programme' in place with the stated aim of ensuring "*that the firm has identified the areas of its business which give rise to risks of non-compliance with the relevant rules and regulations and to set out a comprehensive monitoring schedule to mitigate these risks.*" However, no such monitoring schedule existed in respect of identification of these risks and performing the monitoring function.

4.134.  TJM's Relevant Compliance Documents failed to set out any policies and/or procedures regarding: (i) whether, how, or the frequency with which ongoing monitoring should have been performed; (ii) whether staff ought to have reviewed transactions undertaken throughout the course of the customer relationship to ensure they were consistent with the customer's business and risk profile; or (iii) whether these obligations should have been enhanced for higher risk clients.

4.135.  Similarly, TJM's Solo Procedures did not make any provision for the review and/or monitoring of the Solo Clients following on-boarding. This created a risk that client and transaction monitoring would not be conducted consistently or at all.

4.136.  TJM stated that it did carry out periodic reviews of the Solo Clients  but was unable to explain what specifically they looked at during such reviews.

4.137.  In relation to the Solo Trading, TJM also stated that '*independent periodic monitoring*' was carried out by its 'Trading Support Manager' and an external

41

review was carried out by external compliance consultants. Further, its compliance team would also "*monitor processes and conduct spot checks*".

4.138. TJM was unable to locate records of the monitoring carried out on the Solo Trading by a designated staff member or by its compliance team. The Compliance Consultant confirmed to the Authority that they had not considered trade monitoring as it was not within their remit.

4.139. TJM stated that the monitoring it did carry out in relation to the Solo Trading was manual "spot-*checking*" by one staff member and acknowledged that this was a lower degree of monitoring than it carried out for other parts of its business. TJM's monitoring of the Solo Trading appears to have been limited to simply monitoring calls to office telephone lines rather than any manual or automated review of the Solo Trading trading data itself. Moreover, as mentioned in paragraph 2.6, all of the Solo Trading was conducted via email or Brokermesh, not placed via telephone. As a result, in practice TJM had no systems or controls in place that were capable of effectively monitoring the Solo Trading.

4.140. As a result, TJM did not identify any concerning patterns of trading during the Relevant Period.

4.141. The Authority has not seen any evidence that TJM substantively and/or systematically monitored individual Solo Clients' trading activities, nor that TJM considered whether the trading was consistent with its (limited) knowledge and understanding of the individual Solo Clients, their risk profile, or potential financial crime risk indicators.

4.142. These factors, combined with the Firm's failure to recognise or act upon obvious risks, meant that TJM did not comply with its obligations to undertake appropriate ongoing monitoring, including trade monitoring, which heightened the risk that financial crime would go undetected.

*The Purported Solo Trading*

4.143. During the Relevant Period, TJM purportedly executed high volume Cum-Dividend Trading for the Solo Clients to the value of approximately £78.26 billion in Danish and Belgian equities. TJM received commissions of £1,388,331 from the Solo

42

Trading, which made up approximately 41% of the Firm's revenue during the Relevant Period.

4.144.  TJM purportedly started executing trades on behalf of the Solo Clients on 26 February 2014. The Firm understood that trading would be in large volumes and had an expectation of overall revenue from the Solo Trading of approximately £500,000 per annum.

4.145.  TJM initially conducted the Solo Trading via email. The Firm kept spreadsheets of the trades that were purportedly executed and uploaded these at the end of each day to a post-trade order matching platform for the Solo Group.

4.146.  This process was discontinued with the implementation of Brokermesh on 25 February 2015, which also coincided with the establishment of TJM's relationship with the other Solo Group entities, as well as a reduction of 50% in its commission entitlement and its change of role to act as a matched principal broker.

4.147.  Brokermesh was an automated process on an electronic platform, developed by an entity associated with the Solo Group, which generated trade orders from clients which were transmitted to brokers, including TJM, but did not retain trading records after the end of each day, beyond the creation of automated emails. It was a closed network matching trades between the Solo Clients only with no access to liquidity from public exchanges, which TJM described as "*an order management system*". It deleted all trading records at the close of every day.

4.148.  During the Relevant Period, TJM executed purported OTC Cum-Dividend Trading of approximately £37 billion.

4.149.  TJM accepted every trade order placed on Brokermesh but explained that liquidity was not always found and matched in full for the trades it sought to execute.

4.150.  It was TJM's understanding that Brokermesh automated the administrative process in order to speed up communications and facilitate an anticipated increase in the number of trades.

A.    *Trade sizes*

43

4.151.  Between February 2014 and August 2015, TJM purportedly executed Cum-Dividend Trading, to the value of approximately £58.55 billion in Danish equities and £19.71 billion in Belgian equities on behalf of Solo Clients.

4.152.  Analysis of this Cum-Dividend Trading reveals the following:

a)  TJM purportedly executed 'buy' orders on behalf of Solo Clients in 16 Danish stocks over 22 cum-dividend dates.  An average of 16.77% of the outstanding shares in each stock was traded, which were cumulatively worth a total of £58.5 billion. The volumes also equated to an average of 47 times the total number of all shares traded in those stocks on European exchanges.

b)  TJM purportedly executed 'buy' orders on behalf of Solo Clients in 15 Belgian stocks over 14 cum-dividend dates.  An average of 5.65% of the outstanding shares in each stock was traded, which were cumulatively worth £19.71 billion.   The volumes also equated to an average of 22 times the total number of all shares traded on European exchanges.

c)   The aggregate value of Cum-Dividend trades purportedly executed by TJM on behalf of Solo Clients on a cum-dividend date were in a range of approximately £91.4 million to £13 billion for a Danish equity and approximately £49 million to £6.18 billion for a Belgian equity.

4.153.  The Authority considers that it is significant for market surveillance and visibility that individual trades were below the applicable disclosable thresholds. For example, section 29 of the Danish Securities Trading Act required shareholders holding over 5% of Danish-listed stock to be publicised. Similarly, Belgian law requires pursuant to Article 6 of the 'Law of 2 May 2007 on disclosure of major holdings in issues whose shares are admitted to trading on a regulated market and laying down miscellaneous provisions' holders of more than 5% of the existing voting rights to notify the issuer and the Belgian Financial Services Markets Authority of the number and proportion of voting rights that he/she holds.

4.154.  The purported Cum-Dividend Trading executed by TJM on behalf of the Solo Clients represented up to 24% (an average of 16.77%) of the shares outstanding in the companies listed on the Danish  stock exchange, and up to 10% (an average of 5.65%) of the shares outstanding in companies listed on the Belgian stock exchange.