# Exhibit 57

# Time of taxation on sale of shares - exercise of sale and buyer's right

Previous instance: Order of the National Tax Tribunal of 30 October 2000, 2-2-1819-0764

| | |
|---|---|
| Date of release | 12 Jul 2002 12:52 |
| Date of judgment / ruling / decision / control signal | June 28, 2002 |
| SKM number | SKM2002.399.VLR |
| Authority | Western High Court |
| Case number | Section 9, B-0218-01 |
| Document type | Dom |
| Overall topics | treasure |
| Topics Topics | TAX internally |
| Keywords | Shares, suspensive, time of taxation, buyer's right, right of sale, time of agreement |
| Summary | The case concerned the income year in which the taxpayer had disposed of his shares in a company. The taxpayer claimed that the divestment had taken place in the income year 1995, whereas the Ministry of Taxation claimed that the divestment did not take place until the income year 1996. |
| | The taxpayer had a put option on the shares, which he exercised in 1995. However, the exercise of the put option gave rise to various problems which had to be resolved. Under this, agreement was to be reached on the terms of the deposit of the purchase price, which had great significance for the settlement of the transaction. A letter i.a. The taxpayer's lawyer pointed out that the taxpayer did not consider himself bound by any final agreement between the parties in 1995. In the same direction, he pointed out that in 1996 some additional terms were agreed in connection with the transfer. In addition, the fact that nothing appeared from the taxpayer's tax return for the income year 1995 on a sale of the shares, the High Court found that the shares were not disposed of until the income year 1996. |
| Reference (s) | The Capital Gains Taxation Act, section 1, subsection 2 Equation Guide 2001 SG2.5 , SG2.6.1 |

## Parties

A
(lawyer Morten Leen)

against

Ministry of Taxation
(Chamber Advocate v / lawyer Anders Vangsø Mortensen)

## Judged by the district judges

John Lundum, Chr. Bache and Mogens Heinsen (kst.)

The case was brought on January 29, 2001.

Arguments of the parties:

The plaintiff, A, has in principle filed a claim that the defendant, the Ministry of Taxation, be ordered to recognize that A's share income for the income year 1996 must be reduced by DKK 3,426,303 to DKK 0. In the alternative, A has filed a claim that the Ministry of Taxation be ordered to recognize that A's

share income for the income year 1996 must be reduced by DKK 3,426,303 to DKK 0, while A's capital income for the income year 1996 is increased by DKK 122,057 in additional share gains.

The Ministry of Taxation has in principle claimed acquittal and has in the alternative claimed the employment of A's income for the income year 1996 remanded for reconsideration by the tax authorities.

The issue in the case

The case concerns when A has divested its shares in H1 A ∕ S. A argues before the High Court that the waiver must be attributed to the income year 1995, whereas the Ministry of Taxation argues that the waiver must be attributed to the income year 1996.

The case has been heard by the National Tax Tribunal, which issued an order on 30 October 2000. The ruling upheld the tax authorities' decision that the divestment of the shares should be attributed to the income year 1996. vote in case of tie is decisive, voted to consider the shares relinquished in the income year 1996, while two voters voted to consider the shares relinquished in the income year 1995. The National Tax Court's ruling is included as an appendix to this judgment.

The facts of the case appear to a large extent from the ruling of the National Tax Tribunal. The High Court has therefore chosen to prepare a more concise case presentation, so that as a supplement to this, reference is made to the High Tax Court's ruling.

**Case presentation**

A was trained in 1966 in the ... industry. In 1975, A and NN agreed to start an independent business, also in the ... industry. Together they founded F1 ApS, as A contributed 25% of the share capital and NN contributed 75% of the share capital. The company was later transformed into an A ∕ S, F1 A ∕ S. In 1990, A nominally transferred DKK 5,000 shares in the company to NN, which subsequently owned 75.5% of the shares, while A owned 24.5% of the shares.

F1 A ∕ S ran a business with imports and wholesale sales ..... The goods were purchased in the Far East and resold to ... stores in this country. A, who was responsible for sales in Denmark, and NN, who was in charge of purchasing goods in the Far East, functioned until 1991 as in all respects equal in relation to decisions and management, etc. and F1 A ∕ S.

During the 1980s, competition in the market in which F1 A ∕ S operated had become increasingly fierce, and this led to some disagreement between A and NN about the strategy for the future operation of F1 A ∕ S. As a result of this disagreement, a restructuring of the company was carried out in 1991. This restructuring meant, among other things, that A in 1991 resigned from F1 A ∕ S 'management. The restructuring also meant that the activities in F1 A ∕ S were transferred to a company owned by NN, F2 ApS, which also changed its name to F1 ApS. The company was later transformed into a joint stock company. The former F1 A ∕ S, also changed its name to H1 A ∕ S. For A, the restructuring also meant that, with effect from 1 June 1991, he was employed as sales manager in the "new" F1 ApS. A shareholder agreement was also entered into between A and NN. According to this shareholder agreement, A had a right of sale with a corresponding purchase obligation for NN with respect to A's shareholding in H1 A ∕ S valid until 31 December 1995, while NN had a right of purchase with a corresponding sale obligation for A valid in the period from 1. January 1996 to 1 July 1996. The price for A's shareholding was agreed in the shareholders' agreement at the net asset value determined by the auditor.

However, as the relationship between A and NN continued to develop negatively, a settlement agreement was entered into in 1992 between A on the one hand and NN, H1 A ∕ S and F1 A ∕ S on the other. The settlement agreement is to a large extent reproduced in the National Tax Court's ruling p. 2-5, to which reference is made. The settlement agreement also states, among other things. following:

"...

Preamble:

...

Since A as part of the termination of the employment relationship, cf. further § 1, no longer has an active role in ..... the company F1, the shareholder agreement between A and NN has at the same time been expanded with a hedging of A's financial risks with regard to the shareholding in H1 A ∕ S, which has financed F1 A ∕ S 'acquisition of the company in the summer of 1991.

has financed F1 A / S 'acquisition of the company in the summer of 1991.

> The hedging of A's financial risks is done by inserting in this agreement a provision which means that A can either assert the right of sale acquired to him against NN (or a person or company designated by him) or demand redemption by the company. H1 A / S, by cash adjustment on a valuation basis calculated on the basis of the value of the shareholding in connection with the conclusion of this agreement, or by NN or the company H1 A / S or F1 A / S as guarantee guarantor providing irrevocable bank guarantee as security for the purchase price per . a given transfer date, which is sovereignly determined by A (cf. section 3 (2)) at any time after the conclusion of this agreement.
>
> At the same time, the partnership entered into between A and NN regarding the property complex leased to F1 A / S is dissolved.
>
> With the conclusion of this agreement, the legal position between the parties is at the same time definitively determined, and the parties can therefore not, on other grounds than the rights and obligations contained in §1-1-10 of the agreement, make claims against each other.
>
> ... "

On 15 June 1992, at the request of F1 A / S, Den Danske Bank issued a guarantee of DKK 3,586,457 in favor of A. It appears from the guarantee that the amount is provided as security for fulfillment of F1 A / S 'guarantee obligations in accordance with to § 3, para. 9 of the Settlement Agreement. It also appears from the guarantee that the guarantee amount is increased by 6% per. years with effect from each 1 August. The guarantee also states, among other things:

> "...
>
> The guarantee expires on 01.01.1996.
>
> The said amount ... is paid to A on demand without a trial on condition that A in accordance with the said settlement agreement § 3 para. 1-11 to the bank documents,

| to | A has in writing asserted his right of sale to NN, cf. § 3 pieces. 2 concerning all the A-related shares (nom. 245,000.00) in H1 A / S and |
|---|---|
|  |  |
| to | NN, a company or person designated by NN, cf. § 3 pieces. 2, or the issuing company (H1 A / S) does not fulfill the purchase obligation within 4 weeks after A has asserted his right to sell in writing to NN, and after the final calculation of the purchase price was available, cf. § 3 pieces. 5, |

> provided that A signs the necessary share transfer documents to F1 A / S at the latest at the same time as the payment under this guarantee, and delivers the transferred shares to the bank, to which they are pledged in the event that the guarantee becomes effective.
>
> ... "

As stipulated in the winding-up agreement, A obtained a binding prior notice from the Tax Assessment Council as to whether his accession to section 3 of the winding-up agreement would mean that a final agreement had been entered into for the holding of shares in H1 A / S, so that the shares were considered disposed of at signing of the settlement agreement. This question was answered in the negative by the Tax Assessment Council and stated in the justification for this that the

establishment of the right to sell the shares was only binding on NN, so that there had been no transfer of ownership. The Tax Assessment Council further stated that the time of disposal must be considered to exist at the time when A may invoke the right of sale, ie at the time of exercise.

After the conclusion of the settlement agreement, A had not actually had anything to do with F1 A / S or H1 A / S. He was still a member of the board of H1 A / S, but there was no contact between him and the company or between him and NN.

By letter of 15 September 1995, A's lawyer, lawyer TS, submitted an application to the tax authorities

in the Municipality for permission for the redemption sum in connection with the settlement of a nominal DKK 245,000 shares in the company H1 A / S to be exempt from taxation under section 16 B of the Tax Assessment Act. , PCS. 1, so that taxation took place in accordance with the Danish Capital Gains Tax Act.

By letter of 27 September 1995 to H1 A / S, lawyer TS announced on behalf of A that A formally exercised the right of sale in accordance with section 3, subsection 2, in the settlement agreement applicable in respect of A's shareholding of DKK 245,000. It also appeared from the letter that lawyer TS could agree with the state - authorized public accountant KB's calculation, after which the purchase price according to the settlement agreement amounted to DKK 4,348,051.

By letter of 24 October 1995, the tax authorities in the Municipality notified the applied dispensation for taxation pursuant to section 16 B of the Tax Assessment Act, e.g. on condition that the sale was made at the value in trade and conduct, and that the sale was made within 6 months of the dispensation.

On 30 November 1995, an extraordinary general meeting of H1 A / S was held. At the general meeting, it was decided that the company should acquire A's shareholding at a total price of DKK 4,348,051, and that the purchase price should be adjusted in cash as soon as possible after the expiration of the proclamation issued as a result of the share capital reduction.

In a fax dated 5 December 1995 from lawyer TS to H1 A / S 'lawyer, lawyer FL, it is stated, among other things:

"...

The State Authorized Public Accountant KB informed me by telephone on Thursday, November 30, 1995, that the purchase price of my client's sale of the above post shares will be corrected on Wednesday, December 6, 1995.

For this purpose, I have asked Den Danske Bank to create a new account in A's name with your c / o address ...

As you know, the account's balance with accrued interest can only be released to my client when the rules in section 46 of the Danish Companies Act on proclamations have been observed.

I must therefore allow myself to suggest that ... the following deposit text be provided for the account:

The account's balance together with accrued interest is released to A when the proclamation deadline for the decision at the extraordinary general meeting on 6 December 1995 on the company's acquisition of own shares in connection with a capital reduction pursuant to section 44 a, subsection 1 of the Danish Companies Act. 1 no. 2, has expired.

The release takes place without instructions from any of the parties involved in the case, when 3 months have elapsed from the insertion of the proclamation in Statstidende.

The release takes place regardless of the fact that during the proclamation period it may be established that the conditions in the Danish Companies Act, section 44 a, subsection 1, no. 2, cf. § 46 is not fulfilled, as NN personally (or a person or company designated by him) in any case is considered to have acquired the A-related shares in the company H1 A / S.

... "

Attorney FL answered the fax the same day. In the reply, it was stated that the release of the purchase price should be conditional on no claims being filed against the company during the proclamation period. It was further stated that H1 A / S was the buyer of the shares and that NN and others could not now be obliged to buy the shares. Attorney FL came up with another draft wording of the deposit text in accordance with what the attorney had stated in the letter.

By fax of 6 December 1995, lawyer TS wrote to lawyer FL:

"...

I have yesterday's date at 15.49 received your fax and accompanying letter stating that you can not approve my proposed deposit text.

With reference to the settlement agreement, section 3, subsection 6, 1st sentence, I must inform you in this connection that my client can no longer approve that the sale of my client's shareholding can take place to the issuing company - H1 A / S.

In this connection, I would like to draw your attention to the fact that, as you know, on 27 September

In this connection, I would like to draw your attention to the fact that, as you know, on 27 September 1995 my client exercised his right of sale under the settlement agreement ...

In my opinion, their proposal for a deposit text thus implies that A may risk being in the situation in March 1996 that it is established that Unibank has notified claims in H1 A / S by virtue of the guarantee statement submitted by H1 A / S. According to their deposit text, H1 A / S is no longer obliged to pay the deposited amount to my client, just as NN or a person or company designated by him can not be assumed to be obliged to buy my client's shareholding.

I therefore intend to request Den Danske Bank to pay the guarantee amount in accordance with the demand guarantee, cf. attached draft fax. "

By fax of the same date, lawyer FL announced that he, on behalf of H1 A / S, maintained that an agreement had been entered into for this company's purchase of the shareholding. Attorney FL requested in the fax attorney TS to immediately announce that he agreed that a binding agreement had been entered into regarding the company's purchase of A's shareholding.

By letter of 7 December 1995, lawyer FL informed lawyer TS that the draft text of the deposit, which appeared in lawyer FL's fax of 5 December 1995, was maintained. Attorney FL announced at the same time that he considered the concerns expressed by Attorney TS to be more theoretical than real, as the acquiring company had significant equity.

By fax of 7 December 1995, lawyer TS asked Den Danske Bank to pay the guarantee sum to A.

In a fax dated 21 December 1995 from lawyer TS to lawyer FL's colleague, lawyer TH, lawyer TS announced that A could agree that the documents prepared at the general meeting of H1 A / S on 30 November 1995 were forwarded to the Danish Commerce and Companies Agency , if a number of conditions were met. These assumptions listed in the fax were referred to as drafts. The fax states, among other things:

| "... | |
|------|--|
|      |  |

2.      that the blocking clause for the account created in Den
        Danske Bank A / S in A's name reads as follows:

        The account's balance together with accrued interest
        is released to A when the proclamation deadline for
        the decision at the extraordinary general meeting on
        30 November 1995 on the company's acquisition of
        own shares in connection with a capital reduction pur-
        suant to section 44 a, subsection 1 of the Danish
        Companies Act. 1 no. 2, has expired.

        The release takes place without instructions from any
        of the parties involved in the case, when 3 months
        have elapsed from the insertion of the proclamation in
        Statstidende - all provided that the conditions in the
        Danish Companies Act, section 44 a, subsection. 1, no.
        2, cf. § 46, are met.

3.      that the provisions contained in the settlement agree-
        ment of 1 June 1992, including in particular the one in
        § 3, para. 2 contained a right of sale for A is extended
        until 1 May 1996, so that A has the option in the alter-
        native to demand that F1 A / S or more alternatively
        NN or a company or person designated by him ac-
        quires the shares belonging to A, if H1 A / S can not
        due to the company law rules implement the assumed
        capital reduction.

4.      that the shareholder agreement entered into between
        A and NN from June 1991 in § 2 contained the buyer
        right for NN does not enter into force per. 1 May 1996,
        after which it runs until 1 July 1996.

5.      that Den Danske Bank A / S (or alternatively Unibank A
        / S) provide a demand guarantee of DKK 4,600,000 in
        favor of A, with payment without a trial to A, if F1 A / S
        or more alternatively NN or a company or person des-
        ignated by him does not fulfill the payment obligation
        within 5 banking days after A again, ie despite a letter
        of 27.09.1995 to the management of H1 A / S - may

| | have asserted his right of sale; now to F1 A ⁄ S. |
| | |
| ...<br>" | |

In a letter dated 22 December 1995 from Den Danske Bank to lawyer TS, it is stated, among other things:

"Following on from our telephone discussions, we hereby acknowledge receipt of your letter of 7 December 1995, in which you, on behalf of A, make timely claims under the guarantee provided by the bank of DKK 4,378,315 on behalf of F1 A ⁄ S.

At the same time, we acknowledge receipt of your draft solution proposal of 21 December 1995 as an addendum to the settlement agreement of 1.6.1992 between A and H1 A ⁄ S and others. relating to. settlement and completion of stock trading. This solution proposal will be discussed with F1 A ⁄ S and their advisers for implementation soon.

For the sake of good order, we must note that the bank naturally maintains its guarantee. "

In a letter dated 5 January 1996, lawyer TS announced that he could, on behalf of A, agree to a new general meeting of H1 A ⁄ S with a view to deciding on the same matters as at the general meeting on 30 November 1995. on terms substantially similar to those set out in lawyer TS's letter of 21 December 1995.

By letter of 11 January 1996, lawyer FL informed lawyer TS that he, on behalf of NN and F1 A ⁄ S, could accept the proposal from lawyer TS in the letter of 5 January 1996, although he had a few minor proposals for changes.

On 12 January 1996, a new extraordinary general meeting of H1 A ⁄ S was held. At this general meeting, it was decided that the company should acquire A's shareholding for a total price of DKK 4,492,571. 7, until 23 April 1996, the resolution of the general meeting of 12 January 1996 corresponded in its entirety to the resolution of the general meeting of 30 November 1995.

By letter of 15 January 1996, lawyer TS confirmed to lawyer FL that an agreement had been entered into for the sale of A's shareholding to H1 A ⁄ S on the previously stated terms.

On 17 January 1996, F 1 A ⁄ SA announced irrevocable transport for security in a deposit of DKK 4,210,016 in Unibank. It appears from the transporter declaration that the amount is pledged as security for F1 A ⁄ S 'obligation in the alternative to H1 A ⁄ S to buy A's shareholding.

On 19 January 1996, A released the guarantee provided by Den Danske Bank.

On 23 January 1996, the proclamation on the occasion of the capital reduction in H1 A ⁄ S was published in Statstidende.

In an income and assets statement for A and his wife for 1995, which was prepared on 22 February 1996 by, among others, state-authorized public accountant KB, and which was signed by A and his wife on the same day, A's shareholding in H1 A ⁄ S was included under i.a. the listing of fixed assets.

At an extraordinary general meeting of H1 A ⁄ S on 18 April 1996, the capital reduction was finally approved after the general meeting had established that the proclamation deadline had expired, without any claims having been notified by anyone.

On 24 April 1996, Unibank A ⁄ S sent DKK 4,210,016 to Den Danske Bank. The amount was the purchase price for A's shareholding after deductions for various balances.

In A's tax return for 1995, which A signed on 9 May 1996, the market value of the shares in H1 A ⁄ S is stated under the information on assets.

By letter of 16 July 1996 to the Customs and Tax Region, lawyer TS requested the resumption of A's income assessment for 1992, as the lawyer, among other things, stated that the income assessment for the income year in question was based on the erroneous assumption that A's shareholding was

not deemed to have been relinquished at the conclusion of the settlement agreement in 1992.

By letter dated 2 October 1996, the Customs and Tax Region refused to grant the application.

By letter of 15 October 1996, lawyer TS Told- og Skatteregionen informed that A took note of the refusal of resumption, but that he did not intend to tax the profit by it per. On 12 January 1996, the shares were sold for the 1996 income year, as A was still of the opinion that the divestiture of the shares must be considered to have taken place in the income year 1992 for tax purposes at the conclusion of the winding-up agreement.

In an income and wealth statement for A and his wife for 1996, which was prepared on 13 March 1997 by, among others, the state-authorized public accountant KB, and which was signed by A and his wife on the same day, an information is included that As shareholding in H1 A / S has been sold and that the share transfer must be considered to have taken place on 1 June 1992.

In the tax return for 1996, which A signed on 17 April 1997, neither the value of the shareholding in H1 A / S nor the profit from the sale of the shareholding is stated.

In an internal financial statement for the financial year 1995 covering the period from 1 January to 31 December 1995 for H1 A / S, it is stated that NN and A hold shares with a nominal value of more than 5% of the share capital. It is further stated that the share capital amounts to DKK 1,000,000.

In an internal financial statement of 20 May 1997 concerning the financial year 1996 (1 January to 31 December 1996) for H1 A / S, it is stated that in the financial year the company has acquired a nominal value of DKK 245,000 own shares and that the share capital in the financial year is reduced by the same amount.

**Explanations**

*A* has explained that the shareholder agreement was entered into due to the disagreement between NN and him on the future strategy. He was originally sales manager in the company, but had later become sales director. In 1991, he became sales manager again, but actually served as a representative with his own district. He wanted to get out of the collaboration and in that connection wanted an agreement that was completely bulletproof. The decision to end the collaboration with NN he made when NN at the law firm after signing the shareholders' agreement asked for his keys to the company. When they signed the settlement agreement on June 1, 1992, NN said he could get his money right away if he wanted to. However, he would wait to see if he got a new job. He did so in a short time. He perceived it this way, that his shareholding had been sold in connection with the conclusion of the settlement agreement. It was only a matter of when the shares were to be paid. He had a meeting with lawyer TS on December 1, 1995. It was the lawyer's opinion that everything was fine. When disagreement arose over the deposit text, he perceived it as two lawyers disagreeing. He could not keep up with it. He has never discussed with attorney TS that the trade should be terminated and he has never authorized him to do so. In his view, the shares had already been sold. When he did not exercise the put option until 1995, it was because the return on the purchase price was good and he did not need the money. He had auditor assistance in the preparation of the annual tax returns and wealth statements. He has not discussed with anyone,

*State Authorized Public Accountant KB* has explained that he has been the auditor of A, NN and F1 A / S since 1979. He is still the auditor of A. Prior to 1991, there had been a budding disagreement between A and NN about the future strategy. When A chose to keep its shares in H1 A / S, even though the activities had been transferred to F1 A / S, it was probably due to personal considerations. Following the conclusion of the shareholders' agreement in 1991, A's influence in the company was in fact equal to zero. All the activities were now in a company in which A was not a shareholder. When lawyer TS came into the picture as an adviser to A, it was in particular the security of payment of the purchase price and the non-compete clause that were discussed. A even came to pay for the bank guarantee regarding the purchase price for the shareholding that his lawyer demanded. The letter of 27 September 1995 was a clear announcement that A would exercise its right of sale. NN was in Hong Kong on a daily basis, and it was F1 A / S 'CFO, KG, who took care of the company's affairs on a daily basis. The witness was in close contact with KG and NN. The witness did not really understand

what problems lawyer TS saw in connection with the implementation of the share sale. The same was true for NN and KG. The problems that, in lawyer TS's opinion, were regarding A's security to get his money were very theoretical. At no time has there been any wish at NN or F1 A / S that the trade should be canceled, postponed or made more difficult. When the shareholding in H1 A / S was included in the plaintiff's income and assets statement for 1995, it was probably due to the exchange of letters that had taken place between the lawyers. This exchange of letters might have raised doubts about the transfer. It is true, however, that everyone agreed in February 1996, when the income and wealth statement was made. He does not remember today what considerations he made

in connection with the shareholding being included in the income and assets statement for 1995. There could be a liquidity advantage by waiting until 1996 to tax the profit on the sale, when the tax first appeared. would fall due in 1997. There could also be a reduction of 1% due to longer ownership.

*Lawyer TS* has explained that he saw some problems with regard to A's risk if the purchase price for the shares was not paid. It was this risk that he tried to take into account when concluding the settlement agreement. When A did not just sell his shares immediately, it was because there was a reasonable return on the purchase price. There was also a consideration to take to F1 A / S. It was not at any point in question that A would retain his shareholding. The settlement agreement was clear and unambiguous, and the exercise of the put option just required A to, so to speak, "press the button". The letter of 27 September 1996 from the witness to H1 A / S is an expression that the button was "pressed". What gave rise to problems between lawyer FL and the witness was the wording of the deposit text. A possible solution to the problem could have been to extend the bank guarantee from Den Danske Bank so that it covered the proclamation deadline. This could not be done without further ado, which was due to the fact that F1 A / S had changed bank to Unibank. It was his view that neither lawyer FL nor state-authorized public accountant KB could understand the concerns he raised. The letter of 6 December 1995 from the witness to lawyer FL did not indicate that A would terminate the agreement on the sale of the shareholding. In addition to H1 A / S, both NN personally and F1 A / S were liable to A in accordance with the settlement agreement, and the transaction was maintained in relation to them. Den Danske Bank wanted a solution that did not involve the bank, and efforts were made to find an acceptable solution. On December 21, 1996, the pieces were about to fall into place. At least there was a solution before Christmas, when he and lawyer FL during a telephone conversation, where they wished each other a Merry Christmas, remarked that there was now a solution to the problems. In the letter of 16 July 1996, the witness requested the tax region to resume employment for A for 1992 as a result of the tax region's conclusion in another case with identical circumstances that the waiver should be considered to have taken place in connection with the conclusion of the agreement. . It would have been an advantage for A to have the divestment of the shares attributed to 1992 as a result of subsequent changes in the legislation. July 1996 the tax region to resume employment for A for 1992 as a result of the tax region in another case with identical circumstances had reached the conclusion that the waiver should have been considered to have taken place in connection with the conclusion of the agreement. It would have been an advantage for A to have the divestment of the shares attributed to 1992 as a result of subsequent changes in the legislation. July 1996 the tax region to resume employment for A for 1992 as a result of the tax region in another case with identical circumstances had reached the conclusion that the waiver should have been considered to have taken place in connection with the conclusion of the agreement. It would have been an advantage for A to have the divestment of the shares attributed to 1992 as a result of subsequent changes in the legislation.

*Lawyer FL* has explained that he became a lawyer for F1 A / S when his partner, lawyer TH, became ill. The witness thus first entered the case when the put option was asserted in 1995. He clearly had the view that there was a final agreement on the transfer of the shareholding. When there were two general meetings, it was because the deadline in the Danish Companies Act of 4 weeks for notification was exceeded after the first general meeting. He would not announce the general meeting's decision on capital reduction until there was agreement on what the collateral should be. He believes there was agreement between attorney TS and him to await this. When there was disagreement about the wording of the deposit text, it was because it was stated in the draft from lawyer TS that NN would personally guarantee the payment of the purchase price. However, if NN were to buy the shares itself, money would have to be released from F1 A / S, which would trigger taxation and pull the rug away under the company. He did not at any time consider whether there was any doubt as to whether the transaction would be completed. He did not perceive the letter of 6 December 1995 from lawyer TS as a repeal of the trade, but more as an attempt to push through more than A was entitled to. He does not believe that A was entitled to terminate the agreement. In that case, it would have been NN who had had an advantage in this, as F1 A / S had problems at that time, as the purchases in the East did

not go as they should. Den Danske Bank did not want to help solve the problems that the disagreement with lawyer TS raised when F1 A / S had changed bank to Unibank. The disagreement between the parties probably lasted in reality only a few days.

**Procedure**

*A* has, in support of its principal claim, argued in the first instance that a final and binding agreement was entered into for the sale of his shareholding at the time when H1 A / S received the letter of 27 September 1995 from lawyer TS. The liquidation agreement of 1 June 1992 contained an offer from

H1 A ⁄ S and NN to buy A's shareholding at an already determined price, and therefore all that was required from A's side was an acceptance of the offer. The letter of 27 September 1995 from lawyer TS constituted the necessary acceptance. That the transfer took place by giving the acceptance is very clearly supported by the wording in the Tax Assessment Council's advance notice, where it is stated that there will be a final waiver when the right of sale is exercised. The fact that the price was precisely fixed already in the 1992 settlement agreement and the fact that there was a bank guarantee for the payment of the purchase price also supports that the acceptance letter of 26 September 1995 was sufficient for the transfer to be a reality. It is not decisive that at that time it was not decided who would buy the shareholding. The settlement agreement was binding on everyone who was a party to it, and on the buyer's side it was signed by 3 parties: NN, H1 A ⁄ S and F1 A ⁄ S. In addition, there was a bank guarantee for the payment of the purchase price. The general meeting resolution on the purchase of own shares was in the nature of a formality, and it was not a condition for an agreement to be entered into. In addition, a general meeting of the acquiring company was held in 1995, namely on 30 November 1995. At this general meeting, it was decided to buy A's shareholding. It was further agreed to implement a similar capital reduction, but these two things were not linked. This was solely due to the acquiring company's fact that the general meeting resolution on capital reduction was not notified in time, as A did not take part in making a decision in this regard. Even if it were to be assumed that A agreed that the resolution of the general meeting of 30 November 1995 was not notified, this is not decisive, as the notification was not a condition of validity regarding the decision at the general meeting to acquire the shares, cf. § 48e and f. In any event, A was not in bad faith about the possible unlawful nature of the acquisition, as he correctly assumed that the acquisition took place in connection with a capital reduction. The risk of, that the notification deadline was exceeded cannot be placed with A, who had no influence on this. The fact that, at the turn of the year 1995-96, a longer correspondence developed between the parties' lawyers regarding the wording of the deposit text does not mean that no final agreement had been entered into between the parties. The only problem was that the bank guarantee expired prior to the proclamation deadline. The disagreement over how to deal with this single issue does not mean that a binding agreement was not reached between the parties. The agreement was not terminated by A. In particular, the letter of 6 December 1995 from lawyer TS cannot be regarded as a termination of the agreement. This is clearly seen by the fact that it is announced that A will have the bank guarantee paid out, which corresponds to fulfillment in kind. On the contrary, the letter of 6 December 1995 states that that A would maintain the agreement. This is also supported by the fact that A, by lawyer TS's letter of 7 December 1995 to Den Danske Bank, demanded that the bank guarantee be paid out. At least by letter of 7 December, where the bank guarantee is required to be paid, there is a final agreement. The fact that a new general meeting of H1 A ⁄ S was held on 12 January 1996 and that the purchase price was paid on 23 April 1996, after the proclamation period had expired, relates only to the implementation of the agreement already concluded and cannot be attributed significance for the accrual period. The fact that in connection with the final determination of how the disagreement regarding security for A's purchase price was to be resolved, a new subsidiary right of sale ⁄ purchase obligation for F1 A ⁄ S was inserted, does not mean that an agreement on sale had not already been entered into. of A's shareholding already in 1995. F1's purchase obligation was only subsidiary and should only occur in the event of default by H1 A ⁄ S. This is only an addition to the already concluded and binding agreement. Furthermore, no significance can be attached to the fact that A's shareholding was included in the income and assets statement for 1995 and in the tax return for 1995, or that no income was included as a result of the sale of the shareholding in A's tax return for 1995.

In support of its subsidiary claim, A has argued that if the High Court had reached the conclusion that a final and binding agreement had been entered into between H1 A ⁄ S prior to 1996, but that this agreement was revoked or amended by the dispositions took place after 27 September 1995, then there is a resale from A to H1 A ⁄ S in 1996. A has in this connection stated that the cancellation or change in 1995 will in that case constitute a new transfer from H1 A ⁄ S to A. Under the above conditions, the final completion of the transaction will constitute a new transfer from A to H1 A ⁄ S. In that case, only the additional profits from this will be taxed in 1996.

*Ministry of Taxation* has in support of the claim for acquittal primarily claimed that A's shareholding in H1 A ⁄ S was not sold until 1996, which is why the gain on the shares must be included in A's income in the income year 1996. In this connection, the Ministry of Taxation has stated that no any final and binding agreement on the sale of the shareholding in 1995. In this connection, it must be emphasized that the acquiring company, H1 A ⁄ S, at an extraordinary general meeting on 12 January 1996 decided to buy A's shares as part of a capital reduction. Emphasis must also be placed on the fact that the sale price was set at DKK 4,492,571, which is an expression that the sale sum in accordance with the parties' agreement, cf. 7, was adjusted up to the time of transfer. It must also be emphasized that

that an agreement was only reached between the parties on the wording of the deposit text during January 1996. The prior correspondence between As and H1 A / S 'lawyers shows very clearly that until January 1996 there was disagreement about the terms of A's sale of the shareholding and about who should buy the shareholding. Thus, there has been no disagreement on a minor point. A's lawyer also stated in his letter of 15 January 1996 to lawyer FL that he confirmed that an agreement had been reached on the liquidation of A's shareholding in a sale to the issuing company. The wording used clearly shows that there is only an agreement in 1996. This is also supported by the explanations, as lawyer TS explained that he would not accept any change that entailed any kind of risk to A, while lawyer FL explained, that it was his view that A demanded more than he was entitled to. FL further explained that the parties agreed not to notify the General Assembly resolution of 1995. This shows that there was no final and binding agreement at this time. The extension of the right to sell / purchase obligation and purchase / sale obligation in January 1996, respectively, also shows that there was no final and binding agreement in 1995. The fact that the shareholding appears from A's statement of assets for 1995 and from his tax return for 1995 speaks for itself. language. The dispositions show how A and his auditor perceived the situation. The consequence of the failure to notify the general meeting resolution from 1995 had the consequence that a transfer of the shareholding in 1995 was invalid, cf. section 48 of the Danish Companies Act. This applies at least in the present situation,

In support of the claim for dismissal in the second instance, the Ministry of Taxation has argued that if the High Court had reached a final and binding agreement in 1995 on A's sale of its shareholding, this agreement was terminated by letter of 6 December 1995. from lawyer TS, which has the consequence that the agreement has no tax effect. In this connection, the Ministry of Taxation has stated that the letter of 6 December 1995 shows that until after the turn of the year there was disagreement between the parties on absolutely crucial points, including regarding who should buy the shareholding.

In support of the subsidiary claim for repatriation, the Ministry of Taxation has argued that the tax authorities should have the opportunity to calculate A's taxable profit if the High Court were to reach a final and binding agreement on the sale of A's shareholding in 1995, but that this agreement was revoked or amended in 1995 with the effect that the revocation or change constituted a sale of the shareholding from H1 A / S to A in 1995, after which a new divestment from A to H1 A / S was implemented in 1996.

### The High Court's reasoning and result

In the winding-up agreement that A and NN, H1 A / S and F1 A / S entered into in 1992, several possible buyers of A's shareholding were specified: NN, a company designated by NN or the issuing company (H1 A / S).

The fact that NN in 1995, when A exercised its right of sale, decided that it should be the issuing company that bought A's shareholding, gave rise to various problems which had to be resolved. A was to obtain a dispensation for taxation in accordance with section 16 B of the Tax Assessment Act. Furthermore, the issuing company was to adopt a capital reduction at a general meeting, and this decision was to be notified to the companies register and implemented in accordance with the proclamation. The course of events following the lawyer TS's letter of 27 September 1995 shows that A agreed to be helpful in getting these measures implemented. However, the disagreement that arose between A and the purchasing company over the wording of the deposit text concerned a point of great importance for the settlement of the transaction. Attorney TS's letter of 6 December 1995, in which he states that that A can no longer approve that the sale of the shareholding takes place to the issuing company does not constitute a termination of an agreement between the parties, but rather the letter points in the direction that A's side does not consider itself bound by any final agreement between the parties on sale to the issuing company. The adoption in 1996 of extending the term of the right of sale / purchase obligation and sale obligation / right of purchase, respectively, as well as the inclusion of F1 A / S as a subsidiary directly obliged to buy also points in the direction that the parties did not perceive the situation as having already concluded a final and a binding agreement in

1995. When these circumstances are compared with the fact that nothing appears from A's tax return for 1995 on a sale of the shareholding, which must be taken into account in assessing whether a final agreement had been entered into in 1995,

The High Court therefore upholds the Ministry of Taxation's claim for acquittal.

### T h i is known for right

The defendant, the Ministry of Taxation, is dismissed.

Plaintiff A must pay the costs of the case to the Ministry of Taxation with DKK 65,000.