# Exhibit 82

skat.dk

# Transfer of shares to children with succession and reserved the right to dividends. Taxation of dividends. There was no supported practice

| | |
|---|---|
| Date of release | 19 Dec 2016 12:47 |
| Date of judgment / ruling / decision / control signal | 15 Nov 2016 08:17 |
| SKM number | SKM2016.615.SR |
| Authority | The Tax Council |
| Case number | 15-0866869 |
| Document type | Binding answer |
| Overall topics | treasure |
| Topics Topics | Capital income and deductions from capital income |
| Keywords | Succession, generational change, reserved dividend law, current benefit, share dividend, right income recipient, practice. |

| | |
|---|---|
| Summary | A taxpayer had requested a binding answer about a situation where he, as a father, wanted to transfer shares to his (adult) children by succession, cf. section 34 of the Capital Gains Tax Act. The transfer was to take place in part by gift. According to the transfer agreement, the father would reserve a dividend right on an amount to be specified in the agreement. |
| | The Tax Council agreed that the capitalized value of the reserved dividend right should be included in the father's taxable disposal amount for the shares. The capitalized value of the reserved dividend right was also to be included in the children's acquisition price for the shares. As a result of the succession, the surrender amount to the father had no tax significance. |
| | The Tax Council further determined that the children, as the current shareholders, would be liable to tax on dividends from the company, even if these were to be repaid to the father. |
| | The taxpayer considered that he was not liable to tax on the amounts he would receive under the reserved dividend income, as these amounts were to be regarded as an additional disposal amount for the shares which were tax-free as a result of the succession. |
| | The taxpayer also considered that the children were also not liable to tax on dividends received from the company, covered by the reserved dividend right, as the children had waived the dividend amounts under the reserved dividend rights. In addition, the taxpayer believed that the children would not actually acquire the right to the dividend amounts, as the children would waive these in the transfer agreement. |
| | The Tax Council determined that amounts paid to the father under the dividend rights received could only be considered an additional disposal amount for the shares if the amount was paid at one time. If the amount was paid over several times, on the other hand, it was an ongoing benefit that had to be processed according to the rules in section 12 B of the Tax Assessment Act. would have deductions for the same amounts. The tax council determined that the children would in all cases be liable to tax on dividends from the company. |
| | The Tax Council finally ruled that the right to the principle of equality could not be supported, and that no practice existed. SKAT had previously in 3 cases by binding answer approved the model in question, and in addition, SKAT had in a further 7 cases explicitly or tacitly approved the gift transfers and made a refund of withheld dividend tax. However, the Tax Council ruled that this did not create a practice on which it could be based. In the decision, it was emphasized that none of the decisions had been made by the Tax Council or other higher tax authorities, and that none of the mentioned decisions had been published or mentioned in the Legal Guide. In addition, even if it were to be considered a practice, it would not be justified to rely on it, as the invoked decisions had to be considered to be in direct conflict with both the statutory rules in section 4 e of the State Tax Act and section 16 A, subsection 1 of the Tax Assessment Act. 2, no. 1, as with higher-ranking sources of law. |
| Legal basis | The Capital Gains Taxation Act, section 26, subsection 2, § 30, para. 1, § 31, para. 1, and § 34, para. 1-2, 4 and 6. The Tax Assessment Act § 12 B, subsection. 1-5, and § 16 A, para. 1, and para. 2, no. 1. The State Tax Act § 4, letter e. |
| Reference (s) | The Capital Gains Taxation Act, section 26, subsection 2, § 30, para. 1, § 31, para. 1, and § 34, para. 1-2, 4 and 6. The Tax Assessment Act § 12 B, subsection. 1-5. Tax Assessment Act § 16 A, para. 1, and para. 2, no. 1. The State Tax Act § 4, letter e. |
| Reference | The Legal Guide 2016-2, section **CA1.2.1** . |
| Reference | Legal Guide 2016-2, Section **CC6.8** . |
| Reference | Legal Guide 2016-2, Section **CB2.1.5.4** . |

| Reference | Legal Guide 2016-2, Section **CB2.1.5.5** . |
| Reference | Legal Guide 2016-2, Section **CB3.1** . |
| Reference | Legal Guide 2016-2, Section **CC2.1.2.2** . |
| Reference | Legal Guide 2016-2, Section **AA3.10** . |
| Reference | Legal Guide 2016-2, Section **AA7.1** . |
| Reference | The Legal Guide 2016-2, section **AA7.1.3** . |

**Questions**

1. Can it be confirmed that the value of the reserved dividend rights is to be included in A's taxable waiver for the transfer of the shares in the Company?

2. Can it be confirmed that A is not liable to tax on amounts he receives in accordance with the reserved dividend income when the transfer takes place with tax succession, cf. section 34 of the Capital Gains Tax Act?

3. Can it be confirmed that B and C are not liable to tax on amounts received by A under the reserved dividend rights?

**Reply**

1. Yes
2. No, see setting and justification.
3. No.

**Description of the actual conditions**

The request for a binding reply provided the following information:

A owns the entire share capital in D ApS, CVR no. xx xx xx xx (The Company).

Annual Report 2013/2014 for the Company is attached to the request for a binding response.

The company is the majority owner of EA / S, CVR no. xx xx xx xx, who owns FA / S, CVR no. xx xx xx xx.

The company also owns the majority in G ApS, CVR no. xx xx xx xx and H ApS, CVR no. xx xx xx xx, where B and C are co-owners.

Finally, the Company is a minority owner in a number of companies.

A now intends to transfer between 24 and 50% of the Company's nominal share capital to each of its two children (B and C).

For SKAT's answer to the questions, it can be assumed that the transfers will take place on the terms stipulated in the gift certificates. A copy of the gift certificates is attached to the request for a binding reply.

As described in the deeds of gift, the shares in the Company will be transferred with tax succession, cf. 3, cf. 6.

The shares will be valued at market value and the transfer will, among other things, be corrected by a gift to the children from A.

In connection with the transfers, A reserves a total dividend right regarding the transferred shares. The size of the reserved dividend right has not yet been determined, but is expected to be between 1/2 - 4/5 of the total value of the transferred shares. In determining, the reserved dividend right is calculated at the present value.

SKAT has previously in similar cases by binding answers of 14 June 2011, 28 September 2012 and 19 August 2013 confirmed that such a reserved right to dividend must be regarded as part of the seller's surrender price and that the dividend has no tax consequences for the buyer. A copy of the binding reply of 19 August 2013 is attached to the request for binding reply.

No dividend is expected to be distributed from the Company prior to the conclusion of the transfers, cf. the gift certificates.

In order to clarify the tax position of the parties and to ensure that the dividend payments after a completed transfer will be processed correctly for tax purposes, a binding answer is now required regarding the tax treatment of the reserved dividend rights.

According to the gift certificates, the transfer takes place at market value based on the Company's annual report.

The transfer of the shares to market value is corrected as follows:

Reserved dividend DKK xxx

Succession tax 22% / deferred tax: DKK xxx

Gift DKK xxx

Total amount DKK xxx

The gift tax is paid by the gift giver with 15%.

The gift certificates include the following:

"3. THE RESERVED YIELD

The donor reserves the right to dividend on the transferred shares in the Company until a total of DKK xxx million has been distributed. net after tax on the transferred shares. This means that the Gift Giver may require the Gift Recipient to exercise his voting right on the transferred shares in such a way that the Company declares a maximum dividend within the limits permitted by law, including within the limits intended to accommodate a sound capital resources in the Company.

To the extent that the Beneficiary, before the reserved dividend has been distributed, carries out a company law restructuring, whereby the transferred shares are owned by holding companies, the Giver enters into the right to receive the reserved dividend from dividend distributions declared by the holding companies in question.

The Gift Recipient is personally liable for the Donor to receive a reserved dividend of DKK xxx million. after tax relating to the transferred shares.

In the event of a breach of the obligation to take care of declaring the reserved dividend, the Gift Recipient will incur personal compensation corresponding to the dividend that should have been distributed to the Gift Giver.

4. TAX RESERVATION

The present gift certificate and the method of rectification have the express condition that the reserved dividend is neither taxable with the Giver (who has transferred the shares with full tax succession) nor with the Gift Recipient (who has taken over the shares with full tax succession and accepted the reserved dividend).

The donor's dividend reservation of DKK xxx million is net after any tax. If, against expectations, dividend tax is therefore imposed in connection with the distribution of the reserved dividend, such dividend taxation must finally be borne by the Gift Recipient.

This gift certificate is notified to SKAT for the purpose of calculating gift tax.

The transfer of the gift is conditional on the tax authorities not contesting the full extent of the tax succession in accordance with section 34 of the Capital Gains Tax Act. be entitled to cancel the gift transfer with the effect that the gift in its entirety lapses with effect from the time of the gift transfer.

The present transfer is entirely conditional on the tax and excise authorities, possibly after appeal and / or judicial review, not challenging the transfer price, as being an expression of the trading value of the shares per. takeover day.

If the tax authorities dispute the transfer price or the reserved dividend right, the Gifter decides whether the decision must be appealed or brought before the courts, or whether the gift transfer must be annulled with the effect that the gift lapses in its entirety with effect from the time of gift transfer.

If the Gift Provider does not exercise the above right to demand the transfer canceled, possibly after prior appeal and / or court review, the Gift Recipient must accept that the transfer price and the reserved dividend right are corrected in accordance with the tax assessment. The donor is free to choose whether the correction is made as a gift or reserved for dividends. "

**Questioner's opinion and reasoning**

Question 1

It can be assumed that the reserved dividend right is part of the overall agreement on the financing of the transfers of the shares in the Company from A to its children.

This is stated in the draft gift certificates, where it is based on the total transfer that the financing takes place both by the children's takeover of a liability item / deferred tax, by a gift and by the reserved dividend right.

As stated in the Legal Guide 2015-1 **CB2.1.5.5** , it is established administrative practice that such a reserved dividend is included in the seller's surrender value.

It must therefore be assumed that the dividend right and its equalization cannot be qualified as a dividend, but must instead be regarded as part of A's total disposal amount for the shares in the Company.

The question should therefore be answered with: YES.

Question 2

It appears from the Capital Gains Taxation Act, section 34, subsection. 2, that the transferor is not taxed on gains from the transfer if the parties decide to transfer with tax succession, cf. section 34, subsection. 1. Instead, the transferee enters into the tax position of the transferor.

Since A and the children decide to apply the Capital Gains Taxation Act, section 34, subsection 2, A shall not be taxed on any gain on the transfer. This tax exemption is general and also includes dividends that must be included in A's tax waiver amount, cf. question 1.

Therefore, question 2 should be answered with: YES.

Question 3

It must be assumed that A, in accordance with the gift certificates, will retain the right to dividend to the extent specified.

As the children thus at no time acquire the right to the reserved dividend, the dividend can also not be attributed to their taxable income, cf. section 4 of the State Tax Act.

For the sake of good order, I note that SKAT has already taken a position on a similar question 3 times, cf. binding answer of 19 August 2013 (attached as Appendix 4) and by binding answer of 14 June 2011 and 28 September 2012.

Therefore, question 3 should be answered with: YES.

Consultation response of 9 September 2016

The questioners' representative stated the following in the consultation response of 9 September 2016:

Comments on SKAT's case presentations of 20 July and 30 August 2016.

*Question 1*

SKAT generally "assumes" that the dividend amount "will only be paid after a relatively long time" and that there will be a payment of dividends in several installments. There are no grounds in the request or the other circumstances of the case for making such assumptions and the relevance of this is also difficult to see.

The uncertainty that may be attached to the reserved dividend right - including whether the entire amount will be paid out and, if so, when and for what period - will be expressed in the interest factor by which the dividend right is capitalized at the market value at the time of transfer.

*Question 2*

There is no correspondence between SKAT's justification for the negative answer in question 2 and SKAT's positive answer to question 1.

SKAT states in question 1 that "the capitalized value of the dividend rights must be included in A's taxable disposal amount".

Despite this, SKAT concludes that the reserved dividend right - in addition to being part of the disposal sum for the shares, cf. question 1 - is also an expression of a partially capital gain claim.

There is no legal basis in tax law to qualify one and the same right as two different rights in this way.

Even if the Tax Council, contrary to expectation, had to assume that the right to dividends is at the same time and partly also an expression of a taxable monetary claim under the Capital Gains Act, it is disputed that a monetary gain on monetary claims arises from the payment of installments.

As stated above, the dividend right is part of A's surrender value. If the dividend right is subsequently redeemed at a price higher than the market value at the foundation, it is not a price gain, but rather an adjustment of the purchase price of the shares, cf. section 34, subsection 2 and the Legal Guide (2016-1) section **CB2.1.5.5** .

SKAT "presupposes" without further justification that the Legal Guide section **CB2.1.5.5** - according to which the dividend is part of the disposition of the shares when the shares are transferred subject to the right to dividend - only applies if there is only a single subsequent distribution of dividends. There is no evidence for such an interpretation in either the wording of the law or in the legal guidance and no conclusion can be drawn from the decision **SKM2003.282.LSR** . As stated above, it may not be decisive whether the dividend right is paid in one or more installments.

SKAT's negative answer to question 2 seems to be based on a perception that the dividend right will be paid in installments and that only installment payments will result in taxation under the Capital Gains Act. Therefore, a confirmation is requested that one dividend payment, corresponding to the total reserved dividend right, is tax-free. SKAT is thus requested to answer question 2 on the basis of assumptions about

2a) that the entire dividend right is paid out at once in part

2b) that the dividend right is paid in several installments.

In the opinion of the questioners, at least 2a) can be answered with YES.

*Question 3*

Referring in full to the above under questions 1 and 2, it is noted that there is no correspondence between SKAT's justification for the negative answer in question 3 and SKAT's positive answer to question 1.

There is no legal basis in the State Tax Act, section 4, subsection. 1, letter e and section 16 A of the Tax Assessment Act to tax the income of B and C on the dividends in question, as the right to the dividends, as a condition in connection with rectification of the transfer and calculation of the surrender, remains with A, cf. SKAT's answer to questions 1, the Capital Gains Taxation Act, section 34, subsection 2, the State Tax Act § 5, letter a and **SKM2003.282.LSR** and the Legal Guide section **CB2.1.5.5** .

It appears as follows from the Legal Guide (2016-1) sections **CB3.1** and **CB2.1.5.5** :

"See also section **CB2.1.5.5** on the specific practice of taxation of reserved dividends in connection with the declaration of dividends"

"Rule

When shares are transferred subject to the right to dividend, the dividend is part of the disposal sum for the shares ".

Section 16 A of the Tax Assessment Act authorizes taxation of everything that is distributed by the company to current shareholders. In the present case, nothing is distributed to B and C as current shareholders, as A has reserved the dividend rights as a condition of the divestiture, whereby the dividend is attributed to A's divestment sum, cf. question 1 above.

The dividend payments in question thus never pass through either B's or C's wealth sphere and can thus not be subject to taxation by them either.

As A, as stated above, reserves the right to dividend as a condition for transferring the shares in question, there is no dispositive waiver of the dividend amounts on the part of B and C, and they are not liable to tax thereon.

In the case presentation, SKAT has quoted from the preparatory work regarding the Tax Assessment Act, section 16 A, subsection. 2, No. 1:

"If the dividend reserved is a one-off event that does not have the character of a current service, the dividend is added to the surrender price when calculating the seller's share capital. Amounts that are added to the seller's surrender price are then added to the buyer's acquisition price for the shares."

SKAT's negative answer to question 3 seems to be based on a perception that the dividend right will be paid in installments and that only installment payments will result in taxation according to section 16 A of the Tax Assessment Act. is tax-free for B and C. SKAT is thus requested to answer question 3 on the basis of a presumption of

3a) that the entire dividend right is paid out at once in part

3b) that the dividend right is paid in several installments.

In the opinion of the questioners, at least 3a) can be answered with YES.

*General about practice*

The questioners agree that SKAT's reasons for answering questions 2 and 3 are not in accordance with the binding answers that SKAT has already given regarding the same legal position. The questioners, on the other hand, disagree that they cannot rely properly on the present practice and its scope.

In its justification, SKAT refers to the fact that practice only consists of 3 binding answers. SKAT has subsequently maintained in a letter of 30 August 2016 that there are only 3 binding answers regarding the generational change model: "SKAT must on that occasion announce that SKAT is only aware that the relevant generational change model has been approved in the 3 cases by final decision. , where SKAT has given a binding answer "

SKAT states in its letter of 30 August 2016 that in addition to the 3 decisions, there are only some cases concerning gift notifications and return of dividend tax, but that this does not constitute any relevant practice.

That is not correct.

When responding to a request for access to documents from the inquirers, the Danish Tax Appeals Board has submitted documentation that SKAT has in all 10 previous cases 1) processed requests for binding answers 2) has approved the subsequent gift notifications and 3) has made a refund of withheld dividend tax. The documentation is attached as Appendix A.

It can therefore be assumed that SKAT in 10 previous cases has answered questions 1-3 in the affirmative by binding answers, given notifications and decisions on the refund of dividend tax.

Furthermore, the questioners claim that regardless of whether SKAT has taken a direct position on the generational change model in the form of a binding answer or "indirectly" in approving gift notifications and applications for dividend tax refunds, this is a legally relevant practice that must of course be included in SKAT's making practice for answering questions 1-3.

Contrary to general principles of administrative law, SKAT has not in its revised case presentation dealt with the fact that practice does not consist of 3, but in fact of 10 previous and similar cases. Prior to SKAT's submission of the case to the Tax Council, SKAT is again encouraged to reconsider the reasoning in the light of the present practice and re-evaluate its answer on this basis.

The fact that the 10 cases in question are not mentioned in the Legal Guide does not deprive them of their precedent value for answering the 3 questions raised in this request for binding answer.

The principle of equality in administrative law applies regardless of whether SKAT has chosen to reproduce the decisions in the Legal Guide or not.

Administrative practice, changes in practice and the principle of administrative law equality are described in "Administrative law - general topics", 4th edition, DJØF, as follows:

"Administrative practice is a series of individual decisions from which one can deduce the rule from which the individual decisions are considered to be the result.

There may be a desire in the administration to change an interpretation followed in administrative practice. The possibilities for such a change in practice are narrower than where the decisions in question are based on an estimate.

The starting point is a general principle of equality, according to which essentially equal conditions must be treated equally in legal terms ".

This naturally also applies in tax law.

With reference to the control signal in SKM 2014.489, SKAT proposes that a special legal standard should apply in tax law, so that practice has only been established if a decision has been published in the Legal Guide. Such a standard cannot, by its nature, be established by a service order, as such a deviation would require legal authority or authority in an equivalent legal norm. Such a legal basis does not exist, nor is it stated by SKAT.

In its first case presentation, SKAT referred to the fact that there are only 3 binding answers. In the view of the questioners, this is fully sufficient to establish a practice. Since SKAT - on the questioners' persistent questions - had to present a further 7 decisions, etc., where exactly the same view of the legal position is based, SKAT refers to the fact that in the other 7 cases there are no final decisions and that it otherwise is not decisive whether there are exactly 3 decisions. The questioners agree that the number of decisions is not in itself decisive, but it is contrary to general principles of administrative law if 10 decisions do not constitute a practice - published or not.

Finally, SKAT's reasoning for answering questions 2 and 3 must be understood as meaning that even though SKAT has already answered the questions raised positively in 10 previous cases, this cannot be supported, as there are apparently "some incorrect decisions made by subordinates tax authorities ".

It has the presumption against it that SKAT in 10 individual cases should have made binding decisions and otherwise blue-stamped the questions in "direct conflict with the legislative starting point".

Incidentally, there is no evidence that this should be the case in the substantive case presentation.

The legal assessment is - admittedly - complex and not necessarily obvious, but precisely for that reason SKAT's practice is central, and the fact that SKAT itself overrides it as being in breach of the legal basis lacks any kind of legal foundation.

It is noted in this connection that the binding answers, the gift notifications and the decisions on the return of dividend tax have been processed independently and by a number of different employees, including a tax auditor, at SKAT.

If SKAT has become aware that a number of different employees in SKAT - and thus also the citizens and advisers who have been involved in the specific cases - have a legal opinion that is in direct conflict with the legislative starting point, then SKAT should have reacted promptly both externally and internally. This request for a binding answer was submitted on 9 March 2015, so SKAT must have been aware for some time that such a legal opinion (due to SKAT's decisions) was present, but it has not been possible to establish that SKAT has responded . If SKAT has responded, SKAT is encouraged to present the communication in this connection.

It is thus maintained that there is a clear practice on which the questioners can rely.

This practice is also set out in the Legal Guide (2016-1) sections **CB3.1** and **CB2.1.5.5** .

*The case presentation in general*

In the case presentation, SKAT has a detailed description of the taxation of current benefits pursuant to section 12 B of the Tax Assessment Act, structured receivables pursuant to section 29 (1) of the Capital Gains Act. 3 and the rules for interest payment.

When SKAT in its reasoning subsequently concludes that it is not a current benefit, a structured claim, a dividend contract or an interest benefit, which the questioners can agree with, then pages 9, 11-20, 26-30, 32-35 and 53-54 in the case presentation to be completely superfluous and can therefore be deleted with advantage.

If SKAT maintains the sections in question, an unnecessary complexity is added to the case presentation and more confusion than clarity is created.

<u>Consultation response of 27 October 2016 as a result of corrected case presentation</u>

The questioners' representative has stated the following in the supplementary consultation response of 27 October 2016

*Question 2*

The questioners have noted that the question is answered with "yes" if the reserved dividend right is settled at once.

*Question 3*

The questioners request that the questioners' previously submitted comments on question 3 be more fully included in the case presentation as the references to section 34 (2) of the Capital Gains Tax Act, section 5, letter a of the State Tax Act and **SKM2003.282.LSR** are not included in SKAT's corrected case presentation. Furthermore, the following excerpts / quotations from the Legal Guide are not included either in SKAT's review of the legal basis or in the answer to question 3. The justification of the questions and the excerpt are to be adequately included and quoted in the case presentation.

It appears as follows from the Legal Guide (2016-1) sections **CB3.1** and **CB2.1.5.5** :

"See also section **CB2.1.5.5** on the specific practice of taxation of reserved dividends in connection with the declaration of dividends"

"Rule

When shares are transferred subject to the right to dividend, the dividend is part of the disposal sum for the shares ".

In the answer to question 3, SKAT has not included the questioners' reference to the preparatory work regarding the Tax Assessment Act, section 16A, subsection. 2, No. 1

"If the dividend reserved is a one-off event that does not have the character of a current service, the dividend is added to the surrender price when calculating the seller's share capital gain. Amounts added to the surrender price at the seller are then added to the buyer's acquisition price for the shares."

The questioner's justification and reference to the preparatory work for the Tax Assessment Act, section 16A, subsection 2, no. 1 must be loyally incorporated in the answer, as the reference is central to the questioners' perception that if the reserved dividend right is settled at once, then it can not lead to dividend taxation at B and C, as the payment then belongs to A's waiver, cf. thus also SKAT's answer to questions 1 and 2, The Legal Guide **CB2.1.5.5** and the preparatory work for the Tax Assessment Act, section 16A, subsection. 2, No. 1.

In its justification, SKAT does not precisely relate to the fact that of the preparatory work for section 16A, subsection 2, no. 1 clearly states that a reserved dividend right that is paid out at once must both be added to the surrender price at the seller (A, cf. also questions 1 and 2) and then added to the buyer's acquisition price for the shares (B and C, cf. the questioners' justification for question 3).

As stated by SKAT, it has been established in a number of decisions - correctly - that one subsequent payment must be considered part of the surrender amount. It is possible that there is no practice regarding the acquirer's tax position in the same way, but this is of no significance, as the legislature is already in the preparatory work for the Tax Assessment Act, section 16A, subsection. 2, no. 1 has clearly established that the payment is attributed to the acquirer's acquisition cost, cf. above, which can probably also explain the lack of practice.

As previously stated, there is no legal basis for classifying one and the same right as two different rights. Thus, there is no legal basis for arbitrarily treating the dividend right partly as a waiver / acquisition sum and partly as a dividend distribution. It is with SKAT's positive answer to questions 1 and 2, section 12B and section 16A, subsection 2, no. 1 and the Legal Guide **CB2.1.5.5** only authority to regard one total payment of the reserved dividend right as part of B and C's acquisition cost for the relevant shares.

Reference is also made to the case presentation on page 56, which states that SKAT is bound by the Legal Guide and the legislation. A positive answer to question 3 can clearly and with binding effect for SKAT be deduced from the Tax Assessment Act, section 16A, subsection. 2, no. 1 and Legal Guide **CB2.1.5.5** .

The questioner thus maintains that question 3 must be answered with "YES", at least insofar as the cases where the reserved dividend right is paid at once, as this appears from section 16A of the Tax Assessment Act.

*General about practice*

The questioners assume that Appendix A is attached to the case presentation for the Tax Council.

In the italicized section beginning on page 55, SKAT has only reiterated its previous views, but does not relate to the pleas made by the questioners in their recent comments on practice. The questioners request that their views be loyally incorporated in the section on. practice 'binding effect and not just referenced on page 8f.

The questioners have noted that SKAT, despite a request to this effect, has not presented any communication in which SKAT has sought to correct the illegal legal perception, which according to the case presentation has erroneously existed with both SKAT, citizens and advisers.

The questioners maintain that the practice listed in Appendix A constitutes legally relevant practice with precedent value, which must be included in SKAT's presentation of practice for the answer to questions 1-3.

That the decisions have not been "generally known by SKAT's employees" is irrelevant.

Contrary to general principles of administrative law, SKAT has not in its corrected case presentation dealt with the fact that practice does not consist of 3, but in fact of 10 previous and similar cases.

The questioners dispute that SKAT can "dilute" the concept of practice as it does in the corrected case presentation. In all cases, these are cases where SKAT has directly or indirectly approved the generational change model or key parts thereof (the gift part and repayment of dividends).

It is thus maintained that there is a clear practice on which the questioners can rely.

This practice is also set out in the Legal Guide (2016-1) sections **CB3.1** and **CB2.1.5.5** .

*The case presentation in general*

The case presentation's treatment of "interest benefit", page 28, can be deleted with advantage.

**SKAT's recommendation and justification**

It should be noted at the outset that the consultation response has given SKAT the opportunity to change the recommendation and the reasons for what is stated below:

*Legal basis*

The Capital Gains Taxation Act, section 26, subsection 2, 1. pkt.

(...)

PCS. 2. Gains and losses are calculated as the difference between the surrender price and the acquisition price of the shares in question. (...)

The Capital Gains Taxation Act, section 30, subsection 1, and § 31, para. 1

§ 30. For the purposes of this Act, disposal means sale, exchange, lapse and other forms of disposal.

(...)

§ 31. Acquisition and disposal of shares by gift, inheritance or inheritance advance is equated in this Act with purchase or sale. In these cases, the acquisition price or disposal price is the amount used in the calculation of gift tax, property tax or income tax on the acquisition in question. If the latter has not been liable to tax or income tax, the market value of the share in question at the time of transfer is regarded as the acquisition price or disposal price. The rules in 1-3. pkt. does not apply to the extent that the transferee enters into the transferor's tax position.

(...)

The Capital Gains Taxation Act, section 34, subsection 1-2, 4 and 6

§ 34. In the case of a live transfer of shares, the parties to the transfer may apply the rules in subsection (1). 2-4, if the following conditions are met, cf. 5:

1) The transfer takes place to children, grandchildren, siblings, siblings 'children, siblings' grandchildren or a cohabitant, by which is meant a person who at the time of transfer meets the conditions in the Property Tax Act § 22, paragraph. 1, letter d. Stepchild and adoptive relationships are equated with natural kinship.

2) The individual transfer of shares amounts to at least 1 per cent. of the share capital.

3) These are shares in a company, etc., whose business does not predominantly consist of letting real estate or possession of cash, securities, etc., cf. Lease of real estate, which is used for agriculture, horticulture, nursery, orchard or forestry, cf. the Valuation Act, section 33, subsection. 1 or 7, is not considered in this connection as rental of real estate.

4) The shares are not covered by section 19.

*PCS. 2* . Gains from the transfer are not taxed on the transferor. The transferee enters into the transferor's tax position at the time of the transfer. This applies regardless of when the acquirer relinquishes the shares. In calculating the transferee's gain or loss on disposal of the shares, the shares are treated as acquired for the acquisition price and at the time at which they were acquired by the transferor.

(...)

*PCS. 4. The* Withholding Tax Act § 33 C, sec. 3, 4, 7, 8 and 13, apply correspondingly to shares.

(...)

*PCS. 6*. The company's business is considered to consist predominantly in the letting of real estate or possession of cash, securities, etc. as mentioned in para. 1, no. 3, if at least 50 per cent. of the company's income, by which is meant the accounting net revenue plus the sum of other recognized income, calculated as the average of the last 3 financial years derives from such activity, or if the market value of the company's rental properties, cash, securities etc. either at the time of transfer or calculated as the average of the last 3 financial years amounts to at least 50 per cent. of the market value of the company's total assets. Possession of units covered by section 18 is not considered as possession of securities in the assessment. The return and value of shares in subsidiaries, in which the company directly or indirectly owns at least 25 per cent. of the share capital, etc., is not included. Instead, the part of the subsidiary's income and assets that corresponds to the ownership is included. The assessment disregards income from letting real estate between the company and a subsidiary or between subsidiaries. Real estate that is rented out between the company and a subsidiary or between subsidiaries and that the tenant uses in the operation is not considered a rental property in the assessment.

The Capital Gains Act, section 1, subsection 1

§ 1. This Act covers

1) gain and loss on disposal or redemption of monetary receivables, including bonds, mortgage deeds and promissory notes,

Gains and losses on debt relief and

3) gains and losses on futures contracts and agreements on buy and sell rights without regard to the rules that apply to the underlying asset.

(...)

The Capital Gains Act, section 14, subsection 1 and 2

§ 14. Gains and losses on receivables are included in the calculation of the taxable income, cf. 2 and §§ 15, 17 and 18. 1. pkt. however, only applies if the year's net gain or net loss combined with net gains and net losses covered by section 23 and gains and losses on investment certificates in bond-based investment institutions with minimum taxation, cf. section 22 of the Capital Gains Tax Act, exceeds DKK 2,000.

PCS. Losses on receivables from companies over which the taxpayer has or has had an influence within the meaning of section 4 of the Capital Gains Tax Act, or losses on receivables from the taxpayer's spouse, parents and grandparents as well as children and grandchildren and their spouses or estates after the said persons may not deductible. Stepchild and adoptive relationships are equated with natural kinship. For receivables in foreign currency, the non-deductible loss is calculated in accordance with the first and second sentences. on the basis of the exchange rates at the time of acquisition of the claim.

The Capital Gains Act, section 25, subsection 1

§ 25. Gains and losses on receivables and liabilities that are to be included in the calculation of the taxable income are included in the income year in which the gain or loss is realized (the realization principle), cf. 2-10, and § 22, para. 1, as well as §§ 36 and 37.

(...)

The Capital Gains Act, section 26, subsection 1 and 2

§ 26. Gains and losses on receivables and liabilities are calculated in accordance with the rules in subsection (1). 2-5, cf., however, section 25, subsection 2-5, on the stock principle and section 25, subsection 7-10.

PCS. 2. Gains or losses on receivables are calculated as the difference between the acquisition cost and the disposal amount. The acquisition value at the time of acquisition is used as the acquisition cost, unless the taxpayer proves that he has acquired the receivable for a higher amount.

(...)

The Tax Assessment Act, section 12 B, subsection 1-5

If a current benefit constitutes full or partial consideration in a mutually onerous agreement on the transfer of one or more assets, the rules in subsection (1) shall apply. 2-11, if the agreement was entered into on 1 July 1999 or later. This is an ongoing benefit when there is uncertainty about either the duration of the benefit or the annual amount of the benefit when the benefit runs beyond the contract year. If the taxation of the current benefit is regulated in other legislation, however, it is the provisions laid down therein that apply.

PCS. 2. The parties must, for the purpose of calculating the taxable income, capitalize the current benefit. The capitalization must be made in connection with the conclusion of the mutually onerous agreement. The capitalization made by the parties is subject to review by the Customs and Tax Administration. It must also be stated in the parties' agreement which assets are remunerated with a current benefit. The parties must, at the latest at the same time as the deadline for tax return for the income year in which the agreement is entered into, submit notification to the customs and tax administration of the agreement entered into, including information on the capitalization and the distribution made in accordance with Section 4.

PCS. The parties who have entered into an agreement on the current benefit must each keep a balance in which the capitalized value in the agreement year, as calculated in accordance with subsection 2, is used as the input value. For each income year, the balance is reduced by the nominal value of the benefits paid in that income year. The balance thus written down is carried forward to the following year. The balance is entered up to and including the income year in which the current benefit finally ceases or in which the balance becomes negative. The parties must, at the latest at the same time as the expiry of the deadline for tax return for the individual income year, disclose the balance to the customs and tax administration.

PCS. 4. As long as the balance is positive, the services paid are not taxed at the recipient. In the income year in which the balance becomes negative, the recipient must include the negative amount in the taxable income for that income year. In subsequent income years, the benefits paid in the relevant income year are included in the taxable income. If the current benefit finally ceases before the balance becomes zero or negative, an amount corresponding to the balance can be

deducted in the calculation of the recipient's taxable income in the income year in which the current benefit has ceased. However, no deduction may be made for the part of the balance which corresponds to an amount determined as consideration for an asset, where the profit by the under paragraph. Transfer of such an asset is not taxable, or to an amount which corresponds to the basis for an unpaid deferral amount pursuant to section 40 (1) of the Depreciation Act. 7.

PCS. 5. As long as the balance is positive, the provider may not deduct the benefits paid. In the income year in which the balance becomes negative, the provider can deduct the negative amount from the taxable income. In subsequent income years, the benefits paid in the income year in question can be deducted from the taxable income. If the current benefit ceases definitively before the balance becomes zero or negative, an amount corresponding to the balance must be included in the calculation of the provider's taxable income in the income year in which the current benefit ceased. However, the amount shall not be included to the extent that it corresponds to an amount determined as consideration for an asset if the acquisition price the provider can neither depreciate, deduct or have included in the calculation of taxable profit on a disposal of the asset, or an amount ,

(...)

The Tax Assessment Act § 16 A, sec. 1 and para. 2, No. 1

In the calculation of the taxable income, dividends on shares, unit certificates and similar securities are included, cf. 4.

PCS. 2. Dividends include:

1) Everything that is distributed by the company to current shareholders or members, cf. 3.

(...)

Section 4 of the State Tax Act

The taxable total income of the taxpayer, whether they derive here from the country or not, consisting of money or property of monetary value, is regarded as taxable income, with the exceptions and limitations set forth below, as follows, for example:

(...)

e) of interest or dividends of all kinds of bonds, shares and other domestic or foreign monetary effects, then and of outstanding receivables and of capital, lent here in the country or abroad, with or without pledge against or without prescription. Dividends on Shares and Cooperative Certificates shall be deemed to be all that has been paid out by the Company in question to Shareholders or Shareholders as part of the Profit earned by the Company in the last or previous financial year, whether the Payment takes place as a Dividend, as Distribution at the Company's Liquidation or similar or by the Issuance of Free Shares. (...)

*Processing*

Regarding the Tax Assessment Act, section 16 A, subsection 2, No. 1

Section 16 A of the Tax Assessment Act was amended by section 11, no. 4, of Act no. 1414 of 21 December 2005, which was adopted on the basis of Bill L 79 in the parliamentary year 2005/2006. The comments on section 11, no. 4 of the Bill contain the following:

*"To No. 4*

It is proposed to clarify section 16 A of the Tax Assessment Act so that only amounts distributed to current shareholders are regarded as taxable dividends. The decisive factor will then be whether you are a shareholder (ie have ownership of the share) at the time of declaring the dividend.

The background for the proposal is as follows: In an order of 30 April 2003 (published in **SKM2003.282.LSR**), the National Tax Tribunal found that dividends which, after a share transfer, were distributed to the previous owner of the shares, should be regarded as an additional sale price. The distribution was thus not processed according to the rules for dividends with the previous owner. However, the ruling does not rule on other cases where a distribution is made to others than the current owners of the shares. Thus, with the ruling, no decision has been made as to whether, with the current

legal situation, there are certain possibilities for circumventing the withholding tax on dividends in connection with the transfer of the right to dividends. For example, doubts may be raised as to whether a foreign shareholder can transfer the right to dividend to a Danish bank and thereby utilize the applicable rules to avoid withholding tax on dividends.

With the current shareholder, the dividend is taxed as share income, if there is otherwise a tax liability.

If the current shareholder's obligation to repay the dividend is in the nature of a current benefit, the recipient of the current benefits is taxed in accordance with the rules of the State Tax Act. If the current shareholder is a natural person who has the right to deduct the payments, the deduction is given as a tax deduction in the taxable income. In the event that a share seller has reserved the right to the dividend in connection with the transfer of the shares, there must be a capitalization of the reserved dividend right, which will have an effect on the seller's share profit. In this case, section 12 B of the Tax Assessment Act applies. If the dividend that is reserved is a one-off event that does not have the character of a current benefit, the dividend is added to the surrender value when calculating the seller's share capital gain.

Amounts that are added to the surrender price at the seller are then added to the buyer's acquisition price for the shares. "

Regarding section 12 B of the Tax Assessment Act

Section 12 B of the Tax Assessment Act has been inserted by Act no. 386 of 2 June 1999, which was adopted on the basis of Bill L 212 in the parliamentary year 1998/1999.

Section 12 B of the Tax Assessment Act has been amended by Act no. 1283 of 20 December 2000, which was adopted on the basis of Bill L 34 in the parliamentary year 2000/2001. The change took into account the transfer of assets made under the rules of succession.

The comments on L 212 in the parliamentary year 1998/1999 include the following:

*General remarks, pkt. 3*

"(...)

It is proposed that the current benefits in all cases be capitalized at the time of the agreement. The capitalized value is used as the basis for the calculation of the disposal or acquisition sum and is thus included in any capital gains or income taxation and in any depreciation basis.

   The capitalized value is entered on a balance with each of the parties, the balance being written down each year with the benefits paid.

   It is proposed that the seller is not taxed on receipt of the individual services until these collectively exceed the capitalized value. Similarly, the buyer also does not receive a deduction until the services paid exceed the capitalized value. This will abolish the current double taxation. "

*Comments on the proposed LL § 12 B, para. 1-5*

"§ 12 B, paragraph 1

   In connection with the transfer of, for example, a company, the parties may choose to enter into a mutually onerous agreement that part of the purchase price is paid in the form of a current benefit.

   This is an ongoing benefit when there is uncertainty about either the duration of the benefit or the annual amount of the benefit when the benefit runs beyond the contract year. The uncertainty may be that the size of the individual services is uncertain - for example because they are determined as a percentage of a company's profit or turnover - or that the duration of the service is uncertain - for example in the case of a "lifelong service". The benefits are thus not part of the settlement of a specified receivable, as is the case in an ordinary debt relationship, where the benefits consist of installments and interest.

   According to the proposal, all precarious benefits are covered, regardless of how long they run over. It has previously been uncertain how long a benefit can extend over before it was a current benefit. It is therefore proposed to insert a clear definition in the law. For reasons of simplification, it is proposed that any kind of uncertainty regarding the size of the benefit implies that it is an ongoing benefit.

If the taxation of the current benefit is regulated in other legislation, however, it is the provisions laid down therein that apply. There can be e.g. be benefits in accordance with the Pension Taxation Act.

The current rules and practices regarding taxation of current benefits that are part of a mutually onerous agreement entail, to a certain extent, double taxation due to the combination of capitalization and current taxation. This is because the capitalized value is included in the calculation of the surrender amount and thus in any taxable profit that is taxed at the time of surrender, at the same time as the current benefits are taxable according to the State Tax Act § 4 c, as they are paid.

Double tax effects can also occur for the provider. If the current service constitutes consideration for the acquisition of a depreciable asset, the capitalized value will thus be included in the transferee's depreciation basis, at the same time as the latter has the right to deduct the current services as they are paid.

In order to achieve a more reasonable legal situation, it is proposed to legislate the capitalization of the current benefits and defer the current taxation and the right to deduct until the time when the nominal sum of the accumulated benefits exceeds the capitalized value of the current obligation at the time of agreement. It is proposed that the rules apply to agreements concluded on or after 1 July 1999. A provision that collectively regulates this is proposed to be inserted as section 12 B of the Tax Assessment Act.

The background for the previous double taxation of current benefits must be sought in the fact that the individual benefits are both a part of the settlement of the obligation that the current benefit represents, and at the same time an expression of a return on this obligation. The benefits thus contain both an installment and an interest component, without it being possible to make an amount breakdown of the individual benefit. When capitalizing the current benefit, the future benefits are discounted back with a market interest rate. Based on this consideration, the proposal can be seen as an expression that the benefits are considered installments until the accumulated sum of the benefits paid so far has offset the original capitalized value, ie. the nominal value of the sum of the benefits minus interest. Until this time, the benefits will not be taxable,

The proposal also includes those situations where the current benefit is consideration for the disposal of an asset, where the gain is not taxable. For example, it could be a detached house that has served as the family's home. The proposal thus implies that even in these situations a capitalized value of the current benefit must be calculated. Only if the benefits received exceed the capitalized value is taxation done. This ensures that no ongoing taxation is made on the part of the current benefit that is an installment on a tax-free profit.

By applying the method in all situations, it is also taken into account that the mutually onerous agreement may have been entered into, where only one party has a commercial / tax interest in it.

*§ 12 B, para. 2*

The current benefit must be capitalized in connection with the conclusion of the mutually onerous agreement. The capitalized value of the current benefit can also be referred to as the cash value or the present value. The capitalized value is obtained by calculating the expected future nominal benefits and discounting the benefits at a market interest rate. The difference between the cash value and the nominal value corresponds to the interest that the seller could have obtained by putting a cash payment for the company in the bank - it can be said to be payment to the seller to wait to receive his consideration. If other parts of the legislation lay down methods for capitalization, these rules must be followed. For example, the capitalization of retirement benefits must take place according to the tables laid down on the basis of the Property Tax Act. If the current benefit is of such a nature that no special guidelines have been laid down for a capitalization, the value must be determined on the basis of an estimate. The estimate is made by the parties. This estimate may take into account the value in trade and the conduct of the assets repaid with a current benefit, as the parties in the further design of the current benefit must be considered to try to hit an amount corresponding to what the transferor under similar terms could be obtained for that asset. The capitalized value of the current benefit will thus correspond to the cash value of the asset that is remunerated with a current benefit. This estimate may take into account the value in trade and the conduct of the assets repaid with a current benefit, as the parties in the further design of the current benefit must be considered to try to hit an amount corresponding to what the transferor under similar terms could be obtained for that asset. The capitalized value of the current benefit will thus correspond to the cash value of the asset that is remunerated with a current benefit. This estimate may take into account the value in trade and the conduct of the assets repaid with a current benefit, as the parties in the further design of the current benefit must be considered to try to hit an amount corresponding to what the transferor under similar terms could be obtained for that asset. The capitalized value of the current benefit will thus correspond to the cash value of the asset that is remunerated with a current benefit.

The capitalization is subject to review by the tax authorities. That is, the taxing authority may override the capitalization if the estimate does not correspond to the real value of the current benefit. As an example, it can be mentioned that the current benefit consists of 10 per cent. of the company's profits for the next 10 years. Here the capitalization must be determined at the discretion of the parties. If the parties rate the company's profits significantly higher during the term than the profits have been in recent years up to the conclusion of the agreement, without it being sufficiently probable that the profits can be expected to increase, the capitalization will hardly be accepted. The taxing authority does not have to state its position on the agreed scheme, but only ensures that the current benefit is capitalized correctly.

Where the parties have concrete conflicting interests, the parties can expect the tax authorities to use the discount rate chosen by the parties as a basis. In cases where the parties do not have concrete conflicting interests, the tax authorities will be able to override the chosen interest rate, if this is not an expression of a market interest rate in the matter in question. The fact that the parties do not have concrete conflicting interests may result from the fact that there are ongoing benefits in family relationships, between group companies, or because the parties' different tax conditions make the choice of a high or a low interest rate advantageous for both parties. Customs Tax will subsequently announce an interest rate twice a year that can be used to capitalize current benefits,

In the case where the recipient and the grantor of the current benefit do not belong to the same tax-paying authority, the review is carried out by the recipient's tax-paying authority, which must consult the tax-paying authority for the grantor.

It is also required that it is stated in the parties' agreement which assets are remunerated with a current benefit. The parties' agreement is decisive for which assets in the transfer are remunerated with current benefits, and which assets are remunerated in other ways.

The parties have a duty to inform the tax-paying authorities of the agreement entered into, including information about the capitalization and that pursuant to Section 5. made distribution. The information must be provided by submitting a notification at the latest at the same time as the expiry of the deadline for submitting a tax return for the income year in which the agreement is entered into.

*§ 12 B, para. 3 - 5*

It is proposed that the capitalized value be entered in a balance. In year 1, this balance is the capitalized value at the time of the agreement. The balance must be borne by both the recipient and the provider of the ongoing benefit. The balance is then calculated every year, so that the nominal value of the services paid is deducted from the balance. The balance after deduction of the benefits paid in the income year is transferred to the following income year. Both parties must have the same amount on the balance, cf., however, below on the waiver of the right to the current benefit. The balance value gives a current indication of how large a part of the capitalized value has not yet been matched by paid benefits. The balance is entered up to and including the income year in which the current benefit finally ceases or where the balance becomes negative. The balance must be reported each year to the tax authorities, and this must be done at the latest at the same time as the expiry of the deadline for submitting a tax return for the individual income year. When the balance becomes negative, it is an indication that the benefits paid exceed the capitalized value at the time of the agreement. It is proposed that the recipient in the income year in which the balance becomes negative, should include the negative amount in the taxable income for that income year. The provider may deduct a corresponding amount from the taxable income for the income year in question. In subsequent income years, the recipient includes the benefits paid in the income year in question to the taxable income, and the payer deducts the paid benefits. that the services paid exceed the capitalized value at the time of the agreement. It is proposed that the recipient in the income year in which the balance becomes negative, should include the negative amount in the taxable income for that income year. The provider may deduct a corresponding amount from the taxable income for the income year in question. In subsequent income years, the recipient includes the benefits paid in the income year in question to the taxable income, and the payer deducts the paid benefits. that the services paid exceed the capitalized value at the time of the agreement. It is proposed that the recipient in the income year in which the balance becomes negative, should include the negative amount in the taxable income for that income year. The provider may deduct a corresponding amount from the taxable income for the income year in question. In subsequent income years, the recipient includes the benefits paid in the income year in question to the taxable income, and the payer deducts the paid benefits.

It is proposed that the actual payment of the benefits be used as a criterion for tax liability or right to deduct. This deviates from the general starting point, according to which the time of acquisition is decisive. The reason for this deviation is that this is considered best in line with the purpose of the proposal to facilitate generational change.

(...) "

The comments on Bill L 34 in the parliamentary year 2000/2001 include the following:

*General remarks*

"(...)

The bill also contains an *adjustment of the rules on taxation of current benefits* . In order to facilitate the generational change of the business community, Act no. 386 of 2 June 1999 implemented a reorganization of the taxation of current benefits.

In order to achieve coherence between these rules and the rules on tax succession in the Withholding Tax Act and the Capital Gains Tax Act, which are also applied in connection with generational change, an adjustment of the rules on taxation of current benefits is proposed.

The rules implemented in 1999 for the taxation of current services contain a provision that the seller who, after receiving all the agreed services, has not received an amount corresponding to what is used as the waiver amount for the tax return, can deduct the difference amount. The buyer must include a corresponding amount in the income statement. The reason for this adjustment is that the payment for the transferred asset has actually been lower than assumed. Therefore, in connection with the divestment of the asset, the seller should not have been taxed on such a high divestment sum as happened. On the contrary, the buyer has had too high a purchase price / depreciation basis.

This regulation does not apply to a situation where the buyer has taken over the asset by succession. If an asset is transferred by succession, the seller is not taxed on any profits, and the buyer enters the seller's tax position, ie. the buyer takes over the seller's purchase price and depreciation basis. In order to prevent unfair tax treatment of the parties involved, it is therefore proposed to make an adjustment to the rules on taxation of current services, so that the provisions state that the seller can not make deductions and the buyer must not be taxed in the termination situation when the transfer is happened with tax succession. "

*Comments on section 4, nos. 1 and 2 of the Bill*

To Nos. 1 and 2

It is proposed to insert rules in section 12 B of the Tax Assessment Act, which regulates the situation where the parties have chosen to apply the rules in section 33 C and section 33 D of the Withholding Tax Act or section 11 of the Capital Gains Tax Act on tax succession when transferring an asset.

The current rules in section 12 B of the Tax Assessment Act lay down rules for the tax treatment of current benefits. According to the provision, the current benefit must be capitalized, and the parties must each maintain a balance where the capitalized value in the contract year is used as the entry value. As the benefits are paid, the balance is written down.

If the current benefit finally ceases before the balance becomes zero or negative, this is adjusted in the year of cessation by the recipient receiving a deduction for an amount corresponding to the balance at the time of cessation. The provider must include a corresponding amount in the income statement. The reason for this adjustment is that the payment for the transferred asset has actually been lower than assumed by the capitalization. Therefore, in connection with the disposal of the asset, the recipient of the current benefit should not have been taxed on such a high disposal amount as happened. On the contrary, the provider has had too high a purchase price / depreciation basis.

This does not apply in the case of consideration for non-taxable assets. The provision therefore stipulates that no deduction can be made if there has been a transfer of an asset, where the gain on disposal of such an asset is not taxable. Just as the provider must not include the amount to the extent that it corresponds to an amount determined as consideration for an asset, if the acquisition price the provider can neither depreciate, deduct or have included in the calculation of taxable profit on a disposal of the asset. The amount must be included in the calculation of the provider's taxable income, only one of the mentioned conditions applies.

If an asset is transferred by succession in accordance with the rules of the Withholding Tax Act, the transferor is not taxed on any profits, including recovered depreciation. The acquirer enters into the transferor's tax position, ie. the acquirer takes over the transferor's acquisition cost and depreciation basis. Section 12 B does not state what applies when the asset has been transferred with tax succession.

In relation to the provision in section 12 B, subsection 4, on taxation of the *recipient* of the benefits, it is assumed that the recipient has no deduction for any remaining balance when the amount is determined as consideration for an asset transferred with tax succession, as the succession implies that the gain is not taxable. It is the nature of the asset - and the tax treatment applicable to such assets in the situation in question - that is decisive for whether adjustment is to take place upon termination of the current benefit. In order to clarify that the tax treatment of the gain must be considered in the transfer made between the parties, including whether the current benefit is determined as consideration for an asset transferred with tax succession in accordance with the rules in section 11 of the Capital Gains Tax Act or section 33 of the Withholding Tax Act. C, a minor rewording of the provision is proposed.

The decisive factor as to whether *the provider* must include the remaining balance of his taxable income is whether it corresponds to an amount determined as' consideration for an asset if the acquisition price the provider can neither depreciate, deduct nor have included in the calculation of taxable profit by a disposal of the asset '. In assessing whether the residual balance is to be recognized as income, it is thus the tax treatment of the profit on the provider's subsequent disposal of the asset that is decisive.

In the event of transfer by succession, the provider enters into the recipient's acquisition price, depreciation basis, etc. If the asset is not fully written down, the provider can thus continue the depreciation process, and in a subsequent disposal of the asset, the recipient's original acquisition price will be used in the profit statement.

In a number of situations, there will thus also be a purchase price in the succession cases, which will be covered by the wording of the provision, regardless of whether it derives from a previous transfer. As this is a different acquisition cost than the one envisaged in the legal text, there will be no correlation between the size of this and the size of the amount (residual balance) to be recognized as income, which could lead to unfair tax treatment of the provider.

The provision in § 12 B, para. 5, is therefore proposed to be extended with a provision that the residual balance shall not be included in the calculation of the provider's taxable income if it corresponds to an amount determined as consideration for an asset transferred in accordance with the rules in section 11 of the Capital Gains Tax Act or section withholding tax. 33 C. "

*Practice regarding the material issues*

The Legal Guide (2016-2) section **CA1.2.1 Time of** taxation

"(...)

Waiver of assets

(...)

Waiver before the acquisition of rights

If a person waives an income before the final acquisition of rights, the starting point is that no taxation takes place. However, taxation occurs if the person does not give a blank waiver, but makes a so-called dispositive waiver.

Disposable waiver

When a person in connection with the waiver of an income decides how the income is to be used, it is called a dispositive waiver. This is equivalent to the person acquiring the right to the income and then passing it on. In the event of a disposable waiver, the person will therefore be taxed on the income.

Example of the difference between blank waiver and dispositive waiver

There should be no taxation of an actor performing unpaid for a charity. On the other hand, the actor is taxed if he acts "free" in exchange for the employer paying an amount for a specific purpose determined by the actor.

Examples of dispositive waiver

Remuneration received for lecturing must be taxed at the lecturer if he disposed of the remuneration by requesting this donated to a charity. This is a disposable waiver of income. See **SKM2011.112.SR** .

By selling the shares in his company, the complainant had guaranteed a certain operating profit and given a commitment that he would waive salary in an underlying subsidiary for a future period of approx. 8 months if the operating result was not reached. The operating result was not reached and the warranty therefore became current. The High Court ruled that it must have been a precondition for the obligation to be fulfilled by wage waiver that the complainant performed a work effort during the period, which could form the basis for wage earnings. Thus, there had in fact been a payment of the guarantee obligation with wage income, which therefore had to be subject to usual taxation. It was therefore a dispositive waiver, and taxation of the taxpayer occurred. See TfS 1995, 860 VLD.

The Tax Council found that an author could not waive 50 per cent. of the rights to a book, in favor of a named fund, without the waiver triggering taxation, as it was a dispositive waiver. See **SKM2006.322.SR** .

The National Tax Tribunal considered a player's agent to be the rightful income recipient of fees he received from footballers for whom he was an agent, regardless of whether he intended to waive the amounts in favor of a company he owned. The waiver had to be considered dispositive, as he had decided in connection with the waiver how the amounts were to be used. See **SKM2007.172.LSR** .

The Tax Council did not agree with a bank's view that a contribution to a fund calculated as a percentage of deposits in a particular account type, in agreement with the customers of that account type, was deductible for the bank as an advertising expense under LL § 8, PCS. 1. The Tax Council found instead that this was a scheme for dispositive waiver of interest income on the part of the customers, and that the customers were therefore the real contributors to the fund. See **SKM2008.501.SR** .

The National Tax Court upheld a binding answer from the Tax Council, according to which employees in various companies were to be taxed on salaries, which they waived in order to make contributions to charitable causes. The Tax Council found that the employees' waiver of future wage income, given in connection with and as part of an intended charity project, should be equated with dispositive waivers, where the employees reserve that the waiver amounts are used for charity. The National Tax Court referred in its reasoning to the fact that the wage waiver was intended to be used for charity with a pre-determined amount. See **SKM2010.489.LSR** .

The Tax Council could not confirm that amateur photographers who offer photo work in exchange for the client donating an amount to an approved relief organization should not be taxed on income from the payment. The waiver of the income was considered dispositive, as the photographers only performed the work for the client in return for the latter presenting a receipt for payment of a minimum amount to a charity, mentioned in the list of Danmarks Indsamlingen 2010. See **SKM2010.747.SR** .

Examples where there is no dispositive waiver

The Tax Council agreed that private persons who perform specific services within a specified group of persons will not be liable to tax on the amount that the recipients of the services in question provide as payment for the services to a non-profit or non-profit organization. See **SKM2010.764.SR** .

The Tax Council approved that the fee in connection with Operation Dagsværk 2011, similar to the previous years, must be processed so that employers can refrain from withholding A-tax etc. in remuneration to school students who perform work for Operation Dagsværk on 9 November 2011. Students must not include the remuneration on the tax return. Employers can deduct the amount as an expense in the operating accounts. See **SKM2011.615.SR** . (Later decision regarding Operation Dagsværk, see **SKM2013.677.SR, SKM2014.677.SR** and **SKM2015.614.SR** ).

(...) "

The Legal Guide (2016-2), section **CB1.2.1** Receivables, liabilities and financial contracts covered by the Capital Gains Act

"(...)

Rule

The Capital Gains Act concerns the tax treatment of gains and losses on receivables, liabilities and financial contracts that are not to be taxed together with the underlying asset in the case of

- renunciation or redemption
- liberation
- compensation and insurance sums.

See **KGL § 1** , para. 1.

Also see

See section **CB1.7.5** on the realization principle, where the concepts of renunciation, redemption and liberation are described.

Price gains and losses

 The law covers both gains and losses that occur with

- creditor (creditor, lender) in waiving or repaying a monetary claim
- debtor (debtor, borrower) who is released from an obligation.

The rules apply to all capital gains and capital losses on receivables and liabilities.

Examples of price gains and price losses

Here are some examples of price gains and price losses:

- Increases and decreases in market value resulting from changes in interest rates, index adjustments or exchange rate changes
- Losses due to the debtor's default and insufficient security by mortgage or surety.

Receivables, liabilities and financial contracts covered by the Capital Gains Act

The Capital Gains Act contains rules for taxation of gains and losses on:

1. receivables, including bonds, mortgage deeds and promissory notes
2. debt

(...)

See **KGL § 1** , para. 1, 2, 5 and 6.

Claims not covered by section 1 of the Capital Gains Act

KGL § 1, stk. 1, no. 1, defines which receivables are covered by the rules of the Capital Gains Act. The law thus covers money receivables, including bonds, mortgage deeds and promissory notes.

Deductions according to KGL will only be considered if a loss that can be attributed to the monetary claim occurs on a monetary claim covered by KGL. If, for example, a claim arises in a contractual relationship that is not fully met, it will thus depend on the specific circumstances whether a loss has arisen which is deductible under KGL. This follows from the Supreme Court **judgments SKM2013.779.HR** and **SKM2009.318.HR** .

Gains and losses that, for example, cannot be attributed to the monetary claim, but for example to shares, real estate or income and expenses related to the wealth sphere, cf. SL § 5, subsection. 1, letter a, will thus not be covered by KGL.

In a number of decisions from 2016, the Tax Council has taken a position on what was covered by KGL § 1 in connection with the assessment of the right to deduct for persons pursuant to KGL § 14. See **SKM2016.173.SKAT** .

Losses on cash receivables, which are covered by KGL § 14, para. 1, is for example the following:

- Losses on lending money
- Losses on bonds
- Losses in connection with bail for money receivables.

Losses that are not covered by KGL are, according to the Tax Council, for example the following:

- Losses in connection with prepayments for the purchase of private services, both goods and work services, which are not provided or where there are errors and deficiencies.
- Loss on compensation for burning and pain.

Losses due to fraud, theft, etc., eg losses incurred in connection with the theft of private objects, cannot be deducted. Losses incurred in relation to the operation of a business enterprise which are not considered to be covered by section 17 of the Capital Gains Act cannot be deducted either. See **SKM2016.136.SR** , **SKM2016.137.SR** and **SKM2016.138.SR** .

In **SKM2016.101.LSR** , which was published on 1 March 2016, the National Tax Court found in a case of internet fraud that there was no deduction in accordance with KGL § 14, subsection. 1, which is in accordance with **SKM2013.779.HR** and **SKM2009.318.HR** .

*Note*

A specific assessment must always be made of whether the receivable, the debt or the financial contract is covered by the rules in the Capital Gains Act. This assessment must also be made in relation to a possible return.

Ad a and b - cash receivables and liabilities

A claim for money means a legal claim for payment of a sum of money. This must be a legal claim, and this means that the creditor (the creditor) must be able to make the claim for payment against the debtor (the debtor) in the courts.

The Capital Gains Act applies as a starting point to all monetary receivables regardless of type, eg bonds, mortgage deeds and promissory notes. The completely individual receivables that arise from sales on credit, from salary and fee receivables or from very short-term apartment loans without collateral are also covered.

An amount deposited in a seller's bank account in connection with the sale of shares was not considered to be a monetary claim on the buyer. The amount was transferred to the seller as payment and deposited in the seller's bank. The amount was to be released when the conditions for this were met. As a result of the deposit, the seller was satisfied with cash as agreed, and the seller therefore did not have a legal claim on the buyer for payment of a sum of money as a result of the transaction. See **SKM2009.204.BR** .

(...)

The rules in the Capital Gains Act apply to both cash receivables and debt, ie. the tax rules apply to both creditor and debtor.

Both cash receivables and debt in Danish kroner and foreign currency, respectively, are covered by the Capital Gains Act.

(...) "

<u>The Legal Guide (2016-2), section **CB1.7.5** General information on the realization and stockholding principle (concerning receivables and liabilities)</u>

"(...)

The realization principle

Receivables

Under the realization principle, gains and losses on receivables must be included in the taxable income in the income year in which the gain or loss is realized. See **KGL § 25** , para. 1.

Gains and losses on receivables are calculated as the difference between the acquisition cost and the disposal amount. See **KGL § 26** , para. 2.

It is the market value at the time of acquisition that is used as the acquisition cost, unless the taxpayer proves that the receivable has been acquired for a higher amount.

(...)

Partial redemption - installments

If redemption takes place through installments, such a large part is included, which corresponds to the ratio between, on the one hand, the redemption sum less the acquisition sum and, on the other hand, the redemption sum.

Realized gains and losses are calculated as the ratio between:

((redemption sum - acquisition sum) / redemption sum) x installments.

Example

A debt of a nominal DKK 100,000 is set at DKK 50,000. An annual installment of DKK 5,000 is paid.

The exchange rate loss on the installment amounts to:

(100,000 - 50,000) / 100,000) x 5,000 = 2,500 kr.

(...)

Taxation presupposes that a capital gain or loss can be established

Taxation of a capital gain or deduction for a capital loss presupposes that a capital gain or loss can actually be ascertained.

If the debtor is a company, it is accepted in practice that if the trustee issues a notice of how much dividend will be paid at most, then the creditor can make a deduction for the part of the loss which it is hereafter probably will not be covered. The deduction can be made in the year in which the trustee issues the notice. After the termination of a company's bankruptcy estate, the company ceases and the debtor therefore no longer exists.

This practice does not apply when the debtor is a person, after which the claim against the debtor thus continues to exist, regardless of whether the debtor's bankruptcy estate has been closed. Nor is there any deduction on filing the debtor's declaration of insolvency. In cases where the debtor is a person, a loss can thus only be considered to have been finally established when the claim lapses as a result of limitation, composition, remission, etc. See eg **SKM2016.135.SR** , under the justification for question 2.

The realization principle

When applying the realization principle, there must be a realization for tax purposes, including

- waiver of the claim
- debt relief or repayment.

Contractual payments could not be qualified as a capital loss on a euro loan when a property is transferred successively (ideal shares) in connection with the buyer paying according to a set payment schedule. As the buyer first acquires additional shares of the property in step with the payment of the services according to the stipulated payment schedule, an obligation to pay only arises at these stipulated times. See **SKM2012.628.SR** .

See **SKM2009.553.SR** , where it was a question of lending bonds and not realization.

According to the realization principle, a non-interest-bearing receivable is taxed at the time of redemption. This also applies in loan relationships between the main shareholder and the company when the loan is to be repaid at a premium. The Tax Council assumed that the loan relationship was in accordance with the arm's length principle in LL § 2. See **SKM2010.864.SR** .

In family relationships, it happens that parents provide an interest-free or low-interest loan to their children. If the amount that the children borrow is the same as the amount to be repaid to the parents, the parents have not obtained any capital gain. There will therefore be nothing to tax under the Capital Gains Act. This applies, for example, to loans with overnight terms. This means that no repayment date has been agreed, but that the loan must be repaid at the creditor's request.

(...)

The Legal Guide (2016-2) section **CB2.1.5.4** Ongoing benefits

"(...)

When the sale of shares is paid for with a current payment, the surrender price for the seller is determined taking into account the value of the current payment. See **LL § 12B** and **CA4.1.5** deductions for current benefits and gifts **LL §§ 12** and **8** A.

(...) "

The Legal Guide (2016-2) section **CB2.1.5.5** Reserved dividends

"(...)

When shares are transferred subject to the right to dividend, the dividend is part of the disposal sum for the shares.

(...) "

The Legal Guide (2016-2) section **CB2.15.1** Taxation of interest benefit rights including restricted capital

"(...)

Rule

The taxation of interest-bearing rights, including restricted capital, does not appear in the legislation, but is based on a long-standing practice.

(...)

Interest benefit

By interest payment is meant that a person by gift or will gets the right to the income from a certain capital, but not the ownership of it.

In Danish law, there are three types of interest benefit rights:

- Interest benefit right with outsourced capital owner and without foreclosure of the capital
- Interest benefit right with capital owner with capital tied up
- Interest benefit right without capital owner with capital tied up.

(...) "

The Legal Guide (2016-2) section **CB3.1** The concept of tax dividends

"Rule

Dividends on shares, unit certificates and similar securities are included in the calculation of taxable income.

Dividends include everything the company distributes to its shareholders or shareholders, regardless of the form in which the distribution takes place. See **LL § 16 A, para. 1** .

It does not matter whether the distribution from the company stems from the profit for the year, increases in value or realization of assets and also includes the payment of liquidation proceeds.

Dividends from both Danish and foreign companies must be included in the income. In the income statement, shareholders must include the full declared dividend and thus also any withheld dividend tax.

(...)

Persons covered by the rule

Only the amounts distributed to current shareholders are considered taxable dividends. See **LL § 16 A, para. 2** . number 1.

The decisive factor will then be whether you are a shareholder (ie have ownership of the share) at the time of declaring the dividend.

*Also see*

See also section **CB2.1.5.5** on the special practice of taxation of reserved dividends in connection with the disposal of shares.

Taxation takes place according to the right to dividends

It is SKAT's opinion that dividends - declared as well as disguised - from a company are in principle taxed by all shareholders in relation to their dividend rights. See LL § 16 A, **SKM2010.452.BR** , **SKM2008.619.ØLR** and **SKM2006.164.LSR** .

The exception is, for example, cases of disguised dividends, where one or more shareholders, after a specific assessment, must be considered to have challenged the disposition.

If the distributed values are distributed differently to the shareholders than in relation to their dividend rights, the values are generally considered to be transferred from the shareholders directly to those who have actually received the values.

The exception is e.g. cases where a holding company has been deposited between the company and the shareholder. In this case, the distribution of values from the company to the holding company can, after a specific assessment, be considered to have been distributed from the holding company to the shareholder, who has subsequently transferred the values to those who have actually received the values.

(...)

Forms of distribution to the shareholders

This section describes the different types of values that can accrue to the shareholders of the company and which are considered as dividends.

1. Declared dividend

(...)

Ad a. Declared dividend

The part of a company's income that is distributed to the company's shareholders and which is declared at the company's ordinary or extraordinary general meeting is included as ordinary dividends, including extraordinary dividends and on account dividends. "

The Legal Guide (2016-2), section **CC2.1.2.2** Waiver of income

"(...)

If, prior to the time of the final acquisition of the right, an income is waived against the person who should have paid the consideration, there is normally no taxation.

Condition: Blank waiver, not dispositive waiver

It is a prerequisite for tax exemption that the waiver is blank. This means that the person who was to receive the amount must not, in connection with the waiver, decide on how the income is to be used.

Taxation must therefore take place if the recipient decides on the use (dispositive waiver).

Examples: Blank waiver

There should be no taxation of an actor who performs for a charity without pay.

A deputy in a parliamentary election had, a week before he participated as a deputy in the election, given a binding waiver of his diet amount. The income was therefore not to be taxed. See LSRM 1973, 122 LSR.

Examples: Disposable waiver

Taxation must apply if an actor acts 'free of charge' in return for an amount paid for a purpose determined by the actor.

A volunteer at a mission company had arranged for his lecture fee to be sent to some mission companies. He himself was taxed on the amounts. See LSRM 1974, 29 LSR. "

The Legal Guide (2016-2) section **CC6.4.2.1** Other intellectual property rights

"(…)

Dividend contract

A dividend contract is to be understood as any contract with a right to current income. This applies regardless of whether the right to this has been acquired in connection with the transfer of the right of use to a property or in connection with a sale, etc. of a fortune.

The provision only covers the waiver of the right to an existing dividend contract.

The actual formation between the original parties does not constitute an assignment of a dividend right. Such an agreement may, on the other hand, be covered by the rules on current benefits pursuant to **LL § 12 B** in the case of the transfer of an asset.

See **SKM2012.370.SR** on an agreement on the purchase of the right to turnover, which is not considered a dividend contract or covered by **LL § 12 B** , but rather a financial contract. An asset is not transferred, but a capital contribution is made, which is repaid via the right to turnover.

(…)

The Legal Guide (2016-2) section **CC6.8.1** Ongoing benefits covered by LL § 12 B

"(…)

In connection with the transfer of one or more assets, including a full or partial business transfer, the parties may choose to enter into a mutually onerous agreement that part of the purchase price must be paid with a current benefit covered by **LL § 12** B.

This means, as with other divestitures, that the transferor must be taxed in full in the divestiture year. On the other hand, the subsequent current benefits must only be taxed if these exceed the value capitalized and taxed in the year of disposal, which must be paid with current benefits covered by **LL § 12** B. See section **CC6.8.7** for examples of taxation of current benefits.

The rules on the tax treatment of such current benefits are found in **LL § 12 B** and only apply to mutually onerous agreements on transfers pursuant to **LL § 12 B** , subsection. 1.

The provision was inserted in the Tax Assessment Act by Act no. 386 of 2 June 1999 and has effect from 1 July 1999.

The main purpose of the provision is to avoid double taxation of the current benefits. Prior to LL § 12 B, all current services to the seller were taxed pursuant to SL § 4, regardless of the fact that the capitalized value had already been taxed in the year of disposal. So double taxation. Under LL § 12 B, only the part of the paid current benefits that exceeds the taxed capitalized value will be taxed. Similarly, there will be deductions in cases where the paid current benefits do not have time to cover the taxed capitalized value. According to the provision, corresponding regulation takes place with the buyer. To manage this, both buyer and seller must keep a balance that will always be the same size for both.

Definition of the law

This is a current benefit when there is uncertainty about either the duration of the benefit, eg a "lifelong benefit", or the size of the individual benefits, eg because they are determined as a percentage of a company's profit or turnover.

The benefits are thus not part of the settlement of a specified receivable, as is the case in an ordinary debt relationship, where the benefits consist of installments and interest.

It is crucial that the current benefit runs beyond the agreement year, ie that one or more benefits are calculated and due after the end of the agreement year.

Therefore, if there is uncertainty regarding the size or duration of the benefit, it is an ongoing benefit when the benefit runs beyond the contract year. The agreement year is the income year in which the agreement is entered into. See **SKM2014.154.SR** .

Mixed services

As is clear from the law's definition of a current benefit, only amounts for which there is uncertainty can be described as a current benefit.

If a time-limited annual minimum payment is stipulated in the agreement, the amount in addition is considered to be the current benefit.

Example

A company is transferred, and goodwill is set at DKK 5 million, for example. Of this, DKK 4 million must be paid. at the takeover, and the rest must be paid as ongoing benefits corresponding to eg 10 per cent. of the turnover for a period of 5 years, however, at least DKK 100,000 annually. In this case, it will only be amounts in addition to the minimum amount of DKK 100,000 that are uncertain and which can therefore be covered by **LL § 12** B.

The minimum amount itself is considered to be an installment on a claim, because at the time of the transfer, the exact amount that the minimum payments will amount to over the given number of years (DKK 5 x 100,000) can be calculated.

The tax treatment of the agreed minimum amount (the claim) follows the general rules of tax legislation, typically the Capital Gains Act.

Boundary

If an agreement contains both a fixed waiver payment paid in the agreement year and a regulation provision, it will depend on the detailed formulation of the regulation provision whether it is a current benefit.

If the regulation means that, in addition to the payment of a cash amount in the agreement year, a percentage of, for example, the profit in one or more subsequent years must be paid, the profit-dependent amounts constitute a current benefit.

The value of the mentioned profit-dependent amounts (the current benefits) must be capitalized in the year of disposal, and this value is included in the calculation of the total disposal amount, which must be taxed in the agreement year. In addition to the current benefits, the total surrender sum may also include other agreed remuneration, eg cash, receivables, etc.

(...)

A single subsequent adjustment of the surrender amount

The Tax Assessment Council has decided that a single subsequent adjustment of the transfer sum for a shareholding, which in the transfer agreement was agreed to take place upon fulfillment of certain conditions, should be taxed as additional consideration for disposal of the shares instead of as ongoing benefits under **LL § 12 B.** _ See **SKM2003.78.LR** .

In a similar case concerning a single subsequent adjustment of a consideration for the disposal of shares, the question arose as to whether this consideration should be taxed as additional consideration. In the case, the shareholder wanted to resign from the company, and according to the terms of the transfer, the divestment amount was to be adjusted for the result in the divestment year in a subsidiary. This meant that the surrender amount would be adjusted in the year after the surrender. The divestment of the shares took place with 5/6 in the agreement year and with 1/6 in the following year. The payment was also made in two installments, however, the surrender amount as a whole corresponded to the value prescribed in the agreement. In the decision, the Tax Assessment Council emphasized that there should only be a single post-adjustment of the transfer sum, and found that there was no ongoing benefit under **LL § 12 B**. In the opinion of the Tax Assessment Council, this applied whether the post-adjustment occurred in the agreement year or in a subsequent income year. The Tax Assessment Council referred to the wording of **LL § 12 B** , as well as to the fact that the provision was intended to facilitate the generational change of the business community. See **SKM2003.457.LR** .

Also see

The Tax Council has also taken a position on the issue of a single subsequent adjustment in **SKM2007.871.SR** and **SKM2011.41.SR** , which also concerned share transfers.

(...) "

The Legal Guide (2016-2) section **CC6.8.2** The scope of LL § 12 B

"(...)

Which assets are covered

The agreement may relate to consideration for the transfer of all types of assets, including

- real estate
- goodwill
- shares and
- other securities.

**LL § 12 B** also covers those situations where the current benefit is consideration for the disposal of an asset, where the gain is not taxable. For example, it could be a detached house that has served as the family's home. This means that even in these situations a capitalized value of the current benefit must be calculated.

Taxation only occurs if the benefits received exceed the capitalized value. In this way, it is ensured that the part of the current benefit that is an installment on a tax-free profit is not taxed on an ongoing basis. "

The Legal Guide (2016-2) section **CC6.8.3** The taxation of current benefits

"(...)

In order for a service to be said to constitute a consideration from the buyer to the seller, the buyer must first acquire the right to what is paid. This applies to the company's profits, share dividends, etc.

(...)

It is the actual payment of the benefits that is the decisive criterion for both tax liability and right of deduction.

(...)

The Legal Guide (2016-2) section **CH2.1.8.1 The surrender** and acquisition price for ordinary sale / purchase

"(...)

Definition

The surrender and acquisition price for the transfer of real property in a free trade is basically defined as the amount stated in the deed or purchase agreement.

(...)

Rights of use, deductions, etc.

The transfer sum may contain a deductible obligation that the buyer has assumed towards the seller. In such a situation, the capital value of the deductible obligation agreed by the buyer and seller must be included in the disposal and acquisition sum, respectively.

In certain situations, SKAT may, in accordance with the rules in **EBL § 4** , subsection 6, verify the parties' determination of the capital value of a current benefit. See more about this in section ( **CH2.1.9.2** ) on the distribution of the transfer sum on assets.

Example: The surrender amount included current benefit

Statement of profit on a property from the sale of agricultural property in 1996. Part of the sale price was a current benefit. See **SKM2004.306.ØLR** .

Current benefits, including retirement benefits that are part of agreements entered into on or after 1 July 1999, are taxed in accordance with **LL § 12** B. See on current benefits and **LL § 12 B** in section ( **CC6.8** ).

The capital value must be calculated according to the annual value of the benefit and the capitalization factors at the time of transfer.

See BEK no. 996 of 8 November 2000 on determining the value of usufruct, interest or income benefits when calculating inheritance and gift tax.

(...) "

Article by Michael Serup, published in RR.7.1990.29

This article includes the following:

"The decisions of the Supreme Court seem to be taken as an expression that the civil law freedom of contract and validity of contract is not in itself binding for the authorities' tax assessment of the legal effects of the agreement entered into, and is not affected by the tax assessment. This must be accepted, and in this sense, "tax law" can probably be considered as an independent legal system. "

Decisions on the material matters

LSRM 1942.182 and LSRM 1971.112

In both of these decisions, the National Tax Court ruled that the current owner should be taxed on wealth returns.

U.1982.152H

The Supreme Court ruled that a subsequent payment under an agreement on price-adjusted consultancy fees to the seller of the entire share capital of the company had to be regarded as an additional disposal fee for the seller.

TfS 1992, 588 LSR

The National Tax Court found that the taxpayer, who by reserving shares had reserved the right to dividends for the closed financial year, had rightly included both the dividend and the tax rebate in his taxable income. It was only the dividend relating to the financial year ended at the time of sale.

TfS 1995, 561 BEER

One company's main shareholder had ceded its shares, partly to the company and partly to the other main shareholder. In connection with the share divestment, the company undertook to pay a commission of 45 per. cent. of the difference between the book value of a specified item and the sale price. The High Court ruled that the additional amount paid for the former major shareholder was an additional sale price for the shares, while taxation was to be made as a disguised distribution for the remaining major shareholder.

TfS 1997, 198 BEER

A shareholder had acquired the remaining shares from a co-shareholder and in close connection with this had taken over a claim which the seller had on the company. The same year a bank guarantee was issued. The High Court found that the guarantee amount had to be regarded as part of the consideration for the transfer of the shares and the claim. In these circumstances, the High Court found that the guarantee amount had to be regarded as a disguised distribution to the new sole shareholder.

**SKM2001.88.HR** (TfS 2001, 90 HRD)

The Supreme Court ruled that an amount paid after the transfer of the shares in the company could not be considered a distribution from the company to the sellers, even though a similar amount was actually transferred from the company to the sellers. For the sellers, the amount should instead be treated in accordance with the rules on taxation of capital gains on the sale of shares.

**SKM2001.135.LR**

A father had transferred a residential property to his daughter and in connection with this reserved a lifelong right of residence (retirement benefit). The Tax Assessment Council found that the value of the right of residence should be included as part of the purchase price for the property. The Tax Assessment Council also found that the deductible benefit was covered by section 12 B of the Tax Assessment Act, so that taxation of deductions for the deductible benefit, respectively, was deferred until the time when the sum of the accumulated benefits exceeded the capitalized value at the time of agreement.

**SKM2001.538.HR** (TfS 2001, 494 HRD)

The Ministry of Taxation responded in the affirmative, thereby acknowledging that the transfer of some assets from the company to the seller and buyer in connection with the sale of shares in the company should not be taxed as dividends, but included in the calculation of the taxable profit on disposal of the shares. There was a single distribution in a company emptying case, as the company was emptied of funds at the distribution.

**SKM2003.78.LR**

There was one subsequent adjustment of the surrender amount regarding the sale of shares. The Tax Assessment Council found that the adjustment amount should be taxed as an additional consideration for the sale of the shares.

**SKM2003.282.LSR**

The National Tax Court found that the distribution of dividends from the shares after the transfer should be regarded as part of the surrender amount. There was one distribution of dividends after the transfer, as the shares were disposed of on 2 May 1996, and a subsequent distribution of dividends took place in August 1996. The National Tax Court did not decide whether the buyer should be taxed on the dividend, as the buyer's tax assessment did not was appealed.

This decision is commented on in an article by lawyer Svend Erik Holm, Advokatfirma Plesner Svane Grønborg, published in RR.SM.2003.237. In this article, it is concluded that the ruling of the National Tax Tribunal has the consequence that reserved dividends for the future must be considered for tax purposes to have passed the buyer of the shares. If the buyer is not a company that can receive tax-free dividends, then the buyer will be taxed on the dividends, even if this is actually collected by the seller. It also appears that a reserved dividend may result in dividend taxation of the buyer first and then capital gains tax on the shares.

The decision is also commented on in an article by Ole Bjørn, published in SR.2003.331. It is also clear from this article that dividends reserved by a seller and declared after the sale have taken place are taxable in addition to the sale price and should not be regarded as dividends from the seller.

It is noted that in the said decision there was only one distribution of dividends after the share transfer that accrued to the seller of the shares.

**SKM2003.457.LR**

There was one subsequent adjustment of the surrender amount regarding the sale of shares. The Tax Assessment Council found that the adjustment amount should be taxed as an additional consideration for the sale of the shares.

**SKM2004.416.LR**

The Tax Assessment Council recognized the outlined generational change model, which, among other things, gave the A and B shareholders the right to advance dividends. New shares were subscribed for, and the model was therefore completely different than in the present case.

**SKM2005.320.LR**

The Tax Assessment Council recognized the outlined generational change model, which, among other things, gave the A shareholders the right to an advance dividend. The share capital was increased by B shares. The model was therefore completely different than in the present case.

**SKM2007.418.SR**

In connection with the transfer of some bonds from mother to daughter, the mother reserved a lifelong income / interest benefit of the transferred bonds and whatever came in their place. The Tax Council found that the reserved interest benefit should be capitalized at the time of transfer, and that the lifelong interest benefit had to be regarded as a current benefit that was covered by section 12 B of the Tax Assessment Act (answers to questions 1 and 2). In addition, the Tax Council found that the mother should only be taxed on the annually received income / interest benefit when the balance according to the Tax Assessment Act § 12 B had been used (and thus become negative) (answers to questions 4 and 5). The Tax Council found that the daughter should be taxed on the interest income of the transferred bonds in accordance with the State Tax Act, section 4, subsection. 1, letter e, even if the interest accrued to the mother (answer to question

6). When the balance under section 12 B of the Tax Assessment Act had been exhausted, the daughter was to be taxed on the interest return in accordance with section 4 (1) of the State Tax Act. 1, letter e, but could deduct the same amount as a current benefit in accordance with section 12 B of the Tax Assessment Act (answer to question 7).

## SKM2007.871.SR

The Tax Council found that a single adjustment of the disposal consideration for shares should be regarded as an additional consideration under the Capital Gains Tax Act for disposal of the shares.

## SKM2008.207.SR

The case concerned, among other things, whether some pure interest rate products, where the redemption price was fixed and where the current exchange rate changes were solely due to changes in the interest rate level, had to be regarded as structured receivables. The Tax Council determined that such pure interest rate products were not covered by section 29 (1) of the Capital Gains Act. 3, on structured receivables, as the receivables were not adjusted in relation to the development in share prices or otherwise.

## SKM2009.474.SR

In this case, someone other than the current owner of the capital was entitled to the return on assets. The Tax Council found that the right income recipient was the one who was entitled to the income while the current owner had not acquired the right to the return. However, it was not a dispositive waiver on the part of the current owner, but a result of a third party decision.

## SKM2010.516.SR

A company's share capital was divided into two share classes, the A- and B-class. The A-shares were entitled to an advance dividend that was limited in time to 3½ years. The Tax Council confirmed that the advance dividend would not have tax consequences for either the A or B shareholder, as it was assumed that the advance dividend and the described regulatory mechanism would appear in the articles of association. The Tax Council also found it crucial that there were two independent parties without overlapping interests. It is expressly stated in the decision that if the advance dividend right and the regulatory mechanism are not stated in the articles of association, skewing the dividend in relation to ownership share could entail a tax consequence in the form of income tax.

## SKM2011.41.SR

There was one subsequent adjustment of the surrender amount regarding the sale of shares. The Tax Council found that the adjustment amount should not be considered a current benefit, but was covered by the rules in the Capital Gains Tax Act.

## SKM2011.289.SR

The Tax Council determined that a receivable whose return depended on the result of some forward exchange transactions had to be regarded as a structured receivable that was covered by section 29 (1) of the Capital Gains Act. 3.

## SKM2014.154.SR

In connection with the transfer of goodwill and know-how, it was agreed that the transfer sum was to be paid via two services, based on the turnover in recent years. The Tax Council determined that this was an ongoing benefit, covered by section 12 B of the Tax Assessment Act, provided, however, that the transfer had taken place on arm's length terms.

## SKM2015.293.SR

The Tax Council found that the issuance of bonds with a formal maturity of 1,000 years could be qualified as a debt. The Tax Council emphasized that there was an incentive for early redemption and that this incentive was not insignificant.

## SKM2016.281.HR

The Supreme Court found that it had not been established that the company had in fact distributed dividends to its parent company in Luxembourg, as the dividend did not appear in the parent company's annual accounts. The Supreme Court therefore found that it had not been established that the dividend had been paid to a parent company that met the

conditions for exemption from withholding tax. The Supreme Court therefore found that the dividend had been distributed to another party than the parent company, and the company was therefore not exempt from withholding tax on dividends. The case was formally concerned only withholding dividend tax.

The judgment is commented on in the article in RR.SM.2016.101, and the underlying district court judgment is commented on in the article in TfS 2015.272.

*Practice regarding the question of the principle of equality and any change in practice, etc.*

The Legal Guide (2016-2) section **AA3.10** Binding effect going forward

"(...)

Definition of binding effect

The binding effect is that the answer is binding on SKAT for as long as the binding period lasts, and that the questioner can rely on the answer in the same period. The binding effect may lapse in the case of incorrect or non-binding assumptions.

(...) "

The Legal Guide (2016-2) section **AA7.1.1** Background to equality principles and change in practice

"(...)

Definition of the principle of equality

The principle of equality is a fundamentally illegal administrative law principle that must ensure that, in principle, identical decisions are made in relation to citizens with identical circumstances. Or put another way, an authority must not discriminate unreasonably. The principle of equality is disregarded to the extent that a citizen can rely on the right to an incorrect individual statement and thus be placed in a better position than others with identical circumstances. See section **AA4** .

Derived effects of the principle of equality

It is a direct consequence of the principle of equality that a citizen can, under further conditions, rely on SKAT's administrative decision-making practice, including the description of practice in SKAT's legal guidelines, control signals and other published descriptions of practice. See **SKM2014.489.SKAT** , of which i.a. it appears that this is only exceptionally deviated from, as the right to SKAT's descriptions of practice can not be relied upon if there is a clear discrepancy in relation to higher-ranking sources of law.

Change of practice

However, the principles of the possibility of changes in practice may mean that an exception must be made to the principle of equality. The following describes the detailed conditions for being able to support the right to the principle of equality and administrative practice, as well as the principles for change of practice, including the difference between change of practice and completion / clarification of practice. "

The Legal Guide (2016-2) section **AA7.1.2** Equality principle

"(...)

This section is about the basic conditions for being able to support the right to the principle of equality, ie. that the citizen's / company's case must be decided without unreasonable discrimination and therefore as a starting point must be decided in the same way as similar other cases. The principle of equality is deviated from to the extent that a citizen can rely on the right to an incorrect individual statement, which thus puts the citizen in a better position than others with the same circumstances. See section **AA4** .

(...)

The condition of identity

First, it is a condition that the corresponding cases are completely identical. From practice, the following decisions can be mentioned as examples of insufficient identity:

Example

A pilot who had been taxed on the savings of partial free travel from home to work could not support the right that i.a. DSB employees were not taxed on similar free travel. See TfS 1995.486.ØLD.

Example

An export driver who was entitled to a standard deduction of DKK 150 per could not support the right that most other employees were entitled to a deduction of DKK 350 per day. Day. See TfS 1998.778.HD.

The condition of material accuracy

Secondly, it is a condition that the decisions or practices referred to are in accordance with the publicly declared practice of the tax authorities. From practice, the following decisions can be referred to as examples of cases where the discrimination was not unreasonable because the decisions referred to were materially incorrect in relation to practice in general:

Example

The principle of equality could not be invoked by a bus driver who was denied a deduction for additional expenses for catering, despite the fact that bus drivers in other municipalities had been wrongly approved for a deduction. See TfS 1995,483.HD.

Example

The complainant had been denied a deduction for depreciation in a sale and lease back project, despite the fact that other participants in the project had wrongly been granted depreciation. See TfS 2000.374.HD.

Example

The complainant was unsuccessful that when calculating the profit on the sale of real estate, a price index adjustment of the acquisition price was to take place, even though the co-owner had been granted a price index adjustment. It was assumed that the calculation of the co-owner's profit was incorrect. See **SKM2006.610.ØLR** .

Example

A power plant was not upheld in that only tax on additional fuel consumption had to be paid, regardless of the fact that other plants in the same period had incorrectly only paid tax on additional fuel consumption. The principle of equality could thus not lead to a different result in this situation. See **SKM2013.141.HR** .

The condition of legality

Thirdly, it is a condition that the decisions or practices referred to are not directly unlawful. In such cases, it would not be unreasonable discrimination for a decision not to be taken in accordance with the unlawful practice. From practice, reference can be made to the following example:

Example

The National Tax Court ruled that SKAT's practice of offsetting against residual tax with excess AM contributions before calculating the percentage surcharge of the residual tax amount was unlawful. As a result, the complainant could not, with reference to the principle of equality, rely on the right to the unlawful practice. See **SKM2006.679.LSR** .

Example

The Supreme Court found that a possible administrative practice, according to which no claim for payment was required, could not lead to a different result, already because a practice such as the alleged one would be in clear conflict with the law's express condition for payment of cost reimbursement. See **SKM2015.479.HR** .

Exception to the principle of equality

There is also the exception from the principle of equality that there may be situations where a citizen can rely on the right to an individual declaration from SKAT, regardless of whether this leads to a result that is not in accordance with general practice. See section **AA4 for** details . "

The Legal Guide (2016-2) section **AA7.1.3** The right to support the right to administrative practice

"(...)

This section is about the fact that it is a consequence of the principle of equality that citizens and companies can in principle support the right to current administrative practice, unless the practice is direct, ie. obvious, illegal. To the extent that the European Court of Justice has ruled that Danish practice has been in conflict with EU law, the starting point will be that the right to Danish practice can be relied on until the change in practice is published with appropriate notice. The administrative practice in the tax area is formed by judgments and national tax court rulings / decisions. To the extent that a question has not been decided by a judgment or national tax court ruling / decision, practice will in principle be formed by publishing decisions on SKAT's website. Unpublished decisions may, according to the general principle of equality, be relevant in the circumstances, unless there is conflict with general sources of law. The administrative practice may subsequently be changed by the courts. The administrative practice is continuously incorporated in the general description of practice, which appears from SKAT's legal guidelines, control signals and other published descriptions of practice. As shown by the control signal **SKM2012.280.SKAT** , the right can be relied on SKAT's descriptions of practice, unless the description is clearly in conflict with higher ranking legal sources.

(...)

Practice must be documented or made probable

If an alleged practice is not described in SKAT's guidelines, etc. or has not been translated into a fixed practice, it is up to the citizen / company to make the alleged practice probable. This was not possible in the following examples:

- Regarding a border trade concept, the district court found that it had not been established that there had been an administrative practice that the purchase was VAT-exempt. It was also established that SKAT had not shown such inaction that it was an obstacle to the collection of VAT. Finally, it was established that regardless of the fact that the company had stated VAT-free EU trade in its VAT returns, this did not mean that SKAT had a separate duty to act or that the claim was lost. See **SKM2014.271.BR** , confirmed by **SKM2015.292.ØLR** .
- In a cross-border trade event, the purchase of a boat was subject to VAT in Denmark, because the participating German company was in fact an independent intermediary. It was not established that SKAT had previously had a more lenient practice, or that SKAT had shown a passivity that could be equated with such a practice. See **SKM2013.850.VLR** .
- Previous decisions authorizing the depreciation of "working interests" in their capacity as dividend rights were not considered to constitute such a practice that the Supreme Court's differing views on the issue could be regarded as a retroactive practice. The Supreme Court ruled that instead it was income from self-employment, so that there was no basis for depreciation according to **AL § 40, para. 2** . See **SKM2013.793.HR** .
- A decision refusing to write off the investor's fee for the provider of a real estate investment project (so-called "finders fee") was not an expression of a practice tightening with retroactive effect. In support of the fact that this was an illegal change of practice, the representative referred to a number of decisions from the Tax Assessment Council and a decision from the National Tax Court. The Supreme Court did not find that the Tax Assessment Council and the National Tax Court in the cases in question had decided on how a fee for a project provider should be treated for tax purposes. The Supreme Court therefore did not find that there was a practice whereby such provider fees could be added to the depreciation basis for an asset. See **SKM2011.587.HR** .
- The court found that it had not been established that there had hitherto been a fixed administrative practice that unlimited balancing adjustments were allowed under the rules of the **FUL .** See **SKM2006.497.VLR** .
- It was assumed that no practice had hitherto existed for interest deductions relating to loan agreements on non-recourse terms. See TfS 2000.148.HD.
- It was assumed that a subsequent practice of price indexation of the acquisition price was not applicable for 1997. See **SKM2006.610.ØLR** .
- For a period of 5 years, the tax authorities had not taken steps to collect the correct tax from a number of power plants. The court held that, as a result of the inaction of the authorities, it had not been established that an administrative practice had existed that the tax should not be paid. See  **SKM2013.141.HR** .

- It was not considered proven that SKAT had had a practice of failing to exercise a subsidiary tax law regarding a doctor's income earned in Norway. See **SKM2012.7.VLR**  and **SKM2013.391.ØLR,** confirmed by **SKM2015.24.HR** .
- It was not considered established that there was a practice of exemption from registration tax on commercial buses used to a lesser extent for private purposes. See **SKM2012.101.LSR** .
- It was not considered established that an administrative practice of full refund of electricity or water tax had existed. See **SKM2015.700.ØLR** .
- The applicant had not proved the existence of a fixed administrative practice on the part of the tax authorities as alleged. See **SKM2015.494.ØLR** .
- The company had not lifted the burden of proof that SKAT's decision constituted a tightening of previous practice. See. **SKM2015.341.ØLR** .
- A settlement entered into by SKAT was only considered to have legal effect for the parties to the settlement, which is why another company was not considered by reference to the settlement in question to have proved that SKAT's response was contrary to administrative practice. See **SKM2016.47.ØLR** .
- The High Court did not find, unlike the City Court and the National Tax Court, that the mortgage bank had proved the existence of a fixed administrative practice, according to which mortgage banks prior to the issuance of SKAT's control signal of 6 July 2010 ( **SKM2010.444.SKAT** ) were exempted from paying payroll tax. they made investments as they referred to. See **SKM2016.46.ØLR** .
- The National Tax Court did not find it too proven that there was a fixed administrative practice that SKAT, when parents rent out properties to their children, accepts the rental as a business, even though the rental makes a loss and there is no prospect of a profit. Likewise, it was not found to be proven that prior to the Tax Council's decision of 20 November 2012 published in **SKM2012.701.SR** , there was a firm and binding administrative practice that letting of cooperative housing for residential use could be approved as a commercial enterprise. See **SKM2016.30.LSR** .
- According to the present administrative practice, including the ministerial answers to questions about the application of the 15% rule, it was not proven that there was a fixed administrative practice for a valuation of a deceased's estate, which does not deviate more than 15% from the contact property value, must always be taken into account. See  **SKM2016.279.HR** .

Practice must be unambiguous, unreserved and not in clear conflict with higher sources of law

There are a number of decisions that shed light on whether the practice has been so unambiguous, unreserved and not clearly in conflict with higher sources of law that citizens / companies can rely on this practice.

An internal memorandum is not necessarily identical to SKAT's current practice. See TfS 2000.871.HD, where an internal memorandum on the tax treatment of boat rentals could not be relied upon.

Below are referenced decisions divided as examples of when the right can be supported or can not be supported the right to practice.

Examples of cases where the description of practice could be relied upon:

Example

The Supreme Court ruled that the complainant was entitled to a deduction for expenses for legal and auditing assistance in connection with a tax criminal case. The reason was that this was stated in the Tax Assessment Council's binding instructions for the year in question, and that this could be relied on, even though it had later been changed. See UfR 1965.399.HD.

Example

The Supreme Court ruled in favor of the complainant that, in accordance with the Tax Assessment Guide's description of practice, a deduction could be granted for expenses for a workroom. See TfS 1996.210.HD.

Example

The Supreme Court rejected the tax authorities' fixation of interest regarding the main shareholder's receivable in own company. The reason was that in the absence of special legislation, existing practice could be relied upon, after which no interest rate fixation had taken place. See TfS 1996.642.HD.

Example

The description of the Tax Assessment Guide's description that the acquisition of a real estate from a major shareholder company could take place could be based on the most recently published property valuation plus / minus 15%. See TfS 1994.295.ØLD.

Example

The Tax Assessment Guide's statement that a single-family house can be subdivided into 2 owner-occupied flats, both of which can be sold tax-free according to the detached house rule, could be relied upon, regardless of the residence requirement. See **SKM2008.149.BR** .

Example

**The right to the VAT Guide's section Q.1.3.2.4** could be relied on , according to which an imposed fine in accordance with a VAT Board decision could lead to regulation of the VAT liability. According to **ML § 52, para. 5** , cf. **ML § 27, para. 1** , it was only compensation that could lead to regulation of the VAT liability. See **SKM2010.463.LSR** .

Example

In the period 15 July 2008 - 14 July 2011, it was stated in SKAT's legal guidance that the limitation period for claims for cost reimbursement ran from the last timely payment date on the invoice in question. The text was subsequently amended so that it is now stated that the limitation period runs from the time when the case is finally closed. The National Tax Court found that SKAT had refrained from applying the statute of limitations for claims for cost reimbursement of invoices that could have been issued during the period in which the text of SKAT's legal guidance was applicable. As the statement in SKAT's legal guidance was based on an interpretation of **FORÆL § 2, subsection 1** , it was not clear in violation of the law why the company could rely right on this. See **SKM2015.699.LSR** .

Examples of cases where the description of practice could not be rightly supported:

Example

A statement in SKAT's Legal Guide, section **AA12.1** on the possibility of deferral in the event of an appeal against a refusal of resumption, was considered by the National Tax Court to be in clear conflict with **SFL § 51** , so that the statement in Legal Guide could not be upheld. See **SKM2012.399.LSR** .

Example

The gain on the sale of a holiday home was taxable because the building was not suitable as a holiday home. It could not change anything in this established practice that a few deviating decisions from subordinate authorities had been documented. See **SKM2009.369.ØLR** .

Example

The right to an internal memorandum on the tax treatment of boat rentals could not be relied upon, as internal memoranda are not necessarily identical to current practice. See TfS 2000.871.HD.

Example

The tax assessment statement's statement on the right to a deduction in the acquisition price could not be based on the sale of shares to the issuing company, because the loss was not considered real, but instead designed to obtain a tax deduction. See **SKM2007.29.HR** .

Example

There could be no right to rely on a circular letter from the Danish Customs and Tax Administration. It appeared from the letter that the making of an extraordinary tax assessment was conditional on the conduct of a criminal case. As the content of the letter was not supported by law or preparatory work, the appointment could be made even if no criminal proceedings were instituted. See **SKM2001.582.ØLR.**

Example

The statement of the Tax Assessment Guidelines on the taxation of major shareholders of the value of the disposal of a pleasure boat could not be relied on because the person in the case, in addition to being the main shareholder, was also a director of the company. See **SKM2004.153.VLR** .

The Legal Guide (2016-2) section **AA7.1.4** Change or completion / clarification of practice

The importance of filling in / clarifying practice

A change in practice can occur either as a relaxation of previous practice or as a sharpening of previous practice. Such changes in practice may occur under certain conditions.

See section **AA7.1.5** on tightening practice and section **AA7.1.6** on easing practice.

However, these conditions regarding change of practice are not relevant if it is not an actual change of practice, but rather a completion / clarification of previous practice. To the extent that a decision contains a completion / clarification of previous practice, the citizen is barred from claiming that the decision is contrary to the principle of equality or previous practice.

If it is assumed that a decision is an expression of clarification / completion of practice, it will be possible in the same case and in other similar cases to change backwards in time limited by the applicable time limit and limitation rules.

See section **AA8** on time limits and section  **AA9** on limitation.

Especially on clarifying practice

After SKAT has been established as a unitary organization from 1 November 2005, the concept of clarification of practice has virtually no independent significance. On the other hand, the concept had significance in the former hierarchical structure with superior and subordinate tax authorities, where a clarification of practice could correspond to a situation where a decision clarified an ambiguous practice of the subordinate authorities. In a unitary organization, a decision clarifying an ambiguous practice should, as a general rule, be treated as a change of practice, ie. as a change in the sub-practice that has now been disregarded, or as a sharpening of a previous sub-practice. See section  **AA7.1.5** on tightening practice, and section  **AA7.1.6** on easing practice.

Especially about completing practice

In reality, only situations where a decision fills a previous vacuum need not be dealt with according to the principles of practice change. A number of decisions can be mentioned as examples of cases where it has been established that a decision filled in - and thus did not change - previous practice.

Example

The Tax Council found that the decision in **SKM2013.250.SR** as well as the change in the Legal Guide 2013-2 section **CA10.4.3.7** that was a consequence of this was not a change in practice because no decision had previously been made on the tax qualification of staff assessment in relation to **PBL § 53 A** and therefore there had been no practice. See **SKM2016.62.SR** .

Example

There was no established administrative practice of not applying a subsidiary tax law in relation to income from Norway, even though SKAT had not enforced this subsidiary tax law for a period of 5 years. See **SKM2012.7.VLR** .

Example

It was assumed that there had been no administrative practice that passengers on the catamaran ferries were exempt from airfare. See **SKM2009.39.ØLR** .

Example

The complainant was refused a write-off on the investor's expense for the "finders fee" because it could not be documented that this issue had been regulated in current practice. See **SKM2009.196.ØLR** .

Example

It was assumed that a decision on AM contributions of remuneration for work for a Danish employer abroad filled in and thus did not change previous practice. See **SKM2007.154.BR** .

Example

Refusal to deduct expenses for the maintenance of listed parks was not considered a change in previous practice. See **SKM2009.95.HR** .

The Legal Guide (2016-2) section **AA7.1.5** Tightening practice

"(...)

This section deals with the basic principles for implementing an aggravating change in practice. These principles of aggravation of practice are not relevant if it is assumed that a decision complements or clarifies previous practice. See section  **AA7.1.4** for more information .

- Notice of change with future effect
- Factual justification for the change

Notice of change with future effect

It is a fundamental principle of administrative law that it is only possible to initiate an aggravating change of practice with effect for the future and after issuing an appropriate notice that allows citizens to adapt to the changed legal situation.

Example

In 1962, the Tax Assessment Council's directive restricted access to deductions for expenses for legal and auditing assistance in tax cases. This increase in practice could not be implemented to the detriment of the complainant in the years before 1962. See UfR 1965.399.HD.

Example

The Supreme Court held that a change of practice so that the deduction of limited partners was limited to the responsible deposit changed the legal position of limited partners so significantly that the change could only have an effect for the future. See UfR 1983.8.HD.

What is to be understood as an appropriate notice depends entirely on the specific circumstances, ie. what period of time the citizens are deemed to need to be able to adapt to the tightening of practice.

A practice tightening must be published in a relevant way, eg in the form of an SKM message (control signal) or by special news marking in the legal guidelines.

Factual justification for the change

A tightening of practice is also conditional on the change being objectively justified. The following examples can be mentioned where a change was objectively justified:

Example

The Supreme Court considered it a factually justified change in practice that the limited partners' deduction was limited to the responsible deposit, as negotiations in the Folketing on this issue had not resulted in legislation. See UfR 1983.8.HD.

Example

The Supreme Court ruled in favor of the tax authorities that it was objectively justified to change the practice of companies' deductions for benefits to the founders. The change in practice consisted in the right to deduct - unlike before - being made conditional on the benefits being in reasonable proportion to the consideration. See UfR 1973.18.HD.

On the other hand, there is an example of the condition of factual justification for the change not being met:

Example

An aggravating change in the practice of taxing private driving in the employer's car was disregarded, i.a. because the change lacked factual justification. It was emphasized that taxation was discriminatory in relation to other similar situations. See <u>TfS 1997.834.VLD</u> . "

<u>Decisions on the principle of equality and (possible) change in practice</u>

<u>TfS 1994.587 HRD</u> ( <u>U.1994.798 / 2H</u> ) and <u>U.1994.792.H</u>

The Supreme Court ruled that some interest expenses paid to a common fund could not be considered interest on debt for tax purposes and were therefore not deductible. The Supreme Court did not find that it was a question of changing the practice with retroactive effect, as no decision had previously been made by the higher tax authorities on the right to deduct interest for loans of this kind.

<u>TfS 1995, 483 HRD (U.1995.734.H)</u>

The Supreme Court held that the fact that a municipality had made a decision which was contrary to the incorrect decision of another municipality in a similar case did not constitute a breach of any principle of equality.

<u>TfS 2000, 148 HRD</u> ( <u>U.2000.879.H</u> )

The Supreme Court ruled that the interest expenses at issue in the case were not deductible, that there was no administrative practice on the issue at hand (deductions for interest expenses on non-recourse loans) and that the fact that investors in the agreement complex on incorrect grounds had possibly been deducted in other municipalities for the interest expenses in question, did not involve any breach of the principle of equality.

<u>TfS 2000, 374 HRD (U.2000.1509.H)</u>

The Supreme Court found that the fact that other taxpayers, as a result of the tax authorities' failure to intervene, could have been wrongly granted a deduction in circumstances such as the taxpayer's case, could not justify a right of deduction for the taxpayer on the basis of equality.

**SKM2003.386.HR** ( <u>TfS 2003, 742 HRD</u> )

The Supreme Court upheld the judgments of the Eastern High Court, according to which the taxpayers had not, by citing any specific decisions, the predominant part of which had been made by local tax authorities, had proved that the decisions in the taxpayers 'cases were contrary to the tax authorities' fixed administrative practice. in the Equation Guide.

**SKM2007.147.HR** and **SKM2007.217.DEP**

The Ministry of Taxation responded in the affirmative in the case in question and thereby acknowledged that the taxpayers could at the same time have more than one year-round home, which was covered by the detached house rule in EBL § 8, para. 1. On the basis of an unpublished practice, the Ministry of Taxation found that a taxation in the lawsuit would be contrary to established administrative practice, which consisted of two national tax court rulings and two binding advance notices from the Tax Assessment Council.

**SKM2009.369.ØLR**

The High Court ruled that the issuance of individual decisions made by subordinate authorities was not evidence of an alleged established administrative practice contrary to the decision.

**SKM2011.209.HR** (formerly **SKM2009.164.ØLR** )

The Supreme Court upheld an increase in profits of business and found it - regardless of whether the taxpayer had invoked the principle of equality - to be irrelevant that the National Tax Court had waived an increase in tax assessment for the co-owner of the taxpayer's business.

**SKM2011.587.HR**

The Supreme Court found that it had not been established that prior to the decisions of the similar authorities in 2001, there had been a decision from the higher tax authorities, according to which it had been approved that an expense such as the one in question could be recognized in a property's depreciation basis. What the taxpayers had stated about a

practice of the similar authorities could not be considered substantiated either. For this reason alone, the Supreme Court agreed that the tax authorities had refused to include the provider's fees in the depreciation basis.

### SKM2013.793.HR

A number of decisions had given the taxpayers the right to make tax depreciation pursuant to section 40 (1) of the Depreciation Act. 2, on depreciation of dividend rights. The decisions were made by the National Tax Court and the Tax Council and were published and discussed in the Tax Assessment Guide. The Supreme Court ruled that the decisions were based on a misconception and that there were no dividend rights covered by section 40 (1) of the Depreciation Act. 2. The taxpayer in question considered that practice could only be changed with effect for the future. The Supreme Court ruled that there was no retroactive change in practice because the old decisions in the present circumstances did not constitute a fixed and binding administrative practice.

### SKM2014.489.SKAT

In this control signal, it was clarified that the Legal Guide together with the legislation etc. constitutes the administrative basis in SKAT and is binding on SKAT's employees, unless the content of the guidelines is clearly not in accordance with higher-ranking legal sources. It also appears that the Legal Guidance expresses SKAT's perception of current practice and has circular status. The content of the Legal Guide can therefore be relied upon, unless the content of the guide is clearly not in accordance with higher-ranking sources of law.

### SKM2013.769.LSR , SKM2013.772.LSR , SKM2014.211.LSR and SKM2014.477.LSR

In several cases, the National Tax Tribunal has ruled on the question of whether a financial contract aimed at reducing the company's interest expenses could be considered to be related to a commercial activity, so that losses were not limited in source type. The National Tax Tribunal has ruled that in the income years to which the cases related, there was no administrative practice for approving forward exchange contracts that were not intended to cover an underlying risk as having a connection to a business activity. This applied regardless of the Tax Council's decision in **SKM2007.411.SR**, which stated the opposite, was mentioned in the tax assessment guide for those years. In the latter decision, the National Tax Tribunal further stated that the practice relied on by the complainant did not in any case have support in higher-ranking sources of law, including the drafting of the statutory provision and the practice of the National Tax Tribunal.

### SKM2014.801.SKAT

In this control signal, SKAT stated that with the Tax Council's decisions in the binding answers **SKM2014.85.SR** and **SKM2014.86.SR** , it had to be considered that a fixed administrative practice had been established in relation to the allowances in question. These were compensation for unjustified dismissal, as the dismissals had violated the Discrimination Act. In the decisions, the Tax Council determined that the allowances were tax-free. In **SKM2014.354.SR,** the Tax Council reassessed the issue (cf., however, **SKM2015.285.LSR** , discussed below), so that the allowance in question was to be treated as a severance pay. In the control signal, SKAT stated that the tightened practice could only be implemented with effect for the future and after an appropriate notice.

### SKM2015.285.LSR

The National Tax Court amended the Tax Council's decision in **SKM2014.354.SR** , cf. above, as the decision was an expression of a tightening of practice that could only take place with future effect. The allowance in question was therefore considered tax-free as a result.

### SKM2015.494.ØLR

Among other things, the taxpayer had claimed that there was a established practice that a financial contract intended to reduce the company's financing costs could be considered to be related to the commercial business, so that losses were not limited in source type. The taxpayer referred to some decisions of the Tax Council. The Eastern High Court did not find that the taxpayer had proved the existence of a fixed administrative price, regardless of the fact that one of the mentioned decisions from the Tax Council was mentioned in the tax assessment guide.

### SKM2015.768.VLR

The Western High Court found that the company's understanding of a notification from SKAT would be in conflict with VAT legislation, which is why the company could not support the notification right for that reason either.

*Question 1*

We would like to confirm that the value of the reserved dividend rights must be included in A's taxable disposal amount for the transfer of the shares in the Company.

*Reasons*

According to the Capital Gains Taxation Act, section 26, subsection 2, 1st sentence, gain and loss are calculated as the difference between the surrender price and the acquisition price for the shares in question.

According to established practice, the value of the reserved dividend rights must be regarded as part of A's taxable disposal price for the shares, cf. section 26 (1) of the Danish Capital Gains Tax Act. 2, 1st sentence, The Legal Guide (2016-2), section **CB2.1.5.5** , U.1982.152H (where, however, there was a consultancy fee) and **SKM2007.418.SR** .

The amount considered as part of the surrender amount is the capitalized value of the reserved dividend rights.

According to the gift certificates, A reserves the right to dividend on the transferred shares in the Company until a total of DKK xxx million has been distributed. net after tax on the transferred shares. The recipients of the gift are personally liable for A to receive a reserved dividend of DKK xxx million. after taxes. It is expressly stated that the recipient of the gift in the event of default incurs personal compensation corresponding to the dividend that should have been distributed to the gift giver. It is stated that the size of the reserved dividend right has not yet been determined, but that it is expected to amount to between l / 2 and 4/5 of the total value of the transferred shares.

It is assumed that a precise amount is deposited in the gift certificates.

It must therefore be assumed that the said amount will only be paid after a relatively long time, and there is also the uncertainty that the Company may never be able to distribute a total dividend amount corresponding to the reserved dividend right, or that the Company will be liquidated before said dividend amount has been distributed. The amount in question does not have to bear interest and the gift certificates do not contain any provisions on security.

The questioners' representative has stated in the consultation answer that there are no grounds for SKAT's assumption that the dividend amount will only be paid after a relatively long time, and that there will be a payment of dividends in several installments. The questioners' representative has further argued that the relevance of the assumption is also difficult to see.

According to the information, the size of the expected dividend right is expected to be between 1/2 and 4/5 of the total value of the transferred shares. SKAT does not find it very likely that such a large dividend amount will be paid out at once. The questioners' representative has explicitly stated in the consultation response that the uncertainty that may be attached to the reserved dividend right - including whether the entire amount will be paid out and, if so, when and for what period - will be expressed in the interest factor with which the dividend right is capitalized at the market value at the time of transfer.

See also the justification for answering question 2.

The capitalized value of the reserved dividend rights is therefore not par with the amounts stated in the deeds of gift.

SKAT agrees with the questioner that the value of the reserved dividend rights, by which is meant the capitalized value of the dividend rights, must be included in A's taxable disposal amount for the transfer of the shares. As the transfer is reported to take place by succession, cf. section 34 of the Capital Gains Tax Act, A is not liable to tax on the capitalized value of the dividend rights.

For questions of admissibility, see justification for answering Question 3.

*Setting*

SKAT recommends that question 1 be answered with "Yes".

*Question 2*

It is wished to confirm that A is not liable to tax on amounts he receives in accordance with the reserved dividend income when the transfer takes place with tax succession, cf. section 34 of the Capital Gains Tax Act.

*Reasons*

According to established practice, cf. the Legal Guide (2016-1), section **CB2.1.5.5** , and the above-mentioned decisions, a single additional waiver consideration is considered a supplement to the waiver amount, and according to established practice, a single regulation therefore means that the statement of gain or loss in the divestment year must be changed, cf. **SKM2003.78.LR** , **SKM2003.282.LSR** , **SKM2003.457.LR** , **SKM2007.871.SR** and **SKM2011.41.SR** .

When the transfer takes place by succession pursuant to section 34 of the Capital Gains Tax Act, gains in the year of disposal are not taxable, and a single additional disposal consideration would therefore not have been taxable either.

In the case of several adjustments, on the other hand, it is considered to be a current benefit that is covered by section 12 B of the Tax Assessment Act, if there is uncertainty regarding either the duration of the benefit or the annual amount of the benefit, cf. section 12 B of the Tax Assessment Act. PCS. 1, **SKM2007.418.SR** (answer to question 1) and **SKM2014.154.SR** . In the case of several adjustments, the capitalized value of the current benefit must be included in the surrender amount, while subsequently paid current benefits according to established practice do not change the surrender amount, but are treated as current benefits, cf. section 12 B of the Tax Assessment Act.

A current benefit is taxable to the extent that the total current benefit exceeds the capitalized value calculated at the time of disposal, cf. section 12 B, subsection 1 of the Tax Assessment Act. 4.

It is explicitly stated in the Tax Assessment Act, section 12 B, subsection. 5, that section 12 B of the Tax Assessment Act may also include current benefits that constitute full or partial consideration in a mutually onerous contract, even if the transfer of the shares takes place by succession pursuant to section 34 of the Capital Gains Taxation Act.

The questioners 'representative has stated in the consultation answer that there is no correspondence between SKAT's reasoning for the negative answer to question 2 and the positive answer to question 1, and the questioners' representative has further argued that there is no authority in tax law to qualify one and the same right as two different rights. (According to the previous draft case presentation, question 1 was answered as stated above, while SKAT according to the previous draft case presentation would recommend that the dividend right was a monetary claim with the consequence that capital gains on the individual installments were taxable under section 14 of the Capital Gains Act. (1).

The questioners' representative has now argued that the uncertainty that may be attached to the reserved dividend right - including whether the entire amount will be paid out and, if so, when and for what period - will be expressed in the interest factor by which the dividend right is capitalized at market value at the time of transfer.

According to what has now been stated, there is therefore such uncertainty about both the total benefit, the duration of the benefit and the annual amount of the benefit that it must be considered a continuous benefit, covered by section 12 B of the Tax Assessment Act. is paid in accordance with the reserved dividend right, and there is therefore no guarantee that the amounts stipulated in the gift certificates will actually be paid, just as the annual amount of the benefit and thus the duration of the benefit is also uncertain. See also the justification above for answering question 1.

The above assessment applies, regardless of whether A according to the gift certificates is entitled to dividend rights on specified amounts, that the gift recipients are personally liable for A to receive a reserved dividend of DKK xxx million. after tax, and that the gift recipients in the event of default incur personal compensation corresponding to the dividend that should have been distributed to the gift giver. It is noted that the gift certificates do not contain anything about what must happen in the event that one of the parties may die before the amounts stated in the gift letters have been paid in full, or what must happen if the Company e.g. will be liquidated before the amounts stated in the gift certificates have been paid in full.

According to what has now been stated, the dividend rights can no longer be regarded as monetary claims, covered by section 1, no. 1 of the Capital Gains Act.

The rules on the waiver of a dividend right cannot be applied, as these rules only apply to the waiver of an existing dividend contract, cf. the Legal Guide (2016-2) section **CC6.4.2.1** . The rules, on the other hand, do not apply to the formation between the original parties.

The dividend rights can not be regarded as dividend income for A, since A no longer owns the shares in question, cf. section 16 A, subsection 1 of the Tax Assessment Act. 1, and para. 2, No. 1.

The payment of the individual amounts in accordance with the dividend rights depends on the size of the amounts that the Company distributes as dividends. However, the principal of the receivable is not regulated, and in SKAT's opinion, it is therefore not a structured receivable, covered by the Capital Gains Act, section 29, subsection. 3, cf. the wording of this statutory provision and **SKM2008.207.SR** .

The remark in the Legal Guide (2016-2), section **CB2.1.5.5** , according to which the dividend is part of the disposition of the shares when shares are transferred subject to the right to dividend, cannot lead to any other result, as it the said remark must be presumed that there is only a single subsequent distribution of dividends. It is noted that in the decision mentioned in the section ( **SKM2003.282.LSR** ) there was only a single subsequent distribution.

The questioners' representative has argued that there is no legal basis for classifying one and the same right as two different rights, and that it is difficult to see the relevance of whether the payment of dividends will take place in one or more installments.

It is explicitly stated in the Tax Assessment Act, section 12 B, subsection. 1, that it is an ongoing benefit when there is uncertainty about either the duration of the benefit or the annual amount of the benefit when the benefit runs beyond the contract year. According to the Legal Guide (2016-2), section **CC6.8.1** , the Tax Assessment Council and the Tax Council have, however, decided that a single subsequent adjustment of the transfer sum for a shareholding should be taxed as additional consideration for disposing of the shares instead of as ongoing benefits under the Tax Assessment Act. 12 B, cf. **SKM2003.78.LR** , **SKM2003.457.LR** , **SKM2007.871.SR** and **SKM2011.41.SR**. It is therefore decisive whether the payment of dividends is made in one or more installments, as dividend amounts paid in one installment are considered an additional surrender amount, while dividend amounts paid in several installments are considered a current benefit.

It is explicitly stated in the Tax Assessment Act, section 12 B, subsection. 2-4, that a capitalization of the current benefit must be made, that a balance must be calculated regarding the current benefits, and that the paid benefits must not be taxed at the recipient, as long as the balance is positive.

It is therefore entirely in accordance with the rules of law that the capitalized value of the current benefit is treated as part of the disposal sum for the shares, while paid benefits are treated as ongoing benefits in accordance with section 12 B of the Tax Assessment Act.

For questions of admissibility, see justification for answering Question 3.

Question 2 must then be answered with "No, see option and justification", as the answer will be "Yes", if the entire dividend right is paid out at once

*Setting*

SKAT recommends that question 2 be answered with "No, see recommendation and justification".

*Question 3*

It is requested to confirm that B and C are not liable to tax on amounts received by A in accordance with the reserved dividend rights.

*Reasons*

In SKAT's opinion, the dividends in question must be regarded as taxable for B and C (as share income), cf. section 4 (1) of the State Tax Act. 1, letter e, and the Tax Assessment Act § 16 A, sec. 1, and para. 2, No. 1.

This is because B and C must be considered to have acquired the right to the dividend amounts, cf. the above-mentioned statutory provisions, the principle in the Supreme Court judgment in U1982.152H, and the Eastern High Court judgments in TfS 1995, 561 ØLD and TfS 1997, 198 ØLD, where the High Court considered the current shareholders / shareholders for the correct income recipients regarding distributions from the company. This view is also stated in the principle of the Tax Council's decision in **SKM2007.418.SR** , answers to questions 6 and 7.

As it is stated in the gift certificates who is entitled to the dividend amounts, it must be considered a disposable waiver of the dividend amounts, cf. the Legal Guide (2016-1), section **CA1.2.1** and section **CC2.1.2.2** .

The questioners' representative has argued that there is no legal basis in the State Tax Act, section 4, subsection. 1, letter e, and section 16 A of the Tax Assessment Act to tax share income B and C of the dividends in question, as the right to the dividends remains with A as a condition in connection with rectification of the transfer and calculation of the surrender amount. The questioners' representative has referred to the Legal Guide section **CB2.1.5.5** , which states that when shares are transferred subject to the right to dividend, the dividend is part of the surrender price for the shares.

The representatives of the enquirers have argued that the dividend payments in question thus never pass through the wealth sphere of B and C and therefore cannot be subject to taxation by them either.

In addition, the questioners' representative has argued that since A reserves the right to dividends as a condition for transferring the shares in question, there is no dispositive waiver of the dividend amounts.

However, when / if the total current benefits exceed the capitalized value calculated at the time of disposal, B and C may deduct the same amounts (in the capital income), cf. section 12 B, subsection 1 of the Tax Assessment Act. 5, cf. **SKM2007.418.SR** , answer to question 7.

As a result of the provision in section 16 A, subsection 1, and para. 2, no. 1, the current shareholders, who after the transfer will be B and C, may, however, be considered taxable on dividend amounts relating to the transferred shares, cf. the Eastern High Court judgments in TfS 1995, 561 ØLD and TfS 1997, 198 ØLD, it appears that there is no practice of a different interpretation. Reference is also made to the remarks in the bill to section 11, no. 4, of Act no. 1414 of 21 December 2005, according to which the decisive factor is whether one is a shareholder.

The above interpretation is in accordance with the Tax Council's decision in **SKM2007.418.SR** , answers to questions 6 and 7.

In SKAT's opinion, B and C will thereafter be liable to tax on dividend amounts, regardless of whether the dividend right is paid at one time or in several installments. In this connection, it should be noted that the decisions which have established that a single subsequent consideration is regarded as an additional disposal amount, cf. .

See also the explanatory memorandum to the answer to question 2.

<u>Addition due to consultation response of 27 October 2016</u>

This is explicitly stated in the comments on the Tax Assessment Act, section 16 A, subsection. 2, no. 1, cf. above, that if a share seller has reserved the right to dividend in connection with the transfer of the shares, there must be a capitalization of the reserved dividend right, which becomes important for the seller's share profit. In this case, section 12 B of the Tax Assessment Act applies. It also appears that if the dividend reserved is a one-off event that does not have the character of a current benefit, the dividend is added to the surrender price when calculating the seller's share capital gain. Amounts that are added to the surrender price at the seller are then added to the buyer's acquisition price for the shares.

It appears from the Legal Guide (2016-2), section **CB2.1.5.5** , that when shares are transferred subject to the right to dividend, the dividend is part of the disposal sum for the shares.

However, in SKAT's view, the above only regulates the seller's tax situation and the buyer's acquisition price for the shares. It is not seen in the preparatory work for the Tax Assessment Act § 16 A, in the Legal Guide or in published decisions (including **SKM2003.282.LSR** ) that a position has been taken on the taxation of the dividend.

In SKAT's opinion, the capitalized value of the reserved dividend must therefore, in accordance with the above, be included in the surrender price for the person who disposes of the shares and be added to the acquisition cost for the acquirers (which as a result of the succession under section 34 of the Capital Gains Tax Act is without tax significance). Subsequently paid current benefits must be treated in accordance with the rules for current benefits, cf. section 12 B of the Tax Assessment Act, unless the dividend right is settled at once. These regulations apply (each with its own sign) to both the person who relinquishes the shares and the acquirer of the shares.

In addition, the dividend amounts must be taxed with the current shareholders pursuant to section 16 A, subsection 1 of the Tax Assessment Act. 2, no. 1, cf. the Tax Assessment Act, section 16 A, subsection 2, no. 1, the preparatory work for the Tax Assessment Act, section 16 A, subsection 2, no. 1, The Legal Guide (2016-2), section **CB3.1** , and article by lawyer Svend Erik Holm, law firm Plesner Svane Grønborg, published in RR.SM.2003.237, cf. above under the discussion of **SKM2003.282 .LSR** . This applies regardless of whether the reserved dividend right is settled at once or as a current benefit. It is noted that otherwise the dividend amounts would not be taxed.

In SKAT's opinion, B and C must therefore be taxed on the dividend amounts, regardless of whether the dividends as a result of the reserved dividend right accrue to A, as B and C are current shareholders after the transfer, cf. section 16 A, subsection 1 of the Tax Assessment Act. 2, no. 1. The dividend amounts must therefore be considered to pass B's and C's finances for tax purposes.

In SKAT's opinion, the arguments put forward by the questioners' representative can therefore not lead to any change in SKAT's position.

*Justification for admissibility issues relating to all three issues (but mainly questions 2 and 3)*

*The questioners' representative has argued that SKAT's reasons for answering questions 2 and 3 are not in accordance with the binding answers that SKAT has already given regarding the same legal position. The questioners are of the opinion that they can rely correctly on the present practice and its scope.*

*According to the Legal Guide (2016-2), section **AA3.10** , the person in question may rely on a binding answer. It follows that no one other than the questioner can rely on the answer.*

*In SKAT's view, on the basis of the principle of equality, the right to the three binding answers to which the questioners' representative has referred cannot be upheld. This is partly due to the fact that the three binding answers must be considered to be in direct conflict with the legislative starting point in section 4 e of the State Tax Act and section 16 A, subsection 1 of the Tax Assessment Act. 2, no. 1, cf. the justification regarding question 3 above as well as **SKM2013.793.HR** and **SKM2015.768.VLR** , and partly that the three binding answers are not in accordance with the published practice. A practice is not considered to have been established as a result of any wrongful decisions by subordinate tax authorities.*

*In assessing whether there is a practice, it has been taken into account that the three binding answers have not been given by the Tax Council or higher authority, and the above recommendation is thus not considered to be in conflict with the principle of equality, cf. TfS 1994.587 HRD, TfS 1995, 483 HRD, TfS 2000, 148 HRD, TfS 2000, 374 HRD, **SKM2003.386.HR** , **SKM2009.369.ØLR** and **SKM2011.587.HR** .*

*It is also taken into account that the three binding answers have not been published and that they have not been referenced in the Legal Guide. These conditions militate against the establishment of a practice, cf. the control signal in **SKM2014.489.SKAT** , in which it is stipulated that the Legal Guide together with the legislation, etc. constitutes the administrative basis in SKAT and is binding on SKAT's employees, unless the content of the guidelines is clearly not in accordance with higher-ranking legal sources. The three binding answers have therefore not been generally known by SKAT's employees.*

*A published decision from the Tax Council or a higher tax authority may, on the other hand, establish a practice which can only be changed with future effect and after appropriate notice, cf. **SKM2014.801.SKAT** and **SKM2015.285.LSR** . However, this does not apply unconditionally, cf. **SKM2014.477.LSR** , where the National Tax Court ruled that the relied on practice in any case did not have support in higher-ranking legal sources, including the draft law and the National Tax Court's practice, and **SKM2015.494.ØLR** , where the High Court did not found that the taxpayer had proved the existence of a fixed administrative practice, notwithstanding that a decision of the Tax Council was mentioned in the tax assessment guide.*

*In special cases, however, unpublished decisions may constitute a practice, cf. **SKM2007.147.HR** . However , the fact that the Ministry of Taxation responded in the affirmative in case **SKM2007.147.HR** , cf. the Ministry of Taxation's comment in **SKM2007.217.DEP** , cannot lead to the three binding answers to which the questioners' representative in this case referred, can be considered as constituting a practice. This is partly because the binding answers are not referenced in the Legal Guide, which argues against the binding answers constituting a practice, and partly because in **SKM2007.147.HR it** was an unpublished practice from higher tax authorities ( The National Tax Court and the Tax Assessment Council).*

*In SKAT's view, the three binding answers thus do not constitute a practice on which the questioners in this case can rely.*

*The questioners' representative has argued that in addition to the three binding answers, there are seven cases where gift notifications have been submitted and dividend tax has been refunded in accordance with section 55 of the Withholding Tax Act.*

*In SKAT's view, the 7 decisions do not constitute a practice concerning the generational change model in question, on which the questioners can rely.*

*The gift notifications in the mentioned seven cases have been submitted in accordance with the Property Tax Act, and it appears from the Property Tax Act, section 27, subsection. 2, that if the customs and tax administration finds that a valuation does not correspond to the market value at the time of receipt of the gift, it may change the valuation within 6 months of receipt of the notification. However, the deadline only begins to run from the time when the customs and tax administration has the information necessary to take a position on the valuation. If the Customs and Tax Administration has not submitted a request for additional information before the expiry of 6 months, the deadline for changing the valuation cannot be extended beyond 6 months from receipt of the notification.*

*Thus, only the valuation of the gifts can not be changed after the expiry of the 6-month deadline, while the gift notifications and SKAT's approval of the valuation according to the gift notifications do not mean that the generational change model is otherwise approved. This applies regardless of whether SKAT has expressly approved the valuation according to the gift notification, or whether SKAT has remained passive until the 6-month deadline was exceeded.*

*Payment of dividend tax in accordance with section 55 of the Withholding Tax Act in the mentioned seven cases also does not mean that the generational change model has been approved. The requests for a refund of dividend tax are due to a (in SKAT's erroneous) assumption that the dividend amounts were tax-free for both the shareholders who had disposed of the shares and for the acquirers.*

*A payment pursuant to section 55 of the Withholding Tax Act is a change in the advance registration, and according to section 41 (1) of the Withholding Tax Act. 1, and § 42, an advance registration is only a preliminary tax return and not a tax assessment, which can be supported right in relation to the subsequent tax-declared income. This is also stated in the Legal Guide (2016-2), section **AA4.3.3** , as well as **SKM2013.585.LSR** . In this connection, it is irrelevant whether or not an explicit reservation has been made as to the correctness of the refund until the equation is completed or not.*

*Based on the above, it is SKAT's view that the questioners cannot invoke the principle of equality on the basis of the three binding answers, just as it is SKAT's opinion that there is no practice regarding the generation change model in question that the questioners can rely on.*

Addition due to consultation response of 27 October 2016

Appendix A mentioned in the consultation response contains the above three binding responses in anonymised form, as well as anonymised requests for binding responses, gift notifications and requests for recovery of withheld dividend tax in the above seven cases, as well as in some of the other seven cases further anonymised approvals from SKAT of the gift notifications. As a result of access to documents, the questioners' representative has become aware of the material.

The fact that there are not only three decisions where SKAT has recognized the generational change model in question in a binding answer, but in addition seven cases where gift notifications have been submitted that have not been disregarded by SKAT, and a dividend tax refund has been made in accordance with the Withholding Tax Act. § 55, in SKAT's opinion, does not mean that there is a practice on which the questioners can rely. It is hereby taken into account that none of the mentioned decisions have been published or mentioned in the Legal Guide.

In SKAT's view, the arguments put forward by the questioners 'representative can therefore not lead to the existence of a practice on which the questioners' representative can rely, cf. the justification above.

*Setting*

SKAT recommends that question 3 be answered with "No".

**The Tax Council's decision and justification**

The Tax Council agrees with SKAT's recommendation and justification.