# Exhibit 10

In re

CUSTOMS AND TAX ADMINISTRATION OF

THE KINGDOM OF DENMARK

(SKATTEFORVALTNINGEN) TAX REFUND

LITIGATION*

*This Report relates to all related dockets in *In re: Skat Tax Refund Scheme Litigation*, 1:18-md-2865.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No.18-MD-2865 (LAK)

# Rebuttal Expert Report

of

C. FREDERICK REISH

1800 Century Park East, Suite 1500

Los Angeles, CA 90067

February 1, 2022

# Table of Contents

I.    Introduction ................................................................................................................ 1

    A.    Assignment and Scope .................................................................................... 1

    B.    Summary of Rebuttal ...................................................................................... 1

II.    Tax-Qualification Requires Nothing More Than Form and Operation in Accordance with Section 401(a) of the Internal Revenue Code ...................................................................... 2

III.    The IRS's Approach to Tax-Qualification Regulation and Enforcement .......................... 6

IV.    There Is No Evidence That the Plans Were Not Operated for the Exclusive Benefit of the Participants ...................................................................................................................... 7

    A.    The Exclusive Benefit Requirement .............................................................. 7

    B.    The Facts in this Case Do Not Support Violations of the Exclusive Benefit Requirement ................................................................................................................... 11

V.    The Plans Were Not Improperly Funded ....................................................................... 16

    A.    Funding Requirement ..................................................................................... 16

    B.    The Evidence Does not Indicate That the Plans Received Improper Funding ............... 19

VI.    The Plans Were Intended to be Permanent .................................................................... 23

    A.    The Permanence Requirement ....................................................................... 23

    B.    The Plans Met the Permanence Requirement ............................................... 27

VII.    The "No Change" Letter the IRS Issued to the RJM Plan Following an Extensive Plan Examination Demonstrates that Ms. Wagner's Characterizations of the Qualification Requirements and IRS Enforcement Practices Are Not Accurate ................................................ 30

VIII.    There Is No Evidence That Plan Assets Were Impermissibly Commingled With Other Assets ................................................................................................................... 34

IX.    ERISA Rules Are Not Applicable to These Non-ERISA Plans and Do Not Concern Qualification Regardless ...................................................................................................... 37

X.    Ms. Wagner Considers a Host of Other Plan Requirements Unrelated to Qualification ... 40

    A.    Location of Custody and Plan Assets ............................................................ 41

    B.    Prohibited Transactions ................................................................................. 44

    C.    Records Requirement ..................................................................................... 45

    D.    Regulatory Requirement ................................................................................ 46

    E.    "Retirement Industry Standards" .................................................................. 47

XI.    Conclusion .................................................................................................................... 49

## I.    Introduction

### A.    Assignment and Scope

1.    I have been retained on behalf of certain Defendants in this case to analyze and opine on issues related to the qualification of pension plans, the practices of the Internal Revenue Service ("IRS") as the agency with the authority to determine whether a pension plan is qualified under section 401(a) of the Internal Revenue Code ("IRC" or the "Code"), and the approach of the federal regulators in their oversight of pension plans.

2.    Counsel has asked me to review the Expert Report of Marcia S. Wagner dated December 31, 2021 ("Wagner Report").[1]

3.    I have been asked to review the Wagner Report and to opine on Ms. Wagner's conclusions that the pension plans at issue in this litigation are not tax-exempt under section 401(a) of the Code (that is, "tax-qualified" or "qualified").[2]

4.    While my opinions are based on my practical experience, *e.g.*, in working on plan qualification issues with the IRS, I have referred to the relevant legal authorities in those cases where Ms. Wagner's report was essentially a recitation of the law and where, in my experience, her interpretations were inconsistent with my experience and with the law.

### B.    Summary of Rebuttal

5.    Most of the discussions in Ms. Wagner's report have no relevance to the issue of whether the pension plans in this case satisfied the requirements for tax qualification under section 401(a) of the Code, which is the only issue Ms. Wagner identifies as relevant to qualify as a "plan" under the treaty.  Rather, much of the discussion consists of scattershot allegations that various other laws were violated, or that "retirement industry standards," in her view, were not followed.  In my view, the Wagner Report materially misstates a number of these legal requirements and retirement industry standards, and consistently

---

[1] I have also reviewed and considered the documents listed in Exhibit 1 to this Report.  This list is in addition to the documents listed in Exhibit 3 to my Expert Report dated December 31, 2021.

[2] I am not an international tax lawyer, have not read the US-Denmark tax treaty, and express no opinion as to whether a plan must be tax-qualified under the IRC to qualify as a "plan" and be entitled to dividend withholding tax reclaims under the treaty.

attempts to import laws and standards that do not apply to the plans at issue. But, regardless, these allegations are irrelevant because tax qualification under section 401(a) of the Code does not hinge upon adherence to anything other than section 401(a)'s specifically stated requirements.

6.    Moreover, the discussions in the Wagner Report often group together or conflate the relevant qualification requirements under section 401(a) of the Code with a myriad of other laws or purported industry practices that have nothing to do with plan qualification. These discussions are not only irrelevant to the issue of plan qualification, but also obfuscate those few issues addressed by Ms. Wagner that are potentially relevant to plan qualification.

7.    To the extent that Ms. Wagner's report does address issues that do relate to plan qualification, the conclusions that she draws regarding the qualification status of the plans at issue are not supported by the laws or IRS practice. As set out in my initial report, based on the documents that I have reviewed, there is no reason to believe that the IRS would disqualify the plans at issue on any basis. The opinions contained in Ms. Wagner's report do not alter that conclusion.

8.    Indeed, as set out in my initial report, the IRS performed a two-year audit of the RJM Capital LLC Pension Plan ("RJM Plan") and received voluminous documents regarding both the RJM Plan and numerous other plans at issue in this case. These documents would have been sufficient to alert the IRS to each of the purported "disqualifying" issues Ms. Wagner describes— if they had in fact been disqualifying. However, the IRS concluded its audit by issuing a "no-change" letter, and did not disqualify or allege any qualification defects with respect to the RJM Plan or any other plan at issue in this case.

## II.    Tax-Qualification Requires Nothing More Than Form and Operation in Accordance with Section 401(a) of the Internal Revenue Code

9.    To be qualified, plans must be formed and operated in accord with specific, objective requirements set out in section 401(a) of the Code. There are no other requirements for qualification.

10.    Within section 401(a) of the Code, there are cross-references that require compliance with other specific sections of the Code. Of particular relevance, though, section 401(a)

2

does not refer to, and does not otherwise condition tax qualification on, compliance with (i) Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), (ii) section 4975 of the Code (relating to prohibited transactions), or (iii) retirement industry practices (or any similar term or notion).

11.   As set out in my initial report, qualification in form is unequivocally met where a plan adopts a prototype plan from a volume submitter that received a favorable opinion letter from the IRS or where a plan adopts an individually designed plan that received a favorable determination letter from the IRS. The Wagner Report does not contain any opinion to the contrary.

   a.   While plans often request and obtain a favorable determination letter or opinion letter that they are qualified in form, the IRS does not impose an affirmative requirement that they do so in order to be qualified in form.

12.   Since the Wagner Report does not opine that any plans were not qualified in form, this leaves only qualification in operation. Ms. Wagner identifies three operational qualification requirements that she argues were violated: (1) exclusive benefit; (2) permanence; and (3) funding. Though as discussed further below, Ms. Wagner does not correctly describe the meaning of those standards, nor how the IRS actually applies or enforces them in practice.

13.   There are many other laws that may or may not apply to particular pension plans, depending on the circumstances. For example, Title I of ERISA, and specifically part 4 thereof (titled "*Fiduciary Responsibility*"), describes the fiduciary requirements that apply to plans covering common-law employees of private sector employers. Part 4 of ERISA also establishes certain prohibited transaction rules, which are designed to limit the negative impact of conflicts of interest on plan participants. Title I of ERISA is a separate statute that does not govern plan qualification and, more specifically, neither the fiduciary rules nor the prohibited transaction rules in Title I of ERISA (or, for that matter, in the Code) affect the qualified status of a tax-qualified pension plan. Indeed, there exist qualified non-ERISA pension plans, as well as ERISA plans that are not (and not intended to be) qualified. In short, whether a plan is qualified and whether it is governed by Title I of ERISA are two separate and unrelated questions.

14.     Ms. Wagner includes as part of her analysis that the plans at issue failed to meet many of these other laws and industry standards, including ones concerning ERISA compliance and prohibited transaction rules. *See, e.g.*, Wagner R. ¶ 88 (claiming plans must satisfy "fiduciary standards generally accepted in the retirement industry" to be qualified). However, those laws and standards do not govern the tax qualification of pension plans.

15.     Ms. Wagner further describes purportedly typical plan conduct and objectives. *See, e.g.*, Wagner R. ¶ 89 ("The objective is to gradually grow the account by adding contributions and investment earnings over the course of the participant's working life. Seeking outsized investment returns is discouraged, because of the high level of risk entailed by the investments typically needed to achieve such returns."); *id.* ¶ 97 (describing pre-tax and after-tax salary reduction contributions and then stating "[i]n my experience, enabling such contributions is the typical motivation for establishing a 401(k) plan"); *id.* ¶ 155 (describing how plans and participants have "distinct identities" reflected in records,[3] and how "under a traditional tax-qualified 401(k) plan, recordkeeping with respect to inflows and outflows of cash is meticulous").

16.     In my opinion, it is misleading to import general notions of "typical" or "traditional" practice as to 401(k) plans to the non-ERISA solo 401(k)s and other small plans at issue. Most 401(k) plans are established by employers that have common law employees and are therefore subject to the ERISA fiduciary conduct standards (and to potential lawsuits regarding compliance with those standards). In those cases, plan sponsors (many of whom are large and sophisticated organizations) and their plan committees and trustees are charged with managing retirement savings on behalf of a large number of workers. For solo 401(k)s and other one-person non-ERISA plans, the sole participant, who also serves as the trustee, often has a desire to maximize the plan's investment returns and does not have a motivation to misuse or mismanage their own retirement savings.

---

[3] For most of the plans (which were solo 401(k)s and thus, by definition, maintained for self-employed individuals), there is no *per se* distinction between "personal" assets and "business" assets in the sense that personal money or assets can be placed in a "business," or other entity sponsoring a qualified plan, and used for the purposes of the business (or entity), including contributions to qualified plans. In that regard, the source of funds does not relate to qualification.

17.    In my experience, solo 401(k)s and other small plans often invest in partnerships and other alternative investments that provide opportunities considered attractive by the covered individuals, even if they are investments that might not be selected for mass consumption by hundreds or thousands of rank-and-file workers in a corporate 401(k) setting. In this sense, these types of plans are more akin to individual retirement accounts.

18.    Further in my experience, it is not uncommon for solo 401(k)s and similar plans to be established as tax-advantaged vehicles to pursue unique investment opportunities for plan participants (i.e., business owners and employees), especially for small plans with only a few participants (or, as is true for most of the plans in this case, just one participant). Pursuing such opportunities, or otherwise seeking "outsized returns" over a short period (*see, e.g.,* Wagner ¶ 155 ("the Plans ... were, from the start, established to make millions of dollars in a year or so…" and referring to certain of the plans as "shams unrelated to retirement needs"), is not a plan qualification issue or even unusual.[4] The proper inquiry is whether the investments and other activities were intended to accumulate money for future benefits, e.g., financial security in retirement, and not whether the investments were aggressive or atypical.

19.    Regardless, whether these assertions of typical pension plan conduct and objectives are accurate is beside the point, as none of these assertions concern whether the plan was formed and operated in compliance with Section 401(a) of the Code. The purported requirements Ms. Wagner invokes have no basis in the Code or in IRS practice; the IRS simply does not disqualify plans for "seeking outsized investment returns,"[5] failing to have "meticulous" recordkeeping, or for any other reason not explicitly included in Section 401(a) of the Code.

---

[4] Ms. Wagner repeatedly cites deposition testimony for the proposition that defendants admitted to participating in a "scheme" with Solo Capital. *See, e.g.,* Wagner R. ¶¶ 33, 34. I have reviewed the specific testimony she cites and do not read it as supporting that characterization.

[5] I will note, however, that the reason pursuit of investments that carry a "high level of risk," but that may offer "outsized returns," is "discouraged" for larger ERISA-governed plans is that those plans are subject to the fiduciary responsibility provisions in Title I of ERISA and the fiduciaries face the potential of lawsuits, including class action litigation (which has been well publicized in the media). For those reasons, the standard practice for larger plans is to make more conservative investments with smaller, consistent returns. In my experience, this is typical only of larger pension plans and is, if anything, *a*typical for solo 401(k) plans like those at issue in this litigation.

20.    In short, and as discussed in more detail *infra* at Paragraphs 132-142, a violation of ERISA or another law (and certainly, a deviation from an industry standard or typical practice that is not otherwise required by law) does not cause disqualification, which concerns only the requirements under section 401(a) of the Code.

### III.    The IRS's Approach to Tax-Qualification Regulation and Enforcement

21.    The IRS has exclusive regulatory and enforcement authority with respect to the qualification requirements for pension plans.

22.    Certain terms that appear in section 401(a) of the Code or the IRS's rulemaking under that section, or that are otherwise used colloquially by practitioners, need to be understood in the relevant context of IRS practices for determining the qualified status of pension plans.  One example is the application of the "exclusive benefit" standard.  For example, investing plan assets is treated by the IRS as being in support of benefit payments and is thus permissible.  Another example is the so-called "permanency" requirement.  The permanency requirement does not mean that a plan need be perpetual.  Rather, as applied by the IRS and as understood by the retirement plan community, it requires that when qualified plans are formed, they are intended to continue for an indefinite period and are not intended to take advantage of the immediate tax deduction benefit of contributions to a qualified plan on a purely temporary basis – for example during a period of unusually high business earnings – and then to be disbanded once the tax deferral opportunity is not quite as substantial.  For example, a defined benefit pension plan that was formed with an intention to have large tax-deductible contributions for 2 years and then distribute those benefits could be found to not be permanent.  By contrast, establishing a plan with an eye toward a particular investment opportunity does not indicate that the plan itself was intended to be a temporary vehicle.  After all, the investment itself could remain viable for a long period, and creating a plan to invest in an indefinite-length investment necessarily does not have a definite intended endpoint and would satisfy the permanence requirement.

23.    Where there is an error in form and/or operation, the IRS consistently seeks correction rather than plan disqualification.

a. If errors are made as to form, the IRS offers correction programs which allow plans to correct them, whether they are self-corrected (where permitted by the IRS), discovered and self-reported by the sponsor to the IRS, or discovered by the IRS via a plan audit. In my experience, errors as to form are common and, if corrected, do not result in disqualification.

b. With respect to operation in accordance with section 401(a) of the Code, in my experience many plans experience errors of some type, at some point in time. The IRS offers correction programs which allow plans to correct errors as to operation, whether they are self-corrected (where permitted by the IRS), self-reported by the sponsor to the IRS, or discovered by the IRS via a plan audit. In my experience, errors in operating qualified plans do occur and, if corrected, the plans are not disqualified. In other words, the IRS applies the qualification requirements in a manner that helps plans maintain their qualified status in order to further the policy goal of encouraging and supporting the accumulation of retirement benefits.

24. Based on my experience in working with qualified plans and the IRS, a pension plan, once qualified, retains its qualified status until the IRS determines that it is disqualified. It is my understanding that the IRS has not disqualified any plan at issue in this litigation. Indeed, as discussed *supra*, the IRS performed a two-year audit of RJM Plan, and did not disqualify it or allege any qualification defects.

IV. **There Is No Evidence That the Plans Were Not Operated for the Exclusive Benefit of the Participants**

A. **The Exclusive Benefit Requirement**

25. Ms. Wagner states that qualified plans must be maintained for the exclusive benefit of plan participants. She claims that requirement was violated because the plans were formed to take advantage of a particular investment opportunity that also benefited other parties. Wagner R. ¶¶ 14, 93-96.

26. She explains that "[t]o meet this standard, it must be impossible under the plan/trust instrument for any part of the trust's corpus or income to be used for, or diverted to, purposes other than the exclusive benefit of the employees or their beneficiaries." Wagner R. ¶ 93. On its face, I agree that this is a correct statement of law.

27.    Ms. Wagner further cites to language in section 401(a)(2) and a specific IRS (Treasury) regulation which explains that:

> (t)he phrase "*purposes other than for the exclusive benefit of his employees or their beneficiaries includes* **all objects or aims not solely designed for the proper satisfaction of all liabilities** *to employees or their beneficiaries covered by the plan.*" Wagner R. ¶ 94 n.223 (emphasis added).

28.    As Ms. Wagner's report cites specifically to those legal provisions, I note that IRS regulations under section 401(a) state, with respect to qualified plan investments, that:

> *No specific limitations are provided in section 401(a) with respect to investments which may be made by the trustees of a trust qualifying under section 401(a). Generally, the contributions may be used by the trustees to purchase* **any investments permitted by the trust agreement to the extent allowed by local law…** (emphasis added)

As the quoted language explains, the rule is that there are not limitations on the investment that a trust under a qualified plan can make.  More specifically, there is not a limitation on making unusual investments or investments that are perceived as risky.

That regulation does impose some limitations that are not applicable here, for example, an investment by a qualified plan in the securities of the sponsoring entity could be a qualification issue, if the arrangement is unfair to the plan.

29.    Ms. Wagner's apparent interpretation of the exclusive benefit requirement—that plans cannot be formed to take advantage of specific investment opportunities and that those investments cannot also benefit others—does not comport with my experience, the above-cited regulations, or IRS practices.

30.    In my experience, it is well understood and accepted by the IRS that investing plan assets, in support of benefits, is permitted under this rule.  Qualified plan assets are often invested in one or more of the following types of investments:  mutual funds, collective investment trusts, unregistered private funds (which are often partnerships), commingled trust funds, real estate, insurance products, and stocks, bonds and other securities.  The exclusive benefit rule does not mean that all plan assets must be held in cash or other non-fee-paying accounts awaiting benefit payments.

31.    Plan investments in funds and other securities invariably benefit third parties, including investment managers and advisers who receive fees (as well as service providers who

charge for their services).  If payments to third parties violated the exclusive benefit rule, virtually all pension plans would have to be disqualified.  That the IRS has not done so is demonstrable evidence of Ms. Wagner's mistaken interpretation.

32.     Understood in context, there is no tension between the exclusive benefit rule and the ubiquitous and universally accepted practice of investing plan assets in funds and other commingled vehicles.  It is not required that the plan's trust maintain actual custody of its cash at all times, which would make investing in any partnership or other fund impossible.  Rather, where cash is invested in another vehicle, the plan's ownership interest in that vehicle is evidenced by, e.g., shares of a mutual fund or an interest in a partnership; in turn, that evidence of ownership (that is, the mutual fund shares or the partnership interest) must be held in trust.  Likewise, it is not forbidden for asset managers or other parties to be paid for their work; rather, the investments and services for investing the plan money must be in ultimate support of accumulating retirement benefits.

33.     Ms. Wagner further opines that "whether investment and service provider fees are unreasonable and/or excessive relative to the services rendered" can "violate the exclusive benefit rule by diverting plan assets to parties other than plan participants and their beneficiaries."  Wagner R. ¶ 96.  In my experience, I have never seen the IRS take the position that excessive fees can lead to disqualification under the exclusive benefit rule.  In over four decades of participating in industry conferences, continuing education programs and meeting with the IRS, I have never even heard of that happening.  Instead, the IRS asserts prohibited transactions for excessive payments to service providers, which, as a practical matter, requires that the excess amounts be restored to the plan.

34.     In my experience, the IRS does not typically interpret the payment of fees to service providers and investment managers, even unreasonable fees, as a violation of the Code's exclusive benefit rule.  In fact, I have never heard of any instance in which the IRS considered unreasonable fees to a third party (unrelated to the plan sponsor) as a violation of the exclusive benefit rule.  Indeed, there are specific prohibited transaction rules (which are not qualification rules and are housed in section 4975 of the Code) that prohibit the receipt of compensation by service providers that is in excess of reasonable amounts.  The "penalty" for a prohibited transaction under section 4975 is that the *service*

*provider* must pay an excise tax on the excess amounts and must restore those amounts to the plan. It is not disqualification, or any other penalty, imposed upon the plan itself.

35.    Obfuscating the relevant inquiry, Ms. Wagner further alleges violations of the exclusive benefit rule "as reflected in the Code and ERISA, which elevates loyalty to the interests of the plan and its participants to the highest plane." Wagner R. ¶ 93. This argument is based on the ERISA fiduciary standard for employer-sponsored plans, which is inapplicable because the plans at issue here are *non*-ERISA plans subject only to the exclusive benefit requirement in section 401(a)(2) of the Code.

    a.    A violation of ERISA's fiduciary requirements (even if they were applicable) would not disqualify a plan. However, Ms. Wagner's discussion of investment providers continues to suggest disqualification due to reference to other laws or industry standards. Wagner R. ¶ 95 (". . . a plan sponsor is never relieved of *the fiduciary responsibility, under the Code and ERISA*, to monitor the plan's providers…"); *id.* ¶ 96 ("…Under *the Code and ERISA, a key fiduciary issue* is whether investment and service provider fees are unreasonable and/or excessive relative to the services rendered."). When those arguments are considered within the context of qualified plan status, the response is that the fiduciary requirements to monitor plan providers are in ERISA and therefore simply not applicable to qualified status for even *ERISA* plans, let alone the *non*-ERISA plans here. The only references in the Code to fiduciaries applicable to *non*-ERISA plans are in the context of prohibited transactions, which also do not concern qualified status.

36.    The Code's exclusive benefit requirement is not applied by the IRS to prohibit plan formation to take advantage of an investment opportunity or plan continuation to invest in any particular investment or strategy, so long as the investment is intended to generate benefits in the plan.

37.    To argue that a plan violated the rule because it would take advantage of a particular investment is therefore incorrect by definition; the proper inquiry is whether the investment was intended to help fund retirement benefits.

38.    In my career, I have never heard of the IRS attempting to revoke a plan's qualified status due to making an investment with a third party on the basis that the investment was too

expensive or risky, or was otherwise revealed through hindsight to have been an inadvisable investment. That is particularly true for a solo 401(k) plan where only the individual making the investment decisions is impacted by the investment outcomes.

### B.    The Facts in this Case Do Not Support Violations of the Exclusive Benefit Requirement

39. With respect to the Argre and Post-Argre[6] plans, Ms. Wagner identifies two types of payments made by the plans that she claims caused them to violate the exclusive benefit requirement. First, she states that some plans paid 66% or 75% (depending on the plan) of the reclaims they received to Ganymede, a third party. Wagner R. ¶¶ 39, 125. Ms. Wagner states further that some plans entered into partnership agreements pursuant to which they paid 90% or 95% of the funds remaining after payments to Ganymede and others to other defendants in this case. Wagner R. ¶¶ 40, 125.

40. Plan payments to service providers, investment managers, or other third parties do not violate the exclusive benefit requirement. If this were not true, no qualified plan could ever engage investment or other service providers, a patently absurd result. There is no rule that service providers to plans have to work for free. The relevant question is whether the fee payments are for investments or services that are ultimately in support of benefit payments.

41. Nor does the participation in partnership agreements or any other vehicles with other qualified plans (and other investors) where, as here, the profits are allocated in proportion to capital contributions, violate the exclusive benefit requirement. In fact, that is how it is commonly done. If this were not true, no qualified plan could ever purchase an interest in an investment fund (almost all qualified plans do purchase such interests) unless all other investors were willing to hand their profits to the plan, another patently absurd result. In many cases, the general partner or manager of a partnership or other fund may receive some share of profits as part of its compensation; but aside from this exception, in my career I have never heard of an investment vehicle for qualified retirement plans that did not allocate profits in basic proportion to the amounts invested by its various

---

[6] Ms. Wagner refers to as the "Kaye Scholer Plans," but that appears to be a misnomer. I understand from counsel that Kaye Scholer had no interest in these plans, that no Kaye Scholer attorney was a beneficiary or a trustee of these plans, and that Kaye Scholer did not sponsor these plans.

investors, whether those investments are capital contributions to a partnership, shares held in a corporation or mutual fund, or otherwise.

42. In my experience, IRS enforcement concerning the exclusive benefit rule focuses primarily on whether the employer has misused plan assets for its own private purposes (unrelated to the provision of benefits), and does not concern the level of fees paid to third-party providers at all. There is no logical reason for a plan to subordinate the interests of participants to benefit an unrelated party, in particular for solo 401(k)s where the decision maker is also the sole account holder. Based on my experience, the IRS does not assert exclusive benefit violations unless plan assets are used for the employer's private purposes (or that of its business affiliates or the plan's controlling fiduciaries). If plan assets were used for a purpose objectively unrelated to the provision of benefits, I believe that could also constitute an exclusive benefit violation in theory, but it is difficult to see why that would occur, particularly in the context of a one-person plan. In my career I have never heard of the IRS asserting an exclusive benefit violation due to overpayment of an unrelated service provider, or due to payments by a plan to its partners in proportion to all partners' capital contributions. My opinions regarding Ms. Wagner's claims that the plans' payments to third parties and to their partners violated the exclusive benefit rule are set out in more detail below.

43. The plans' payments to third-party service providers did not violate the exclusive benefit rule.

   a. I have never seen the IRS propose to disqualify any plan on the basis that it paid excessive fees to a third party (nor have I even heard mention of the possibility of doing that). And in my opinion, even if the IRS were to take a position that excessive fees were a qualification issue (which it would not), the IRS would be even less likely to take such a position for a solo 401(k) or other individual plan where the consequences of excessive fees would only be borne by the account holder who caused them to be paid.

   b. Even if the IRS were to argue that payment of excessive fees to a third party is a basis to disqualify a particular plan (which it would not), I do not believe the fee levels in this case would be considered so egregious as to constitute an exclusive

benefit violation. Ms. Wagner significantly overstates the fees that were paid. For example, she states that: "As part of the DWT scheme, the Argre Plans paid 66% of the DWT refunds received from SKAT to Ganymede." Wagner R. ¶ 125 (similar/same statements are made at ¶¶ 39, 42, 46). This mischaracterizes Ganymede's compensation, because it ignores the fact that Ganymede/Solo had to bear the costs and fees associated with the operation. I understand that Solo's actual share was 25%, once other costs were netted. (Markowitz Tr. 540:18-541:9). Ms. Wagner's report also states that the Post-Argre Plans paid Ganymede 75% of the DWT refunds, Wagner R. ¶ 125, but again omits that Ganymede/Solo had to bear the costs and fees, same as above.

c.  25%, on a net-of-fees basis, is not an unreasonable share of profits, based on my experience with private funds and their fees, which provide a useful analogy. Even if the "net of fees" share to Solo exceeded 25% for the Post-Argre Plans, perhaps even reaching 30-35%, this would still not be exceptional compensation, in the sense that the fees charged by other private funds that are vetted by professional advisers can be even higher, as explained below.

d.  Within funds (such as hedge funds and private equity funds) that are structured as partnerships, it is typical for the general partner and/or investment manager (who, if both exist, are typically affiliates) to receive management fees equal to 2% (or more, in some cases) of all invested assets, plus 20% (or more, in some cases) of the partnership profits. Compensation structures in hedge funds, private equity funds, and similar private funds differ significantly based on the activities of the partnership and other factors, but 2% plus 20% of profits, which is referred to colloquially in the industry as a "two-and-twenty" arrangement, is probably the single most common fee structure.

e.  Within this type of arrangement, the sum of the management fees and profits interest payable to the general partner and/or manager, expressed only as a percentage of profits, can easily reach 30-50% even where the partnership has a profitable year. For example, a 2% management fee on a $100 investment is $2; if the $100 produces partnership profits of $10, the 20% of profits fee would apply.

In that scenario, the $2 management fee is equivalent to an additional 20% of the profits (that is, $2 out of the $10 of profits), for total compensation of 40% of profits after expenses.

f.  Within funds that are structured as partnerships, it is typical for the partnership itself to bear its own ongoing operational expenses, and often its organizational (or formation) expenses as well.  These expenses are not typically the responsibility of the general partner/manager, and where the general partner/manager pays them on behalf of the partnership, it will almost certainly be entitled to reimbursement. Reimbursement for such out-of-pocket expenditures made on behalf of a partnership is never, in my experience, regarded as "compensation" or "fees" to the general partner/manager.

44.  The plans' sharing of the profits from their investments with its partners in proportion to their capital contributions did not violate the exclusive benefit rule.

a.  As noted previously, in my experience all partnerships and other vehicles in which qualified plans invest allocate profits in basic proportion to the amounts invested by the various investors.  Except for a profit share paid to the general partner or manager of the investment vehicle as compensation for its services, I am not aware of any reason why any investor would agree to receive less than a share of the profits in proportion to its capital contributions.

b.  Furthermore, it is common for qualified plans to invest in partnership interests, for example, hedge funds and private equity funds.  I have also seen plans, and particularly smaller plans, invest in partnerships holding a variety of assets, including real estate.

45.  Ms. Wagner's conclusions that the third-party fees and partnership sharing of profits violate the exclusive benefit rule are also incorrect.

a.  Ms. Wagner states:

*It is clear from these facts, that the Plans were created to participate in the scheme and that they were created mostly for the benefit of Solo, Ganymede, Shah, Markowitz, van Merkensteijn, and Klugman.  Thus, the Plans that were in partnerships were created for the benefit of Ganymede, Shah, and the entities with*

*which they were in partnership, including entities controlled by Markowitz, van Merkensteijn and/or Klugman.* Wagner R. ¶ 127.

b.  For the reasons described above, this statement misses the point on multiple levels. At the outset, it conflates payments to third-party Ganymede—a service provider— with payments made to other pension plans—for which Markowitz, van Merkensteijn, and Klugman were trustees and beneficiaries—pursuant to the profit allocation provisions of partnership agreements. These two payments are distinct. And, as explained above, neither presents qualification issues.

c.  The payments to Ganymede did not violate the exclusive benefit requirement. First, that Ganymede (and any entities or individual related to Ganymede) benefitted from the arrangement is not a basis for an exclusive benefit violation. It is universally understood among practitioners and the IRS that service providers to plans, including asset managers, can be paid for their work. Second, understood in context, the purported 66% and 75% shares were actually perhaps 25-30% on a net-of-cost basis, which is not unusually high for analogous investments in my experience.

d.  The payments pursuant to partnership agreements also did not violate the exclusive benefit requirement because it is customary and not objectionable to distribute partnership profits in proportion to capital contributions. And importantly, it is my understanding that the payments that Ms. Wagner claims were made to "Markowitz, van Merkensteijn, and Klugman" were to the pension plans that benefitted them and not to them individually. Obviously it is appropriate for pension plans to benefit from the earnings on their investments.

46.  To briefly sum up, I am not aware of any situation in which the IRS purported to revoke a plan's qualified status due to paying allegedly excessive fees to a third party, or for participating in a partnership agreement with other qualified plans where the profits are allocated in proportion to capital contributions. Even if the IRS were to do so, for the reasons above I do not believe it would consider doing so in this case.

47.     Ms. Wagner's conclusions that the Lehman and ED&F Plans were not operated for the exclusive benefit of their participants are based on a similarly flawed application of the exclusive benefit rule.

48.     Ms. Wagner alleges that "[a]ll the Lehman Plans were created less than a year before they began to trade in Danish securities and submit DWT refund applications to SKAT." Wagner R. ¶ 145.  Assuming that statement is true, that fact would have no bearing on whether those plans had violated the exclusive benefit rule because, as I have explained, the IRS does not apply the exclusive benefit requirement to prohibit the formation of a plan to take advantage of an investment opportunity, so long as the investment is intended to generate benefits in the plan.  Again, the proper inquiry is whether the investment was intended to help fund retirement benefits.[7]

49.     And Ms. Wagner's conclusion that the ED&F Plans were not operated for the exclusive benefit of their participants relies on the same misplaced analysis of "excessive and unreasonable" fees to third party service providers that I have already addressed with respect to the Argre and Post-Argre Plans.  The relevant question is not the size of the fee, but whether the fee payments were for services ultimately in support of benefit payments—which I understand these were.

V.     **The Plans Were Not Improperly Funded**

A.     **Funding Requirement**

50.     Ms. Wagner alleges a failure to fund the plans from permissible sources.  This is first alleged in the *Summary of Opinions* ¶15, and in further detail particularly in Paragraphs 97-99.

51.     She explains that: "The Code limits the sources of funds that can be contributed to a plan for that plan to remain tax-exempt.  Salary reduction contributions to 401(k) plans can be made by participants on a pre-tax basis, and participants may also make after-tax

---

[7] Ms. Wagner also asserts that two Lehman Plans, the FWC Plan and Proper Pacific Plan, "received no money" from their participation in the trades.  Wagner R. ¶ 144.  Elsewhere in the Report, Ms. Wagner uses more careful phrasing, asserting that "no money [from the trading] was retained by the Plan," citing statements from the plans' custodial accounts.  Wagner R. ¶¶ 78, 82.  I understand from counsel that these Plans in fact received a similar percentage of the trading strategy proceeds as the Argre and Post-Argre Plans discussed above, but that these proceeds were held in a Solo Capital custodial account, and not transferred to individual custodial accounts associated with the Plans, in order to facilitate continued investing.

contributions. In my experience, enabling such contributions is the typical motivation for establishing a 401(k) plan. Plan sponsor employers can also make contributions to a 401(k) plan on behalf of participants. Further, self-employed individuals can make contributions to their plans from net earnings from self-employment. Funding a plan with other sources may lead to the Plan losing its tax-exempt status." Wagner R. ¶ 97.

52.     Ms. Wagner goes on to argue that "In order to qualify for the tax advantages of plan sponsorship and participation, the sponsor of a solo 401(k) plan, whether an individual or the individual's LLC, is required to show that it is carrying on a trade or business by engaging in an income-generating activity for profit on a regular and continuous basis. Investment activity by the plan itself, such as the purported Plan investments in Danish stocks, is not taken into account for this purpose." Wagner R. ¶ 104; *see also* ¶ 130 ("Generally speaking, qualified plan sponsors must be actively engaged in a profitmaking trade or business").

53.     These are largely conclusions of law, not IRS practice or a description of experience with actual plan operations. However, in my opinion they are misleading conclusions of law, and I am compelled to respond in part by reference to legal authority.

54.     To begin with, these statements do not accurately describe all the permissible sources of qualified plan contributions. There is no requirement that qualified plan contributions must be sourced exclusively from actual profits or business operating revenues, nor need a qualified plan's sponsor "show that it is carrying on a trade or business by engaging in an income-generating activity for profit on a regular and continuous basis." Wagner R. ¶ 104. Instead, it is permissible to fund qualified plans from capital contributed by the owner(s) of the entity that sponsors the plan, or even money borrowed by the entity.

55.     While IRS regulations do contain the phrase "trade or business," this phrase is not applied in the way Ms. Wagner suggests, and needs to be understood in proper context. Section 401(a)(27) of the Code explains that:

> **Contributions need not be based on profits**. *The determination of whether the plan under which any contributions are made is a profit-sharing plan shall be made without regard to current or accumulated profits of the employer and without regard to whether the employer is a tax-exempt organization.*

Qualified 401(k) and profit sharing plans can therefore be maintained even by tax-exempt charities and governments, which are not "trades or businesses."

56.    To illustrate an important distinction implicit in this rule, if a person uses his or her own money to capitalize and start a business (or even a charity), or borrows money to do so, the IRS does not prohibit qualified plan contributions from being made from these monies. This is manifest under the above requirement, because if contributions are not required to come from "current or accumulated profits," by definition there is no other remaining source of funding other than owners' contributions of capital (or debt). Stated slightly differently, if the above rule did not apply, there would be no ability to make employer contributions to a qualified plan until, and solely during such times that, the entity is profitable. Practically speaking, this would render it impossible to offer non-discretionary (required) contributions under a qualified plan, since no guarantee of profitability at any given point in time can be made.

57.    Stated simply, references to "trade or business" do not mean that qualified plans must be funded exclusively from actual business revenues which are the product of operations. To be clear, I am not suggesting that a person who never engages in employment or business activity can simply move his or her savings into a qualified plan (there would be no tax advantage to doing this, and in fact it would cause previously-taxed income to be taxed a second time upon distribution from the plan as "retirement benefits"). But it is not true – as Ms. Wagner suggests – that a particular LLC or other business activity funded and capitalized by an individual is prohibited from making qualified plan contributions until it can afford to do so from its own profits (if any).

58.    Further, 401(k) plans can even be maintained by individuals for their household workers (who are not, by definition, employed in connection with a trade or business). In fact, in such a case the IRS recognizes an exception to the excise (penalty) tax which ordinarily attaches to non-deductible plan contributions, for:

*(c)ontributions to a SIMPLE 401(k)...considered nondeductible because **they are not made in connection with the employer's trade or business**.*[8]

59.   Qualified plan contributions can also be sourced from transfers and rollovers from other accounts.  The IRS permits transfers and rollovers between any and all qualified plans, 403(b) plans (tax-deferred annuity plans of charities and governmental entities) and governmental 457(b) (deferred compensation) plans, including tax-deferred and Roth (after-tax) accounts in any such plans, in addition to SIMPLE IRA plans, SEP-IRA plans, and both traditional (pre-tax) and Roth IRAs.  This is summarized on a chart on the IRS's website at https://www.irs.gov/pub/irs-tege/rollover_chart.pdf.

60.   In sum, the IRS recognizes a range of sources from which qualified plan contributions can be made.  In my experience, I have never heard of the IRS disqualifying a plan solely because plan contributions were made from sources other than actual profits or business operating revenues.

### B.    The Evidence Does not Indicate That the Plans Received Improper Funding

61.   With respect to the Argre and Post-Argre plans, Ms. Wagner states that "The 401(k) plans established pursuant to Solo Capital's dividend trading scheme were, as a general matter, not funded with assets derived from the plan sponsors' trade or business income and were improperly funded through putative stock loans."  Wagner R. ¶ 129.

62.   For example, Ms. Wagner claims that certain plans were funded with initial contributions ranging from $100 to $2000, and that these contributions do not appear to have come from the plan sponsors.  Wagner R. ¶¶ 37, 42, 54, 58, 131.  For instance, Ms. Wagner says that contributions to the Roadcraft Plan came from "personal" assets.  Wagner R. ¶ 131.

63.   Ms. Wagner states further that "to the extent that the Plans were funded from sources other than their LLC sponsors or their participants, acting as participants in deferring

---

[8] Instructions to IRS Form 5330, *Return of Excise Taxes Related to Employee Benefit Plans,* Part II, Schedule A.

compensation from the Plan sponsor, the funding would be improper, and the plans disqualified." Wagner R. ¶ 132.

64. These claims – that contributing to qualified plans from sources other than profits or revenues from business operations is improper and would result in plan disqualification – are incorrect for the reasons set forth in the previous section. In short, there is no requirement under the code that a plan be exclusively "funded with assets derived from the plan sponsors' trade or business income." Wagner R. ¶ 129. I will not repeat the arguments, but several points of clarification are in order.

65. A fallacy in the Wagner Report is that it implies – incorrectly – that no qualified plan contributions could be made by or on behalf of any individual Defendant unless the dollars could be tracked to profits generated by the business of a <u>particular</u> LLC or other specific activity at the time of contribution.

66. In addition, there is no "minimum" contribution under IRS rules that is required to constitute "proper" funding of a 401(k) or similar plan. In my career, I have never heard of the IRS attempting to revoke a plan's qualified status because elective 401(k) deferrals from individuals, or other discretionary contributions for a 401(k) plan, were not high enough. The IRS imposes maximum limits on contributions because of the tax deferral benefits associated with them; there is no reason to impose *minimum* limits and the IRS does not do so.

67. Ms. Wagner also states that "The Basalt Ventures LLC - like other van Merkensteijn LLCs - did not receive income directly, but when van Merkensteijn received consulting income in his personal capacity, he would allocate it among some of his LLCs, including the Basalt Ventures LLC." Wagner R. ¶ 55.

   a. At some risk of unnecessary repetition, I must point out again that contributions of capital to an entity that person owns (or borrowing by such entity) are not "prohibited" sources of funding for a qualified plan sponsored by that entity.

   b. Also, as a practical matter, where an individual provides similar services (for example, consulting services) through more than one entity, the individual will

necessarily need to decide which entity is providing the particular service and allocate the revenues to that entity.

68.     Ms. Wagner's conclusions that the Lehman and ED&F Plans were not qualified because they did not receive contributions derived from profits or revenues from business operations are as mistaken with respect to these plans as they were with respect to the Argre and post-Argre plans.  Again, there is no requirement under the Code that a plan be "funded with assets derived from the plan sponsors' trade or business income."

69.     With respect to the Lehman plans, Mr. Wagner's statements that certain plans were "minimally funded" or "not funded at all" have no bearing on whether those plans were qualified because, as I have said, there are no "minimum" contributions required under IRS rules to constitute "proper" funding of a plan.  Wagner R. ¶ 146.

70.     Similarly, her statements that certain defendants associated with the Lehman plans "have admitted that many of their LLCs had not conducted any trade or business" at the time they participated in the trading are simply not relevant to the issue of plan qualification: there is no requirement that qualified plans must be funded from actual business revenues which are the product of operations.  Wagner R. ¶ 147.

71.     The same is true of Ms. Wagner's conclusions with respect to the ED&F Plans, which once again focus on the lack of business activity by the plans' sponsoring entities.  As I have explained, the lack of business activity is not a basis for disqualification.

72.     Finally, Ms. Wagner also makes the following claims with respect to the all of the Plan Defendants:

> In many instances, Plan contributions made by the Plan Defendants were minimal and consisted of a few hundred dollars made on a one-time basis. Accordingly, Plan assets were generally limited to such contributions which, in my experience, was an extremely unusual circumstance. Generally speaking, only plan participants or the plan sponsor may contribute to a tax-qualified plan, and the IRS will view such advances as a loan or other extension of credit. However, in the circumstances of the Plans, it is unclear whether a regulator, such as the IRS, would view such amounts as plan assets, a loan or an illegal contribution given that only plan participants or the plan sponsor may contribute to a tax-qualified plan. Wagner R. ¶ 97 n.224.

This appears to me to be a combination of her previous arguments concerning "minimal" funding and supposedly proper sourcing of plan contributions. I will not repeat my responses on these items again, but in the interest of thoroughness a few additional observations are warranted.

73.    First, whether there existed an "extremely unusual circumstance" does not implicate any qualification requirement(s) under section 401(a) of the Code. At most, this reflects some notion of the common practices, which is irrelevant, particularly for smaller plans and solo plans.

74.    Second, even if there were "loans or other extension of credit" to the plan sponsor entities, that is not an issue that would impact the qualification of the plans. Corporations issue bonds and otherwise borrow money all the time, and there is no rule or IRS practice providing that borrowed monies cannot be used to fund qualified retirement plans. After all, surely it would be impossible to determine whether the source of a particular plan contribution was from a company's operating revenues or borrowings, given that all such corporate assets would be commingled and fungible with one another. Again, there is no requirement or expectation that qualified plan funding must be "tracked" to a particular source, to the exclusion of all others

75.    Third and finally, Ms. Wagner does not actually conclude that the IRS would disqualify these plans for improper funding. While she suggests the possibility of some impropriety, she states only that it is "unclear" in her view how a regulator would categorize the funds at issue. But all that is relevant is whether the IRS (and not some other regulator) would disqualify the plan on this basis, and the answer is no. Companies borrow money all the time, which is commingled with other funds and used for any number of purposes, which may include funding qualified plans. I have never heard of any theory that borrowed funds cannot be used for plan contributions, let alone that doing so would somehow disqualify the plan, nor have I ever heard of the IRS taking the extraordinary step of disqualifying a plan on this basis.

VI.    **The Plans Were Intended to be Permanent**

A.    **The Permanence Requirement**

76.    Ms. Wagner alleges that the plans failed the IRS' "permanency" requirement.  Wagner
R. ¶¶ 16, 100-02.

77.    In the *Summary of Opinions*, Ms. Wagner states that:

> *relevant Treasury regulations require that a 401(k) plan be **established with the intent
> to be permanent rather than a temporary program**.*"  (emphasis added)

In Paragraph 100, she states that:

> *A condition that all retirement plans seeking tax qualification, including 401(k)
> plans, must satisfy is that the plan **will be a permanent rather than temporary
> program**...abandonment of the plan within a few years after it has taken effect for
> any reason other than business necessity **will be evidence that the plan**, from its
> inception, was not a bona fide program for the exclusive benefit of employees.*
> (emphasis added)

78.    The quotations in the preceding paragraph illustrate a subtle but important distinction
between the "intent" that a plan be "permanent" as opposed to whether a plan in fact
exists in perpetuity.  While Ms. Wagner conflates these two concepts, it is only the
"intent" that is relevant to qualification.  In my experience, the IRS does not require that
qualified plans be permanent, or even necessarily long term.  Rather, the IRS requires
that the *intent*, at the time of plan establishment, is that it be other than a temporary
vehicle, for example, that the plan is intended to last for an indefinite duration, as opposed
to an intention that it only exist for a limited duration.

79.    Ms. Wagner further confuses the issue by incorrectly referring to plans for which
contributions have not been made or a period of years as "abandoned."  *See* Wagner. R.
¶ 100 ("A plan established to pursue a single investment strategy and thereafter
effectively abandoned as a result of the employer's failure to make further plan
contributions would generally be treated as violating the permanence requirement").  In
actuality, the IRS recognizes a distinction between "frozen" plans – meaning those for

which no further contributions will be made – and abandoned plans. [IRM 7.12.1.7 (02-16-2017), titled *Frozen Plans*].[9]

80.    Crucially, frozen and abandoned plans are both still qualified plans. In other words, even accepting Ms. Wagner's statement that lack of further plan contributions makes a plan abandoned (which is not true), the IRS still would not generally treat the plan as temporary.

81.    On the issue of permanence, in my experience the IRS would not treat a frozen plan (whether by formal amendment or otherwise) as abandoned or as disqualified. And regardless, an abandoned plan would not be disqualified by the IRS simply because it is abandoned.

82.    For 401(k) plans that provide only elective 401(k) deferrals, and/or discretionary profit sharing contributions, the cessation of contributions, and particularly of employer contributions, could result in full vesting of participant accounts holding the investments attributable to employer contributions. But it would not cause the IRS to disqualify the plan.

83.    Because the IRS would not disqualify a plan based on cessation of contributions, particularly for discretionary profit sharing plans, I disagree with Ms. Wagner's position that the IRS, in determining permanence, considers "the likelihood of the employer's ability to continue making contributions" and requires that there "must generally be recurring and substantial contributions by the employer." Wagner R. ¶ 102. It is sufficient that, at the time the plan was formed, there was an intent that the plan continue indefinitely.

84.    Ms. Wagner continues: "If the plan sponsor is floundering, it may be required to look ahead to see if the company is likely to go out of business. Unless there have been unforeseen business developments not within the employer's control that would preclude continuance of a plan, abandonment of the plan reverses an initial presumption of

---

[9] For clarity, there are also "terminated" plans and "wasting trusts" as forms of qualified plans where contributions are not being made.

permanence and leads to a presumption of impermanence so that the plan may be disqualified retroactively." *Id.* Each step of this reasoning is flawed.

    a.  A plan sponsor is not required to anticipate its future failure. It is enough that it *intends* to continue to exist and to continue to sponsor the plan indefinitely. Ms. Wagner seems to be asserting the plan sponsor has some obligation to be *sure* of its continued existence and success, almost a guarantee that the plan will continue to exist and receive contributions. In my experience, the IRS has never required a plan or its sponsor meet such a high bar.

    b.  Ms. Wagner continues to conflate "abandonment of the plan" and cessation of contributions. Simply ceasing payments is a frozen plan. However, neither carries "a presumption of impermanence."

    c.  Even where a plan is terminated shortly after formation, "[u]nforeseen business developments not within the employer's control" are not the only acceptable reason that will not lead to "disqualify[cation] retroactively." A plan sponsor may also terminate a plan without creating a "presumption of impermanence."[10]

85.    I have never seen the IRS attempt to disqualify a plan so long as it has operated for at least five years. For plans that terminate before five years, the IRS would not disqualify a plan if it was intended to be operated for an indefinite period of time (that is, if it was established without an explicit intent to be terminated a few years later). If, in fact, a plan was terminated within 5 years of establishment, the IRS might question the original intent, but if a rational reason were provided for the termination, the IRS would not disqualify the plan for failure of the permanency requirement.

86.    My practical experience and understanding on these points is consistent with the IRS Internal Revenue Manual ("IRM"). The IRM is used for training IRS agents and as a

---

[10] Ms. Wagner also states: "Plan sponsors must be aware of circumstances leading to plan termination or abandonment before deciding to establish one." Wagner R. ¶ 135. Though a bit unclear, I interpret this to be a more extreme version of the same argument; that is, a plan sponsor must anticipate the possibility that it will be unable to support a plan in the future *before ever sponsoring one*, because if that possibility comes to fruition, the IRS will retroactively disqualify the plan. This argument fails for the same reason—the IRS imposes no such requirement.

guide for regulatory audits of qualified plans.  In this context, it instructs IRS personnel that:

> *(i)f a plan terminates within a **few years** after its initial adoption, the plan sponsor **must give a valid business reason for the termination or there's a presumption that the plan was not intended to be a permanent program** from its inception.* [IRM Sec. 7.12.1.3] (emphasis added).

87. As a practical matter, any number of qualified plans are terminating at any given point in time, a fact that the IRS is clearly aware of.  As a reflection of that fact, the IRS has a determination letter program that, if requested, will confirm the qualified status of plans upon termination.  The IRS even has a special form for this purpose, *Form 5310 – Application for Determination Upon Termination.*  While this program is available to plan sponsors, it is not mandatory to file under the program.

88. The Form only asks for contribution and participant information for the year of termination and the preceding 5 years.  In my experience, the IRS does not challenge the permanency of a qualified pension plan that has been in existence for at least 5 years.

89. The discussion in Ms. Wagner's report incorrectly suggests that the only valid reason for terminating a qualified plan is the cessation of doing business.  *See supra* at ¶ 84.  Instead, the IRS issues a terminating plan a Form 5310, which requires the applicant to indicate the reason for the termination, which, in effect, provides the IRS with the information needed to evaluate whether a plan that was terminated within 5 years of establishment was intended to be permanent.  The Form lists "adverse business conditions" as a possible reason for termination, but also lists four other reasons that, in my experience (and based on discussions with others in the benefits community) are automatically accepted by the IRS as reasons why a plan termination does not indicate an initial intent to have a "temporary" plan, as well as an option for an "other" reason in addition to those that are specifically listed on the form.

90. The IRM explains to IRS agents that, with respect to situations where "Other" is marked, there are other acceptable reasons for plan termination.  It follows with a non-exclusive list of such reasons that includes (quoting) a "substantial change in stock ownership" and even just "employee dissatisfaction with the plan."  [IRM Sec. 7.12.1.3]

91.     The IRM likewise instructs IRS agents that,

> When a plan sponsor lists any reason in "Other," review **all the surrounding facts and circumstances** and determine whether the plan was **intended** to be permanent. *Id.* (emphasis added).

To reiterate, the proper inquiry is original intent, not – from the perspective of hindsight – how long the plan in fact continued operating.

92.     Finally, and of note, I have never seen the IRS attempt to disqualify a plan because it was established to take advantage of a particular investment opportunity, if that investment unexpectedly ceases to exist. In my opinion, in such a case the IRS would recognize that the sponsor did not intend for the plan to be a short-term tax deferral vehicle upon establishment, but rather, the termination is due to an unforeseen factor that arose later on.

## B.     The Plans Met the Permanence Requirement

93.     The Wagner Report suggests that Plans would not satisfy the permanency requirement because they were "effectively abandoned as a result of the employer's failure to make further plan contributions…" Wagner R. ¶ 100.

94.     Ms. Wagner further claims that "[t]o the extent the Plan participants and sponsoring LLCs ceased making Plan contributions, the likelihood of abandonment is reinforced." Wagner R. ¶ 136. She then points to instances of plans ceasing contributions. *E.g., id.* ¶ 135 ("The RJM Plan was funded in its first year (2013) but funding ceased in 2014, 2015, and 2016.").[11]

95.     I have never seen the IRS attempt to disqualify a plan—or deem the plan "abandoned"— simply because contributions ceased. For a 401(k) plan, where the only contributions may be employee deferrals, it is inconceivable that the IRS would take that position.

96.     With respect to the Argre and Post-Argre plans, Ms. Wagner notes that "[m]any of the Plans were terminated or left dormant after SKAT announced it would stop paying refunds on their DWT refund applications." Wagner R. ¶ 135. But observing, after the

---

[11] Wagner cites a response to the IRS audit of the RJM Plan for the proposition that funding for the RJM Plan ceased in 2014, 2015, and 2016. It is telling that she cites, as evidence that the plan was not permanent (and therefore was not qualified), documents that *were in the IRS's possession* when the IRS issued its no change letter to the RJM Plan after a two-year audit. Clearly the IRS did not believe these facts were disqualifying.

fact, that many of the Plans were discontinued (even if true) shortly after refunds stopped being issued would not establish that the sponsors *originally intended* them to be temporary. Indeed, even accepting as true that "[t]he vast majority of the sponsoring LLCs and Plans appear to have been created solely in order to submit DWT refund applications to SKAT,"[12] I have seen nothing suggesting it was known at the time that the investment opportunity would only be available for a definite time period. Formation to participate in an investment strategy of indefinite length *necessarily* means the plans were expected to exist for an indefinite period of time, and thereby met the Code's permanence requirement as the IRS enforces it.

97.    Ms. Wagner continues: "Altbach was unsure whether his plans still existed, Klugman terminated all his plans in 2016, and rog responses indicate many plans did not know whether the plans or sponsoring LLCs had been terminated. In my experience, this would be a factor considered in whether the Plans were abandoned and thus effectively terminated." *Id.* In my experience, the IRS would not consider uncertainty about the status of a plan in deciding whether the plan was originally intended to be permanent.

98.    Ms. Wagner further opines that "the only permissible basis for Plan termination shortly after its formation is a business reason by the sponsoring LLC, and the failure of the Argre and Post-Argre Plans to receive profits from DWT refunds, would not be a sufficient reason to terminate the Plans which might otherwise be expected to continue in existence for an indefinite period of time, during which it would be expected to invest Plan assets derived from participant and plan sponsor contributions as well as the proceeds of prior investments." Wagner R. ¶ 137.

   a.    First, as discussed *supra*, a sponsoring entity's business reason is not "the only permissible basis for Plan termination shortly after its formation."

   b.    Second, the unexpected end of a preferred investment strategy is a reasonable basis for the single-participant of a plan to decide not to continue to contribute to the plan (which is not the same as terminating the plan, as discussed *supra*), and would not cause the IRS to retroactively disqualify it.

---

[12] Wagner R. ¶¶ 50, 135. Again I will note that it does not run afoul of the Code's qualification rules to form a pension plan to invest in a specific investment strategy.

c.  Third, even if the single-participant actually did terminate the plan, as some single-participants did, the IRS would still focus exclusively on the question of whether the plan, at the time it was formed, was intended to be permanent.  Since the investment strategy was of an indefinite time, so too would be the plan created to invest in that strategy.  In my experience, this would satisfy the IRS that the plan was sufficiently permanent at the time of formation.

d.  Finally, to the extent Ms. Wagner suggests a plan is only permanent if it continues to "invest Plan assets derived from participant and plan sponsor contributions as well as the proceeds of prior investments," *id.*, this is clearly incorrect.  As I have mentioned, there are many types of plans that continue to be qualified plans despite having stopped receiving contributions and/or stopped investing. *See supra*, ¶¶ 79-82.

99.  Ms. Wagner concludes: "That the applicable Argre and [Post-Argre Plans] were actively operated for such a short period of time is strong evidence that the applicable Argre and Post-Argre Plans, from their inception, were not established as permanent bona fide retirement benefit programs." Wagner R. ¶ 136.

a.  In my experience, plans "actively operated for such a short period of time" will often lead the IRS to inquire as to whether the plan was intended to be permanent, but would not be dispositive or "strong evidence" that they were not.  As explained above, the correct inquiry is what the plan sponsor intended at the time of plan formation, not – from the perspective of hindsight - how long the plan actually operated.  These are two fundamentally different issues. *See supra* ¶¶ 78, 85-91.

b.  A more accurate framing is that operation (active or not) for more than five years *virtually guarantees* the IRS will not question the plan's permanence, and operation (active or not) for a lesser period may cause the IRS to inquire as to intent.

c.  For the reasons already discussed, had the IRS inquired as to whether these plans were intended to be permanent (meaning without a definite endpoint in mind), I believe the IRS would have found that they were indeed formed with the intent that they exist for an indefinite period, satisfying the permanence requirement.

d.  To state the inverse, for Ms. Wagner to argue persuasively that the plans failed the permanence requirement (due to their investment activities), she would have to

29

demonstrate that the sponsors knew at the time of plan formation that the trading strategies at issue in this case would only be available for a short duration. That is not supported in the record.

100. The Wagner Report's application of the permanency requirement to the Lehman and ED&F Plans is flawed for the same reasons as discussed above with respect to the Argre and Post-Argre Plans. As I have explained, the various factors on which Ms. Wagner relies—the supposed "abandonment" of plans, the creation of the plans soon before the commencement of the investing strategy, or the termination of the plans after the strategy became unavailable—do not work a violation of the permanency requirement so long as they were formed with the intent that they exist for an indefinite period. *See* Wagner R. ¶¶ 148-49, 158.

## VII. The "No Change" Letter the IRS Issued to the RJM Plan Following an Extensive Plan Examination Demonstrates that Ms. Wagner's Characterizations of the Qualification Requirements and IRS Enforcement Practices Are Not Accurate

101. Ms. Wagner's conclusions that the plans at issue were not qualified based on the issues addressed above is not only inconsistent with my own experience with IRS oversight of plan qualification, but also entirely inconsistent with what the IRS *itself* concluded following a detailed audit of the RJM Plan with respect to its 2016 Form 5500-EZ return, after which the IRS issued a "no change" letter accepting the RJM Plan's Form 5500-EZ filing as previously filed, and alleging no violations of the qualification requirements.

102. The IRS's examination of the RJM Plan was quite extensive, lasting almost two years. And while it examined the RJM Plan with respect to the plan year ending December 31, 2016, the IRS requested and reviewed substantial information going back several years before (covering the entire period at issue in this case), both with respect to the RJM Plan and its sponsoring LLC, as well as the following plans which are also at issue: (i) Avanix Management LLC Roth 401(k) Plan, (ii) Batavia Capital Pension Plan, (iii) Battu Holdings LLC Roth 401(k) Plan, (iv) Calypso Investments LLC Pension Plan, (v) Cavus Systems LLC Roth 401(k) Plan, (vi) Crucible Ventures LLC Roth 401(k) Plan, (vii) Hadron Industries LLC Roth 401(k) Plan, (viii) Limelight Global Productions LLC Roth 401(k) Plan, (ix) Michelle Investments LLC Pension Plan, (x) Monomer Industries LLC Roth 401(k) Plan, (xi) Plumrose Industries LLC Roth 401(k) Plan, (xii) Remece

Investments LLC Pension Plan, (xiii) Routt Capital LLC Solo 401(k) Plan, f/k/a Routt Capital Pension Plan and Trust, (xiv) True Wind Investments LLC Roth 401(k) Plan, and (xv) Xiphias LLC Pension Plan.

103.    In the course of that audit, the IRS examined the RJM Plan's compliance with the plan qualification requirements in Section 401(a) of the Code.  As described in the Internal Revenue Manual, under "Overview of Form 5500 Examination Procedures" (which covers Form 5500-EZ examinations):

> *(1) EP Examinations **determines if a retirement plan is qualified under IRC 401** and the underlying regulations, and **therefore, exempt from tax under IRC 501**.*
>
> *(2) Policy Statement 4-119 provides that the primary objective of the Employee Plans examination program is regulatory, with emphasis on continued qualification of employee benefit plans.  **IRS selects and examines returns** to:*
>
> a.  *Promote the highest degree of voluntary **compliance with the tax laws governing plan qualification**.*
>
> b.  *Determine the extent of compliance and the causes of noncompliance with the tax laws by qualified plans.*
>
> c.  ***Determine whether such plans meet the applicable qualification requirements in operation**.*
>
> [IRM Section 4.71.1.1.1 (last updated Nov. 29, 2019)] (emphasis added).

104.    I have reviewed documents submitted to the IRS by the RJM Plan over the course of that examination; in my opinion, those documents would have been sufficient to have alerted the IRS to each of the purported "disqualifying" issues Ms. Wagner describes – if they had in fact been disqualifying.

105.    For example, in support of her claims that plans were formed to invest in the partnerships for the benefit of others (ostensibly in violation of the exclusive benefit rule and the "permanency" requirement), Ms. Wagner states that:

> *For the first six years of its existence, RJM Capital LLC did not sponsor a pension plan; then, in February 2013, it established the RJM Plan, and just one month later, on March 7, 2013, the RJM Plan purported to purchase over 149,000,000 DKK (approximately $26,149,297 USD as of March 7, 2013) of TDC A/S stock.* Wagner R. ¶41.

106.    But the IRS requested and received, "all monthly bank and broker statements for 2012, 2013, 2014, 2015 and 2016" for the RJM Plan, along with significant additional

information, including documents with information about the "plan account at Solo Capital Partners" and significant tax and financial information concerning Solo and other investment partnerships.[13]   The materials also make clear that the RJM Plan was established in 2013.

107.   These bank statements and other information would have allowed the IRS to learn of the payments from the RJM Plan to Solo that Ms. Wagner claims violated the exclusive benefit requirement.  But the IRS did not disqualify the RJM Plan on the basis of those payments or allege that the RJM Plan had violated the exclusive benefit requirement.  In fact, the IRS issued a "no change" letter to the plan, indicating that the IRS did not find any disqualifying defects in the form or operation of the plan.

108.   In support of her conclusion that the plans were not funded in accordance with the Code, Ms. Wagner states that:

> The RJM Plan was also initially funded with $100, and these funds appear attributable to sources other than the Plan's sponsor…it is my opinion that these issues were sufficient to disqualify [the RJM Plan, and others noted by Ms. Wagner] under the Code.  Wagner R. ¶131.

109.   However, the IRS requested and received, along with significant additional information, documents identifying "the sources of all plan income (other than investment earnings) received from the plan's effective date through December 31, 2016."[14]

110.   If the IRS concurred with Ms. Wagner's understanding of the law—that the plans' investments were required to have been funded with assets derived from the plans' sponsor's trade or business income—it had obtained enough information from the RJM Plan to determine that the RJM Plan violated that requirement.  That fact that it did not do so is consistent with my view that Ms. Wagner has misstated the funding requirements for qualified plans.

111.   In support of her conclusion that the plans were not established or operated as "permanent" plans, Ms. Wagner states that:

> The RJM Plan was funded in its first year (2013) but funding ceased in 2014, 2015, and 2016… To the extent the Plan participants and sponsoring LLCs ceased

---

[13] *See* Response to IRS' February 4, 2019 Request for Information, dated February 25, 2019, WH_MDL_00357011.
[14] *See* Response to IRS' September 13, 2018 Request for Information, dated October 4, 2018, WH_MDL_00356990.

> *making Plan contributions, the likelihood of abandonment is reinforced.* Wagner
> R. ¶135-36.

112.    As noted above, the IRS requested and received information about all sources of plan
funding during all relevant periods (excluding investment earnings, sources of plan
funding would include contributions, rollovers and transfers). Accordingly, it would
have been apparent to the IRS that "funding ceased in 2014, 2015, 2016," and the IRS
did not thereafter find that the plan was disqualified or "abandoned."

113.    As noted above, on February 3, 2020, the IRS issued a "no change" letter accepting the
RJM Plan's Form 5500-EZ filing as previously filed, and alleging no violations of the
qualification requirements.

114.    The examination program is the IRS' primary enforcement program relating to tax
qualification. Despite this, and the extensive scope of relevant plan, LLC and investment
information reviewed, the IRS did not allege a violation of the exclusive benefit rule, or
any other qualification requirement relating to funding, "permanency" or otherwise, let
alone actually disqualify the RJM Plan (as noted previously, in my experience, even
when the IRS identifies such violations it almost always offers the opportunity for
correction, to allow plans to remain qualified).

115.    It should also be noted, for the avoidance of any doubt, that the IRS did not request or
analyze any information concerning the RJM Plan's adherence to principles from ERISA
(to which the RJM Plan was not subject), or supposed industry standards or norms,
concerning investments, fees and the like. This is consistent with my personal experience
representing plans before the IRS, that is, the focus is on compliance with the
qualification requirements in section 401(a) of the Code.

116.    I have not seen any evidence in the materials that I reviewed concerning the other plans
at issue in this case which I believe would lead to a different result than that of the RJM
Plan. Additionally, in the course of providing information in response to the IRS audit,
the RJM Plan provided information regarding a number of other plans that are defendants
in this litigation. *See supra* at ¶ 102. Based on my experience with IRS audits, it can be
fairly presumed that this information would have allowed the IRS to allege violations of
the exclusive benefit and permanency requirements and funding rules if Ms. Wagner's

claims as to what constituted a violation were correct. But the IRS did not do so. Furthermore, if the IRS had any issues, suspicions, or concerns about documents they received relating to the non-RJM Plans, nothing prevented them from initiating separate audits of those plans, which they also chose not to do.

## VIII. There Is No Evidence That Plan Assets Were Impermissibly Commingled With Other Assets

117. Ms. Wagner alleges that the plan assets were impermissibly commingled with other assets, and that this is a violation of the Code that can be the basis for plan disqualification. Wagner R. ¶¶ 17, 103.

118. She claims: "Qualified plan trusts generally may not commingle plan assets with the assets of other investors, since this would violate the Exclusive Benefit Rule under the Code as well as ERISA. The IRS has relaxed the general rule by permitting plans to pool their assets with the assets of other tax-advantaged plans but only if certain safeguards protecting the separate interests of the plans are met." Wagner R. ¶ 103; *see also* Wagner R. ¶ 138 (citing a number of IRS rulings purporting to set forth this group trust "requirement").

119. Although it is not entirely clear, presumably Ms. Wagner intends to state that, by "commingling" assets, the assets were somehow impermissibly diverted from the plan trusts, in violation of the Code's Exclusive Benefit Rule.[15]

120. This claim is incorrect. The cited rulings describe the types of qualified and non-qualified plans that can commingle assets in a group trust (and certain requirements that apply to the group trust) without causing the underlying trusts to lose their federal tax exemptions. But these rulings do not state that a qualified plan cannot invest in funds or other commingled vehicles in which non-pension investors participate. It is crucial to understand how the term "plan assets" is defined by regulators in this context.

121. At a high level, purchasing an investment with cash from a plan's trust, whether that investment consists of partnership interests, stocks and bonds, shares of a mutual fund or

---

[15] Ms. Wagner also at one point appears to allege violations of a purported "provision against co-mingling of assets" in the Code. Wagner R. ¶ 17 The Code does not have a freestanding provision against co-mingling qualified plan assets. In fact, as explained elsewhere in this report, the co-mingling of assets in qualified plans is accepted, common and permitted.

otherwise, does not mean that plan assets have been impermissibly diverted or "commingled" with those of other investors.  What is required is that the investment purchased (e.g., the shares of a mutual fund or the interest in a partnership) be then held in the trust.

122.    Indeed, qualified retirement plans are some of the largest investors in both registered (i.e., mutual) funds and non-registered funds (such as hedge and private equity funds, which are typically partnerships).[16]  If qualified plans could not invest in mutual funds in which non-plan investors participate, virtually all qualified plans would be disqualified.  And, if qualified plans could not co-mingle their assets with non-plan investors in hedge fund and equity fund partnerships, many of the largest pension plans in America would be disqualified.  Stated differently, in my experience in working with retirement plans and in handling IRS audits, most plans invest in co-mingled vehicles, such as mutual funds, and many plans invest in co-mingled vehicles such as partnerships, and I am not aware of the IRS even indicating an issue, much less proposing to disqualify a plan for that reason.

123.    As explained by the IRS on its website:

> there is no list of approved investments for retirement plans, there are special rules contained in the Employee Retirement Income Security Act of 1974 (ERISA) that apply to retirement plan investments.[17]

124.    It is clear that the IRS is aware of, and allows, qualified plans to invest in partnerships, mutual funds and other commingled investment vehicles.  Thus, it clearly does not interpret the Exclusive Benefit Rule to require the plan's cash remain physically custodied with its trustee, which would make investing impossible.  Rather, where cash is invested in another vehicle, the plan's ownership interest in that vehicle (e.g., shares, partnership interests) must then be held in the plan's trust.

125.    Understood in context, there is no tension between the Exclusive Benefit Rule and the ubiquitous and universally accepted practice of investing plan assets in funds and other

---

[16] See, e.g., New York State Common Retirement Fund Asset Listing as of March 31, 2021, available at https://www.osc.state.ny.us/files/retirement/resources/pdf/asset-listing-2021.pdf (indicating that the New York State Common Retirement Fund invests in a variety of types of registered and non-registered funds).
[17] https://www.irs.gov/retirement-plans/retirement-plan-investments-faqs.

commingled vehicles.  In turn, it becomes apparent that "commingling" a plan's investment in a partnership with those of the other partners is not a violation of the Exclusive Benefit Rule.  This crucial distinction is easily illustrated:  if, instead of investing in a commingled partnership, a plan's sponsor instead re-titled the plan's partnership interests in the name of the sponsor, this would constitute an Exclusive Benefit Rule violation.

126. Under ERISA, which does not apply for plan qualification purposes, there is a statutory provision and accompanying U.S. Department of Labor ("DOL") regulation which define "plan assets" in the context of investments.  Specifically, they define when the underlying assets of a partnership or other vehicle are deemed "plan assets."  [ERISA Section 3(42); 29 CFR §2510.3-101].  These rules apply to ERISA plans and non-ERISA qualified plans like solo 401(k)s (in the latter case, only for purposes of the Code's prohibited transaction rules under section 4975).

127. To paraphrase in relevant part, the "plan assets" rules provide that, where a plan invests in a partnership that is not an operating company (an operating business), the partnership interests themselves are plan assets, but the underlying assets of the partnership (i.e., contributed by plans) are not "plan assets" unless 25% or more of a class of equity interests are held by "benefit plan investors," including qualified plans, IRAs and certain others.

128. Even where the assets contributed to a partnership or similar vehicle constitute "plan assets" under these rules, this does not require that each plan's "share" of the underlying holdings be custodied and maintained separate from those of other investors.  Rather, it is required only that the partnership interests be held in the plan's trust.  As DOL rules governing the trust requirement explain:

> *If the assets of an entity in which a plan invests include plan assets by reason of the plan's investment in the entity, the [trust requirements] are satisfied with respect to such investment if the indicia of ownership of the plan's interest in the entity are held in trust on behalf of the plan by one or more trustees.*[18]

---

[18] 29 CFR § 2550.403a-1(b)(3).

129.    The IRS does not have any rule or practice that suggests or compels a different result. This is an area of DOL jurisdiction. In my career I have never heard of the IRS purporting to disqualify a plan because it participates in a partnership or other commingled vehicle in which non-pension investors also participate.

130.    Ms. Wagner concludes: "If the assets of the Argre and Post-Argre Plans were in fact pooled with the assets of other plans, as their custodial agreements indicated, there is no indication that a group trust meeting IRS conditions was ever created for purposes of holding their pooled assets. If the Plans participating in the scheme had at any time been pooled with non-plan assets of Solo Capital or another custodian or trustee, that fact alone would likely have led to their disqualification for U.S. tax purposes. In this event the pooling would have caused the Plans to lose their tax-qualified status which would, in turn, have made them ineligible for beneficial treatment under the Treaty." Wagner R. ¶ 138.

131.    For the reasons explained above, this opinion is incorrect. Understood in context, there is no impermissible "commingling" of assets among plans (i.e., that could require the establishment of a group trust) so long as each plan held its partnership interests in its trust.[19]

IX.    **ERISA Rules Are Not Applicable to These Non-ERISA Plans and Do Not Concern Qualification Regardless**

132.    Ms. Wagner's Report contains the word "ERISA" 277 times, often using phrases like the "Code and/or ERISA," without differentiating between their respective requirements, and treating them effectively as one. But they are different and only one (the Code) applies here. And even if the ERISA provisions Ms. Wagner cites did apply here (they do not), they do not concern qualification and are therefore not relevant to the question of whether the plans are tax-qualified.

133.    ERISA is regulated and enforced by the DOL. ERISA applies to plans of employers that cover common law employees. In those cases, plan sponsors and their plan committees

---

[19] I am not an expert in international tax or double taxation treaties and therefore do not opine on what the U.S.-Denmark tax treaty requires. Suffice to say that the pooling of plan assets would not cause the plans to lose tax-qualified status, so loss of tax-qualified status cannot "in turn, have made them ineligible for beneficial treatment under the Treaty."

37

and trustees are charged with managing retirement savings on behalf of rank-and-file workers. Thus, stringent fiduciary and conflict-of-interest (prohibited transaction) provisions apply. There is no ability to "opt out" of ERISA. For solo 401(k)s and other non-ERISA plans (that cover self-employed business owners), the sole account owner has no apparent motivation to misuse or mismanage their own retirement savings. And just as employer plans cannot opt out of ERISA, solo 401(k)s and other plans that do not cover common law employees cannot opt in.

134.    Solo pension plans, including solo 401(k) plans, cover only self-employed individuals (and their spouses) and are not subject to ERISA's provisions.

135.    It appears that many, or perhaps virtually all, of the plans at issue are solo pension plans, and more particularly solo 401(k)s. ERISA's provisions are therefore inapplicable.

136.    Even if the plans *were* subject to ERISA, which generally governs fiduciary conduct and conflicts of interest, a violation of ERISA's provisions would not cause a plan to be disqualified. Violations of ERISA rules can result in personal liability for fiduciaries, including disgorgement of compensation, restitution for loss of plan assets, other equitable relief, fines for certain violations, and even criminal liability in extreme cases, but not plan disqualification.

137.    Ms. Wagner makes numerous attempts to apply ERISA's requirements to the non-ERISA plans at issue here. *See, e.g.,* Wagner R. ¶ 91 ("While these solo plans are not expressly subject to ERISA's requirements, it is not uncommon for solo 401(k) plan documents to incorporate ERISA's now ubiquitous fiduciary provisions by reference, including ERISA's requirement that plan fiduciaries, including plan sponsors, perform their duties solely in the interests of the plan and its participants and act prudently when making plan investment decisions. For document providers as well as investment and service providers dealing with non-ERISA plans, this facilitates a single standard for providing investment advice and administrative services."); Wagner R. ¶ 105 ("Even where the ERISA statute does not apply, by its terms, its protections are nevertheless generally accepted as a uniform national standard for service providers and fiduciaries to follow.").

138.    Ms. Wagner's report suggests ERISA's obligations are so "generally accepted" that they have become ubiquitous and we can hold non-ERISA plans accountable for failing to

adhere to them.  This is false.  The IRS does not in my experience (and cannot) enforce ERISA requirements indirectly by somehow reading them in to the qualification rules under section 401(a) of the Code.  The qualification requirements are an objective list of specific mandates from Congress that must be met to achieve certain tax benefits; they are not concerned with fiduciary or general industry practices.  The varying policy goals that Congress believed should attach to retirement plans covering common law employees on one hand, versus those that attach to IRAs, solo 401(k)s and other individual vehicles on the other, are exactly why ERISA and the Code were issued as separate statutes in the first place.  The IRS does not have statutory authority to enforce Title I of ERISA and, as a result, the IRS would not hold non-ERISA plans to ERISA standards.  For example, the IRS does not enforce ERISA's fiduciary standard of care for managing investments.  In my experience the IRS does not, and has not ever, held non-ERISA plans to those standards.

139.    Ms. Wagner's report alternatively suggests that, if a form plan document refers to ERISA, the plan is subject to ERISA's requirements *and* those requirements become qualification requirements, Wagner R. ¶ 91, even if the plan is not an ERISA plan and despite the ERISA requirements not being qualification requirements in the first place.  This is not the case.

    a.    Whether it is common or not to incorporate some ERISA requirements into the plan documents for plans not otherwise subject to ERISA is not relevant for at least two reasons.  First, a non-ERISA plan does not *have* to incorporate these requirements, so they are still inapplicable to a plan that did not do so.  As discussed further *infra* at Paragraphs 149-152, though plans at issue included some paraphrasing of ERISA's fiduciary requirements, some also included an explicit provision rendering those provisions inapplicable if the plans are not ERISA plans.  Since they are not ERISA plans, these provisions are inapplicable, the plans do not incorporate any ERISA requirements, and ERISA requirements are therefore inapplicable.

    b.    Second, these fiduciary rules do not concern qualification.  If a plan violates an applicable fiduciary rule, the possible penalties include potential liability for the

fiduciary, equitable relief, and certain other remedies designed to restore the plan to its proper financial condition.  The violation does not result in loss of qualified status.

140.    As discussed above, to the extent Ms. Wagner's opinion is based on requirements under ERISA, it is incorrect.

141.    Ms. Wagner also points to the Code's fiduciary requirements and prohibited transaction rules.  Solo pension plans are indeed subject to the Code, and they must comply *only* with the provisions of Code section 401(a) in order to be qualified.  The fiduciary requirements and prohibited transaction rules in the Code are not contained in section 401(a), precisely because they do not concern qualification.  Violations of these other rules may lead the IRS to impose taxes on the amount involved in the prohibited transaction but do not affect a plan's qualified status.

142.    In short, the arguments in Ms. Wagner's Report conflate certain ERISA fiduciary requirements with the tax qualification requirements under section 401(a) of the Code.  As only the qualified status of the plans is an issue, this obfuscates the relevant point.  The only qualification requirements Ms. Wagner discusses are addressed in Sections IV-VII above; everything else in Ms. Wagner's Report, including her discussion of ERISA rules, is not relevant to the question of qualification under the Code.

X.    **Ms. Wagner Considers a Host of Other Plan Requirements Unrelated to Qualification**

143.    Beginning in the *Summary of Opinions,* Wagner R. ¶¶ 18-21 (and in numerous other places), Ms. Wagner argues that the plans failed to comply with "other U.S. legal obligations."  Because Ms. Wagner frames the relevant issue as whether the plans satisfied the requirements in section 401(a) of the Code, her arguments are not relevant to the qualified status of the plans.[20]

---

[20] Indeed, at times Ms. Wagner herself seems to acknowledge many of the requirements to which she points lead only to penalties, not disqualification.  *See, e.g.,* Wagner R. ¶ 105 ("U.S. law imposes a wide variety of other legal obligations on qualified pension plans, including regulatory reporting, disclosure and operational requirements. Failure to comply with these requirements may lead to the imposition of financial or other penalties on a plan or sponsor.").

144.    Even though the discussions of "other U.S. legal obligations" in Ms. Wagner's Report do not bear on the question of tax qualification, I provide some brief summary responses to assist the Court.  I have included these because Ms. Wagner frequently conflates the qualification requirements of section 401(a) of the Code with (i) other laws that do not affect plan qualification, (ii) other sections of the Code that do not affect plan qualification, and (iii) other laws that do not apply to the plans at issue.

A.    **Location of Custody and Plan Assets**

145.    Ms. Wagner's Report contains a number of arguments concerning the fact that the plan assets were purportedly insufficiently tied to the U.S.  These arguments appear under multiple labels including "custody," "indicia of plan assets ownership" and "domestic trust requirement."  Wagner R. ¶¶ 19, 106-07.

146.    In particular, Ms. Wagner states:

> *In the case of a plan subject to ERISA, the plan trustee may not maintain the indicia of ownership of plan assets outside the jurisdiction of the district courts of the United States.  Generally speaking, this requires the trustee to have a U.S. presence.  Plan assets which are foreign securities may be placed under the management and control of a fiduciary which is a corporation or partnership organized under the laws of the United States or a State, which fiduciary has its principal place of business within the United States and is a bank, insurance company, or investment adviser meeting certain financial criteria and subject to U.S. regulatory agencies. The assets of a plan not otherwise subject to ERISA, such as a solo 401(k) plan, could be subject to these management and control restrictions depending on the breadth of the prototype plan language relating to fiduciary matters.*  Wagner R. ¶ 106 (emphasis added); *see also* Wagner R. ¶ 139.

147.    As explained in the previous section, the underlying assets of a partnership in which a plan participates do not have to be custodied separately from those of other investors.

148.    In the *Summary of Opinions*, Wagner R. ¶ 19, Ms. Wagner states that "a 401(k) plan *should generally* custody its assets in the United States…", suggesting that the plans should not be viewed as qualified for that reason.  But, of course, there isn't any such qualification requirement in the Code.  In addition, "should generally" is a vague standard, perhaps of preference, but not reflective of any requirement that would be overseen by the IRS or relevant to a plan's  tax-qualified status.

149.   I disagree that non-ERISA plans would become subject to ERISA requirements simply because those requirements are referenced in a form prototype document. The qualification rules in Section 401(a) of the Code simply do not mandate adherence to plan terms unrelated to qualification. It is axiomatic that, since most 401(k) plans are subject to ERISA, a form prototype document intended for broad use would refer to it. But even to the extent that such a document does not make clear that ERISA applies only to ERISA plans, this is nonetheless the correct understanding in my view.

150.   Stated slightly differently, since a non-ERISA plan can neither comply with ERISA nor violate ERISA, then, by definition, references in a plan document to what ERISA permits or prohibits must be read in that context.

151.   Further, even if what Ms. Wagner argued were the case, in my experience the inclusion of ERISA's fiduciary requirements in a pre-approved plan document, and a violation of those fiduciary provisions, would not lead the IRS to propose that a plan be disqualified. Pre-approved plan documents, such as those with opinion letters, are now the prevalent form of documentation for qualified plans. I have not seen, or even heard of, the IRS taking a position that a violation of Title I of ERISA, or a violation of a plan provision that parroted an ERISA requirement, would disqualify a plan.

152.   In addition, while some of the documents may paraphrase ERISA's fiduciary requirements, the document used by the RJM Plan (and presumably others) includes the following provision:

   *J. Inapplicability of Certain Provisions If Plan is Not an ERISA Plan.*

   *Notwithstanding any other provision of this Agreement, at such times that the Plan is not an "employee benefit plan," within the meaning of Section 3(3) of ERISA, or is not subject to Part 4 of Title I of ERISA, Paragraphs B,C, E, F and G of Article Ill, the entirety of Article XII, and any reference to ERISA in this Agreement shall be inapplicable, and the Trustee shall have the authority to direct the investment and management of Trust assets.*

153.   The RJM Plan is not an ERISA plan.

154.   Finally, Ms. Wagner's Report argues that:

   *(i)n addition to ERISA's indicia of ownership rules, Treasury regulations issued pursuant to the Code contain an additional requirement: not only must the trust be*

*created or organized in the United States, but also "it must be maintained at all times as a domestic trust in the United States."* Wagner R. ¶ 107.

155.   Ms. Wagner goes on to point out that this requires U.S. persons to have control over trust assets.  Neither of these provisions prohibit overseas investments; it is only required that the trustee be domestic.[21]   In fact, qualified retirement plans are among the largest categories of investors in overseas markets and funds.  While most of the plans at issue are not subject to ERISA, the DOL has issued a regulation that deals exclusively with the issue of when ERISA retirement plans (almost all of which are tax-qualified) can maintain the "indicia of ownership" of assets outside of the U.S. for purposes of accessing foreign markets.  [29 CFR §2550.404b-1, titled *Maintenance of the indicia of ownership of plan assets outside the jurisdiction of the district courts of the United States*].  But this rule is inapplicable to non-ERISA plans.

156.   Further, while it does not have the force of law, I am aware of an IRS revenue ruling confirming that the domestic trust requirement does not mean that assets cannot be situated in a foreign country.  What the IRS requires is that the trustee must control the trust fund, and must be obligated to withhold tax from trust distributions.  [Rev. Rul. 57-199].

157.   For fundamentally the same reasons set forth in the previous section, the requirement that the trustee control the trust fund does not mean the trust is prohibited from investing in funds or other investments managed by third parties.

158.   It is axiomatic that, when a plan invests in a fund or other commingled vehicle, the professional asset manager of the fund is going to make the specific investment decisions, rather than the trust or other person who invests in the fund.  The fund's manager is likely to make dozens, or hundreds, of investment decisions, whereas the trust only made one (to invest in the fund in the first place).

159.   In my experience, most 401(k) plan trustees are directed (i.e., non-discretionary) and do not themselves select investments.  Rather, investments are typically selected by a plan

---

[21] It is common for U.S. pension funds to invest overseas.  *See, e.g.*, New York State Common Retirement Fund Asset Listing as of March 31, 2021, *available at* https://www.osc.state ny.us/files/retirement/resources/pdf/asset-listing-2021.pdf.

committee in the context of large 401(k)s, often with the assistance of professional investment advisors. For small plans, it is more typical that individuals pick the investments.

160.     In Paragraph 140 of her Report, Ms. Wagner intimates that other parties' authorities as to the investment of plan assets would disqualify the plans:

> *Moreover, it does not appear that Solo met the domestic trust requirements imposed by the IRS and so must be treated as a foreign custodian. In order for a trust to be considered domestic, '[o]ne or more United States persons have the authority to control all substantial decisions of the trust.' Here Solo Capital and/or Ganymede provided the [Post-Argre] and Argre Plans with instructions on which shares of Danish securities were to be traded, the volume of shares to trade, and the counterparties or brokers with whom to trade. Even though the Post-Argre and Argre Plans could theoretically decline to engage in the trades, in practice, the Plans assented to nearly every trade proposed by Solo Capital and/or Ganymede. The Post-Argre and Argre Plans therefore failed the Code's domestic trust requirement.*

161.     This assertion is incorrect, or at least highly misleading. The IRS is very well aware of the fact that 401(k) plans routinely rely on investment managers to select investments. It is also well aware of the fact that, within commingled investment vehicles such as funds, the third-party asset manager makes the investment decisions. This does not mean that the U.S. trustee lacks the requisite control, such that the trust ceases to be "domestic." 401(k) plans invest in markets all over the world, and if appointing professional investment managers who are not U.S. persons meant that a plan's "domestic trust" status was somehow in peril, then many of the 401(k) plans in America would likely be disqualified on that basis alone. Similar to the discussion in the previous section, Ms. Wagner conflates the issue of the trust's control over the investment of plan assets in a fund or other vehicle with the underlying investment decisions that are made by the professionals who operate the vehicle. It is the indicia of ownership in the fund (eg., shares of a mutual fund) or partnership that must be held in the domestic trust.

### B.     Prohibited Transactions

162.     Ms. Wagner argues that the plans committed prohibited transactions under ERISA and section 4975 of the Code because the arrangements involved allegedly excessive fees and for other reasons. Wagner R. ¶¶ 20, 108-115.

163.   Even if true, this allegation is not relevant.  As Ms. Wagner agrees, almost all of the plans
       were solo 401(k)s and thus not subject to ERISA.  More fundamentally, prohibited
       transactions under ERISA *and* under the Code do not result in plan disqualification under
       section 401(a) of the Code.  Under the Code, section 4975 exclusively governs prohibited
       transactions.  There is no qualification requirement under section 401(a) to avoid
       prohibited transactions.

164.   For the same reason, Ms. Wagner's discussion of the "Stock Lending Exemption" is not
       relevant.  Wagner R. ¶¶ 114-15.  This is one of many exemptions to the prohibited
       transaction rules.  Since the prohibited transactions rules are not relevant to the issue of
       tax-qualification, the applicability of any exemptions to the prohibited transactions rules
       are similarly not relevant.

165.   In my experience, I have never heard of the IRS attempting to revoke a plan's qualified
       status due to a prohibited transaction.  Under the Code, the consequence of prohibited
       transactions is an excise tax imposed upon a "disqualified person,"[22] for example, a
       service provider.  The tax is not applied to the plan and the violation does not disqualify
       the plan.  This is commonly known to the IRS and to practitioners who work with the
       IRS on plan qualification issues.

### C.    Records Requirement

166.   Ms. Wagner argues that the plans were required to maintain books and records available
       for review by the IRS, and did not. Wagner R. ¶¶ 21, 116-118.

167.   To be qualified under section 401(a) of the Code, a 401(k) plan has to maintain a
       compliant plan document and trust document (and may need to rely on an IRS correction
       program to remain qualified, for example if a required amendment is missed).  But
       otherwise section 401(a) of the Code does not impose any affirmative obligation to
       maintain books and records as a condition of qualification.

---

[22] "Disqualified person" is a defined term in the Code (section 4975(e)(2)).  It generally refers to persons closely
related to a qualified plan (or other tax-preferred account).  The term "disqualified person" refers to the relationship
of the person to a qualified plan (or tax-preferred account) and not to the qualification of the plan (or tax preferences
of the account).  In fact, the consequence of being a disqualified person is that some transactions with plans are
prohibited, and in that case, an excise tax imposed on the disqualified person, but that term does not refer to the
qualified status of a plan (or tax preferences of the account).

168.   For clarity on that point, the IRS requires books and records to be submitted as part of its plan audits (*i.e.*, to prove that the plan was operated in accordance with the qualification requirements of section 401(a)).  In turn, in a practical sense, plan sponsors should, for risk management purposes, maintain records of plan operation and documentation.  This does not mean, however, that section 401(a) imposes a legal obligation to maintain books and records, as if maintaining deficient records would disqualify the plan automatically. In this same sense, taxpayers generally should maintain records demonstrating that tax deductions and exclusions claimed on their tax returns are accurate.  But this does not mean a taxpayer whose records are insufficient is guilty of tax evasion.

169.   Ms. Wagner's report goes on to state that distributions must be reported on a properly coded Form 1099-R.  This is a tax reporting requirement, not a qualification requirement under section 401(a) of the Code.  As with other failures to file tax returns and reports, the consequence of a violation is a financial penalty, not plan disqualification.

170.   The Report further goes on to state that a solo 401(k) plan with assets of $250,000 or more must file a Form 5500-EZ with the IRS.  This is a tax reporting requirement, not a qualification requirement under section 401(a) of the Code.[23]

171.   In my experience, I have never heard of the IRS attempting to revoke a plan's qualified status due to a failure of bookkeeping, tax reporting or a Form 5500 series filing.  While failure to satisfy certain such obligations may have other consequences, loss of tax qualification is not one of them.

### D.      Regulatory Requirement

172.   Ms. Wagner's Report states that plans may be required to make certain filings (for example, TIC, FBAR and FinCEN filings), and states that if they did not, it would "suggest to me" that the Plans were not "bona fide" pension plans.  Wagner R. ¶ 119. These are regulatory filings designed to combat tax evasion, money laundering, etc., but not qualification requirements.

---

[23] In any event, multiple plans *did* file Forms 5500-EZ with the IRS. *E.g.*, 2015 Form 5500-EZ for Avanix Capital Management LLC Roth 401k Plan, WH_MDL_00002713; 2014 Form 5500-EZ for Batavia Capital Pension Plan, WH_MDL_00002719; 2014 Form 5500-EZ for RJM Capital LLC Pension Plan, WH_MDL_00002741.

173.    In my experience, I have never heard of the IRS attempting to revoke a plan's qualified status due to a failure the comply with a regulatory reporting requirement. While failure to satisfy reporting obligations may have other consequences, loss of tax qualification is not one of them.

174.    Ms. Wagner also claims "qualified pension plans seek to comply with these reporting requirements." Wagner R. ¶ 119. I understand that all the Argre and Post-Argre Plans, if not all the plans relevant to this litigation, consistently filed the TIC and FBAR forms she identifies. These efforts to "seek to comply," according to Ms. Wagner, suggest the plans are qualified.

175.    The IRS requests documents for their audits of plans, and plan sponsors and fiduciaries generally keep track of the relevant data for compliance with the IRS qualification requirements. But, there is not a "books and records" for qualified pension plans in the sense that the records need to be kept in a set of books or that the records be maintained in a particular form or location. That is evidenced by the large volume of records provided to the IRS in its audit of the RJM Plan. There were multiple requests by the IRS related to the plan's operations and those requests were answered by records from various sources. The IRS did not, in that audit, assert a qualification failure due to that lack of a formal set of books and records, because there is no such qualification requirement.

### E.    "Retirement Industry Standards"

176.    Ms. Wagner argues that the Plans were not created or operated in accordance with "retirement industry standards," "operational standards" or similar nomenclature. Since the key question—and the focus of Ms. Wagner's opinions—is whether the Plans satisfied the requirements set forth in section 401(a) of the Code, to the extent "retirement industry standards" refers to section 401(a) of the Code and the IRS' enforcement of its requirements at issue in this case (*e.g.*, exclusive benefit, permanency lack of improper funding), I disagree with Ms. Wagner's reasoning and conclusions for the reasons explained in those respective discussions. Otherwise, any discussion of "retirement industry standards," "operational standards," etc. has no bearing on the question of tax qualification.

177.   Further, reliance on "retirement industry standards" or "operational standards" with respect to solo 401(k) plans is misleading.  First, the discussion of these standards seems to refer to practices that are based on requirements in Title I of ERISA, and not on the Code's qualification requirements.  To the extent that is the case, the reliance on those standards is misplaced where the focus of Ms. Wagner's opinions is whether the plans are qualified under the Code.  Second, these standards, to the extent that they exist at all, are vague and largely meaningless, because the practices in the retirement industry differ materially between, for example, types of plans, sizes of plan in terms of assets and participants, and one-person, or solo, plans.  Thus, in addition to the fact that these vague standards are not relevant on the question of tax qualification, relying on them has the effect of "back-door" application of ERISA standards to circumstances where they do not apply.

178.   To illustrate, in the lead paragraph under "*The Plans Were Not Established or Administered as Qualified Plans*," Wagner R. ¶ 88, Ms. Wagner concludes in relevant part that:

> ...the Plans needed to satisfy the requirements for tax-exempt status which, as set forth in section 401(a) of the Code, concentrate on preserving plan assets for retirement purposes and safeguarding the interests of plan participants. For the reasons detailed below, t**he Plans did not satisfy these fiduciary standards generally accepted in the retirement industry** and therefore were not entitled to a refund under the Treaty. (emphasis added)

179.   Again, Ms. Wagner conflates "satisfy[ing] the requirements for tax-exempt status," which are in section 401(a) of the Code, and "fiduciary standards generally accepted in the retirement industry."  The requirements under section 401(a) of the Code are not "fiduciary standards," and except with respect to what section 401(a) actually requires, do not hinge on what is "accepted in the retirement industry."  Beyond that, there is not a commonly accepted definition of what is "accepted in the retirement industry", leaving any such statements meaningless.

180.   In short, Ms. Wagner's reference to retirement industry standards, fiduciary duties, prohibited transactions, ERISA, and anything other than the specific requirements specified in section 401(a) of the Code, are not relevant in any way to the question of qualification.

## XI.    Conclusion

181.    In conclusion, it is my opinion that, based on the information and materials I have reviewed, the plans at issue are qualified in both form and operation. Based on my understanding of and experience with how the IRS applies and enforces the Code's qualification requirements, it is my opinion that the IRS would not propose to disqualify the plans.

182.    To be qualified in form and operation, a plan must do nothing other than comply with the qualification requirements set out in section 401(a) of the Code. Nevertheless, Ms. Wagner's report imports a number of concepts and standards that do not apply to the qualification of pension plans. For example, large sections of Ms. Wagner's report purport to apply Title I of ERISA and alleged "industry standards," but neither are at all relevant to qualification under section 401(a) of the Code. Additionally, the ERISA standards that she discusses do not apply to solo 401(k) plans and the alleged industry standards appear to be based on the operations of large plans (and, in some cases, are practices of some plans but not standards at all).    Ms. Wagner's report frequently conflates these other concepts and standards with the qualification rules.

183.    With respect to those issues that are relevant to plan qualification, Ms. Wagner's report does not point to any audit practices, IRS approval filings, or other guidance to plan sponsors that apply to the facts of this case.  As this rebuttal report explains, Ms. Wagner's claims that the defendant plans in this case were not qualified because they violated the exclusive benefit and permanency requirements and were not funded in accordance with the Code's qualification rules are not supported by the application of relevant IRS standards and practices to the facts. The plans were operated in a manner that satisfied the qualification requirements relating to exclusive benefit, permanence, and funding, and the IRS application of those standards to qualified plans.

184.    My opinion that the plans would not be disqualified by the IRS is bolstered by the fact that the IRS performed an extensive audit of the RJM Plan and did not disqualify it. During the course of this two-year audit, the IRS received sufficient information for it to disqualify the RJM Plan or allege a qualification violation for the reasons Ms. Wagner claims it is not qualified, if the IRS agreed with those reasons.  Instead, the IRS issued

49

the RJM Plan a "no change" letter indicating that the IRS did not find any disqualifying defects in the form or operation of the plan. The IRS also received significant information and documents about a number of the other plans at issue, and likewise did not allege violations of the qualification requirements (or commence audits) of those other plans.

This Report is executed:

Date: February 1, 2022

_____
C. Frederick Reish

**Exhibit 1**
**Additional Materials Considered**

Expert Report of Marcia A. Wagner, Esq., December 31, 2021

Final Transcript of remote VTC Videotaped Deposition under Oral Examination of Michael Ben-Jacob, October 11, 2021

Final Transcript of remote VTC Videotaped Deposition under Oral Examination of Michael Ben-Jacob, Volume II, October 12, 2021

Final Transcript of remote VTC Videotaped Deposition under Oral Examination of Robert Klugman, January 28, 2021

Final Transcript of remote VTC Videotaped Deposition under Oral Examination of Richard Markowitz, April 8, 2021

Final Transcript of continued Remote VTC Deposition under Oral Examination of Richard Markowitz, Volume II, April 9, 2021

Adoption Agreement for William S. Jacobs Associates, Inc. Standardized Non-Integrated Defined Benefit Prototype Plan; Letter from Internal Revenue Service to William S. Jacobs Associates, Inc. – March 31, 2010; William S. Jacobs Associates, Inc. Defined Benefit Prototype Plan and Trust, RIVER_00000310

Cover letter of March 18, 2016 from Elite Pension Consultants to Basalt Ventures LLC, with enclosed copy of plan document, summary plan description, and IRS approval letter, MBJ_0077103.

The FWC Capital LLC Pension Plan, FWCCAP00000414

The Proper Pacific LLC 401k Plan, PROPPACIF00003619

2015 Form 5500-EZ for Avanix Capital Management LLC Roth 401k Plan, WH_MDL_00002713

2014 Form 5500-EZ for Batavia Capital Pension Plan, WH_MDL_00002719

Internal Revenue Service, "IRS Internal Revenue Manual," *available at* https://www.irs.gov/irm

Internal Revenue Service, "Retirement Plan Investments FAQs," *available at* https://www.irs.gov/ retirement-plans/retirement-plan-investments-faqs

Internal Revenue Service, "Rollover Chart," *available at* https://www.irs.gov/pub/irs-tege/ rollover_ chart.pdf

Office of the New York State Comptroller, "New York State Common Retirement Fund Asset Listing as of March 31, 2021," *available at* https://www.osc.state.ny.us/files/retirement/ resources/pdf/asset-listing-2021.pdf