# Exhibit 19

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CUSTOMS AND TAX ADMINISTRATION<br>OF THE KINGDOM OF DENMARK<br>(SKATTEFORVALTNINGEN) TAX<br>REFUND SCHEME LITIGATION | MASTER DOCKET<br>18-md-2865 (LAK) |

**SECOND**
**EXPERT REPORT OF RICHARD SALTER QC**

*28 February 2022*

I, **RICHARD STANLEY SALTER**, Barrister and one of Her Majesty's Counsel, of 3 Verulam Buildings, Gray's Inn, London WC1R 5NT, **DECLARE** as follows:

## (A)   Introduction

### (A1)   *The issues on which I have been asked to state my opinion*

1.   I have been asked by Wilmer Cutler Pickering Hale and Dorr LLP and Kostelanetz & Fink LLP on behalf of Richard J. Markowitz, Jocelyn P. Markowitz and the entities listed in Part 1 of Schedule A (together "**the Markowitz Defendants**"), and John H. van Merkensteijn, Elizabeth van Merkensteijn and the entities listed in Part 2 of Schedule A (together, "**the van Merkensteijn Defendants**") to state my opinion for the assistance of the United States District Court for the Southern District of New York ("**the New York Court**") on the issues of the law of England and Wales ("**English law**") discussed in the Rebuttal Expert Report dated 1 February 2022 of Ms Felicity Toube QC ("**the Second Toube Report**").

2.   For the purpose of this Report, I have been shown the documents cited in the Second Toube Report and the additional documents listed in Schedule B below.

### (A2)   *My qualifications to express this opinion*

3.   I incorporate by reference into this Report Section A2 of my Expert Report dated 1 February 2022 ("**the First Salter Report**"). That Section sets out my qualifications as an Expert Witness as to English law (annexing as Appendix 1 my curriculum vitae and as Appendix 2 a list of my academic publications), and my understanding of my duty to the New York Court. As there stated, my fee for my work in connection with this Second Report (as for the First Salter Report) and any testimony in this action is £950

per hour plus normal reimbursable expenses. My compensation does not in any way depend on the opinions I express or the outcome of this litigation. I have no connection with the Plaintiff, Skatteforvaltningen ("**SKAT**"), or with any of the Markowitz Defendants or the van Merkensteijn Defendants other than my instructions in connection with this case.

### (A3)    *The structure of this report*

4.    In order to assist the Court, I have divided the main part of this Report into the following sections:

    4.1    In **Section C**, I seek to summarise the main conclusions of the Second Toube Report, and to analyse the issues to which (in my view) those conclusions appear to give rise.

    4.2    In **Section D**, I discuss the English law of set-off.

    4.3    In **Section E**, I apply the principles of English law discussed here and in the First Salter Report to the interpretation of the Solo Custody Agreements.

    4.4    In **Section F**, I deal briefly with the potential effect of estoppel.

    4.5    In **Section G**, I summarize my conclusions.

5.    In this, my second Report (as in the First Salter Report) I shall refer to the interests in the shares in Danish companies[1] which are said by the Defendants to have been acquired for the purposes of the dividend arbitrage strategy[2] (and which are therefore in issue in these proceedings) as "**the Danish Shares**" and to the dividends payable and paid in respect of the Danish Shares as "**the Dividends**". Otherwise, to avoid confusion, I will generally adopt the capitalised abbreviations used by Ms Toube in the Second Toube Report.

### (B)    Summary

6.    By way of very brief summary, it is my opinion (on the basis of the information presently available to me and for the reasons explained in more detail in the following sections of this Report) that an English court would be likely to hold that the terms of the Solo Custody Agreements did not deprive the Pension Plans of all rights, title, and interest to the dividends they received, and for that reason, I disagree with the overall conclusion of the Second Toube Report.

---

[1]    I discuss the nature of these interests under English law in Section (D2) ("Intermediated Securities") of the First Salter Report.

[2]    See the Deposition of Richard Markowitz Day 1 at 144/23 to 146/12.

## (C)    The issues to which the Second Toube Report gives rise.

### (C1)    *Ms Toube's main conclusions*

7.      As I understand the position, Ms Toube's main conclusions are as follows:

7.1     The question of whether the Pension Plans were entitled to the dividends paid on the Danish Shares cannot be determined solely by the recorded entries on the account statements (as described in the Carr Report), but rather depends upon the terms of the Custody Agreements between each Pension Plan and the relevant Solo Custodian[3].

7.2     The terms of those Custody Agreements included provisions for set-off and (to the extent not set-off) for a Title Transfer Financial Collateral Arrangement ("**a TTFCA**") in relation to any funds received or held by the relevant Solo Custodian for its Pension Plan client[4].

7.3     The effect of those provisions was that, to the extent that any Pension Plan was entitled to a Dividend (and the Pension Plan had not requested that those funds be treated as Client Money) that Dividend would either "automatically and immediately, by operation of law") have been set-off against any outstanding debt to the relevant Solo Custodian, or all right, title and interest in that Dividend would automatically have been transferred to the relevant Solo Custodian[5].

7.4     Accordingly "the Pension Plans did not have any right title or interest to any alleged Dividend that they purportedly received" under these Custody Agreements (except to the extent that the Pension Plan had made a valid request that the Dividends be treated as Client Money)[6].

### (C2)    *The English law issues*

8.      The English law issues that seem to me to arise from these conclusions are these:

8.1     Is it correct that an English court would be likely to hold that the issue of entitlement to the Dividends depends solely or mainly on the terms of the Custody Agreements?

8.2     On the true interpretation of the terms of the Custody Agreements, in their documentary and commercial context:

---

[3]     Second Toube Report paras 6 and 66
[4]     Second Toube Report paras 8(1) and 66
[5]     Second Toube Report paras 8(2), 21(4)/(5), 66 and 67.
[6]     Second Toube Report paras 7, 66 and 67.

8.2.1.    Are the terms of the set-off provisions self-executing, so that any set-off of the dividends occurs (as Ms Toube states) "automatically and immediately, by operation of law"?

8.2.2.    Are the terms of the TTFCA provisions self-executing, so that any transfer of title occurs (as Ms Toube states) "automatically and immediately, by operation of law"?

8.2.3.    What effect (if any) do those provisions have on the entitlement of the Pension Plans to the Danish Shares and the Dividends on the Reference Date and/or thereafter prior to receipt of payment?

8.2.4.    What effect (if any) do those provisions have on the entitlement of the Pension Plans to the Danish Shares and the Dividends on and following receipt of payment?

8.3    Might the parties' actions, accounting entries and statements of account give rise to an estoppel, such as might prevent the Solo Custodians from asserting rights (eg of set-off or of TTFCA) that are inconsistent with that treatment?

8.4    What (if anything) was the effect of:

8.4.1.    The 2014 Solo Modification Letters; and/or

8.4.2.    The Amended Old Park Lane Custody Agreements; and/or

8.4.3.    The 2015 Solo Custodian Custody Agreements?

9.    Many of these issues overlap with each other, and so need to be considered together in the sections of this Report which follow.

*(C3)    Danish tax law*

10.    As I have indicated, the Second Toube Report concludes overall that "the contention in the Carr Report that the Pension Plans were entitled to the alleged Dividends is incorrect"[7]. Ms Toube does not, however, expressly identify the assumptions that she has made as to the nature and extent of the rights that the Pension Plans would have had to have possessed (and at what point in time and against whom) in order to qualify for the Danish tax refunds which they claimed from SKAT.

11.    In particular, the First Toube Report and my First Report were concerned (admittedly in relation to the documentation of Custodians other than Solo) with issues relating to

---

[7]    Second Toube Report para 66.

4

the ownership of interests in the Danish Shares as at the "Reference Date"[8] (ie, the last day of the "cum-dividend" trading period[9]). The discussion in the Second Toube Report appears to be concerned with a later point in time, when the Dividend has already been paid by the Danish company on the "Payment Date" and is thereafter received directly or indirectly by the relevant Custodian on behalf of the Pension Plan[10].

12.    The Second Toube Report sets out, in Section C paragraph 12, a summary of Ms Toube's understanding of the factual background: but that summary does not distinguish between ownership of the Danish Shares and receipt of the Dividends. Nor does it deal with the issue of the relevant time at which ownership or entitlement must be shown, or otherwise explain the assumptions that Ms Toube has been instructed to make with regard to these issues.

13.    These are not issues of English law. Under English principles of private international law they would (to the extent that they are justiciable at all in an English court[11]) be regarded as issues of Danish tax law.

14.    Since these issues are not issues of English law, neither Ms Toube nor I can usefully assist the New York Court in relation to them. The resolution of these issues is nevertheless likely to determine the nature and extent of the issues of English law that arise.

## (D)   The English law of set-off

15.    I begin with a few observations about the English law of set-off[12]. For a process which is an integral part of many ordinary, everyday commercial transactions, the historical

---

[8]    The Reference Date refers to the date at which the holder of a dividend-bearing share needed to have acquired (and continued to hold) the share in order to be eligible for the dividend. See Response 1 of ED&F Man's Response to Claimant's Request Dated 2 March 2021 for Further Information under Part 18.

[9]    See Section VI, paragraphs 118 to 128 of the Carr Report.

[10]    For example, in Figure 1 on page 40 of the Carr Report (which gives the dates relevant to the April 2013 Maersk Stock Trade by the RJM Plan), the "Reference Date" is 11 April 2013 and the "Payment Date" is 17 April 2013.

[11]    On 25 February 2022, the Court of Appeal (*Skatteforvaltningen v. Solo Capital Partners LLP & Ors* [2022] EWCA Civ 234) allowed SKAT's appeal from the decision of Andrew Baker J, sitting in the Commercial Court in London ([2021] EWHC 974 (Comm)), that SKAT's fraud-based claims infringed the English law rule against the enforcement of foreign revenue laws. A further appeal to the Supreme Court from that decision would require the permission of the Court of the Appeal or the Supreme Court: Constitutional Reform Act 2005 s 40(6).

[12]    The leading English textbook on the law of set-off is probably Rory Derham, *Derham on the Law of Set-Off* (4th edn, OUP 2010) ("***Derham***") (according to OUP, a fifth edition is due in May 2022). There are also two works by Philip Wood: his monumental *English and International Set-Off* (Sweet & Maxwell, 1989), now rather out of date, and Part 2 of his *Set-Off and Netting, Derivatives and Clearing Systems* (3rd edn, Sweet & Maxwell, 2019) ("***Set-Off and Netting***"). See also Gullifer and Pichonnaz, *Set-Off in Arbitration and Commercial Transactions* (OUP, 2014). In the banking context, there is Sheelagh McCracken, *The Banker's Remedy of Set-off* (3rd edn, Bloomsbury Publishing, 2010) (again, a new edition is in prospect). The topic of set-off is also dealt with in a number of more general textbooks, such as Joanna Benjamin, *Financial Law* (OUP 2007) Ch 12 ("***Financial Law***"); Louise Gullifer, *Goode*

origins of the English law of set-off make it a complicated and confusing area, bedevilled by uncertainties of terminology.  As George Leggatt QC[13] said in *Fearns v Anglo-Dutch Paint & Chemical Co Ltd*[14]:

> **The term "set-off" as it is used in English law has no uniform meaning and is therefore a ready source of confusion.**

16.    In general terms, set-off is the right of a debtor who is owed money by his creditor on another account or dealing to secure payment for what is owed to him by setting this off in reduction of his own liability[15].

> **It is difficult to give a comprehensive definition of set-off without reference to the various forms that it can take, but on a general level it can be defined as the setting of money cross-claims against each other to produce a balance. It provides a defence to an action, although, depending on the form of set-off, the issue need not arise in that context**[16].

17.    This setting-off of one money claim against another is a method of payment[17].

> **.. [S]et-off is the discharge of reciprocal obligations to the extent of the smaller obligation. It is a form of payment. A debtor sets off the cross-claim owed to him against the main claim which he owes his creditor. Instead of paying money, the debtor uses the claim owed to him to pay the claim he owes ..**[18]

18.    At the heart of the concept is the idea that – prior to the set-off – cross-claims exist between the parties, to which the existence or exercise by one of a right of set-off may, either to an extent or completely, provide an answer:

> **.. The essence of set-off, in this sense of the word, is the existence of cross-demands ..**[19]

> **.. Set-off and netting apply cross claims to reduce or extinguish each other, and thus replace gross claims with net claims ..**[20]

---

and Gullifer on Legal Problems of Credit and Security* (6th edn, Sweet & Maxwell, 2017) Ch 7 ("***Credit and Security***"); Hugh Beale, Michael Bridge, Louise Gullifer and Eva Lomnicka, *The Law of Security and Title-Based Financing* (3rd edn, OUP 2018) Ch 8 ("***The Law of Security***"); Victoria Dixon, *Goode on Payment Obligations in Commercial and Financial Transactions* (4th edn, Sweet & Maxwell 2020) Ch 2 ("***Payment Obligations***"); and Louise Gullifer and Jennifer Payne, *Corporate Finance Law: Principles and Policy* (3rd edn, Hart Publishing 2020) section [6.3.4].

13    Now Lord Leggatt, a Justice of the Supreme Court

14    [2010] EWHC 2366 (Ch), [2011] 1 WLR 366, at [11].  See also *Axel Johnson Petroleum AB v MG Mineral Group AG* [1992] 1 WLR 270 at 275-276, per Staughton LJ: "Its historical development has led to results which appear to lack logic and sense".

15    *Credit and Security* para [7-01]

16    *Derham* para [1.01]

17    *Payment Obligations* para [2-04].  "

18    *Set-Off and Netting* para [2-010]

19    *Derham* para [1.01].

20    *Financial Law* para [12.01].

19. In English law, there are (at least) five main categories of set-off. The labels traditionally used to describe these are decidedly uninformative, and the terminology coined by Professor Wood, which is much more meaningful, has gained acceptance in the courts[21]. These are; (1) Independent set-off (which includes legal set-off under rules carried over from the former Statutes of Set-Off and the rules of equity applied by analogy); (2) Transaction set-off (which includes both the common law right of abatement and equitable set-off); (3) Current account set-off (which includes the banker's right of combination of accounts); (4) Insolvency set-off (as regards companies, under the Insolvency (England and Wales) Rules 2016 rules 14.24 and 14.25); and (5) contractual set-off.

20. Insolvency set-off happens automatically, and irrespective of any agreement between the parties[22]. However, that is not the case in relation to most other forms of set-off, which require some act of assertion by the party relying on the set-off:

> **Independent set-off, whether under the Statutes of Set-Off or as applied by analogy in equity, is procedural only and the claimant is entitled to treat the claim and cross-claim as entirely distinct and independent of each other, so that the latter does not operate to reduce or discharge the former or affect the remedies for its enforcement except in legal proceedings in which the set-off is asserted.**

> **Other forms of set-off, including transaction (or equitable) set-off, are now recognised as substantive defences [but] it is now clear that this does not necessarily entail that the claim is extinguished or reduced by the cross-claim before judgment.**[23]

---

[21]    *Credit and Security* para [7.03].

[22]    "Certain principles as to the application of these provisions have been established by the cases. First, the rule is mandatory ('the mandatory principle'). If there have been mutual dealings before the winding-up order which have given rise to cross-claims, neither party can prove or sue for his full claim. An account must be taken and he must prove or sue (as the case may be) for the balance. Secondly, the account is taken as at the date of the winding-up order ('the retroactivity principle') .. Thirdly, in taking the account the court has regard to events which have occurred since the date of the winding up ('the hindsight principle') ..": *MS Fashions Ltd v Bank of Credit and Commerce International SA (No. 2)* [1993] Ch 425 at 432-433, per Hoffmann LJ.

[23]    *Credit and Security* para [7-02]. "The defence of set-off derived from the Statutes of Set-off is commonly described as a procedural defence. By this it is meant that separate and distinct debts remain in existence until judgment for a set-off, and, moreover, the defence has no effect until judgment. Prior to judgment the rights consequent upon being a creditor still attach, as do the obligations and liabilities consequent upon being a debtor. A similar analysis should apply when equity acts by analogy with the Statutes" .. "Equitable set-off, unlike set-off under the Statutes of Set-off, admittedly is regarded as a substantive defence. But this does not mean that it takes effect as an automatic extinction of the cross-demands to the extent of the set-off .. Rather, the substantive nature of the defence means that, prior to judgment for a set-off, the unpaid creditor's conscience is affected in equity such that he or she is not entitled to assert that moneys are due from the debtor to the extent of the cross-demand, notwithstanding that at law the cross-claims continue to subsist": *Derham* paras [4-29] and [5-154].

> **.. an equitable set off does not extinguish liability until the netting off of the cross-claims has been agreed, ordered by a judgment or awarded by an arbitral award ..**[24]

21.    In the present case, the Custody Agreements contain terms which expressly provide for contractual set-off.

> **.. Contractual set-off is sometimes referred to as though it were a distinct type of set-off, though it is more a case of existing types of set-off being modified by agreement between the parties, which may either increase or diminish to the point of extinction rights of set-off that would otherwise arise ..**[25]

In general, contracting parties are free to agree on almost any terms for contractual set-off that they may choose, and these will be effective so long as they are not cut off by insolvency.  The nature and extent of the rights thereby created and/or extinguished will therefore depend upon the true interpretation of the contractual set-off provisions, in their documentary and commercial context.

22.    The terms "netting" and "set-off" are sometimes treated as interchangeable.  In the context of financial transactions, however, the terms are normally used to describe different concepts[26].

> **In financial circles netting is used to denote contractual arrangements by which claims of different parties against each other are reduced to a single balance whereas the simple form of contractual set-off is a clause in a contract providing that one party is entitled to set-off against any sums it owes to the other all sums owed to it by the other.** [27]

## (E)    The Solo Custody Agreements

23.    Against that general background, I therefore now turn to consider how an English court would interpret the relevant provisions of the Solo Custody Agreements.  The general

---

[24]    *Aramco Trading Fujairah FZE v Gulf Petrochem FZC* [2021] EWHC 2650 (Comm) at [7], citing *Fearns v Anglo-Dutch Paint & Chemical Co Ltd* (fn 14 above) and *Stemcor UK Ltd v Global Steel Holdings Ltd* [2015] EWHC 363 (Comm).

[25]    *The Law of Security* para [8-71].  According to Philip Wood, contractual set-off "is a set-off created by contract where it would not otherwise exist": *Set-Off and Netting* para [2-016].

[26]    There are many varieties of "netting" provision, including "novation netting" (where "two (or more) entire contracts (not just payment obligations) of the same type are terminated and replaced by a new contract of exactly the same type that mirrors only the net balance of the terminated contract": Paech, *Preliminary draft report on the need for an international instrument on the enforceability of close-out netting in general and in the context of bank resolution* (prepared for Unidroit); "settlement netting" ("The computation by contract of equivalent fungible claims under executory contracts, e.g. for commodities or foreign exchange where the mutual deliveries fall due for payment or delivery on the same day. Settlement netting is different from 'classical' set-off because it applies to deliveries under contracts that are still to be performed, whereas set-off traditionally applies to debts that are due": *ibid*); and "close-out netting" (see the definition of "close-out netting" in the Financial Collateral Arrangements (No 2) Regulations 2003 (SI 2003 No 3226) reg 3).

[27]    *Credit and Security* para [7-02]

principles which the English courts apply in interpreting commercial contracts such as this are set out in Section (C) of the First Salter Report, and I shall not repeat them here.

## (E1)   *The 2012 Solo Custody Agreements*

24.    I begin, like Ms Toube, with the 2012 Solo Custody Agreements.

25.    The relevant provisions of the 2012 Solo Custody Agreements are set out in paragraph 20 of the Second Toube Report.  In particular:

25.1    Clause 4.1 provides that:

**If requested by the Client the Custodian may, in its sole discretion, advance funds to the Client to facilitate the settlement of any transaction relating to Property, or settle any transaction relating to Property for the account of the Client. Any such funds advanced or amounts settled by the Custodian will immediately become repayable by the Client to the Custodian on demand.**

25.2    Clause 4.2 provides that:

**Any funds received or held by the Custodian for the account of the Client in connection with any transaction relating to Property[28] (including, without limitation, any collateral or margin) and any dividend, distribution or other income on any Investments[29] received by the Custodian for the account of the Client shall be set off, immediately and without notice to the Client, against any liability of the Client to the Custodian that has arisen from or as a result of this Agreement (including, without limitation, any liability of the Client which may have arisen as a result of the Custodian advancing funds to the Client or settling any transaction for the account of the Client under clause 4.1).**

25.3    Clause 4.3 then provides that:

**The Client agrees that, where any amount of funds received by the Custodian for the account of the Client exceeds the Client's existing liabilities towards the Custodian, all right, title and interest in and to any excess funds which do not become subject to immediate set-off on receipt by the Custodian in accordance with clause 4.2 will transfer to the Custodian free of any liens, claims, charges or encumbrances as security for any future or prospective actual or contingent liabilities of the Client towards the Custodian ..**

---

[28]    Defined in clause 1.1 to mean "any cash and Investments of the Client held or administered pursuant to this Agreement"

[29]    Defined in clause 1.1 to mean " all other assets other than cash of the Client held or administered pursuant to this Agreement".

(E1.1)    Set-off under clause 4.2

26.    According to paragraph 21(4) of the Second Toube Report:

> **Under English law, the effect of this set off** [under clause 4.2] **would be to net off any Dividend received against the liability of the Pension Plan to the Custodian.**

27.    The set-off contemplated by clause 4.2 is of the Custodian's liability to the Pension Plan in relation to "funds received" against "any liability of the Client to the Custodian that has arisen from or as a result of this Agreement".

27.1    The first point to note about this is that, if the Pension Plan does not have any relevant liability to the Custodian, there can be no set off under clause 4.2[30].

27.2    The second is that the use of the words "that has arisen" would, in my view, suggest to an English court that the Pension Plan's liabilities to which this set-off applies would only be those which were, at the relevant moment, then due and payable.  That interpretation would also fit with the provisions of clause 4.1, which says that funds advanced or amounts settled by the Custodian shall "immediately become repayable on .. demand".  It would also fit with the provisions of clause 4.3, which provides for a TTFCA rather than a set off "where any amount of funds received by the Custodian for the account of the Client exceeds the client's *existing* liabilities towards the Custodian", and for those funds to be held "as security for any future or prospective actual or contingent liabilities".

27.3    If that be right, then the set-off under clause 4.2 would apply only to such of the Pension Plan's liabilities to the Custodian (if any) which were then immediately payable, and not to those (if any) which were only payable at some future date or where the parties had agreed that they should be discharged in some other way or from some other source.

28.    A more difficult issue is whether (as Ms Toube asserts) the use of the phrase "shall be set off, immediately and without notice to the Client" in clause 4.2 means that that clause gives rise "automatically and immediately, by operation of law"[31] to the netting off of the parties' claims, without any further action on the part of either of them.

29.    As I have noted in paragraph 20 above, that is not usually the effect of solvent set-off under English law.  It is, nevertheless, always open to parties to provide for that effect in their contract.  The contractual context here unfortunately provides only a very little

---

[30]    See further paragraph 35.1.1 below.
[31]    Second Toube Report para 67(1).

assistance in deciding whether they have in fact done so in the present case.  What there is, however, is at least consistent with that *not* being their intention.

29.1    The phrase that I have just quoted speaks of the set-off taking place "immediately" and "without notice".   Clause 4.2 does not, however, use the Ms Toube's word "automatically".  Nor does it refer expressly to the parties' cross-claims being "netted off" against each other to produce a single net liability.

29.2    Clause 4.3 speaks of the Pension Plan's funds becoming "*subject to* immediate set-off on receipt"[32] under clause 4.2.  The use of the words "subject to" might perhaps suggest that the effect of clause 4.2 is not automatic, but simply gives the Custodian the right to deal with the funds of the Pension Plan in that way.

29.3    Similarly, clauses 5.1 and 5.2 refer to "Funds in respect of which set-of *is applied* under clause 4.2"[33].  The use in these clauses of the word "applied" might again perhaps suggest that some positive act of application (for example, the making of suitable accounting entries recording the set-off) is required before the set off will occur.

30.    As for the wider context, Clause 4.2 of the 2012 Solo Custody Agreements provides that the set-off shall take place "without notice".  Under CASS 7.2.9 "Money is not client money when it becomes properly due and payable to the firm for its own account".  The Dividends would therefore not, following any set-off, be Client Money subject to the Client Money Rules.   However, the receipt of a Dividend and its use by way of set-off in reduction of any amounts owing by the Custodian to the Pension Plan ought nevertheless always to have been recorded in the relevant Solo Custodian's own records[34] and to have been reflected in any transaction reports or statements of account provided by the Custodian to the Pension Plan[35].   That certainly appears (eg from paragraphs 160(c) and 172(c) of the Carr Report and from the various example statements of account which I have seen) to be how the transactions were in fact operated and accounted for in practice[36].

---

[32]    Emphasis added.

[33]    Emphasis added.

[34]    In order to comply, inter alia, with the requirement in CASS 7.6.1 to "keep such records and accounts as are necessary to enable it, at any time and without delay, to distinguish client money held for one client from client money held for any other client, and from its own money", and the requirement in CASS 7.6.3 to "maintain its records and accounts in a way that ensures their accuracy, and in particular their correspondence to the client money held for clients".

[35]    In order to comply, inter alia, with the requirements of COBS 16 with regard to transaction reports, and with the Custodian's more general contractual, common-law and fiduciary duties (supplemented by its statutory obligations under COBS 2.1 to "act honestly, fairly and professionally in accordance with the best interests of its client" and under COBS 4.3 to ensure that any " communication [in relation to designated investment business such as safeguarding and administering investments in securities] is fair, clear and not misleading").

[36]    Though, as noted in fn 38 below, that may (depending on the facts) be simply because there were no relevant liabilities in relation to which the set-off under clause 4.2 could operate.

31.    While this post-contractual conduct cannot of itself influence the interpretation of the 2012 Solo Custody Agreements[37], the regulatory context to which I have just referred would nevertheless be part of "the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract". That context – that the Custodian would in practice need to record any set-off under clause 4.2 internally and to reflect any such set-off in any statements of account – would in my view be regarded by an English court as a significant factor in determining which of the available interpretations of clause 4.2 makes the most business sense.

32.    Taking all these matters into account, and on a fine balance, it is my view that an English court would probably hold that clause 4.2 was not self-executing, but instead simply gave the relevant Solo Custodian the right (if it so chose) to effect the set-off by making suitable credit and debit entries in its records. That seems to me to be the interpretation which make the best sense of the words used in clause 4.2 in their overall documentary and commercial context.

33.    Even were I to be wrong about that, the parties' post-contractual conduct could nevertheless (as I explain in Section F below) have significant consequences for the legal rights of the parties. Whether it did so would, of course, depend on the facts.

34.    In relation to the effect of the set-off provided for by clause 4.2, Ms Toube then goes on to say that:

> **To the extent that a Dividend is subject to set off in full, the result is that there will be no Dividend remaining to which the Pension Plan could have rights, title or interest.**

35.    It of course follows simply as a matter of logic and arithmetic that, if a money obligation owed by a Custodian to the Pension Plan – ie a Dividend - has been applied in full in discharge by set-off of the Pension Plan's money obligations to a Custodian, none of that money obligation  - ie that Dividend - will then remain. However when the New York Court comes to consider the underlying significance (if any) under Danish tax law (or otherwise for the purposes of this case) of that otherwise unremarkable fact, a little further analysis of the position than Ms Toube provides may perhaps be useful:

35.1    First of all, as I have pointed out in paragraph 16 above, at the heart of the concept of set-off is the idea that, prior to the set-off, cross-claims exist between the parties. This has two consequences:

35.1.1.    As noted in paragraph 27 above, the set-off provided for in clause 4.2 can only occur to the extent that there is a debt due *from* the relevant

---

[37]    See paragraph 18 of the First Salter Report.

Pension Plan *to* the relevant Solo Custodian.  If there is no relevant debt due from the Pension Plan to the Custodian, then there can be question of the Dividend being used by way of set-off to discharge that debt[38].

35.1.2.  For similar reasons, the set-off provided for in clause 4.2 can only occur to the extent that there is a debt due in the opposite direction, ie *from* the relevant Solo Custodian *to* the relevant Pension Plan.

35.2    It is therefore implicit that, prior to the operation of this right of contractual set-off against a Dividend, the relevant Pension Plan has a claim in relation to that Dividend against the relevant Solo Custodian. In simple terms, the Dividend must, prior to being set-off under clause 4.2, belong to the Pension Plan.  Put in the terms used in paragraph 21(4) of the Second Toube Report that means that, prior to the operation of this contractual set-off, there was in the hands of the Solo Custodian (albeit perhaps only for a *scintilla temporis*) a "Dividend to which the Pension Plan had rights, title or interest", in relation to which the Pension Plan had a claim against the Custodian.

35.3    This can also be seen from the fact that the use to which the Dividend is put by the operation of this contractual set-off provision is to discharge a monetary obligation owed by the Pension Plan - in ordinary language, to pay one of the Pension Plan's debts.  It is implicit in that that the Pension Plan was, prior to the Dividend being put to that use, entitled to the Dividend.  One cannot properly pay a debt with someone else's money.

35.4    Once the Dividend had been put to that use, it of course no longer exists, because the money had been spent.  But that is because that money has been used by (or, at least, with the authority of) the Pension Plan, as the person entitled to that money.  The same effect would have occurred if the Dividend had been paid, not to the Custodian, but into an overdrawn bank account operated by the Pension Plan, or had been used to buy goods or services for the Pension Plan.

35.5    Finally, clause 4.2 only takes effect on "funds received".  The set-off for which it provides can therefore in any event only occur if and when the funds are received.  If the relevant moment under Danish tax law for determining entitlement to reclaim withholding tax occurs on the Reference Date or at any point thereafter prior to that receipt (including the moment of payment by the Danish company), clause 4.2 and its effects will not be relevant to that issue.

---

[38]    This is a factual issue.  However, I note that the Carr Report states that the Pension Plans in fact financed their purchases of the Danish Shares through funds obtained by stock lending transactions, rather than by borrowing from the relevant Solo Custodian: see Carr Report paras 25, 144(c) and 146.  If that be so, clause 4.2 would have no relevant application.

### (E1.2)    TTFCA under Clause 4.3

36.    Paragraph 21(5) of the Second Toube Report then deals with the effect of clause 4.3 of the 2012 Solo Custody Agreements, stating that:

> **.. [U]pon receipt of any part of an alleged Dividend which was not subject to immediate set-off (i.e. where there were no liabilities owed to Solo arising from the relevant agreement), all right, title and interest in and to any such alleged Dividend would be transferred to Solo under the [TTFCA], which would ensure that the Pension Plan could meet any liabilities to Solo, whether future or present, actual or contingent ..**

37.    In the First Salter Report, I set out an overview of the English law relating to interests in Intermediated Securities (such as the Danish Shares) in section (D2), and of the English law relating to Financial Collateral Arrangements in section (D3).  I invite the attention of the New York Court to those sections (which I shall not set out again here).

38.    The position in relation to the Dividends is perhaps less clear than in relation to the Danish Shares themselves.  However, both are interests simply represented by book entries: and, by analogy with the reasons which I explained in those sections of the First Salter Report in relation to the custody of and transfer of title to the Danish Shares, it seems to me to be well arguable that the transfer contemplated by clause 4.3 would not have occurred automatically on the receipt of the Dividends but would have required the making of some kind of accounting entry by the relevant Solo Custodian recording that transfer in order for it to be effective actually to transfer to that Custodian title to the Dividends.

39.    I therefore do not agree with the analysis in paragraph 21(5) of the Second Toube Report.

### (E1.3)    Business common sense

40.    In paragraph 22 to 26 of the Second Toube Report, Ms Toube seeks to support her interpretation of the 2012 Solo Custody Agreements by reference to "business common sense", on the basis that "it provides Solo with comprehensive protection in respect of its exposure to the Pension Plan".

41.    Business common sense is, of course, often a highly relevant consideration in the interpretation of commercial contracts. However, while an interpretation which provided Solo with "comprehensive protection" could possibly have accorded with business common sense from the point of Solo, it would not necessarily have made the same business sense from the point of view of the Pension Plans.  Moreover, as is clearly

apparent from the Deposition of Richard Markowitz[39], the overall commercial purpose of both parties to these arrangements was to give effect to the dividend arbitrage strategy. Anything which undermined or impeded the effectiveness of that strategy would have been contrary to that overall commercial purpose. As explained in section (C3) of the First Salter Report, the overall commercial or business object of the transaction is often regarded by the English courts as the best guide to the interpretation of the commercial documents intended to give effect to it.

### (E1.4)    Conclusion

42.    Paragraph 27 of the Second Toube Report states:

> **In summary, my opinion is that pursuant to the 2012 Solo Custody Agreements any alleged Dividends, to the extent that they are not subject to the immediate Set-Off Provision in clause 4.2, will be subject to the TTCA in clause 4.3 by which all right, title and interest in those Dividends will pass to the Solo Custodian upon receipt. Under either scenario, the 2012 Solo Custody Agreement operates to deprive the Pension Plan of any right, title or, interest in any alleged Dividend.**

43.    For the reasons which I have just explained, I do not entirely agree with this summary. In my view, an English court would probably hold that:

43.1    Clause 4.2 was not self-executing, but instead simply gave the relevant Solo Custodian the right (if it so chose) to effect the set-off by making suitable credit and debit entries in its records.

43.2    The set-off for which clause 4.2 provides can in any event only occur if and when the funds are received. If the relevant moment under Danish tax law for determining entitlement to reclaim withholding tax occurs before that moment, then clause 4.2 is irrelevant to that issue.

43.3    The set-off under clause 4.2 would apply only to the Pension Plan's liabilities which were then immediately payable, and not to those (if any) which were only payable at some future date or where the parties had agreed that they should be discharged in some other way or from some other source. If the Pension Plan did not have any relevant liability to the Custodian, there could be no set-off under clause 4.2.

43.4    It is in any event implicit that, prior to the operation of this right of contractual set-off, the relevant Pension Plan has a claim in relation to the Dividend against the relevant Solo Custodian. It is also implicit in that that the Pension Plan was,

---

[39]    See fn 2 above.

15

prior to the Dividend being used by set-off to pay its liabilities to the Custodian, entitled to the Dividend.

43.5    Once the chose in action[40] that is the Custodian's debt to the Pension Plan in relation to the Dividend had been used for that purpose, it of course would no longer exist.  However, the same effect would have occurred if the Dividend had been paid, not to the Custodian, but into an overdrawn bank account operated by the Pension Plan or used to buy goods or services for the Pension Plan.

43.6    The transfer of title contemplated by clause 4.3 would not have occurred automatically on the receipt of the Dividend but would have required the making of some kind of accounting entry by the Custodian recording that transfer in order for it to be effective actually to transfer title to the Dividend.

### (E2)    The 2014 Solo Custody Agreements

44.    As is pointed out in paragraph 31 of the Second Toube Report, in the RJM-Solo Agreement (2014):

44.1    The definitions in clause 401.1 are similar to those in clause 1.1 of the 2012 Solo Custody Agreements;

44.2    Clause 404.1 is in similar terms to clause 4.1 of the 2012 Solo Custody Agreements; and

44.3    Clause 404.2 is in materially identical terms to clause 4.2 of the 2012 Solo Custody Agreements.

45.    These provisions are materially the same as those found in the 2012 Solo Custody agreements.   My view as to the way in which an English court would be likely to interpret these provisions has therefore already been expressed in section (E1) above.

46.    Clauses 404.3 and 404.5 of the RJM-Solo Agreement (2014) are, however, in different terms to those found in the 2012 Solo Custody Agreements.  Clause 404.3 provides that:

**The Client agrees as a condition to the continued provision by the Custodian of services to the Client, that all Cash transferred to the Custodian by the Client, on behalf of the Client, for the account of the Client or which is otherwise held by the Custodian for the Client from time to time for the**

---

[40]    English common law draws a fundamental distinction between real and personal property, and then sub-divides the latter into two classes of thing, choses in possession (or chattels) and choses in action (or intangibles).  "'Chose in action' is a known legal expression used to describe all personal rights of property which can only be claimed or enforced by action, and not by taking physical possession": *Torkington v Magee* [1902] 2 KB 427 at 420, DC.

purpose of securing or otherwise meeting the Client's obligations to the Custodian whether present or future, actual or contingent or prospective shall be transferred to the Custodian with full ownership so that the Client no longer has a proprietary claim over it ('TTC Funds'). The Client acknowledges and agrees that:

404.3.1 all right, title and interest in and to TTC Funds shall vest in the Custodian free and clear of any liens, claims, charges or encumbrances or any other interest of the Client or any third person;

404.3.2 the Custodian will not segregate TTC Funds from the Custodian's own assets and the Custodian may use the TTC Funds in the course of its own business. If the Custodian becomes insolvent, the Client will rank only as a general creditor;

404.3.3 no mortgage, charge, lien, pledge, encumbrance or other security interest is intended to be or is created in favour of the Custodian in the TTC Funds;

404.3.4 TTC Funds shall be treated by the Custodian as collateral in accordance with Chapter 3 of the FCA handbook known as CASS (as amended from time to time) and not as client money in accordance with the Client Money Rules in that sourcebook; and

404.3.5 if the Custodian determines in its discretion that the TTC Funds held are more than is necessary to cover the Client's obligations whether present or future, the Custodian will return an appropriate amount of TTC Funds to the Client.

47.    In paragraph 33 of the Second Toube Report, Ms Toube expresses the view that clause 404.3 "similarly operates to transfer all right, title and interest to any alleged Dividends to Solo upon receipt of those Dividends".   I do not agree.

48.    The first issue which an English court would have to consider, when interpreting this provision, is whether the phrase "*all Cash*[41] *transferred to the Custodian by the Client, on behalf of the Client, for the account of the Client or which is otherwise held by the Custodian for the Client from time to time for the purpose of securing or otherwise meeting the Client's obligations to the Custodian whether present or future, actual or contingent or prospective*" encompasses the Dividends.

49.    The discussion of that issue in paragraph 33(1) of the Second Toube Report ends the quotation after the words "held by the Custodian for the Client". On that basis, Ms Toube expresses the view that the Dividends amount to "Cash .. transferred to the Custodian for the account of the Client" or "Cash .. otherwise held by the Custodian for the Client". However, the definition of the "Cash" to which clause 404.3 applies does

---

[41]    Defined as "money in any currency credited to an account and any similar claim for repayment of money".

not in reality end there, but continues with the words "for the purpose of securing or otherwise meeting the Client's obligations to the Custodian ..".  The issue is whether that restrictive description applies only to the "Cash" described in the last phrase – "or which is otherwise held by the Custodian for the Client from time to time" -, or qualifies the entirety of the provision quoted.

50.     In my view, an English court would be likely to hold that the restrictive description "for the purpose of securing or otherwise meeting the Client's obligations to the Custodian .." was intended to qualify the whole of the provision.  That is because it is preceded by the words "or which is *otherwise*".  The provision does not say "Cash transferred .. by the Client, on behalf of the Client, for the account of the Client, or held for the purpose of securing".   Instead, it says "Cash transferred .. by the Client, on behalf of the Client, for the account of the Client, or <u>otherwise</u> held for the purpose of securing" - thereby implying that the earlier words, "Cash transferred .. by the Client, on behalf of the Client, for the account of the Client" are also qualified by that description of their purpose.

51.     If that is so, then the provisions of clause 404.3 will apply only to money transferred to or held by the Custodian as security.  In effect, clause 404.3 is saying that all money held as security is held on title transfer terms.  That clause would, however, have no effect on funds not transferred or held as security.  It would not, therefore, apply to the Dividends.

52.     I do not think that an English court would be likely to find such an interpretation to be inconsistent with clause 404.5, under which the Client may request for Cash to be treated as Client Money.  On the contrary, the idea that the Client should be entitled to ask for money held as security no longer to be held for that purpose fits well with the provisions of clause 404.3.5, which provide for the Custodian itself to return funds which "in its discretion" it deems to be "more than is necessary to cover the Client's obligations".

53.     Even if that interpretation be wrong, it would nevertheless be my view (for the reasons already discussed) that the transfer of title contemplated by clause 404.3 would not have occurred automatically on the receipt of the Dividends but would have required the making of some kind of accounting entry by the Custodian recording that transfer in order for it to be effective actually to transfer title to the Dividends.  The wording "shall be transferred" and "shall vest" in that clause is consistent with the idea that some positive act of transfer is required.

54.     In paragraph 37 of the Second Toube Report, it is stated that:

> **.. If and to the extent that a Pension Plan has specifically requested [under clause 404.5] that the Solo Custodian treat those Dividends as Client Money .. any alleged Dividends will be treated as Client Money ..**

I agree. For the reasons just stated, however, I do not agree with the general proposition stated at the outset of that paragraph that "any right title and interest to any alleged Dividends will transfer to Solo pursuant to the 2014 Solo Custody Agreements".

### (E3)    Modifications to the Solo Custody Agreements

55.    As is recorded in paragraph 38 of the Second Toube Report, on or around 30 April 2014, Solo sent the 2014 Solo Modification Letters to several of the Pension Plans.

56.    In paragraph 40 of the Second Toube Report, Ms Toube expresses the view that the 2014 Solo Modification Letters support the interpretations for which she has contended. In my view, an English court would not take these letters into account in carrying out the exercise of interpretation. As I explained in paragraph 18 of the First Salter Report, the factual background that (under English law) is admissible in aid of interpretation is limited to that which existed at the time when the contract was made and which was (or should have been) known at that point to both – and not just one – of the parties. An English court will not generally look at the subsequent statements or conduct of the parties to interpret a written agreement[42].

57.    A more difficult issue is the question of whether the 2014 Solo Modification Letters were in fact effective to change the terms of the Solo Custody Agreements.

58.    Clause 20.1 of the 2012 Solo Custody Agreements provides (relevantly) that the agreements may only be varied with the written consent of both parties. It is difficult to conceive that an English judge would hold that such a clause was effective to deny legal effect to the 2014 Solo Modification Letters, given that they were sent by the party detrimentally affected by the variation and were (probably, though that is an issue of fact) relied upon as effective by the other party.

59.    However, as a result of the decision of the Supreme Court in the case of *Rock Advertising Ltd v MWB Business Exchange Centres Ltd*[43] the position in English law may not entirely be that sensible or straightforward:

> **The freedom of contracting parties also extends to agreeing that any amendment to their contract must be made in writing and signed by both parties and the courts will give effect to such a clause. English law therefore permits contracting parties to bind themselves as to the form of any variation to their contract and in this way to restrain their autonomy of action for the future. There has been held to be no "conceptual inconsistency" between a general rule which enables contracts to be made informally and a specific rule**

---

[42]    Lewison, *The Interpretation of Contracts* (7th edn, Sweet & Maxwell 2020) Ch 3(19). "[I]t is not legitimate to use as an aid in the construction of the contract anything which the parties said or did after it was made. Otherwise one might have the result that a contract meant one thing the day it was signed, but by reason of subsequent events meant something different a month or a year later": *Whitworth Street Estates (Manchester) Ltd v James Miller & Partners Ltd* [1970] AC 583 at 603, per Lord Reid.

[43]    [2018] UKSC 24, [2019] AC 119

> that effect will be given to a contract term which requires that any variation be made in writing.
>
> However, there may come a point where the actions of the parties in reliance upon the non-compliant oral variation are such that they will trigger the operation of an estoppel the effect of which will be to prevent a party from relying upon a contract term which lays down conditions for the formal validity of a variation. But the circumstances in which such an estoppel may operate largely remain to be defined. At a minimum there must be some words or conduct which unequivocally represents that the variation is valid notwithstanding its informality and "something more would be required for this purpose than the informal promise itself". The nature of that "something more" remains to be established, but it would appear to require a significant or material course of action by both parties in reliance upon the efficacy of the informally agreed variation[44].

60.    As I have indicated, I find it hard to believe that an English judge would debar the Pension Plans from relying upon these letters simply because they themselves had not signed them. However, this is a fact-sensitive issue. I do not know the full facts, and the test suggested in these cases has an element of circularity about it:

> .. if it is said that waiver prevents reliance on a no waiver clause there would have to be something which indicated that the waiver was effective notwithstanding its non-compliance with the non-waiver clause and something more would be required for this purpose than what might otherwise simply constitute a waiver of the original right itself ..[45]

61.    The equivalent "no variation" clause in the 2014 Solo Custody Agreements permits the Custodian to amend the terms of the Agreement by written notice, to take effect 10 business days after the date of the notice. It therefore does not give rise to the same problems.

### (E4)    The Old Park Lane Custody Agreements

62.    The material terms of the Old Park Lane Custody Agreements are set out in paragraph 48 of the Second Toube Report. As paragraph 50 of the Second Toube Report states, the relevant provisions of these agreements are in materially the same terms as those of the 2014 Solo Custody Agreements.

63.    My views as the way in which an English court would interpret those provisions are set out in section (E2) above.

---

[44]    Beale (ed), *Chitty on Contracts* (34th edn, Sweet & Maxwell 2021) para 25-047.

[45]    *Sumitomo Mitsui Banking Corp Europe Ltd v Euler Hermes Europe SA NV* [2019] EWHC 2250 at [64], per Butcer J. (Comm)

*(E5)    The Amended Old Park Lane Custody Agreements*

64.    In paragraph 52 of the Second Toube Report, Ms Toube expresses the view that the amendments which were made in 2015 to some of the Old Park Lane Custody Agreements "provide[] strong support to the conclusion that [she has] reached above".

65.    For the reasons explained in paragraph 56 above, it is my view that an English court would not take these amendments into account in carrying out the exercise of interpreting the original Old Park Lane Custody Agreements.

66.    As is stated in paragraph 54 of the Second Toube Report, the main change made by these amendments is the deletion of the TTFCA provisions.  I have already explained my views as to the interpretation which an English court would be likely to put on the remaining set-off provisions.  Under the Amended Old Park Lane Custody Agreements, any Dividends (or any part of them) which were not set-off on receipt would have been held in Custody for the relevant Pension Plan.

67.    As is stated in paragraph 61 of the Second Toube Report, the Amended Old Park Lane Custody Agreements did not include any provisions expressly dealing with what should happen to any funds previously held on TTFCA terms.  If the view which I have expressed in the previous sections of this Report about the need for some accounting entry or positive act of transfer (and if, as I believe to be the case, no such entries or acts in fact occurred) then there will not have been any such funds.  However, if there were, it is my view that an English court would be likely to hold that the effect of the amendments deleting the TTFCA terms would have been to require the Custodian to restore any sums so held to custody on behalf of the relevant Pension Plan.

*(E6)    The 2015 Solo Custody Agreements*

68.    As is stated in paragraph 64 of the Second Toube Report, the 2015 Solo Custody Agreements are in materially the same terms as the 2014 Solo Custody Agreements.

69.    My views as to the way in which an English court would interpret those provisions are set out in section (E2) above.

(F)    Estoppel

70.    In the preceding sections of this Report, I have dealt (like Ms Toube) with the interpretation of the Solo Custody Agreements almost in isolation, divorced from their commercial context and from the way in which the parties to those agreements in fact operated them.

71.    The way in which the Solo Custody Agreements were in fact operated by the parties from time to time is, of course, an issue of fact for the New York Court, rather than an issue of English law.  However, as is recorded in paragraph 6 of the Second Toube

21

Report, the Carr Report "concludes [on the basis of "the book entry credits on the Pension Plans' account statements created by the applicable Solo Custodian"] that the Pension Plans were entitled to the alleged Dividends". In my view, that is not a circumstance which an English court would be likely wholly to ignore.

72.    Ms Toube says that she does "not agree that the ownership of the alleged Dividends can be determined solely by the recorded entries on the account statements". I agree with her that English law would not look at the recorded entries on the account statements in isolation. However I do not agree that those recorded entries are irrelevant, or that English law would regard the words used in the Solo Custody Agreement as the sole determinant of ownership. In my view, an English court would be likely to take all material circumstances into account, both (a) as an aid to the correct interpretation of those contractual provisions (to the extent permissible under the interpretive principles discussed in section (C) of the First Salter Report), (b) as showing how those contractual provisions in fact operated, to the extent that their operation depended upon the parties' subsequent actions, and (c) as potentially giving rise to estoppels, either by representation or by convention, preventing the parties from contending that their rights were other than those that were shown by their subsequent actions and communications with each other.

73.    In section (D1) of the First Salter Report, I provided a brief summary of the English law relating to rectification and estoppel. In relation to the Solo Custody Agreements, I have not seen any evidence to suggest that the provisions discussed above are liable to be rectified. In particular, I have seen no evidence that the parties were aware at the time that those provisions were in any way incompatible with the dividend arbitrage strategy (to the extent, if any, that they are so incompatible).

74.    However, the account statements which I have seen and the contents of the Carr Report do suggest that there may well be scope for the application of the doctrine of estoppel by representation (resulting from the provision of those account statements) and/or of estoppel by convention (resulting from the parties' actions and communications).

## (G)    Conclusions

75.    The overall conclusion stated in paragraph 66 of the Second Toube Report is that:

> **.. the contention in The Carr Report that the Pension Plans were entitled to alleged Dividends is incorrect .. the Solo Custody Agreements either (a) immediately transferred any interest of the Pension Plans in the Dividends to the applicable Solo Custodian, (b) immediately set off any alleged Dividend to satisfy any obligation owed by the Pension Plan to the Solo Custodian (in which case, there would be no Dividend remaining to which the Pension Plan could have any right, title or interest) or (c) during the period of time in which the custody agreements with Client Money Provisions were in place, immediately transferred any interest of the Pension Plans in the Dividends to the applicable**

    **Solo Custodian unless the Pension Plan requested that the alleged Dividends be treated as Client Money.**

76.    I do not agree that that is the overall conclusion to which an English court would be likely to come.   For the reasons set out in greater length above, it is my opinion (on the basis of the information presently available to me) that an English Court would be likely to hold as follows:

## (G1)   *The 2012 Solo Custody Agreements*

### G1.1   Set-off

76.1    The set-off provided for in clause 4.2 of the 2012 Solo Custody Agreements would not operate automatically upon receipt of the Dividends by the Custodian, but would have required the Custodian to give effect to it (eg by making debit and credit entries in its records).

76.2    Those set-off provisions would in any event operate only in respect of:

    76.2.1.  Dividends received by the Custodian; and

    76.2.2.  those of the Pension Plan's liabilities which were then immediately payable, and not those (if any) which were only payable at some future date or where the parties had agreed that they should be discharged in some other way or from some other source.

    If the Pension Plan did not have any relevant liabilities to the Custodian, there could be no set off under clause 4.2.

76.3    It is implicit in the operation of these set-off provisions that:

    76.3.1.  Prior to the operation of this right of contractual set-off, the relevant Pension Plan would have had a claim in relation to the Dividend against the relevant Solo Custodian.  Absent such a cross-claim, there could be no set-off.

    76.3.2.  Prior to the Dividend being used by set-off to pay the Pension Plan's liabilities to the Custodian, the Dividend belonged to the Pension Plan.  It would not be possible to set off against the liabilities of the Pension Plan amounts which were due to anyone other than the Pension Plan.  One cannot properly pay a debt with someone else's money.

    76.3.3.  Once the chose in action that was the Custodian's debt to the Pension Plan in relation to the Dividend has been used for that purpose, the

23

Dividend would of course no longer exist. However, the same effect would have occurred if the Dividend had been paid, not to the Custodian, but into an overdrawn bank account operated by the Pension Plan, or had been used (for example) to buy goods or services for the Pension Plan. The Dividend money has simply been spent.

76.4   The set-off for which clause 4.2 provides in any event only occurs if and when the funds are received. If the relevant moment under Danish tax law for determining entitlement to reclaim withholding tax occurs before that moment, then clause 4.2 is irrelevant to that issue.

### G1.2   TTFCA

76.5   The transfer of title contemplated by clause 4.3 would not have occurred automatically on the receipt of the Dividends but would have required the making of some kind of accounting entry by the Custodian recording that transfer in order for it to be effective actually to transfer title to the Dividends.

## (G2)   *The 2014 Solo Custody Agreements*

### G2.1   Set-off

76.6   The set-off provisions in the 2014 Solo Custody Agreements are materially the same as those found in the 2012 Solo Custody agreements. The views in section G1.1 above therefore apply equally to them.

### G2.2   TTFCA

76.7   The TTFCA provisions in the 2014 Solo Custody Agreements are different to those found in the 2012 Solo Custody Agreements, particularly in relation to the scope of the monies subject to the set-off.

76.8   In my view, an English court would be likely to hold that the restrictive description "for the purpose of securing or otherwise meeting the Client's obligations to the Custodian .." was intended to qualify the whole of the description in that provision of the monies subject to the set-off for which it provides. On that basis, the TTFCA provisions in the 2014 Solo Custody Agreements will apply only to money transferred to or held by the Custodian as security - in effect saying that all money held as security is held on title transfer terms. Those provisions would, however, have no effect on funds not transferred or held as security. They would not, therefore, apply to the Dividends.

76.9   Even if that interpretation were wrong, an English court would be likely to hold that the transfer of title contemplated by those provisions of the 2014 Solo

Custody Agreements would not have occurred automatically on the receipt of the Dividends but would have required the making of some kind of accounting entry by the Custodian recording that transfer in order for it to be effective actually to transfer title to the Dividends.

### (G3)  *Modifications to the Solo Custody Agreements*

76.10  The 2014 Solo Modification Letters were sent by the party detrimentally affected by the variation and were probably relied upon as effective by the other party. Both parties plainly intended those letters to be effective to vary the terms between themselves.

76.11  In the circumstances, I think it unlikely that an English judge would hold that the Pension Plans were unable to rely upon the terms of those letters simply because they had not themselves signed them.  I hold that view, despite the provision in clause 20.1 of the 2012 Solo Custody Agreements, which provides (relevantly) that the Solo Custody Agreements can only be varied with the written consent of both parties, and despite the decision of the Supreme Court in the *Rock Advertising* case[46].

76.12  However, this is a fact-sensitive issue, I do not know the full facts, and the test suggested in *Rock* and subsequent cases has an element of circularity about it.

76.13  The equivalent "no variation" clause in the 2014 Solo Custody Agreements permits the Custodian to amend the terms of the Agreement by written notice, to take effect 10 business days after the date of the notice.  It therefore does not give rise to the same problems.

### (G4)  *The Old Park Lane Custody Agreements*

76.14  The relevant provisions of the Old Park Lane Custody Agreements in are in materially the same terms as those of the 2014 Solo Custody Agreements.

76.15  The views in section G2 above therefore apply equally to them.

### (G5)  *The Amended Old Park Lane Custody Agreements*

76.16  The main change made by these amendments to the Old Park Lane Custody Agreements is the deletion of the TTFCA provisions.

76.17  The set-off provisions in the Old Park Lane Custody Agreements are materially the same as those found in the 2014 Solo Custody agreements.  The views in section G2.1 above therefore apply equally to them.

---

[46]        Fn 43 above

*Confidential*

76.18 The deletion of the TTFCA provisions from the Amended Old Park Lane Custody Agreements means that any Dividends (or any part of them) which were not set-off on receipt would have been held in Custody for the relevant Pension Plan.

77. There is also scope, depending upon the facts of the relevant cases, for the application of the doctrine of estoppel by representation (resulting from the provision of those account statements) and/or of estoppel by convention (resulting from the parties' actions and communications) to produce a different result from that which a straightforward interpretation of the Solo Custody Agreements might suggest.

78. I have carefully considered the various contrary arguments propounded by Ms Toube. For the reasons explained above, I do not think that an English court would be persuaded by the arguments which she deploys and (to the extent explained above) I therefore respectfully disagree with her conclusions.

**Richard Salter QC**

**3 Verulam Buildings**
**Grays' Inn**
**London WC1R 5NT**

28 February 2022

*Confidential*

---

## SCHEDULE A

---

### Clients

Part 1

Richard J. Markowitz
Jocelyn P. Markowitz

Avanix Management LLC Roth 401(k) Plan
Batavia Capital LLC Solo Roth 401(k) Plan (formerly the Batavia Capital Pension Plan)
Calypso Investments LLC Solo 401(k) Plan
Cavus Systems LLC Roth 401(k) Plan
Hadron Industries LLC Roth 401(k) Plan
RJM Capital LLC Solo 401(k) Plan (formerly the RJM Capital Pension Plan)
Routt Capital LLC Solo 401(k) Plan (formerly the Routt Capital Pension Plan)
Avanix Management LLC
Cavus Systems LLC
Hadron Industries LLC


Part 2

John H. van Merkensteijn
Elizabeth van Merkensteijn

Azalea Pension Plan
Basalt Ventures LLC Roth 401(K) Plan
Bernina Pension Plan
Bernina Pension Plan Trust
Michelle Investments Pension Plan
Starfish Capital Management LLC Roth 401(K) Plan
Omineca Pension Plan
Omineca Pension Plan Trust
Remece Investments LLC Pension Plan
Tarvos Pension Plan
Voojo Productions LLC Roth 401(K) Plan
Xiphias LLC Pension Plan

*Confidential*

---

## SCHEDULE B

---

### I. Bates Stamped Documents[47]

- ELYSIUM-00414757
- ELYSIUM-08368161
- MPSKAT00003793
- MPSKAT00023982
- MPSKAT00024030
- WH_MDL_00064585
- WH_MDL_00115038
- WH_MDL_00282770
- WH_MDL_00282775
- WH_MDL_00282776
- WH_MDL_00282781
- WH_MDL_00282856
- WH_MDL_00282858

### II. Expert Reports
• Expert Report of Emre Carr, Ph.D., CFA, dated Dec. 21, 2021.
• Rebuttal Expert Report of Felicity Toube QC

### III. Legal Documents
• Amended Complaint, *Skatteforvaltningen v. Avanix Management LLC Roth 401K Plan*, No. 19-cv-01867 (LAK) (S.D.N.Y. Apr. 20, 2020), ECF No. 60.
• Amended Complaint, *Skatteforvaltningen v. Aerovane Logistics LLC Roth 401K Plan,* No. 18-cv-07828 (LAK) (S.D.N.Y. Apr. 27, 2020), ECF No. 90.
• Amended Complaint, *Skatteforvaltningen v. Basalt Ventures LLC Roth 401(K) Plan*, No. 19-cv-1866 (LAK) (S.D.N.Y. Apr. 20, 2020), ECF No. 55.
• Amended Complaint, *Skatteforvaltningen v. Edgepoint Capital LLC Roth 401K Plan,* No. 18-cv-07827 (LAK) (S.D.N.Y. Apr. 27, 2020), ECF No. 91.

Transcript of the Deposition of Richard Markowitz and exhibits

---

[47]    All references to Bates-stamped documents are inclusive of the documents' family.