UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re

CUSTOMS AND TAX ADMINISTRATION OF THE
KINGDOM OF DENMARK (SKAT) TAX REFUND                    18-md-2865 (LAK)
LITIGATION

This document applies to:   18-cv-04051, 18-cv-09840,
18-cv-09841, 18-cv-10098, 19-cv-01812, 19-cv-01866,
19-cv-01898.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION

Appearances:

William R. Maguire
Marc A. Weinstein
Neil J. Oxford
HUGHES HUBBARD & REED LLP
*Attorneys for Plaintiff*

Alan Schoenfeld
Julia Pilcer Lichtenstein
Micahel Bongiorno
Andrew S. Dulberg
WILMER CUTLER PICKERING HALE AND DORR LLP
*Attorneys for Bellwether Defendants Richard Markowitz and RJM Capital Pension Plan*

Sharon L. McCarthy
Nicholas S. Bahnsen
KOSTELANETZ & FINK, LLP
*Attorneys for Bellwether Defendants Basalt Ventures LLC Roth 401(k) Plan and John van Merkensteijn*

John C. Blessington
Brandon R. Dillman
Michael R. Creta
John L. Gavin
K&L GATES LLP

*Attorneys for Bellwether Defendants American Investment Group of New York, L.P. Pension Plan, Riverside Associates Defined Benefit Plan, Robert Crema, David Schulman, Stacey Kaminer, and Acer Investment Group, LLC*

Michelle Rice
Consuelo Mejer
KAPLAN RICE LLP
*Attorneys for Bellwether Defendants Roadcraft Technologies LLC Roth 401(K) Plan and Ronald Altbach*

Zhanna A. Ziering
MOORE TAX LAW GROUP LLC
*Attorney for Bellwether Defendants RAK Investment Trust and Robert Klugman*

Thomas E.L. Dewey
Sean K. Mullen
DEWEY PEGNO & KRAMARSKY LLP
*Attorneys for Bellwether Defendant Michael Ben-Jacob*

Joseph LoPiccolo
John N. Poulos
Daniella DaCunzo Dalia
POULOS LOPICCOLO PC
*Attorneys for Bellwether Defendants Doston Bradley, The FWC Capital LLC Pension Plan, The Proper Pacific LLC 401K Plan, and Roger Lehman*

Neil S. Binder
BINDER & SCHWARTZ LLP
*Attorney for Third-Party Defendant ED&F Man Capital Markets, Ltd.*

LEWIS A. KAPLAN, *District Judge.*

This multidistrict litigation consists of more than one hundred and fifty actions

brought by the Customs and Tax Administration of the Kingdom of Denmark ("SKAT") to recover

3

funds allegedly obtained from it by fraud. SKAT alleges that the defendants, pension plans and the plans' agents and representatives, fraudulently obtained millions of dollars in tax refunds by falsely claiming to have owned stocks in Danish companies that paid dividends net of withholding tax. The matter now is before the Court on the bellwether defendants' consolidated motion for summary judgment.

*Facts*

SKAT ("Skatteforvaltningen") is an agency of the government of Denmark that is responsible for the assessment and collection of Danish taxes. In 2018, SKAT filed lawsuits in federal district courts across the United States, including this one, against over one hundred retirement and pension plans based in the United States and their alleged agents and representatives.

A multidistrict litigation ("MDL") is a procedural device that permits "civil actions involving one or more common questions of fact [that] are pending in different districts" to be "transferred [by the Judicial Panel on Multidistrict Litigation ('JPML')] to any district for coordinated or consolidated pretrial proceedings."[1]  The JPML is authorized to transfer cases "upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."[2]  The JPML transferred all of the cases brought by SKAT in other districts to this one upon finding that the cases "involve common questions of fact, and that centralization will serve the convenience of the parties and

---

[1]    28 U.S.C. § 1407(a).

[2]    *Id.*

4

witnesses and promote the just and efficient conduct of this litigation."[3]

   In each case, SKAT alleges that the defendants engaged in a fraudulent tax refund scheme. Specifically, it alleges that the defendants participated in a scheme that "deceive[d] SKAT into paying out over 12.7 billion Danish Kroner ('DKK'), the equivalent of approximately $2.1 billion (US), of allegedly withheld dividend tax."[4]  As this Court has explained previously, "Danish companies are required by law to withhold a certain percentage of dividends distributed to shareholders as tax, which may be refunded to shareholders in certain circumstances under a double taxation treaty."[5]  SKAT alleges that the defendants "pretended to own shares in Danish companies" and "applied to SKAT claiming repayments of tax withheld on dividends that they purported to have earned on shares of Danish companies."[6]  According to SKAT, "[t]hese applications were fraudulent because the claimants did not own the shares that they claimed to own, they did not earn the

---

[3]   Dkt 1 (JPML Transfer Order) at 1.

[4]   *E.g.*, Doc. No. 18cv4051, Dkt 1 (Cpt.) at 1, ¶ 2.

  Unless otherwise indicated, a citation for an allegation to a complaint against a bellwether defendant indicates that SKAT has made the same allegation against all of the bellwether defendants.

[5]   *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 307-08 (S.D.N.Y. 2019).

  Additional factual background is described in detail in the Court's prior decisions. *E.g.*, *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.,* No. 18-cv-5053 (LAK), 2020 WL 70938, at *1 (S.D.N.Y. Jan. 7, 2020); *In re Customs & Tax Admin. of Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-cv-5053 (LAK), 2020 WL 3962066, at *1 (S.D.N.Y. July 13, 2020); *In re SKAT Tax Refund Scheme Litig.*, No. 18-cv-05053, 2020 WL 7059843, at *1-2 (S.D.N.Y. Dec. 2, 2020).

[6]   *E.g.*, Doc. No. 18cv4051, Dkt 1 (Cpt.) at 1, ¶ 3, 2, ¶ 4.

dividends they claimed to have earned, and they were not entitled to the tax refunds they claimed."[7]

*Prior Proceedings*

Prior to the initiation of this MDL, this Court consolidated for pretrial purposes approximately fifty three actions that were brought by SKAT in this district and were assigned to the undersigned.[8] The Court required the defendants in those cases (the "New York defendants") to "file a single joint memorandum of law in support of [a motion to dismiss] except to the extent that any individual defendant or smaller groups of defendants raise issues that are not common to all[.]"[9] On August 15, 2018, the New York defendants jointly moved to dismiss SKAT's claims principally on the basis of the "revenue rule," as well as on other grounds.[10] The revenue rule is a common law principle that "prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws."[11] It is explained in further detail in the discussion below.

On October 3, 2018, the JPML transferred cases brought by SKAT in other districts to the undersigned. In January 2019, this Court denied the motion to dismiss brought by the New

---

[7]    *Id.* at 2, ¶ 4.

[8]    Doc. No. 18-cv-4047 (Master Docket for Pre-MDL Consolidated Cases), Dkt 16 (Pretrial Order No. 1).

[9]    *Id.* at 2.

[10]    The New York defendants included some, but not all, of the bellwether defendants.

[11]    *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 310.

6

York defendants.[12]  The Court determined, on the limited record before it, that neither the revenue rule nor any other ground raised by the defendants warranted dismissal of SKAT's claims.  With certain exceptions, the Court determined that its ruling on the New York defendants' motion to dismiss would apply fully to all of the cases in the MDL.[13]  In June 2019, certain defendants, including some of the bellwether defendants, moved to dismiss on the ground that SKAT lacked standing.  The Court denied that motion as well.[14]

In mid-November 2021, the Court set a deadline of December 3, 2021 for all fact discovery to be completed and a deadline of April 8, 2022 for all expert discovery to be completed.[15] The Court established also a procedure for motions for summary judgment to be determined on the basis of certain bellwether cases, as discussed below.

*The MDL Bellwether Cases*

In an MDL, courts often select certain cases to be "bellwethers."  "Bellwethers" typically are cases within an MDL that "would constitute a representative sample of the cases comprising" the MDL that are selected to proceed to trial.[16]  "The concept is straightforward: in a

---

[12]    *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300.

[13]    Dkt 133 (Pretrial Order No. 8).

[14]    Dkt 243 (Pretrial Order No. 13).

[15]    Dkt 675 (Pretrial Order No. 29).

[16]    *In re Fosamax Prod. Liab. Litig.*, No. 06-MD-1789 (JFK), 2011 WL 1584584, at *1 (S.D.N.Y. Apr. 27, 2011).

situation that has engendered hundreds or thousands of individual tort cases, the court system is swamped with potential trials; rather than run them all, [the idea with bellwether cases is to] run a few – and [, potentially,] use what is learned therefrom to create a settlement structure for the entire mass of cases."[17]  Here, the Court determined that it would be useful to select bellwether cases for summary judgment purposes.

To select the bellwether cases, the Court, in a pretrial order issued on November 15, 2021, ordered SKAT to submit its selection of proposed bellwether and backup cases to the defendants and ordered the defendants to respond.[18]  The order required that the proposed bellwether cases consist of five cases where the defendants used certain firms as their "Solo Custodian" and two cases where the defendants used ED&F Man Capital Markets, Ltd., as their custodian.[19]  These terms are described in greater detail below.  The order stated that "[t]o the extent that the parties differ in their selection of any bellwether or backup cases, they shall submit separate proposed selections on or before January 31, 2022."[20]  It set also deadlines for motions for summary judgment for the bellwether cases and stated that "[t]he parties shall file a joint Rule 56.1 statement [of facts]" and

---

[17]  "The term bellwether is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock."  *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).

4 Newberg and Rubenstein on Class Actions § 11:11 (6th ed.).

[18]  Dkt 675 (Pretrial Order No. 29) at 2.

[19]  *Id.* at 2-3.

The order required also that one of the two bellwether cases where the defendants used ED&F as their custodian involved tax refund applications that included a so-called "Annex E" tax voucher.

[20]  *Id.* at 2.

that "[a]ll movants and all non-movants shall submit one joint motion [for summary judgment]."[21] The parties agreed on seven bellwether cases that satisfied the Court's criteria by the deadline. The matter now is before the Court on the consolidated motion for summary judgment brought by the defendants in the bellwether cases.

The bellwether defendants include seven pension plans that are based in the United States and their trustees or participants. There are two "ED&F Bellwethers" and five "Solo Bellwethers." "ED&F" refers to ED&F Man Capital Markets, Ltd., a financial brokerage business based in England. The defendants in the ED&F Bellwethers are two U.S.-based pension plans to which ED&F "provided financial brokerage, settlement and custody services . . . in relation to transactions in Danish securities," the two plans' participants and trustees, and a financial services firm that acted as the plans' agent "in connection with [their] trading in Danish securities conducted through ED&F."[22]  And, ED&F itself is a third-party bellwether defendant.

The defendants in the Solo Bellwethers are five U.S.-based 401(k) plans, the sole participants in those plans, an attorney who provided services to two of the plans, two trusts with

---

[21]    *Id.* at 3.

[22]    Dkt 790 (Parties' Joint Rule 56.1 Statement) at 59, ¶ 275, 61, ¶¶ 286-87.

The two pension plans are the American Investment Group of New York, L.P. Pension Plan ("AIG Plan") and the Riverside Associates Defined Benefit Plan ("Riverside Plan").  Robert Crema was the sole participant in and beneficiary of the AIG Plan.  Stacey Kaminer was a trustee of the AIG Plan, and David Schulman was a trustee of the Riverside Plan.  The financial services firm that acted as a representative and agent for the AIG and Riverside Plans was Acer Investment Group, LLC ("Acer").

which one of the plans entered into partnerships, and the trustees of those two trusts.[23]

To understand SKAT's claims and the parties' arguments on summary judgment, a summary of the alleged trades at issue is useful.

*The Solo Bellwether Defendants' Trades*

The Solo Bellwether pension plans used certain financial services firms as "Solo Custodians" to provide custodial services.[24]  "In every case[,] . . . documents issued by the Solo Custodians and by brokers state[d] that the [Solo Bellwether plans] purchased Danish shares on the date of the issuer's [a]nnual [g]eneral [m]eeting" and "a broker issued a trade confirmation stating that the broker executed on behalf of the [Solo Bellwether plans] a purchase of shares of Danish

---

[23]

*Id.* at 12-14, ¶¶ 79-90.

The five plans and their solo participants are: (1) RJM Capital Pension Plan ("RJM Plan") and its sole participant, Richard Markowitz, (2) Basalt Ventures LLC Roth 401(k) Plan ("Basalt Plan") and its sole participant, John van Merkensteijn, (3) Roadcraft Technologies LLC Roth 401(k) Plan ("Roadcraft Plan") and its sole participant, Ronald Altbach, (4) Proper Pacific 401(k) Plan ("Proper Pacific Plan") and its sole participant, Doston Bradley, and (5) FWC Capital LLC Pension Plan ("FWC Plan") and its sole participant, Roger Lehman.  The attorney, Michael Ben-Jacob, provided legal and administrative services to the Basalt Plan and the Roadcraft Plan.  The  Roadcraft Plan entered into partnerships with Routt Capital Trust and RAK Investment Trust, the two trust defendants.  Richard Markowitz is the trustee of Routt Capital Trust, and Robert Klugman is the trustee of RAK Investment Trust.

SKAT agreed to dismiss its claims for unjust enrichment, money had and received, and payment by mistake against Mr. Ben-Jacob. Dkt 918 (Stipulation and Order).

[24]

According to SKAT, "[t]he 'Solo Custodians' are the four U.K.-based firms that issued allegedly fraudulent dividend credit advices to the defendants in the Solo [B]ellwethers: Solo Capital Partners LLP, Telesto Markets LLP, Old Park Lane Capital PLC, and West Point Derivatives Ltd."  Dkt 831 (Pl. Opp. Mem.) at 1 n. 2. SKAT claims that these Solo Custodians were controlled by Sanjay Shah.

securities before the ex-dividend date."[25]  The Solo Custodians generated account statements that "reflect[ed] credits for net dividends to the [Solo Bellwether plans]" and "[d]ividend [c]redit [a]dvi[c]e statements" for each plan that "listed the name of the security, the number of shares, the gross dividend, the tax, and the net dividend."[26]  "The [d]ividend [c]redit [a]dvice statements prepared by the Solo Custodians stated that the pension plan's account was credited with an amount equal to the net dividend."[27]  Reclaim agents, Goal TaxBack Limited ("Goal") and SynTax GIS, subsequently submitted tax reclaim (refund) applications to SKAT on behalf of the Solo Bellwethers.

SKAT initially approved the reclaim applications and paid out each reclaim. However, pursuant to an investigation by SKAT "[s]everal years after it had approved reclaim payments to the US pension plan defendants, [it] issued letters to the US pension plan defendants informing them that it 'has decided to revoke the previous decisions on dividend tax refunds.'"[28] SKAT's letters to the pension plans stated that:

> "a. The pension plan did not own the shares[,]
>
> b. The pension plan did not receive dividends[,]
>
> c. The pension plan did not have the capital required to make the investments that formed the basis of the claim for refund[,]
>
> d. The pension plan was newly established[,]

---

[25] Dkt 790 (Parties' Joint Rule 56.1 Statement) at 18, ¶¶ 111, 113.

[26] *Id.* at 20, ¶¶ 125-26.

[27] *Id.* at 20, ¶ 127.

[28] *Id.* at 54, ¶ 236.

11

e. The pension plan had one participant only[,]

f. The pension plan did not submit Form 5500 to the IRS[, and]

g. The pension plan 'does not fulfill the conditions for refunds of dividend tax withheld on Danish shares, see article 10 of the double taxation convention between Denmark and the USA.'"[29]

The Solo Bellwether defendants dispute these claims. They argue that they were the beneficial owners of the Danish shares, that they received the dividends pursuant to their trades, and that they were entitled to receive the tax refunds. SKAT, however, contends that "the Solo Custodians never held any such shares nor received any such dividends, notwithstanding the defendant plans' Solo Custodian or broker-issued dividend credit advices, account statements and trade confirmations."[30]  The crux of SKAT's argument is that the Solo Custodians never held the shares nor received the dividends that the dividend credit advices and account statements purportedly reflected.[31]  It accordingly claims that the Solo Bellwether defendants never were entitled to receive the tax refunds for which they applied and that they obtained.

---

[29]

    *Id.* at 54-55, ¶ 237.

[30]

    Dkt 831 (Pl. Opp. Mem.) at 5.

[31]

    Dkt 817 (Pl. Mem. in Support of Pl. Mtn. for Summary Judgment) at 13 ("While the Solo Custodians issued dividend credit advices and account statements and the brokers issued trade confirmations to the defendant plans purporting to show that the plans bought the shares and received the dividends identified in their refund applications, the undisputed evidence [, according to SKAT,] shows that the Solo Custodians never held any such shares or received any such dividends.").

*The ED&F Bellwether Defendants' Trades*

With respect to the ED&F Bellwethers, "[t]he transactions in Danish securities undertaken by the AIG Plan and the Riverside Plan through ED&F were all over-the-counter."[32] "For each transaction, ED&F executed a trade on behalf of the AIG or Riverside Plans to acquire the shares of Danish securities on the trade date, which in each case was before the ex-dividend date of the relevant Danish securities."[33]  According to SKAT, the AIG and Riverside Plans engaged in two types of trades through ED&F: "cum-cum" trades and "cum-ex" trades.  As SKAT states, "[i]n the cum-cum trades, the timing of both the trade date and settlement date entitled the defendant plan to receive the dividend from the issuer of the shares, *i.e.*, both were 'cum' or 'with' dividend in that the trade date was before the ex-dividend date and the settlement date was on or before the record date for the dividend."[34]  "In the cum-ex trades, however, while the trade date was before the ex-dividend date, *i.e.*, 'cum' dividend, the defendant plan and broker agreed to a non-standard, extended settlement date that was after the record date, *i.e.*, 'ex' dividend."[35]

"For each trade, Acer sent a written trade instruction on behalf of the AIG or Riverside Plans to ED&F" and, "[o]n the trade date for each trade, Acer received a trade confirmation from ED&F that included a description of the securities and stated the number of shares

---

[32]     Dkt 790 (Parties' Joint Rule 56.1 Statement) at 70, ¶ 317.

[33]     *Id.* at 70, ¶ 320.

[34]     Dkt 817 (Pl. Mem. in Support of Pl. Mtn. for Summary Judgment) at 23.

[35]     *Id.*

purchased by the AIG or Riverside Plans, the trade price, and the trade date."[36]  ED&F prepared tax vouchers for the Riverside and AIG Plans in which it confirmed the shares of stock in Danish companies held by the plans. Goal served as a reclaim agent for the Riverside and AIG Plans and submitted to SKAT "[a]ll of the withholding tax refund applications" for the plans.[37]

SKAT paid each of the refund claims.  However, as with the Solo Bellwethers, SKAT alleges that "the tax vouchers ED&F issued to the ED&F [B]ellwether defendants . . . were false because the trading was circular and did not result in the plans receiving dividends or suffering withholding tax."[38]  With respect to the cum-ex trades, SKAT contends that those trades "were circular and did not result in the plans receiving any Danish dividends."[39]  In any event, SKAT argues that "with respect to all the plans' trades (cum-ex and cum[-]cum), under their agreements with ED&F, the plans transferred to ED&F all right, title and interest in any shares and therefore owned no shares or dividends."[40]  The ED&F Bellwether defendants argue that the tax vouchers were legitimate and that they are entitled to the tax refunds that they received from SKAT because they were beneficial owners of the Danish shares.

---

[36]
       Dkt 790 (Parties' Joint Rule 56.1 Statement) at 70, ¶ 321.

[37]
       *Id.* at 80, ¶¶ 356-57.

[38]
       Dkt 831 (Pl. Opp. Mem.) at 6.

[39]
       *Id.* at 2.

[40]
       *Id.*

14

*Foreign Decisions*

    *Denmark*

        After SKAT decided to revoke its approvals of the bellwether defendant plans' tax refund applications, "each of the bellwether defendant plans appealed SKAT's revocations to the Danish National Tax Tribunal [('Danish Tax Tribunal')], an administrative complaints board."[41]  The "defendants [there] argued . . . that  settlement of the plans' purported trades with actual Danish shares was not necessary for the plans to have been the beneficial owners of shares."[42]  "On June 26, July 7, July 16, and October 2, 2020, the Danish . . . Tax Tribunal [rejected] [four of the bellwether] defendant[] . . . plans' appeals of SKAT's revocations."[43]  Three of the plans did not appeal the decisions of the Danish Tax Tribunal to the Danish courts, and one initially appealed the Danish Tax Tribunal's decision but ultimately withdrew its appeal.[44]  The other bellwether defendant plans withdrew their appeals before the Danish Tax Tribunal ruled on them.[45]


    *United Kingdom*

        In addition to the cases within this MDL and appeals decided by the Danish Tax Tribunal, SKAT pursued actions against ED&F and the Solo Custodians in England.  In 2018, SKAT

---

[41]     *Id.* at 11.

[42]     *Id.*

[43]     *Id.* at 12.

[44]     *Id.* at 13.

[45]     *Id.*

15

filed fraud claims against ED&F, Sanjay Shah, and companies related to him in the Business and Property Courts of the High Court of Justice of England ("English High Court").[46]  In April 2021, Justice Andrew Baker of the English High Court dismissed SKAT's claims on the ground that "SKAT's claims, in substance, sought 'indirectly to enforce . . . Danish revenue law,'"[47] rendering its claims inadmissible under a principal termed "Dicey Rule 3," *i.e.*, that "English courts have no jurisdiction to entertain an action . . . for the enforcement, either directly or indirectly, of a penal, revenue or other public law of a foreign State."[48]  SKAT did not appeal Justice Baker's decision with respect to ED&F.  It did, however, appeal Justice Baker's decision with respect to the other defendants.  In February 2022, the English Court of Appeal overruled Justice Baker's decision, determining that Dicey Rule 3 did not bar SKAT's claims for reasons that are discussed below.[49] On November 8, 2023, the English Supreme Court affirmed the Court of Appeal's decision.[50]

### *Discussion*

*Legal Standard*

The standards governing a motion for summary judgment are well settled.  "Summary

---

[46]  Dkt 790 (Parties' Joint Rule 56.1 Statement) at 62, ¶ 291.

[47]  *Id.* at 63, ¶ 295.

[48]  Dkt 804 (Decl. Of Brandon R. Dillman), Ex. 140 (Justice Baker decision) at 5, ¶ 4 (quoting DICEY, MORRIS & COLLINS, THE CONFLICT OF LAWS, R5-019 (15th ed.)).

[49]  Dkt 804 (Decl. Of Brandon R. Dillman), Ex. 141 (English Court of Appeal decision) at 18-19, ¶¶ 54-55.

[50]  Dkt 923 (English Supreme Court decision) at 18, ¶ 52.

judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law."[51]  "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'"[52]

SKAT's claims against the defendants are governed by state law. In an MDL, "[t]o the extent that [an] action involves issues of state law, this court applies the choice of law rules [and substantive law] that would govern in the transferor forum."[53]  Accordingly, unless otherwise indicated, SKAT's claims against the FWC Plan and Mr. Lehman are governed by Florida law, the law of the transferor forum. SKAT's claims against the other Solo Bellwether defendants were commenced in this Court originally and therefore are governed by New York law.  Finally, SKAT's claims against the ED&F Bellwether defendants are governed by Utah law, the law of the transferor forum.

*The Revenue Rule*

This is the defendants' second application to dismiss SKAT's claims on the basis of

---

[51]
    *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013) (quoting *O&G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 159 (2d Cir.2008)).

[52]
    *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir.1993)).

[53]
    *In re Parmalat Sec. Litig.*, 412 F. Supp. 2d 392, 399 (S.D.N.Y. 2006).  *See also In re Mirena IUD Prod. Liab. Litig.*, No. 13-MC-2434 (CS), 2015 WL 5037100, at *3 (S.D.N.Y. Aug. 26, 2015) ("[A]n MDL transferee court 'applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed.'") (citation omitted).

the "revenue rule." As noted above, the revenue rule is a common law principle that "prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws."[54] This Court explained previously that:

> "[The revenue rule's] purpose is to ensure respect for sovereignty by keeping courts out of the business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices. The rule serves also to preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government.
>
> 'A suit directly seeks to enforce foreign tax laws when a judgment in favor of the plaintiffs would require the defendants to reimburse them for lost tax revenue.' An action that 'seeks a remedy that would give extraterritorial effect' to a foreign state's tax laws is one for indirect enforcement. Courts look to the 'substance of the claim' to determine whether it is one for tax revenues."[55]

As noted above, the defendants argue that they are entitled to the tax refunds they received from SKAT because, they claim, they were "beneficial owners" of the shares in the Danish companies from which they allegedly received dividends net of withholding tax. Beneficial ownership, defendants argue, is a question of Danish tax law. They accordingly contend that the revenue rule strips this Court of subject matter jurisdiction because "[d]eciding whether [their]

---

[54]    *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 310.

[55]    *Id.* at 310-11 (footnotes and citations omitted).

18

alleged misrepresentations of beneficial ownership were true or false requires enforcement of Danish tax law, which prescribes the meaning of beneficial owner."[56]  They make three main arguments:

(1) the revenue rule prohibits this Court from choosing between the parties' conflicting views of beneficial ownership because beneficial ownership is an issue of Danish tax law,

(2) even if the Court "need only 'recognize,' rather than 'enforce,' Danish tax law, separation of powers and sovereignty concerns still support the application of the [r]evenue [r]ule to bar SKAT's claims[,]"[57] and

(3) SKAT is collaterally estopped from litigating the revenue rule issue with respect to the ED&F Bellwether defendants based upon Justice Baker's ruling on the application of Dicey Rule 3.

Each argument fails.

*Whether Beneficial Ownership Is An Issue of Danish Tax Law*

The defendants contend that "[t]hree principles of Danish tax law are relevant here":

"*First*, for purposes of Danish tax law, a purchaser becomes the owner of

---

[56]

Dkt 799 (Defs. Mem.) at 17-18.

Although this argument now is before the Court on the defendants' motion for summary judgment, rather than on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, SKAT – as the party asserting subject matter jurisdiction – retains "the burden of proving, by a preponderance of the evidence, that the [C]ourt has subject matter jurisdiction." *See U.S. ex rel. Woods v. Empire Blue Cross & Blue Shield*, No. 99 CIV. 4968 (DC), 2002 WL 1905899, at *3 (S.D.N.Y. Aug. 19, 2002).

[57]

Dkt 799 (Defs. Mem.) at 37.

19

shares in a Danish company 'when a final and binding and unconditional agreement between the parties has been validly concluded.' . . .

    *Second*, the owner of shares in a Danish company before the ex-dividend date is entitled to the dividend. . . .

    *Third*, the beneficial owner of dividends under Danish tax law is the party entitled to use and enjoy the dividends."[58]

In other words, the defendants argue that "an owner of shares – as confirmed by the execution of a final and binding agreement to purchase them – who enters into an agreement to buy them before the ex-dividend date and is entitled to use and enjoy the dividends is the beneficial owner of dividends, eligible for any refund of withheld dividend tax under Danish tax law."[59]

    To support their argument that beneficial ownership would be determined under Danish tax law, the defendants rely on the double taxation treaty between Denmark and the United States. The technical explanation to the 2006 Protocol amending the double taxation treaty between Denmark and the United States (the "Convention") states that:

    "The term 'beneficial owner' is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (*i.e.*, the

---

[58]    *Id.* at 19-20 (emphases in original).

    SKAT argues that the Proper Pacific and FWC Capital Plans and their participants are collaterally estopped from relitigating whether a binding purchase agreement establishes beneficial ownership because they already litigated that issue and lost before the Danish National Tax Tribunal.  Dkt 831 (Pl. Opp. Mem.) at 23.  Given that the Court denies defendants' arguments with respect to the revenue rule on the merits for the reasons discussed below, it need not and does not now decide SKAT's collateral estoppel argument.

[59]    Dkt 837 (Defs. Reply Mem.) at 2.

> source country). The beneficial owner of the dividend for purposes of Article 10 is
> the person to which the dividend income is attributable for tax purposes under the
> laws of the source State."[60]

The technical explanation, however, makes no specific reference to Danish *tax* law.  To make that
connection, the defendants rely on a declaration by their Danish law expert, Kasper Pilgaard.[61]  Mr.
Pilgaard, however, concedes that "[u]ntil relatively recently, beneficial ownership was not a concept
recognized under Danish law."[30]  According to Mr. Pilgaard:

> "The first prominent Danish beneficial ownership case was [a case before the
> Danish Tax Tribunal] in which the taxpayer prevailed. . . . This decision of the Tax
> Tribunal was confirmed by the Eastern High Court [of Denmark] verdict of 20
> December 2011. . . . In that case, the Eastern High Court used the opportunity to
> clarify the meaning of 'beneficial owner.' . . . The High Court stated that the meaning
> of the term must be in accordance with the *international* understanding of the term.
> . . . Consequently, the term 'beneficial owner' *is not to be interpreted according to
> domestic law*, and is not the same as the principle of the proper person . . . . Rather,

---

[60]

Dkt 801 (Decl. of Kasper Bech Pilgaard), Ex. 41, Technical Explanation of Convention, at
32. *See also* Dkt 847-1 (Errata).

[61]

"'Determination of a foreign country's law is an issue of law.' . . . In determining foreign law,
courts 'may consider any relevant material or source,' Fed. R. Civ. P. 44.1, including
testimony by foreign law experts. . . . Although expert testimony 'remains the 'basic mode
of proving foreign law,' . . . a U.S. court 'is not bound by [such] testimony, even if
uncontradicted.'"  *Owen v. Elastos Found*., 343 F.R.D. 268, 282-83 (S.D.N.Y. 2023)
(citations omitted).

[30]

Dkt 801 (Decl. of Kasper Bech Pilgaard) at 40, ¶¶ 174-75.

the meaning of the term should be assessed according to the OECD [(Organization for Economic Cooperation and Development)] Model Tax Conventions and the 1977 and 2003 comments to the OECD Model Tax Convention, as they express the international meaning of the term."[31]

SKAT's Danish law expert, Professor Mads Bryde Andersen, states that the Danish Tax Tribunal's "decisions are generally regarded as indicative of Danish tax law."[32] The decisions by the Danish Tax Tribunal cited by Mr. Pilgaard, however, do not demonstrate that the Danish Tax Tribunal has applied principles of Danish tax law.[33] Indeed, as the above discussion from Mr. Pilgaard's declaration indicates, to the extent that Danish tax law ascribes any meaning to "beneficial ownership," it apparently does so in reference to the international understanding of the term.

Even accepting, however, for the sake of argument, that beneficial ownership would be determined under Danish tax law,[34] this Court agrees with SKAT that:

"Danish civil law follows the doctrine '*nemo dat quod non habet*' ('no one gives what they do not have'), including with respect to transfers of ownership of

---

[31]

    *Id.* at 41-42, ¶¶ 175-76 (emphasis added).

[32]

    Dkt 834 (Andersen Decl.) at 7, ¶ 17.

[33]

    In one of those examples involving a "Luxembourg company receiving an interest payment from its Danish subsidiary," Mr. Pilgaard states that "[t]he [Danish] Tax Tribunal applied the interpretation of beneficial ownership as defined by the EU [(European Union)] directives to the interpretation of beneficial ownership under the Tax Treaty between Denmark and Luxembourg." Dkt 801 (Pilgaard Decl.) at 42, ¶ 176.

[34]

    For instance, if the Court were to credit the defendants' argument that "[e]ven if Danish tax law looks to other sources (like international law) in assessing questions of beneficial ownership, consideration of those sources is simply part of the process of applying Danish tax law." Dkt 799 (Defs. Mem.) at 19 n. 13.

22

> shares, under which a seller cannot convey rights greater than it itself possesses....
> Thus, if a seller does not have any ownership rights in, for instance, a share, the seller
> cannot convey any ownership rights to a purported buyer. . . . Accordingly, for any
> transfer of ownership, beneficial or otherwise, in a Danish share to be effective, the
> seller must own the Danish share (and ultimately deliver that share to the buyer)....
> Nothing in Danish tax law supplants this basic concept of Danish civil law, and
> therefore if a seller does not have ownership rights under Danish civil law, there is
> no construct in Danish tax laws that could convey or create an ownership right in a
> buyer."[35]

SKAT contends that the defendants' reliance on "binding agreements" to purchase the shares is

flawed because "the purported seller never owned any shares or had any rights to shares or dividends

that could be conveyed."[36]  Accordingly, even if Danish tax law were a source for the definition of

beneficial ownership, in these circumstances, the starting point would be whether the Solo

Custodians from which the defendants purportedly purchased the shares owned the shares in the first

place. If the solo custodians never owned the shares that they allegedly sold to the defendants, the

Court might not need to reach the question of whether the defendants beneficially owned the shares,

under Danish tax law or otherwise.[37]

---

[35]       Dkt 831 (Pl. Opp. Mem.) at 18 (citations omitted).

[36]       *Id.* at 19.

[37]       The defendants contend that "an absence of shares proves nothing because Danish tax law
allows an investor to be the owner without having any shares." Dkt 837 (Defs. Reply Mem.)
at 2.  With respect to the defendants' revenue rule argument, even accepting, for the sake of
argument, that defendants were correct, this disagreement between the parties nonetheless

23

*The Revenue Rule Would Not Prohibit Determination of Beneficial Ownership*

This Court determined previously that "even if there were a Danish tax law or laws concerning beneficial ownership, the Court's consideration of those laws in determining whether the defendants owned the shares in any respect would not necessarily implicate the revenue rule."[38]  This is because the Court "merely would recognize any relevant law and determine its effect" rather than *enforce* Danish tax law.[39]  As the Second Circuit has noted:

> "The distinction between recognizing and enforcing foreign penal judgments
>
> is widely recognized, as demonstrated by our citation to *Regazzoni v. K.C. Sethia*
>
> *(1944) Ltd.*, [1956] 2 Q.B. 490, 515–16 (C.A.), *aff'd*, [1957] 3 All E.R. 287 (H.L.),
>
> in *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d
>
> at 133 n. 42. In *K.C. Sethia*, Lord Denning explained that while 'courts will not
>
> enforce [revenue or penal] laws at the instance of a foreign country[, i]t is quite
>
> another matter to say that we will take no notice of them. It seems to me that we
>
> should take notice of the laws of a friendly country, even if they are revenue laws or
>
> penal laws.' [1956] 2 Q.B. at 515."[40]

"The Second Circuit has described the key policy concerns that trigger the revenue rule as the need

---

would demonstrate that the Court might not need to reach the issue of beneficial ownership – even assuming, as noted above, that beneficial ownership were a question of Danish tax law.

[38]    *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 316.

[39]    *Id.* at 317.

[40]    *United States v. Federative Republic of Brazil*, 748 F.3d 86, 94 n.8 (2d Cir. 2014) (alterations in original).

both to avoid 'complications and embarrassment [that] may follow when one nation's courts *analyze the validity of another nation's tax laws*,' and to respect the executive branch's responsibility to 'decide when our nation will aid others in enforcing their tax laws.'"[41]  As this Court explained,  it "need not pass on the validity of any of Denmark's tax laws to determine whether the defendants were the beneficial owners of the shares."[42]  Accordingly, even assuming, for the sake of argument, that this Court would be required to recognize and apply some principle or principles of Danish tax law to determine whether the defendants beneficially owned the Danish shares, the revenue rule would not prohibit the Court from doing so.

The defendants make two principal arguments to the contrary.  First, they contend that this Court would be required to enforce Danish tax law in determining beneficial ownership because SKAT's claims are for "tax fraud" rather than "'garden variety commercial fraud'" – the latter of which they concede the revenue rule would not prohibit.[43]  The Court rejected this argument previously, when it determined that SKAT "alleges fraud, pure and simple."[44]  Defendants offer no new evidence to compel a different determination on this motion.  Their arguments fail to appreciate that SKAT does not allege that the defendants participated in tax evasion or otherwise violated

---

[41]

     *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 317 (quoting *European Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 180 (2d Cir. 2005), *cert. denied*, 546 U.S. 1092 (2006)) (emphasis added).

[42]

     *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 317.

[43]

     Dkt 799 (Defs. Mem.) at 28 (quoting *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 308).

[44]

     *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 311.

Danish tax law. Instead, the crux of SKAT's claim is that it "seek[s] to recover amounts defendants stole by pretending that the plans were entitled to tax refunds because they owned Danish shares and received Danish dividends, on which Danish tax had been paid."[45] Although not literally a "highway robbery, by an American, of a SKAT truck delivering tax kroner," the hypothetical analogy used by defendants, the wrongdoing SKAT alleges defendants committed is not different in substance.[46] Instead of robbing a SKAT truck, it alleges that the defendants robbed SKAT of tax kroner by falsely claiming entitlement to monies that happened to be tax refunds.

   Second, the defendants argue that "[e]ven if the Court still believes that it need only 'recognize,' rather than 'enforce,' Danish tax law, separation of powers and sovereignty concerns still support the application of the [r]evenue [r]ule to bar SKAT's claims."[47] Specifically, they contend that "vindicating SKAT's claims 'would be ignoring and undermining the treaty negotiation process'" because "in the U.S.-Denmark Treaty, the U.S. has explicitly agreed not to provide collection assistance against its own nationals."[48] Their argument plainly is irrelevant, however, because – as SKAT states – "SKAT is not seeking to collect taxes."[49]

---

[45]    Dkt 831 (Pl. Opp. Mem.) at 26.

[46]    Dkt 799 (Defs. Mem.) at 29.

[47]    *Id.* at 37.

[48]    *Id.* at 32-33 (quoting *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 122 (2d Cir. 2001)).

[49]    Dkt 831 (Pl. Opp. Mem.) at 30.

   The defendants argue that the treaty between Japan and the United States "strongly suggests that the United States would not consider a case involving a fraudulent (or incorrect) refund

The defendants argue also that there now is a "distinct possibility" that the Court might "'render[] a decision under Danish law on the question of beneficial ownership contrary to an opinion of an administrative or judicial body in Denmark deciding the same question[,]'" the "'type of harm or embarrassment against which the revenue rule is designed to protect.'"[50] They correctly point out that if the Court were to agree with defendants that they were beneficial owners under Danish tax law, such a determination would conflict with Danish administrative decisions that the defendants were not beneficial owners of the shares.[51] As the Court determined previously, however, "based on the present submissions," there still "is no reason to expect that this is likely to occur."[52] Finally, none of defendants' arguments demonstrate that, even if the Court would be obliged to determine beneficial ownership under principles of Danish tax law, it would need to pass on the validity of any Danish tax law. The absence of that cornerstone requirement differentiates this case

---

of tax as outside the scope of a collection assistance article." Dkt 799 (Defs. Mem.) at 31 (quoting Dkt 808-8 (Decl. of Nicholas S. Bahnsen), Ex. 8A, Expert Report of Stephen Shay). However, the relevant language pertaining to a fraudulent claim for a refund in the protocol amending the Japan-U.S. treaty is limited to "the collection of taxes . . . together with interest, costs of collection, additions to such taxes, and civil or administrative penalties related to such taxes." *Id.*, Ex. 69 (Protocol amending Japan-U.S. treaty) at 11. In any event, even accepting, for the sake of argument, defendants' interpretation of the Japan-U.S. treaty, it would not demonstrate a separation-of-powers concern at this time because, for the reasons discussed above, the Court might not even need to reach this question with respect to the Denmark-U.S. treaty.

[50]    Dkt 799 (Defs. Mem.) at 36 (quoting *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 318).

[51]    *See* Dkt 831 (Pl. Opp. Mem.) at 29 ("All the bellwether defendant plans' Danish appeals of SKAT's revocation decisions have now either been rejected or withdrawn, with the defendants' beneficial ownership arguments having been rejected in each instance they were considered.").

[52]    *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 318.

from one in which the Court would *enforce* – rather than merely recognize and apply – a foreign

country's revenue law.

*Collateral Estoppel of SKAT's Claims Against the ED&F Bellwethers*

The defendants argue also that SKAT's claims against the ED&F bellwethers are

collaterally estopped by an English court's dismissal of SKAT's claims against ED&F pursuant to

England's version of the revenue rule, "Dicey Rule 3." As noted above, Dicey Rule 3 provides that

"English courts have no jurisdiction to entertain an action . . . for the enforcement, either directly or

indirectly, of a penal, revenue or other public law of a foreign State."[53] The defendants contend that

the English court's decision precludes SKAT from pursuing its claims against the ED&F bellwether

defendants in this litigation because Dice Rule 3 is identical to the revenue rule, and SKAT had a

full and fair opportunity to litigate Dicey Rule 3 and lost in a ruling that it did not appeal as to

ED&F.

Utah courts apply a "four-part test to determine whether the doctrine of issue

preclusion [('collateral estoppel')] is applicable: First, the issue challenged must be identical in the

previous action and in the case at hand. Second, the issue must have been decided in a final judgment

on the merits in the previous action. Third, the issue must have been competently, fully, and fairly

litigated in the previous action. Fourth, the party against whom collateral estoppel is invoked in the

current action must have been either a party or privy to a party in the previous action."[54] Utah courts

---

[53]      Dkt 804 (Decl. Of Brandon R. Dillman), Ex. 140 (Justice Baker decision) at 5, ¶ 4 (quoting
DICEY, MORRIS & COLLINS, THE CONFLICT OF LAWS, R5-019 (15th ed.)).

[54]      *Macris & Assocs., Inc. v. Neways, Inc.*, 16 P.3d 1214, 1222 (2000).

have held also that "[c]ollateral estoppel 'is not an inflexible, universally applicable principle[.] ... [P]olicy considerations may limit its use where the . . . underpinnings of the doctrine are outweighed by other factors.'"[55]  "Application of the doctrine of collateral estoppel may be unwarranted in circumstances where its purposes would not be served. . . . Courts, then, must carefully consider whether granting preclusive effect to a prior decision is appropriate."[56]

      SKAT disagrees that Dicey Rule 3 and the revenue rule are identical.  It contends that the legal standards governing the doctrines are meaningfully different.  Specifically, it argues that "[i]n England, 'the preferred rationale for the revenue rule . . . is that an assertion of sovereign authority by a foreign state within the territory of [English] Courts is not admissible.' . . . By contrast, in the U.S., the preferred rationales for the revenue rule are the distinct separation of powers and sovereignty concerns discussed above."[57]  But it is unnecessary to resolve this disagreement.

      Even if the issues were identical, the circumstances here would counsel against application of collateral estoppel.  Importantly, Justice Baker's decision was overruled on appeal, albeit with respect to defendants other than ED&F only because SKAT chose not to pursue an appeal in relation to ED&F. The English Court of Appeal determined that Dicey Rule 3 did not bar SKAT's claims because "in this case[,] SKAT was not asking the Court to enforce any public law of Denmark. Although the proceedings would require the Court to recogni[z]e the Danish tax laws, there was no objection to such recognition under Dicey Rule 3. The claim was one to recover from

---

[55]

    *Buckner v. Kennard*, 99 P.3d 842, 847 (2004) (citation omitted).

[56]

    *Id.*

[57]

    Dkt 831 (Pl. Opp. Mem.) at 32-33 (quoting Dkt 804 (Decl. Of Brandon R. Dillman), Ex. 140 (Justice Baker decision) at 35, ¶ 118).

29

the alleged fraud defendants payments obtained by fraud."[58]  On November 8, 2023, the English

Supreme Court, the final court of appeal in England, agreed, determining that "the revenue rule has

no application to this case."[59]  Given that these appellate decisions overturned Justice Baker's

analysis and decision, notwithstanding that SKAT did not appeal that ruling as applied to ED&F,

granting preclusive effect in these circumstances would be inappropriate.

*Defendants' Other Arguments*

The defendants raise numerous other grounds upon which they contend that summary

judgment should be granted in their favor. Those grounds include that:

(1) the defendants' statements regarding beneficial ownership and entitlement

to refunds are inactionable legal conclusions, and even if they were actionable, SKAT

cannot prove that they are false,

---

[58]

Dkt 804-52 (Decl. Of Brandon R. Dillman), Ex. 141 (English Court of Appeal decision) at 18-19, ¶¶ 54-55.  *See also id.* at 38, ¶ 128 ("In my judgment, this claim against the SKAT defendants is not a claim to unpaid tax or a claim to recover tax at all. It is a claim to recover monies which had been abstracted from SKAT's general funds by fraud. The alleged fraud defendants' submission that the claim to the refund is still a claim to tax is simply wrong as a matter of analysis and the judge fell into error in accepting that submission. . . . Accordingly, there being no unsatisfied claim to tax in the present case, the revenue rule does not apply, even though SKAT may be an emanation of the Danish state.").

[59]

Dkt 923 (English Supreme Court decision) at 18, ¶ 52.

Defendants argue that "[e]ven were SKAT not entirely precluded by the [r]evenue [r]ule from pursuing its claims against ED&F, its claims would fail . . . because SKAT seeks to pursue its claims in this U.S. court with respect to tax reclaim applications that SKAT admits involved the receipt of actual dividends."  Dkt 799 (Defs. Mem.) at 44.  SKAT contends, however, that "the representations of share ownership and dividend receipt . . . were false because the plans transferred to ED&F all ownership interest in any shares and dividends."  Dkt 831 (Pl. Opp. Mem.) at 41.  Given that there exists a genuine issue of material fact with respect to whether the ED&F bellwether defendants were entitled to the refunds, summary judgment in favor of defendants on this ground is denied.

(2) the reclaim amounts do not belong to SKAT,

(3) SKAT's claims are barred by the applicable statutes of limitations,

(4) SKAT's equitable claims should be dismissed because SKAT has an adequate remedy at law,

(5) SKAT's payment by mistake claim should be dismissed because purportedly undisputed facts show that no mistake was made,

(6) SKAT's negligent misrepresentation claim should be dismissed because SKAT's reliance on the alleged misrepresentation was unreasonable,

(7) SKAT's fraud and negligent misrepresentation claims against the ED&F bellwethers should be dismissed because the ED&F bellwethers did not possess the requisite scienter and were not negligent,

(8) SKAT's aiding and abetting claim against the ED&F bellwethers should be dismissed because Utah does not recognize claims for aiding and abetting fraud,

(9) SKAT's equitable and restitution claims should be dismissed as to certain defendants who allegedly did not receive monies from SKAT, and

(10) SKAT's fraud, aiding and abetting, and negligent misrepresentation claims against Mr. Altbach should be dismissed.

*Defendants' Statements Regarding Beneficial Ownership*

The defendants contend that SKAT's claims should be dismissed because none of the defendants' allegedly false statements regarding beneficial ownership "is actionably false or

misleading."[60]  With respect to two of the allegedly false statements – *viz.*, that the defendants were beneficial owners of the shares in the Danish companies and that they were entitled to refunds of the dividend withholding tax under the Denmark-U.S. treaty – the defendants argue that those statements were "non-actionable statements of law."[61]  Their arguments are unpersuasive.

The defendants' statements that they were beneficial owners of the shares and entitled to a refund under a treaty were not, in these circumstances, purely legal conclusions. Under New York, Utah, and Florida law, a statement that sounds both in law and in fact might be actionable depending on the circumstances in the case.[62]  The defendants contend that their statements regarding beneficial ownership were "pure opinion[s] of law" because beneficial ownership and treaty interpretation are legal concepts.[63]  However, statements that they were beneficial owners of the Danish shares and were entitled to tax refunds under the treaty also were factual assertions.  SKAT does not contend principally that the defendant's claims of beneficial ownership were false because they misinterpreted the legal definition of that term.  It instead contends that the defendants' claims

---

[60]

Dkt 799 (Defs. Mem.) at 45.

[61]

*Id.* at 45-46.

[62]

*Nat'l Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 628 (1969) ("It has been said that 'a statement as to the law, like a statement as to anything else, may be intended and understood either as one of fact or one of opinion only, according to the circumstances of the case'.") (citation omitted); *Demarco v. LaPay*, No. 2:09-cv-190 (TS), 2009 WL 3855704, at *10 (D. Utah Nov. 17, 2009) ("[I]f a misrepresentation of law includes, either expressly or by implication, a misrepresentation of fact, it is justifiable to rely on the misrepresentation of fact as if it were like any other misrepresentation of fact."); *Chino Elec., Inc. v. U.S. Fid. & Guar. Co.*, 578 So. 2d 320, 323 (Fla. Dist. Ct. App. 1991) ("It should be noted, however, that the modern trend of cases is to find statements of fact implied in otherwise material misrepresentations which have some legal character.").

[63]

Dkt 837 (Defs. Reply Mem.) at 21 (alteration in original).

were false because they never owned the Danish shares in any legal *or factual* sense. Indeed, SKAT alleges that the shares that defendants claim to have owned did not exist. The defendants' allegedly false statements accordingly are comparable to an individual allegedly falsely representing that he or she owns the fee simple in a piece of land: although both "fee simple" and "beneficial ownership" raise legal questions, they also involve questions of fact, and here the dispute between SKAT and defendants is not limited to the legal questions concerning beneficial ownership.[64]

The defendants contend also that, in any event, their allegedly false statements of beneficial ownership and that they received dividends and received the dividends net of withholding tax "were true, and no reasonable jury could conclude otherwise from this summary judgment record."[44] Specifically, they argue that "[t]here is no genuine dispute that each Plan received net dividend payments" because each Plan received a "DCA [(dividend credit advice)] confirming that its account had been credited with a net dividend payment, which represented an amount equal to the gross dividend less the dividend withholding tax."[45] There are, however, genuine issues of material fact with respect to the defendants' representations of beneficial ownership and alleged receipt of dividends. As SKAT states in its motion for summary judgment, SKAT's forensic accounting expert, Bruce Dubinsky, "examine[d] the Solo Custodians' records and other materials

---

[64]

As a result, the defendants' allegedly false statements of beneficial ownership are materially different from the statement in *DirecTV, Inc. v. Lewis* – a case upon which defendants rely – where the Court determined that the defendant's "expression of its opinion that its possession [of an unlopper device] is illegal" was an inactionable legal conclusion. No. 03-CV-6241-CJS-JWF, 2005 WL 1006030, at *11 (W.D.N.Y. Apr. 29, 2005).

[44]

Dkt 799 (Defs. Mem.) at 46.

[45]

*Id.* at 54-55.

produced in discovery" and his "examination revealed no evidence whatsoever that the Solo Custodians held any Danish shares or received any dividends at any sub-custodian."[46]  The Court need not and does not now determine whether or not the evidence in fact establishes the falsity of defendants' statements.  Drawing all reasonable inferences in favor of SKAT, as it must on this motion, the Court determines only that genuine issues of material fact preclude summary judgment in favor of defendants on this ground.

*Whether the Reclaim Amounts Belong to SKAT*

The defendants argue that SKAT's claims should be dismissed "[b]ecause Danish taxes belong to *the Kingdom [of Denmark]*, and not to SKAT, any wrongfully paid refunds of withholding tax likewise belong *to the Kingdom [of Denmark]*, and not to SKAT."[47]  They contend that SKAT is not "the rightful owner of funds that [it] now seeks to recover" because:

"(1) dividends paid by Danish companies are taxed by the Kingdom [of Denmark] – not by SKAT, . . .

(2) SKAT cannot keep the tax revenue it collects, and indeed has no discretion as to what to do with it, . . .

(3) SKAT deposits the money it collects into a bank account that belongs to the Kingdom [of Denmark], . . . and

(4) any financial loss from a tax-revenue shortfall – including the alleged loss

---

[46]  Dkt 817 (Pl. Mem. in Support of Pl. Mtn. for Summary Judgment) at 13.

[47]  Dkt 799 (Defs. Mem.) at 57 (emphasis in original).

suffered here – is borne by the Kingdom [of Denmark], not by SKAT."[48] The defendants made a similar argument when they previously moved to dismiss SKAT's claims on the ground that SKAT lacks standing.[49]  In response to that motion, SKAT argued – as it does here – that the defendants are mistaken in their premise because SKAT and the Kingdom of Denmark are not distinct legal entities.[50]  This Court denied the defendants' motion "for substantially the reasons stated in SKAT's memorandum."[51]

The evidence does not support a different ruling on this motion.  First, the defendants have not established that SKAT is a separate legal entity from the Kingdom of Denmark. Mr. Pilgaard, defendants' expert, states that "the Danish administration is divided into *separate* authorities with distinct powers in relation to their subject-matter, and it is not one total legal entity."[52]  The fact that SKAT might be independent from other Danish government agencies does not establish, however, that it is, as Mr. Pilgaard states, "its own legal entity, separate from the

---

[48]

*Id.* (citations omitted).

[49]

Dkt 134 (Defs. Rule 12(b)(1) Mtn.).

[50]

Dkt 158 (Pl. Opp. Mem. to Defs. Rule 12(b)(1) Mtn.) at 1 ("SKAT is the part of the government of the Kingdom of Denmark responsible for collecting and assessing Danish taxes, and is not a separate, legally distinct entity from the Kingdom [of Denmark]."); Dkt 831 (Pl. Opp. Mem.) at 48 ("[The defendants' argument] ails for the same reason the defendants' previous motion to dismiss SKAT's claims for lack of standing failed: the Kingdom of Denmark and SKAT are not separate legal entities.").

[51]

Dkt 243 (Pretrial Order No. 13).

[52]

Dkt 838 (Pilgaard Reply Decl.) at 12, ¶ 63 (emphasis in original).

Kingdom of Denmark, which in turn is its own legal entity."[53]  Second, even if SKAT were a legal entity separate from the Kingdom of Denmark and it is the Kingdom of Denmark that suffered the relevant alleged injuries, the defendants have not demonstrated that, as a matter of law, SKAT is not entitled to bring these claims on behalf of the Kingdom of Denmark.[54]  The defendants' motion for summary judgment on this ground therefore is denied.

*Whether SKAT's Claims Are Time Barred*

The parties agree that, under Danish law, SKAT's claims are subject to a three-year limitations period "running from the point at which SKAT knew or should have known of its claims against [d]efendants."[55]  The defendants argue that SKAT's claims based on refunds it paid to the defendants before January 2015 – a little over three years before SKAT filed these lawsuits – are

---

[53]

Id. at 13, ¶ 69.

[54]

To the extent that the questions of whether SKAT and the Kingdom of Denmark are the same legal entity and/or SKAT is otherwise entitled to bring these claims on behalf of the Kingdom of Denmark are issues of foreign law for the Court to decide pursuant to Federal Rule of Civil Procedure 44.1, the Court need not and does not decide these questions at this time. *See, e.g.*, *Loebig v. Larucci*, 572 F.2d 81, 85 (2d Cir. 1978) ("Rule 44.1 of the Federal Rules of Civil Procedure permits parties to present information on foreign law, and the court may make its own determination of foreign law based on its own research, but it is not mandatory that it do so.").

[55]

Dkt 837 (Defs. Reply Mem.) at 33.

"Denmark's limitations period [is] made applicable in the New York Solo and ED&F [B]ellwethers by New York and Utah's respective borrowing statutes."  Dkt 831 (Pl. Opp. Mem.) at 49.  "Defendants do not argue that the Danish limitations period applies to SKAT's claims in the Florida Solo [B]ellwether."  *Id.* at n. 49.  In any event, Florida's borrowing statute likely would produce the same outcome. Fla. Stat. § 95.10 ("When the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state.").

untimely.  The crux of their argument is that SKAT was obliged to investigate information reported to it and did not do so despite "multiple, independently sufficient reasons [for it] to investigate the basis for each and every reclaim application submitted to it during the relevant period."[56]  Examples of concerns in SKAT's dividend withholding tax refund system that defendants identify include that:

- In 2007, Leif Normann Jeppesen, then the chief internal legal officer of SKAT, "warned that stock lending and short sales in the marketplace created the risk of multiple claims to legal ownership of the same shares, and the documents SKAT required in support of reclaim applications did not permit SKAT to establish which applicant was the beneficial owner for tax purposes. . . . [Mr.] Jeppesen also identified an open legal question about who, as between the owner who lends shares and a buyer who subsequently buys those shares from the borrower without knowledge they are borrowed, is *actually* the beneficial owner of the dividend associated with those shares."[57]

- "During the time that she was in charge of dividend withholding tax refund administration at SKAT (2002-13), Lisbeth Rømer made multiple attempts to inform senior SKAT management of problems with SKAT's process for issuing refunds of withheld dividend tax. . . . First, as Rømer explained, the dividend unit was treated within SKAT as purely an accounting function. ... Second, SKAT knew that it was unable to identify the foreign beneficial

---

[56]    Dkt 799 (Defs. Mem.) at 59.

[57]    *Id.* at 63-64 (emphasis in original).

owner of the dividends for which a reclaim was sought. Omnibus (nominee) accounts within the custody chain meant that SKAT did not receive particularized information about the identity of the ultimate foreign beneficial owner of shares. . . . Instead, SKAT claimed it had visibility only into the identity of the bank through which those ultimate foreign beneficial owners held their shares. . . . Understandably concerned, Rømer raised the issue in written memoranda on numerous occasions."[58]

•    "SKAT's own internal audit division, SIR, also issued a number of reports critical of SKAT's administration of dividend withholding taxes in the years leading up to 2012, including a 2006 report concluding that SKAT did not satisfactorily control the administration of dividend withholding tax refunds."[59]

•    "In 2010, concerned that SKAT might be refunding more in dividend withholding tax to foreigners than was paid to SKAT, the then-head of the Department of the Ministry of Taxation, Peter Loft, asked SIR to investigate. . . . SIR's report, issued in May 2010, confirmed Loft's fears and concluded that SKAT might be refunding dividend taxes more than once per dividend. . . . The 2010 SIR report also concluded that there was 'no check as to whether dividend tax is requested more than once per share,' and 'no checks

---

[58]    *Id.* at 65.

[59]    *Id.*

in connection with refund requests as to whether the investor is actually a shareholder and whether the investor is, in fact, liable for tax in Denmark or not.'"[60]

- "SKAT inexplicably ignored an explosion in the volume of dividend withholding tax reclaims paid starting in 2012. . . . SKAT even paid dividend withholding tax refunds in excess of the dividend withholding tax liability owed to SKAT for a particular dividend distribution on at least one occasion prior to January 2015."[61]

The key flaw in defendants' argument is that none of these purported "'flashing red' warnings" demonstrate that SKAT knew or should have known of its claims against the defendants.[62] As SKAT notes, "Danish law does not impose on SKAT a duty to 'make active investigations (like police investigations in criminal matters)' of all facially sufficient tax refund applications it receives 'on a presumption that facts of relevance to the case may be hidden somewhere.'"[63]  The specific fraud that defendants are alleged to have committed does not have to do with the purchase of "borrowed shares," the risk of multiple claims to ownership of the same shares, determining the ultimate foreign beneficial owner of shares, or any of the other issues identified above. At bottom, for all the pages defendants devote to purported warning signs to SKAT, in none of them do they

---

[60]      *Id.* at 67.

[61]      *Id.*

[62]      *Id.* at 63.

[63]      Dkt 831 (Pl. Opp. Mem.) at 51 (citation omitted).

demonstrate that they are entitled to judgment as a matter of law on this ground.[64]


*SKAT's Claims Do Not Implicate the Court's Equity Jurisdiction*

The defendants argue that SKAT's payment by mistake, unjust enrichment, and money had and received claims should be dismissed because they are "equitable" claims under New York law and Utah law. A federal court sitting in diversity may not grant equitable relief unless there is no adequate remedy at law available.[65] SKAT, however, does not seek equitable remedies. It seeks only monetary relief, which typically would render its claims legal.[66] Indeed, with respect to SKAT's money had and received claim under New York law, this Court previously stated that it

---

[64] The defendants argue also that SKAT's unjust enrichment claims against the solo bellwether defendants governed by New York law are barred by New York's three-year limitations period. "New York's intermediate appellate courts are split as to whether the statute of limitations for unjust enrichment claims is three or six years." *Bascunan v. Elsaca*, No. 15 CIV. 2009 (GBD), 2021 WL 3540315, at *6 n. 5 (S.D.N.Y. Aug. 11, 2021). Given that SKAT's unjust enrichment claims "rest[] on facts that also support another claim governed by a six-year statute of limitations, even where the plaintiff seeks damages," the Court agrees that in these circumstances, a six-year limitations period applies to SKAT's unjust enrichment claims. *City of Almaty v. Sater*, 503 F. Supp. 3d 51, 65-66 (S.D.N.Y. 2020) ("The Court is skeptical of the line of cases in this district that simply recite the Second Department's rule [(applying a three-year limitations period)] without considering the split of authority or the specific provisions of the New York Civil Practice Law and Rules. . . . [O]n these facts, a three-year limitations period applies under either the First or Second Department's standard.").

[65] *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (" The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is. . . the absence of an adequate remedy at law.").

[66] *Id.* at 476 (agreeing with petitioner's contention that "insofar as the complaint requests a money judgment it presents a claim which is unquestionably legal").

"'has been considered an action at law' even though it rests on equitable principles."[67]

The defendants nonetheless contend that SKAT's payment by mistake, unjust enrichment, and money had and received claims are equitable, rather than legal, in nature because they are claims for restitution.[68]  Even accepting, however, for the sake of argument that SKAT's claims are for restitution and therefore sound in equity, that would not warrant dismissal because "the legal claims involved in the action must be determined prior to any final court determination of . . . equitable claims."[69]  The defendants' other argument, that SKAT's allegedly equitable claims

---

[67]

*In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 326 (quoting *Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano*, No. 03-cv-15 (RWS), 2007 WL 1687044 at *10 (S.D.N.Y. June 11, 2007) (internal quotations and citations omitted)).

[68]

"[A] plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).  *See also, e.g.*, *Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 645 (S.D.N.Y. 2005), *aff'd but criticized sub nom. Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) ("Because, in the instant case, the remedies of an accounting, a constructive trust, and restitution seek to restore funds to Design on the grounds that Defendants do not possess them in good conscience, those remedies are, under these circumstances, more appropriately classified as equitable than legal.").  The Utah Supreme Court, however, has determined that "[r]estitution is available as a legal remedy where the plaintiff asks exclusively for monetary relief." *Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 51, 355 P.3d 1000, 1015 (citing Restatement (Third) of Restitution and Unjust Enrichment § 4 (2011) ("If restitution to the claimant is accomplished exclusively by a judgment for money, without resort to any of the ancillary remedial devices traditionally available in equity but not at law, the remedy is presumptively legal.").

The Court need not and does not now determine whether SKAT's payment by mistake, unjust enrichment, and money had and received claims under New York law are equitable because, under New York law, its legal claims, which seek the same monetary relief as its restitution claims, must be decided first.

[69]

*Dairy Queen, Inc.*, 369 U.S. at 479.

The defendants' argument that under New York law, SKAT's unjust enrichment claims should be dismissed as duplicative because "its legal claims are adequate remedies and

should be dismissed because SKAT "could have brought an action for damages in Denmark against the [d]efendants based upon the same factual allegations contained in this case[,]" also is unpersuasive.[70] The defendants cite no authority, and the Court has not found any, to support the proposition that SKAT's purportedly equitable claims are duplicative because it could have, but did not, previously bring the same or similar claims for damages that it is pursuing in this litigation in a different forum. Defendants' motion for summary judgment on the ground that SKAT's claims allegedly implicate the Court's equity jurisdiction therefore is denied.

*SKAT's Payment By Mistake Claim*

The defendants argue that SKAT's payment by mistake claim should be dismissed because "SKAT never sought to ascertain the facts about which it now claims it was 'mistaken' when it issued the refunds."[71] Under New York law, "one who is aware that his or her understanding of a legal obligation may be erroneous can hardly be characterized as truly *mistaken* when he or she

---

because all its claims are premised on the same underlying allegations that defendants made material misrepresentations to SKAT" also is premature. The defendants have not shown that "if [SKAT's] other [(legal)] claims are defective, an unjust enrichment claim cannot remedy the defects." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 791 (2012). As this Court determined previously, SKAT's "unjust enrichment claim alleges an alternative basis for relief from the fraud and negligent misrepresentation claims because both *scienter* and the defendants' liability for the alleged misrepresentations are disputed. The plaintiff's claims for fraud and negligent misrepresentation theoretically could fail and it still could prevail on the unjust enrichment claim." *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d at 325-26 (emphasis in original).

[70]

Dkt 799 (Defs. Mem.) at 74.

[71]

Dkt 799 (Defs. Mem.) at 75.

intentionally proceeds without further investigation of his or her rights."[72]  For the reasons discussed above and based upon the parties' submissions, however, whether SKAT knew, or should have known, that the defendants' tax refund applications were fraudulent is a fact-bound question better reserved for trial.  The defendants' motion for summary judgment on SKAT's payment by mistake claim under New York law on the ground that SKAT was not "mistaken" therefore is denied.

*SKAT's Negligent Misrepresentation Claim*

The defendants' next argument is that SKAT's reliance on the defendants' alleged misrepresentations was unreasonable because SKAT "was thoroughly aware of the risks associated with its dividend tax administration."[73]

To prove negligent misrepresentation, a plaintiff must demonstrate "reasonable reliance" on information that was incorrect.[74]  Generally, however, "'[q]uestions of the

---

[72]

*Est. of Hatch, ex rel. Ruzow v. NYCO Mins. Inc.*, 270 A.D.2d 590, 591 (3d Dept. 2000) (emphasis in original).

Given that the defendants do not reference Utah law or Florida law in their argument with respect to SKAT's payment by mistake claim, the Court need not and does not now address the application, if any, of those states' laws to this argument.

[73]

Dkt 799 (Defs. Mem.) at 80.

[74]

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012) ("It is well settled that [under New York law,] '[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'") (citation omitted); *Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986) ("Utah long ago acknowledged the tort of negligent misrepresentation, which provides that a party injured by reasonable reliance upon a second party's careless or negligent misrepresentation of a material fact may recover damages resulting from that injury when the second party had a pecuniary interest in the transaction,

reasonableness of reliance raise issues of fact that must be resolved at trial.'"[75] Here, as with the defendants' argument with respect to SKAT's payment by mistake claim, the defendants rely on SKAT's alleged ignorance of warning signs to support their position.  For the reasons discussed above and based upon the parties' submissions, whether SKAT knew, or should have known, that the defendants' tax refund applications were fraudulent is a fact-bound question that must await trial. The defendants' motion for summary judgment dismissing SKAT's negligent misrepresentation claim therefore is denied.

*The ED&F Bellwether Defendants' Alleged Scienter*

   The ED&F Bellwether defendants argue next that SKAT's fraud and negligent misrepresentation claims against the ED&F bellwether defendants should be dismissed because they did not possess the requisite scienter and did not act negligently.

   Under Utah law, "[t]o maintain a cause of action for fraud[,] the plaintiff must prove by clear and convincing evidence[,]"  *inter alia*, that the party that allegedly made a false representation "either (a) knew [the representation] to be false, or (b) made [the representation] recklessly, knowing that he had insufficient knowledge upon which to base such representation."[76] "The tort of negligent misrepresentation . . . carries a lesser mental state, requiring only that the seller

---

was in a superior position to know the material facts, and should have reasonably foreseen that the injured party was likely to rely upon the fact.").

[75]

 *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13-CV-4650 (JFK), 2015 WL 769573, at *5 (S.D.N.Y. Feb. 24, 2015) (quoting *MTV Networks v. Curry*, 867 F.Supp. 202, 207 (S.D.N.Y.1994)).

[76]

 *Mikkelson v. Quail Valley Realty*, 641 P.2d 124, 126 (Utah 1982).

act *carelessly or negligently*."[77]

The ED&F Bellwether defendants contend that they never "receive[d] anything that would have led them to question the information provided by ED&F" given that, according to defendants, "[f]or every transaction, Acer, on behalf of the pension plans, received trade confirmations showing the execution of trades on the trade date, account statements reflecting long positions in the Danish securities, account statements reflecting dividend payments net of withholding tax, and a tax voucher from ED&F indicating dividend amounts received and withholding tax suffered."[78] Their argument, however, overlooks certain evidence based upon which a jury reasonably could infer that the ED&F Bellwether defendants possessed the requisite *scienter*. As SKAT points out, there is a "disputed issue of fact as to whether the plans and participants, including via their agent Acer and its principal [Ms.] Kaminer, who coordinated the submission of the plans' refund applications, knew that the representations of beneficial ownership were false or were at least reckless or negligent in making such representations."[79] Specifically, "[n]otwithstanding [the plans'] knowledge" that they had transferred title in any shares to ED&F, "defendants nonetheless instructed ED&F to send tax vouchers that it prepared for the AIG and Riverside plans to their agent Goal for the purpose of making the [allegedly] fraudulent refund applications to SKAT."[80] Given that there exists a genuine issue of material fact with respect to the mental state,

---

[77]     *Robinson v. Tripco Inv., Inc.*, 21 P.3d 219, 223 (Utah Ct. App. 2000) (emphasis in original).

[78]     Dkt 799 (Defs. Mem.) at 82-83.

[79]     Dkt 831 (Pl. Opp. Mem.) at 62.

[80]     *Id.* at 63.

45

if any, of the ED&F Bellwether defendants, summary judgment on these claims is denied.

*Aiding and Abetting Fraud Claim Under Utah Law*

The defendants next argue that SKAT's aiding and abetting fraud claim against the ED&F Bellwethers should be dismissed because Utah law does not recognize such a claim.[81] SKAT acknowledges that Utah courts thus far have not recognized an aiding and abetting fraud claim, but argues that "if faced with the issue, Utah courts would recognize [such a claim]."[82] It contends, in the alternative, that if Utah courts would not recognize a cause of action for aiding and abetting fraud, there would be "an actual conflict between Utah law and Danish law, which does recognize the cause of action, and Danish law should apply to SKAT's aiding and abetting fraud claims in the Utah bellwethers."[83]

While "Utah courts have not yet recognized a claim for aiding and abetting fraud[,]" it is reasonable to predict that they would.[74] As SKAT points out, "the Utah Supreme Court has

---

[81] *E.g.*, *Martineau v. Currutt*, No. 121-CV-00045 (JNP) (DBP), 2022 WL 180735, at *6 n.6 (D. Utah Jan. 19, 2022) ("Specifically, it is 'unclear whether aiding and abetting fraud [is] even a cause of action under Utah law.' *See DiTucci v. Ashby*, No. 2:19-cv-277 (TC) (PMW), 2020 WL 1249627 at *10, 2020 U.S. Dist. LEXIS 46155 at *26 (D. Utah Mar. 16, 2020); *see also Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249, 1252 n.1 (D. Utah 2017) ('Utah courts have not yet recognized a claim for aiding and abetting fraud.'); *Coroles v. Sabey*, 79 P.3d 974, 978 n.10 (UT App. 2003) ("'At the hearing, the Court dismissed [the claims of] aiding and abetting breach of fiduciary duty and aiding and abetting fraud ... because these claims are not cognizable under Utah law.'") (alterations in original).

[82] Dkt 831 (Pl. Opp. Mem.) at 64.

[83] *Id.* at 64-65.

[74] *Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249, 1253 n.1 (D. Utah 2017). *See also Martineau v. Currutt*, No. 121-CV-00045 (JNP) (DBP), 2022 WL 180735, at *6 (D. Utah

repeatedly followed the Restatement (Second) of Torts in defining Utah law."[75]  The Second

Restatement recognizes a cause of action for aiding and abetting a tort, which would include fraud.

Indeed, Utah recognizes a cause of action for aiding and abetting torts other than fraud, such as

breach of a fiduciary duty.[76]  Moreover, as SKAT states, "the cause of action for aiding and abetting

fraud is widely recognized, including in Utah's neighboring states of Colorado, Wyoming, Arizona,

and Nevada."[77]  Given that a claim for aiding and abetting fraud likely would be cognizable under

Utah law, the Court need not and does not now determine whether, in the alternative, a claim for

aiding and abetting fraud under Danish law would apply.[78]  Defendants' motion for summary

judgment dismissing this claim accordingly is denied.


*SKAT's Restitution Claims Against Messrs. Lehman and Bradley and the ED&F Bellwethers*

---

Jan. 19, 2022) ("[I]t is 'unclear whether aiding and abetting fraud [is] even a cause of action under Utah law.'") (quoting *DiTucci v. Ashby*, No. 2:19-CV-277 (TC) (PMW), 2020 WL 1249627, at *10 (D. Utah Mar. 16, 2020)) ("The court granted the motion to dismiss on the ground that it was unclear whether aiding and abetting fraud was even a cause of action under Utah law.").

[75]

Dkt 831 (Pl. Opp. Mem.) at 65 (citing cases).

[76]

*Mower v. Simpson*, 278 P.3d 1076, 1087 (Utah Ct. App. 2012) ("As to aiding and abetting the breach of a fiduciary duty, we agree with Plaintiffs that Utah law does recognize such a cause of action.").

[77]

Dkt 831 (Pl. Opp. Mem.) at 66 (citing cases).

[78]

*See Roche Diagnostics Corp. v. Smith*, No. 2:17-CV-05552, 2022 WL 4596720, at *13 (D.N.J. Sept. 30, 2022) (declining to conduct choice of law analysis where defendants argued a conflict existed between New Jersey law and Utah law "because Utah does not recognize an independent cause of action for aiding and abetting fraud" on the ground that "[l]ack of clarity is not a sufficient substitute for an 'actual conflict' so as to warrant a choice of law analysis").

The defendants contend that SKAT's unjust enrichment and other restitution claims against Mr. Lehman, the sole participant of the FWC Plan, and Mr. Bradley, the sole participant of the Proper Pacific Plan, should be dismissed because SKAT "did not 'pay the [introductory broker] fees' that it seeks as equitable damages from [Messrs. Lehman and Bradley]."[79]

With respect to SKAT's unjust enrichment claim against Mr. Bradley, "the New York Court of Appeals has held that a plaintiff cannot recover under an unjust enrichment theory where the plaintiff did not pay the fees in question."[80]  With respect to its unjust enrichment claim against Mr. Lehman, "[t]he Florida Supreme Court has . . . stated that 'to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant.'"[81]

The defendants contend that the evidence demonstrates that SKAT did not pay the introductory broker fees because "[t]he monies SKAT paid to the tax reclaim agents for tax reclaims filed on behalf of The FWC Capital and The Proper Pacific Plans never reached those Plans or the Plans' respective bank accounts."[82]  They state that, as supported by the report of SKAT's own forensic accounting expert, "[a]ll of the tax reclaim monies – every single penny – were pilfered prior to that payment being made by the various intermediary actors in this matter."[83]  There exists

---

[79]

Dkt 799 (Defs. Mem.) at 85 (citation omitted).

[80]

*Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 209 (S.D.N.Y. 2016) (citing *IDT Corporation v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009)).

[81]

*CFLB P'ship, LLC v. Diamond Blue Int'l, Inc.*, 352 So. 3d 357, 359 (Fla. Dist. Ct. App. 2022) (emphasis and subsequent case history omitted).

[82]

Dkt 799 (Defs. Mem.) at 85.

[83]

*Id.*

a genuine issue of material fact, however, with respect to whether the fees Messrs. Bradley and Lehman obtained derived from SKAT's tax refund payments.  Mr. Bradley testified in his deposition that he was paid by a colleague, Danny Fletcher, "for introducing [his] plans in 2015 to him," which included the Proper Pacific Plan.[84]  He testified also that Mr. Shah – who, as noted above, allegedly controlled the solo custodians – paid him a total of $5 million for introducing ten other plans to him.[84]  SKAT argues that "[o]nly after SKAT started paying the plan's refund applications, did [Mr.] Fletcher, in turn, via [other entities], pay a total of $1,174,890[,] . . . which in addition to at least the $100,000 for the Proper Pacific plan, also included payment for other plans [Mr.] Bradley established to participate in the [alleged] fraud."[85]  Similarly with respect to Mr. Lehman, as SKAT states, Mr. Shah "agreed to pay him $700,000 or $800,000 to do so and 'introduce' the plan to the Solo Custodians," which Mr. Shah did *after* SKAT paid the tax refunds.[84]  Drawing all reasonable inferences in favor of SKAT, as the Court must on this motion, defendants have not met their burden on summary judgment with respect to these claims.

These defendants argue also that "SKAT cannot prove it conferred a benefit"on certain of the ED&F bellwether defendants – Acer, Ms. Kaminer, Mr. Schulman, or Mr. Crema – or that those defendants "engaged in inequitable conduct or some other 'misleading act' to warrant

---

[84]    Dkt 824-99 (Decl. of Marc Weinstein), Ex. 81 (Bradley Dep. Tr.) at 307:19-20.

[84]    *Id.* at 308:12-309:4.

[85]    Dkt 831 (Pl. Opp. Mem.) at 70.

[84]    *Id.* at 71.

restitution."[85]

Under Utah law, "[t]o state a claim for unjust enrichment, a plaintiff must allege facts supporting three elements: '(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.'"[86]   As SKAT states, however, Mr. Crema and Mr. Schulman, "the respective sole participants in the AIG and Riverside plans, benefitted from SKAT's payments to the same extent their plans did," and "Acer was enriched by the fees it was paid, contingent on SKAT paying the 'refunds,' out of SKAT's payments to the AIG and Riverside plans."[87]   Moreover, as discussed above, there is a genuine issue of material fact with respect to the mental state of the ED&F Bellwether defendants.  Defendants' motion for summary judgment therefore is denied with respect to SKAT's restitution claims against the ED&F Bellwether defendants.

*SKAT's Fraud Claims Against Defendant Altbach*

Lastly, the defendants argue that SKAT's fraud, aiding and abetting fraud, and negligent misrepresentation claims against Mr. Altbach should be dismissed.  Mr. Altbach, as noted above, was the sole participant in the Roadcraft Plan. The defendants argue that SKAT's fraud claim

---

[85]   Dkt 799 (Defs. Mem.) at 88.

[86]   *Hess v. Johnston*, 163 P.3d 747, 754 (Utah Ct. App. 2007) (citation omitted).

[87]   Dkt 831 at 74.

There also is sufficient evidence for a jury to reasonable infer that Ms. Kaminer benefitted as the trustee of the AIG plan.

against Mr. Altbach should be dismissed because "the allegedly false statements that SKAT attributes to [Mr.] Altbach were made by Goal [(a solo custodian)] to SKAT."[88]  Goal's allegedly false statements, they contend, cannot be attributed to Mr. Altbach because (1) "[t]he [p]ower [o]f [a]ttorney that Goal provided to SKAT identified only the Roadcraft Plan, not [Mr.] Altbach, as its principal," and (2) "the record contains no evidence of Goal's knowledge or scienter."[89]  Both arguments are unpersuasive.

There is a genuine issue of material fact as to whether Mr. Altbach is liable as a principal for Goal's alleged misstatements to SKAT.  "[A] principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority."[90]  A power of attorney "prepared and executed by [Mr.] Ben-Jacob," an attorney for the Basalt and Roadcraft Plans, "authorized [Goal] to prepare and submit the relevant tax reclaim applications on behalf of the Roadcraft Plan."[91]  The defendants argue that Goal did not have real or apparent authority to act on behalf of Mr. Altbach because the power of attorney recognized only the Roadcraft Plan as the principal.  As SKAT points out, however, Mr. Altbach "personally designated [Mr.] Ben-Jacob to act as his agent through a limited power of attorney, which authorized [Mr.] Ben-Jacob to, among other things, 'execute . . . tax reclaim agreements.'"[92]  SKAT argues also that Mr. Altbach was the

---

[88]     Dkt 799 (Defs. Mem.) at 89.

[89]     *Id.*

[90]     *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir. 1989).

[91]     Dkt 799 (Defs. Mem.) at 90.

[92]     Dkt 831 (Pl. Opp. Mem.) at 76.

Roadcraft Plan's *alter ego*, given that he was the "sole participant, the sole trustee, and the authorized representative of the Roadcraft [Plan], and the sole member of the Roadcraft Technologies LLC, the plan's sponsoring company."[93]  A jury reasonably could infer based upon the evidence that Mr. Altbach is liable as a principal, either pursuant to the alleged "chain of agency running from [Mr.] Altbach to [Mr.] Ben-Jacob to Goal," or pursuant to SKAT's *alter ego* theory.[94]

The defendants' arguments that SKAT's aiding and abetting fraud and negligent misrepresentation claims against Mr. Altbach should be dismissed fare no better.  Under New York law, the elements of an aiding and abetting fraud claim are: "(1) an underlying fraud; (2) the defendant's actual knowledge of the fraud; and (3) the defendant's substantial assistance to the fraud."[95]  The elements of a negligent misrepresentation claim under New York law are that: "(1)

---

[93]

> *Id.* at 78.

> Under New York law, "[t]o plead alter ego liability, the plaintiff must allege that: (1) the person exercised dominion and control with respect to the transaction attacked such that the corporation had no separate will of its own; and (2) the domination was used to commit a fraud or wrong against the plaintiff, *323 which proximately caused the plaintiff's injuries." *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 322–23 (S.D.N.Y. 2019).

[94]

> Dkt 831 (Pl. Opp. Mem.) at 76.

> The defendants' arguments in the alternative, that SKAT cannot show that Goal knew its statements were false and acted with an intent to deceive SKAT, also are unpersuasive.  As SKAT notes, "[u]nder New York law, when a defendant uses a third-party 'as a conduit' to relay a false statement, the plaintiff need only show that the defendant intended that the information be 'communicated to the plaintiff and that the plaintiff rely on it.'"  *Id.* at 79 (quoting *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 827-29 (2016)).  The defendants' contention that SKAT "cannot establish that it relied on [Mr.] Altbach specifically" "[i]n the absence of any communication or communicative act by [Mr.] Altbach relating to the allegedly false statements in the tax reclaim applications" also is unconvincing if in fact Mr. Altbach is liable as a principal or as the Roadcraft Plan's *alter ego*.  Dkt 799 (Defs. Mem.) at 93.

[95]

> *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 482 (S.D.N.Y. 2018).

the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."[96]

Mr. Altbach "expressly denies having any knowledge of the reclaim applications or of the contents of those applications."[97]   There is, however, evidence to support a reasonable inference that Mr. Altbach had actual knowledge of, or consciously avoided confirming, the alleged fraud.[98]  For example, as SKAT states, "[Mr.] Altbach understood [that] the scheme involved trading in Danish securities and 'tax treaties'," yet he "never reviewed (or even asked to review) any documents related to any of his five plans' purported trading or submissions to SKAT."[99]   Mr. Altbach participated also in a call with other defendants that allegedly was "prompted by a Wall Street Journal article, which discussed government investigations into" trades similar to those in this alleged scheme.[100]   Moreover, under New York law, an agent's actual knowledge may be imputed

---

[96]

*Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

[97]

Dkt 799 (Defs. Mem.) at 94.

[98]

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) ("The Court sees no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers.").

[99]

Dkt 831 (Pl. Opp. Mem.) at 81.

[100]

*Id.*

to a principal.[101]  With respect to the negligent misrepresentation claim, the defendants' argument

that SKAT cannot establish any misrepresentation attributable Mr. Altbach fails to persuade for the

reasons discussed above.  Their argument that SKAT cannot establish a special relationship with Mr.

Altbach is irrelevant if Mr. Altbach is liable as a principal or as the Roadcraft Plan's *alter ego*.[102]

The defendants' motion for summary judgment with respect to SKAT's claims against Mr. Altbach

therefore is denied.

       I have considered the defendants' other arguments and found them all unpersuasive.

### Conclusion

       For the foregoing reasons, the defendants' motion for summary judgment (Dkt 798)

is denied in its entirety.

       SO ORDERED.

Dated: November 20, 2023

_____
Lewis A. Kaplan
United States District Judge

---

[101]
*E.g., Hall v. Germain*, 131 N.Y. 536, 540 (1892) ("[U]nder the general principle, knowledge of the agent was knowledge of the principal."); *Thompson v. Naish*, 93 A.D.3d 1203, 1203 (3d Dept. 2012) ("We agree with defendant that '[o]f particular importance is a fundamental principle that has informed the law of agency and corporations for centuries; namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals.'") (citation omitted).

[102]
Their contention that "even Goal and . . . the Roadcraft Plan[] were not in a special relationship with SKAT" because "[t]here . . . cannot be a 'special relationship' when information is provided pursuant to statutory or regulatory requirements" fails for the reasons stated by SKAT.  Dkt 799 (Defs. Mem.) at 97.  The case that defendants rely on, as SKAT notes, "does not speak to whether a special relationship exists where a defendant makes a false statement to a government."  Dkt 831 (Pl. Opp. Mem.) at 83.