# Exhibit 5, Part 1



---

**FINAL NOTICE**

---

To:                         The TJM Partnership Limited (Formerly known as
                            Neovision Global Capital Limited) (In Liquidation)

Firm Reference Number:      498199

Address:                    c/o Moorfields Advisory Limited
                            20 Old Bailey, London, EC4M 7AN

Date:                       15 July 2022

## 1. ACTION

1.1.    For the reasons given in this Final Notice, pursuant to section 206 of the Financial Services and Markets Act 2000 ("the Act"), the Financial Conduct Authority ("the Authority") hereby imposes on The TJM Partnership Limited (In Liquidation) ("TJM" or "the Firm") a financial penalty of £2,038,700 of which £1,198,277 is disgorgement.

1.2.    TJM agreed to resolve this matter and qualified for a 30% (Stage 1) discount under the Authority's executive settlement procedures. Were it not for this discount, the Authority would have imposed a financial penalty of £2,399,000 on TJM.

## 2. SUMMARY OF REASONS

2.1.    Fighting financial crime is an issue of international importance, and forms part of the Authority's operational objective of protecting and enhancing the integrity of

the UK financial system. Authorised firms are at risk of being abused by those seeking to conduct financial crime, such as fraudulent trading and money laundering. It is therefore imperative that firms have in place effective systems and controls to identify and mitigate the risk of their businesses being used for such purposes and that they operate these systems and controls with due skill, care and diligence in order to properly assess, monitor and manage the risk of financial crime.

2.2.    Between 29 January 2014 and 25 November 2015 (the "Relevant Period"), TJM:

a) breached Principle 3 as it had inadequate systems and controls to identify and mitigate the risk of being used to facilitate fraudulent trading and money laundering in relation to business introduced by four authorised entities known as the Solo Group; and

b) breached Principle 2 as it did not exercise due skill, care and diligence in applying its AML policies and procedures and in failing to properly assess, monitor and mitigate the risk of it being used to facilitate financial crime in relation to the Solo Clients, the purported Solo Trading, the Elysium Payment and the Ganymede Trades.

2.3.    The Solo Clients were off-shore companies including BVI and Cayman Islands incorporated entities and individual US 401(k) Pension Plans previously unknown to TJM. They were introduced by the Solo Group, which purported to provide clearing and settlement services as custodian to clients within a closed network, via a custom over the counter ("OTC") post-trade order matching platform in 2014 and via a trading and settlement platform known as Brokermesh in 2015. The Solo Clients were controlled by a small number of individuals, some of whom had worked for the Solo Group, without apparent access to sufficient funds to settle the transactions.

2.4.    TJM executed purported OTC equity cum-dividend trades on behalf of the Solo Clients to the value of approximately £58.55 billion in Danish equities and £19.71 billion in Belgian equities, and received commission of £1,401,608 during the Relevant Period. TJM was "*alert to the potential for an imbalance of influence in its relationship with Solo*" which provided a significant percentage of TJM's overall business. TJM staff were keen to maintain their relationship with the Solo Group

2

which was described as the "*chicken that laid the golden egg*" [sic]. Before the Solo business, TJM was losing approximately £20,000 to £30,000 per month.

2.5.    The Solo Trading was characterised by a purported circular pattern of extremely high value OTC equity trading, back-to-back securities lending arrangements and forward transactions, involving EU equities on or around the last day of cum-dividend. Following the purported Cum-Dividend Trading that took place on designated days, the same trades were subsequently purportedly reversed over several days or weeks to neutralise the apparent shareholding positions (the "Unwind Trading").

2.6.    The purported OTC trades executed by TJM on behalf of Solo Clients were conducted on platforms which did not have access to liquidity from public exchanges. Yet the purported trades were almost invariably filled within a matter of minutes despite representing up to 24% of the shares outstanding in companies listed on the Danish stock exchange, and up to 10% of the equivalent Belgian stocks. The purported OTC trades also equated to an average of 47 times the total number of all shares traded in the Danish stocks on the Danish stock exchange and 22 times the total number of all shares traded in the Belgian stocks on European exchanges on the relevant last Cum-Dividend Trading date.

2.7.    The Authority's investigation and conclusions in respect of the purported trading are based on a range of information including, in part, analysis of transaction reporting data, material received from TJM, the Solo Group, and five other Broker Firms that participated in the Solo Trading. The combined volume of the Cum-Dividend Trading across the six Broker Firms was between 15 - 61% of the shares outstanding in the Danish stocks traded, and between 7 - 30% of the shares outstanding in the Belgian stocks traded. These volumes are considered implausible, especially in circumstances where there is an obligation to publicise holders of over 5% of Danish and Belgian listed stocks.

2.8.    As a broker for the Solo Trading, TJM executed both purported Cum-Dividend Trading and the purported Unwind Trading. However, the Authority believes it unlikely that TJM would have executed both the purported Cum-Dividend Trades and purported Unwind Trades for the same client in the same stock in the same size trades and therefore it is likely that TJM only saw one side of the purported trading. Additionally, the Authority considers that purported stock loans and

forwards linked to the Solo Trading are likely to have been used to obfuscate and/or give apparent legitimacy to the overall scheme. Although TJM understood the Solo Trading would involve "*large European equities hedged with futures or vice versa*", the purported stock loans and forwards were not executed by TJM.

2.9.     The purpose of the purported trading was so the Solo Group could arrange for Dividend Credit Advice Slips ("DCAS") to be created, which purported to show that the Solo Clients held the relevant shares on the record date for dividend. The DCAS were in some cases then used to make withholding tax ("WHT") reclaims from the tax agencies in Denmark and Belgium, pursuant to Double Taxation Treaties. In 2014 and 2015, the value of Danish and Belgian WHT reclaims made, which are attributable to the Solo Group, were approximately £899.27 million and £188.00 million respectively. In 2014 and 2015, of the reclaims made, the Danish and Belgian tax authorities paid approximately £845.90 million and £42.33 million respectively.

2.10.    The Authority refers to the Solo Trading as 'purported' as it has found no evidence of ownership of the shares by the Solo Clients, nor custody of the shares or settlement of the trades by the Solo Group. This, coupled with the high volumes of shares purported to have been traded, is highly suggestive of sophisticated financial crime.

2.11.    TJM did not have adequate policies and procedures in place to properly assess the risks of the Solo Group business, and failed to appreciate the risks involved in the Solo Trading. This resulted in TJM conducting inadequate CDD, failing to adequately monitor transactions and failing to identify unusual transactions. This heightened the risk that the Firm could be used for the purposes of facilitating financial crime in relation to the Solo Trading executed by TJM between 26 February 2014 and 28 September 2015 on behalf of the Solo Clients.

2.12.    The manner in which the Solo Trading was conducted, combined with its scale and volume is highly suggestive of financial crime. The Authority's findings are made in the context of this finding, and in consideration that these matters have given rise to additional investigations by tax agencies and/or law enforcement agencies in other jurisdictions as has been publicly reported.

2.13.   In addition to the Solo Trading, TJM failed to notice a series of red flags in relation to two sets of trades in German equities it executed on behalf of Solo Clients on 30 June 2014 and 23 October 2014, which had no apparent economic purpose except to transfer funds from Ganymede, a private entity owned by Sanjay Shah who is also the owner of the Solo Group, to his business associates.

2.14.   On 4 November 2015, TJM also agreed to a debt factoring offer from a UAE-based entity connected to the Solo Group called Elysium Global (Dubai) Limited ("Elysium") to purchase outstanding debts owed to the Firm by the Solo Clients. TJM accepted a payment of USD 117,960 from Elysium (the "Elysium Payment") without having heard of that entity before and despite having no written agreement in place.

**TJM's Negligence**

2.15.   TJM staff had in place inadequate systems and controls to identify and mitigate the risk of being used to facilitate fraudulent trading and money laundering in relation to business introduced by four authorised entities known as the Solo Group. In addition, TJM staff did not exercise due skill, care and diligence in applying AML policies and procedures, and in failing to properly assess, monitor and mitigate the risk of financial crime in relation to the Solo Clients and the purported Solo Trading, the Ganymede Trades and the Elysium Payment.

**Breaches and failings**

2.16.   The Authority considers that TJM failed to take reasonable care to organise and control its affairs responsibly and effectively with adequate risk management systems, as required by Principle 3, in relation to the Solo Clients, the purported Solo Trading and the Ganymede Trades. TJM's policies and procedures were inadequate for identifying, assessing and mitigating the risk of financial crime as TJM failed to:

a)  Provide adequate guidance on when and how to conduct risk assessments of new clients and what factors to consider in order to determine the appropriate level of CDD to be applied to clients;

b)  Set out adequate processes and procedures for CDD, including in relation to obtaining and assessing adequate information when onboarding new clients;

c) Set out adequate processes and procedures detailing when and how to conduct EDD;

d) Design and implement any effective processes and procedures for ongoing monitoring, including when and how transactions were to be monitored, with what frequency and record keeping; and

e) Set out processes and escalation procedures in identifying, managing and documenting financial crime and AML risks.

2.17.    The Authority also considers that TJM failed to act with due skill, care and diligence as required by Principle 2 in that in assessing, monitoring and managing the risk of financial crime associated with the Solo Clients, the purported Solo Trading, Ganymede Trades and Elysium Payment, the Firm failed to:

a) Conduct appropriate customer due diligence, by failing to follow even its limited CDD procedures;

b) Gather adequate information when onboarding the Solo Clients to enable it to understand the business that the customers were going to undertake, the likely size or frequency of the trading intended by the Solo Clients;

c) Conduct risk assessments for any of the Solo Clients;

d) Complete EDD for any of the Solo Clients despite numerous risk factors being present which ought to have made it clear to the Firm that EDD was required to be conducted on each Solo Client;

e) Assess each of the Solo Clients against the categorisation criteria set out in COBS 3.5.2R and failed to record the results of such assessments, including sufficient information to support the categorisation, contrary to COBS 3.8.2R(2)(a);

f) Conduct ongoing monitoring, including any monitoring of the Solo Trading and Ganymede Trades;

g) Recognise numerous red flags with the Solo Trading. These included failing to consider whether it was plausible and/or realistic that sufficient liquidity was sourced within a closed network of entities for the volumes of trading

6

conducted by the Solo Clients.  Likewise, TJM failed to consider or recognise that the profiles of the Solo Clients meant that they were highly unlikely to be capable of the volume of the trading purportedly being carried out, and made no attempts to at least obtain sufficient evidence of the clients' source of funds to satisfy itself to the contrary;

h) Recognise numerous red flags arising from the purported Ganymede Trades and adequately consider the serious financial crime and money laundering risks they posed to the Firm; and

i) Consider adequately associated financial crime and money laundering risks posed by the Elysium Payment after employees questioned a number of red flags regarding the payment, and shortly after the Authority had conducted an unannounced visit alerting TJM relating to possible issues with the Solo Group.

2.18.    TJM's failings merit the imposition of a significant financial penalty. The Authority considers the failings to be particularly serious because they left the Firm exposed to the risk that it could be used to further financial crime. In particular:

a) TJM onboarded 311 Solo Clients in four batches, some of which were based in jurisdictions which did not have AML requirements equivalent to those in the UK;

b) TJM's AML policies and procedures were not proportionate to the risks in the Solo business that it was undertaking;

c) TJM failed to properly review and conduct due diligence on the KYC materials that were provided by the Solo Clients or ask appropriate follow up questions to red flags in the KYC materials when onboarded clients;

d) TJM failed to conduct any ongoing monitoring of the Solo Trading despite a number of red flags, and facilitated the Solo Clients to purportedly trade equities totalling more than £78 billion;

e) TJM failed to both have and apply appropriate AML systems and controls in relation to the Solo Clients creating an unacceptable risk that TJM could be used by clients to launder the proceeds of crime;

7

f) TJM executed two sets of Ganymede Trades, which resulted in a net loss of EUR 4.7 million for a client whose UBO was Sanjay Shah (who was also the UBO of the Solo Group) to the benefit of six Solo Clients in circumstances which were highly suggestive of financial crime;

g) TJM accepted the Elysium Payment after being alerted to the Authority's concerns regarding the purported Solo Trading and after employees raised concerns regarding the payment; and

h) Finally, none of these failings were identified or escalated by TJM during the Relevant Period.

2.19. Accordingly, to further the Authority's operational objective of protecting and enhancing the integrity of the UK financial system, the Authority hereby imposes on TJM a financial penalty of **£2,399,000**.

## 3. DEFINITIONS

3.1. The following definitions are used in this Warning Notice:

"**401(k) Pension Plan**" means an employer-sponsored retirement plan in the United States. Eligible employees may make pre-tax contributions to the plan but are taxed on withdrawals from the account. A Roth 401(k) plan is similar in nature; however, contributions are made post-tax although withdrawals are tax-free. For the 2014 tax year, the annual contribution limit was USD17,500 for an employee, plus an additional $5,500 catch-up contribution for those aged 50 and over. For the tax year 2015, the contribution limits were USD18,000 for an employee and the catch-up contribution was USD6,000. For a more detailed analysis, please see Annex C;

"**2007 Regulations**" or "**Regulation**" means the Money Laundering Regulations 2007 or a specific regulation therein;

"**the Act**" means the Financial Services and Markets Act 2000;

"**AML**" means Anti-Money Laundering;

"**AML certificate**" means an AML introduction form which is supplied by one authorised firm to another. The form confirms that a regulated firm has carried

out CDD obligations in relation to a client and authorises another regulated firm to place reliance on it in accordance with Regulation 17;

"**Authority**" means the Financial Conduct Authority, known prior to 1 April 2013 as the Financial Services Authority;

"**Broker Firms**" means the other broker firms who agreed with the Solo Group to carry out the Solo Trading;

"**Brokermesh**" means the bespoke electronic platform set up by the Solo Group for the Solo Clients to submit orders to buy or sell cash equities, and for TJM and the Broker Firms to provide or seek liquidity and execute the purported trading;

"**CDD"** means customer due diligence measures, the measures a firm must take to identify each customer and verify their identity and to obtain information on the purpose and intended nature of the business relationship, as required by Regulation 5;

"**Clearing broker**" means an intermediary with responsibility to reconcile trade orders between transacting parties. Typically, the clearing broker validates the availability of the appropriate funds, ensures the delivery of the securities in exchange for cash as agreed at the point the trade was executed, and records the transfer;

"**COBS**" means the Authority's Conduct of Business Sourcebook Rules;

"**Cum-dividend**" means when a buyer of a security is entitled to receive the next dividend scheduled for distribution, which has been declared but not paid. A stock trades cum-dividend up until the ex-dividend date, after which the stock trades without its dividend rights;

"**Cum-Dividend Trading**" means the purported trading that the Solo Clients conducted where the shares are cum-dividend in order to demonstrate apparent shareholding positions that would be entitled to receive dividends, for the purposes of submitting WHT reclaims;

"**Custodian**" means a financial institution that holds customers' securities for safekeeping. They also offer other services such as account administration,

9

transaction settlements, the collection of dividends and interest payments, tax support and foreign exchange;

"**DCAS**" means Dividend Credit Advice Slips. These are completed and submitted to overseas tax authorities in order to reclaim the tax paid on dividends received;

"**DEPP**" means the Authority's Decision Procedure and Penalties Manual;

"**Dividend Arbitrage**" means the practice of placing shares in an alternative tax jurisdiction around dividend dates with the aim of minimising withholding taxes ("WHT") or generating WHT reclaims. Dividend Arbitrage may include several different activities including trading and lending equities and trading derivatives, including futures and total return swaps, designed to hedge movements in the price of the securities over the dividend dates;

"**Double Taxation Treaty**" means a treaty entered into between the country where the income is paid and the country of residence of the recipient. Double taxation treaties may allow for a reduction or rebate of the applicable WHT;

"**EDD**" means enhanced due diligence, the measures a firm must take in certain situations, as outlined in Regulation 14;

"**Elysium**" means Elysium Global (Dubai) Limited;

"**Elysium Payment**" means the c. USD 117,960 payment received by TJM from Elysium on 4 November 2015 in relation to debts owed by the Solo Clients to TJM;

"**Executing broker**" means a broker that merely buys and sells shares on behalf of clients. The broker does not give advice to clients on when to buy or sell shares;

"**European exchanges**" means registered execution venues, including regulated markets, multilateral trading facilities, organised trading facilities and alternative trading systems encapsulated in Bloomberg's European Composite;

"**Financial Crime Guide**" means the Authority's consolidated guidance on financial crime, which is published under the name "Financial crime: a guide for firms". In this Notice, the applicable versions for the Relevant Period were published in April 2013, April 2014, January 2015 (incorporating updates which came into effect on 1 June 2014) and April 2015. The Financial Crime Guide

contains "general guidance" as defined in section 139B FSMA. The guidance is not binding and the Authority will not presume that a firm's departure from the guidance indicates that it has breached the Authority's rules. But as stated in FCG 1.1.8 the Authority expect firms to be aware of the Financial Crime Guide where it applies to them, and to consider applicable guidance when establishing, implementing and maintaining their anti-financial crime systems and controls;

"**Ganymede Trades**" means a series of trades in German stocks executed by TJM on 30 June 2014 and 23 October 2014 on behalf of seven Solo Clients with connections to the Solo Group;

"**Ganymede**" means Ganymede Cayman Ltd incorporated in the Cayman Islands, a private entity solely owned by Sanjay Shan who is also the owner of the Solo Group;

"**Handbook**" means the collection of regulatory rules, manuals and guidance issued by the Authority;

"**JMLSG**" means the Joint Money Laundering Steering Group, which is comprised of leading UK trade associations in the financial services sector;

"**JMLSG Guidance**" means the 'Prevention of money laundering/combating terrorist finance guidance for the UK financial sector' issued by the JMLSG, which has been approved by a Treasury Minister in compliance with the legal requirements in the 2007 Regulations. The JMLSG Guidance sets out good practice for the UK financial services sector on the prevention of money laundering and combating terrorist financing. In this Notice, applicable provisions from the versions dated on 20 November 2013 and 19 November 2014 have been referred to;

The Authority has regard to whether firms have followed the relevant provisions of the JMLSG Guidance when deciding whether a breach of its rules on systems and controls against money laundering has occurred, and in considering whether to take action for a financial penalty or censure in respect of a breach of those rules (SYSC 3.2.6E and DEPP 6.2.3G);

"**KYC**" means Know Your Customer, which refers to CDD and EDD obligations;

11

"**KYC pack**" means the bundle of client identity information received, which usually included incorporation documents, certified copies of identity documents, utility bills and CVs;

"**Matched principal trading**" means a transaction where the facilitator interposes itself between the buyer and the seller to the transaction in such a way that it is never exposed to market risk throughout the execution of the transaction, with both sides executed simultaneously, and where the transaction is concluded at a price where the facilitator makes no profit or loss, other than a previously disclosed commission, fee or charge for the transaction;

"**MLRO**" means Money Laundering Reporting Officer;

"**OTC**" means over the counter trading which does not take place on a regulated exchange;

"**Principles**" means the Authority's Principles for Businesses as set out in the Handbook;

"**Relevant Compliance Documents**" means TJM's "Compliance Manual" and "Anti-Money Laundering Procedures" which were applicable during the Relevant Period;

"**Relevant Period**" means the period from 29 January 2014 to 25 November 2015;

"**SCP**" means Solo Capital Partners LLP;

"**Solo Clients**" means the entities introduced by the Solo Group to TJM and on whose behalf TJM executed purported equity trades for some of the clients during the Relevant Period;

"**Solo Group**" or "**Solo**" means the four authorised firms owned by Sanjay Shah, a British national residing in Dubai, details of which are set out in paragraph 4.3;

"**Solo Project**" means the Solo Group's business proposal, details of which are set out in paragraph 4.24;

12

"**Solo Trading**" means purported Cum-Dividend Trading and the purported Unwind Trading executed for Solo Clients during the Relevant Period;

"**TJM**" means Neovision Global Capital Limited (formerly known as The TJM Partnership PLC);

"**Tribunal**" means the Upper Tribunal (Tax and Chancery Chamber);

"**UBO**" means ultimate beneficial owner with "beneficial owner" being defined in Regulation 6;

"**Unwind Trading**" means the purported trading that took place over several days or weeks to reverse the purported Cum-Dividend Trading to neutralise the apparent shareholding positions;

"**Withholding Tax**" or "**WHT**" means a levy deducted at source from income and passed to the government by the entity paying it. Many securities pay periodic income in the form of dividends or interest, and local tax regulations often impose a WHT on such income; and

"**Withholding Tax Reclaims**" means in certain cases where WHT is levied on payments to a foreign entity, the WHT may be reclaimed if there is a Double Taxation Treaty between the country in which the income is paid and the country of residence of the recipient. Double Taxation Treaties may allow for a reduction or rebate of the applicable WHT.

## 4. FACTS AND MATTERS

**Background**

*TJM*

4.1.    TJM is a UK-based interdealer brokerage firm. During the Relevant Period, TJM primarily facilitated and advised on trades between counterparties in equities and equity derivative products, typically on behalf of private clients, some of whom were high net worth individuals. Before it onboarded 311 Solo Clients in the Relevant Period, TJM had approximately 90 on-boarded clients.

4.2.    Throughout 2014, TJM had permissions under Part 4A of the Act including dealing in investments as agents and in January 2015, the Firm was granted permission

to deal in investments as principal. It was authorised to advise and manage investments on behalf of eligible counterparties, professional clients and retail clients.

*The Solo Group*

4.3.    The four authorised firms referred to by the Authority as the Solo Group were owned by Sanjay Shah, a British national currently based in Dubai:

a)    Solo Capital Partners LLP ("SCP") was first authorised in March 2012 and was a broker.

b)    West Point Derivatives Ltd was first authorised in July 2005 and was a broker in the derivatives market.

c)    Old Park Lane Capital Ltd was first authorised in April 2008 and was an agency stockbroker and corporate broker.

d)    Telesto Markets LLP was first authorised on 27 August 2014 and was a wholesale custody bank and fund administrator.

4.4.    During the Relevant Period, SCP and others in the Solo Group at various stages, held regulatory permissions to provide custody and clearing services. The Solo Group has not been permitted to carry out any activities regulated by the Authority since December 2015 and SCP formally entered Special Administration insolvency proceedings in September 2016. The other three entities are also in administrative proceedings.

**Statutory and Regulatory Provisions**

4.5.    The statutory and regulatory provisions relevant to this Warning Notice are set out in Annex B.

4.6.    Principle 3 requires firms take reasonable care to organise and control their affairs responsibly and effectively, with adequate risk management systems. The 2007 Regulations and rules in the Authority's Handbook further require firms to create and implement policies and procedures to prevent and detect money laundering, and to counter the risk of being used to facilitate financial crime. These include systems and controls to identify, assess and monitor money laundering risk, as

14

well as conducting CDD and ongoing monitoring of business relationships and transactions.

4.7.    Principle 2 requires firms to conduct their businesses with due skill, care and diligence. A firm merely having systems and controls as required by Principle 3 is not sufficient to avoid the ever-present financial crime risk. A firm must also operate those systems and controls with due skill, care and diligence as required by Principle 2 to protect itself, and properly assess, monitor and manage the risk of financial crime.

4.8.    Money laundering is not a victimless crime. It is used to fund terrorists, drug dealers and people traffickers as well as numerous other crimes. If firms fail to apply money laundering systems and controls thoughtfully and diligently, they risk facilitating these crimes.

4.9.    As a result, money laundering risk should be taken into account by firms as part of their day-to-day operations, including those in relation to the development of new products, the taking on of new clients and changes in its business profile. In doing so, firms should take account of their customer, product and activity profiles and the complexity and volume of their transactions.

4.10.    The JMLSG has published detailed guidance with the aim of promoting good practice and giving practical assistance in interpreting the 2007 Regulations and evolving practice within the financial services industry. When considering whether a breach of its rules on systems and controls against money laundering has occurred, the Authority will have regard to whether a firm has followed the relevant provisions in the JMLSG Guidance.

4.11.    Substantial guidance for firms has also been published by the Authority regarding the importance of AML controls, including in the form of its Financial Crime Guide, which cites examples of good and bad practice, publications of AML thematic reviews and regulatory notices.

**Background to Dividend Arbitrage and the Purported Solo Trading**

*Dividend Arbitrage Trading*

4.12.    The aim of dividend arbitrage is to place shares in certain tax jurisdictions around dividend dates, with the aim of minimising withholding taxes or to generate WHT

reclaims. WHT is a levy deducted at source from dividend payments made to shareholders.

4.13.   If the beneficial owner is based outside of the country of issue of the shares, he may be entitled to reclaim that tax if the country of issue has a relevant treaty (a "Double Taxation Treaty") with the country of residence of the beneficial owner. Accordingly, Dividend Arbitrage aims at transferring the beneficial ownership of shares temporarily overseas, in sync with the dates upon which dividends become payable, in order that the criteria for making a WHT reclaim are fulfilled.

4.14.   As the strategy is one of temporary transfer only, it is often executed using 'stock lending' transactions. While such transactions are structured economically as loans, the entitlement to a tax rebate depends on actual transfer of title. The legal structure of the 'loan' is therefore a sale of the shares, on condition that the borrower is obliged to supply equivalent shares to the lender at a specified future date.

4.15.   Dividend Arbitrage may give rise to significant market risk for either party as the shares may rise or fall in value during the life cycle of the loan. In order to mitigate this, the strategy will often include a series of derivative transactions, which hedge this market exposure.

4.16.   A key role of the share custodian in connection with Dividend Arbitrage strategies is to issue a voucher to the beneficial owner which certifies such ownership on the date on which the entitlement to a dividend arose. The voucher will also specify the amount of the dividend and the sum withheld at source. This is sometimes known as 'Dividend Credit Advice Slip' or 'Credit Advice Note'. The purpose of the voucher is for the beneficial owner to produce it (assuming the existence of a relevant Double Taxation Treaty) to the relevant tax authority to reclaim the withholding tax. The voucher generally certifies that (1) the shareholder was the beneficial owner of the share at the relevant time; (2) the shareholder had received the dividend; (3) the amount of the dividend; and (4) the amount of tax withheld from the dividend.

4.17.   Given the nature of Dividend Arbitrage trading, the costs of executing the strategy will usually be commercially justifiable only if large quantities of shares are traded.

*The Purported Solo Trading*

16

4.18.    The Authority's investigation and understanding of the purported trading in this case is based, in part, on analysis of transaction reporting data and material received from TJM, the Solo Group, and five other Broker Firms that participated in the Solo Trading. The Solo Trading was characterised by a circular pattern of purported extremely large-scale OTC equity trading, back-to-back securities lending arrangements and forward transactions.

4.19.    The Solo Trading can be broken into two phases:

a)    purported trading conducted when shares are cum-dividend in order to demonstrate apparent shareholding positions that would be entitled to receive dividends, for the purposes of submitting WHT reclaims ("Cum-Dividend Trading"); and

b)    the purported trading conducted when shares are ex-dividend, in relation to the scheduled dividend distribution event which followed the Cum-Dividend Trading, in order to reverse the apparent shareholding positions taken by the Solo Group clients during Cum-Dividend Trading ("Unwind Trading").

4.20.    The combined volume of the purported Cum-Dividend Trading across the six Broker Firms were between 15% and 61% of the shares outstanding in the Danish stocks traded, and between 7% and 30% of the shares outstanding in the Belgian stocks traded.

4.21.    As a broker for the equity trades, TJM executed the purported Cum-Dividend Trading and the purported Unwind Trading. However, the FCA believes it unlikely that TJM would have executed both the purported cum-dividend trades and purported unwind trades for the same client in the same stock in the same size trades and therefore it is likely TJM only saw one side of the purported trading. Additionally, the FCA considers that purported stock loans and forwards linked to the Solo Trading are likely to have been used to obfuscate and/or give apparent legitimacy to the overall scheme. Although TJM understood the Solo Trading would involve "*large European equities hedged with futures or vice versa*", the purported stock loans and forwards were not executed by TJM.

4.22.    The purpose of the purported trading was to enable the Solo Group to arrange for Dividend Credit Advice Slips ("DCAS") to be created, which purported to show that the Solo Clients held the relevant shares on the record date for dividend. The

DCAS were in some cases then used to make WHT reclaims from the tax agencies in Denmark and Belgium pursuant to Double Taxation Treaties. In 2014 and 2015, the value of Danish and Belgian WHT reclaims made, which are attributable to the Solo Group was approximately £899.27 million and £188.00 million respectively. In 2014 and 2015, of the reclaims made, the Danish and Belgian tax authorities paid approximately £845.90 million and £42.33 million respectively.

4.23.   The Authority refers to the trading as 'purported' as it has found no evidence of ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades by the Solo Group.

**TJM's Introduction to the Solo Group business**

4.24.   In December 2013, the Solo Group approached TJM with a business proposal (the "Solo Project"), whereby TJM would be executing OTC cash equities, futures and options trades for clients introduced by the Solo Group, who would provide custody and clearing services for such trades executed by TJM. By the end of January 2014, TJM and Solo Group representatives met to discuss the Solo Project on at least 4 occasions (the "Initial Discussions"). Prior to this introduction, TJM did not have any business relationship with the Solo Group. TJM did not document or minute any of the Initial Discussions, "many" of which took place 'informally outside the office'.

4.25.   Before the Solo Trading commenced, TJM lacked details about the expected size, volume or frequency of the anticipated trading. However, TJM understood that the trading would be "*good size orders*" in large European equities hedged with futures or vice versa, and that TJM would be one of several broker firms involved in the trading. While the Solo Group did not provide full details or strategy of the proposed trading, TJM believed that the trading would involve Dividend Arbitrage but its role would be a "*discrete part of a wider strategy employed by Solo*".

4.26.   TJM anticipated that the projected revenue from the Solo Project would be £500,000 per annum. Based on the agreed commission rates, TJM would have been able to calculate that, to earn that revenue, they would need to execute trades for the Solo Clients to the value of £40 billion annually. The Solo Project was attractive and important for TJM as it was a new area of business and provided a new source of income to the Firm, following the departure of a key partner and shareholder in 2013. At the beginning of the Solo Trading on 18 March

18

2014, TJM's senior management emailed to the wider team stating "...*we have had another sterling performance today on the Solo account and another Firm record broken*". At a March 2014 board meeting, it was highlighted that TJM was losing approximately £20,000 to £25,000 per month without the Solo Project business. Commencing February 2015, TJM was charged a EUR 5,000 monthly fee by Solo for the Brokermesh platform, TJM staff considered it had little choice but to adopt the platform which was "*dictated*" to them and accept its fees, or cease trading on behalf of Solo Clients altogether. TJM was "*alert to the potential for an imbalance of influence in its relationship with Solo*" which provided a significant percentage of TJM's overall business. TJM staff were keen to maintain their relationship with the Solo Group which was described as the "*chicken that laid the golden egg*" [sic].

4.27. The Firm carried out limited due diligence on the Solo Project. The due diligence which was conducted appears to have been a series of informal steps taken to understand the nature of the Solo Project, without a defined point at which results were discussed and a decision to proceed was made. Specifically, TJM stated it took some limited steps to gain an understanding of:

a) Individuals involved in the management of the Solo Group;

b) The adequacy of skills within TJM to handle the Solo Project;

c) The FCA permissions needed to conduct the trading proposed under the Solo Project;

d) The commercial terms of the Solo Project and the risk these posed to TJM in relation to potential liabilities as a business; and

e) The general legitimacy of Dividend Arbitrage strategies.

4.28. TJM took considerable comfort from the fact that the Solo Group were FCA regulated and that another authorised Broker Firm (which it regarded as reputable and assumed would also have undertaken due diligence) would also be conducting trading for the Solo Group.

4.29. TJM did not document any minutes or notes of the decision to take on the Solo Project.

19

4.30. On 7 February 2014, TJM informed the Solo Group of its intent to sign an agreement with them (the "2014 Services Agreement") which the Firm signed on 24 February 2014. The Authority notes that the 2014 Services Agreement made no reference as to who would provide clearing and settlement services for the trades to be executed by TJM.

4.31. On 3 February 2015, TJM entered a new agreement with each of the Solo Group entities (the "2015 Services Agreement"). The 2015 Services Agreement set out that the Solo Group entities: (i) would assist with the provision of clearing and settlement services to TJM; (ii) might assist TJM with its transaction reporting obligations; and (iii) would provide any other services which may be agreed with TJM. In conjunction with the 2015 Services Agreement, TJM would:

a) only be entitled to half the commission when compared to that under the 2014 Services Agreement. This meant that TJM would need to execute trades for the Solo Clients to the value of £80 billion annually to retain the same expected annual revenue of £500,000 in 2015. TJM requested and received assurances that expected trading would increase significantly in 2015; and

b) required it to act on a matched principal basis.

4.32. On 24 February 2015, TJM agreed to the licence terms of an electronic trading platform known as Brokermesh.

4.33. TJM represented that it had at the time been satisfied the Firm was ready to take on the Solo Project, its staff was confident the proposed strategy was compliant. However, significant gaps remained within the Firm's understanding of the Solo Project, particularly regarding the nature of the anticipated clients and their trading, by the time the Solo Trading had commenced on 26 February 2014.

4.34. Minutes of a TJM "Compliance Meeting" dated 25 March 2014 suggest that TJM had further discussions about the Solo Project, where they appear to review this business as a result of a few "*areas of uncertainty*". TJM acknowledged that the Solo Trading was "*generating a great deal of income*" but "*fairly complex*". Shortly after this compliance meeting, TJM circulated an internal email containing a link to a news article dated 18 December 2011 from The Guardian newspaper

mentioning dividend arbitrage trades and "huge tax avoidance trade "*cheating*" European countries of hundreds of millions of euros a year".

4.35.   TJM requested the written opinion from its external compliance consultant (the "Compliance Consultant") to address some of the areas of uncertainty on "Dividend Washing" (i.e. Dividend Arbitrage) trading.

4.36.   The Compliance Consultant produced a memo dated 2 April 2014 that considered a number of issues, including the legality of dividend arbitrage trading.  Although they stated in their conclusion that *"Fundamentally there should be no reason why this business can't currently continue. However, certain requirements, which should be undertaken by the clearers, need to be confirmed"*, it also alerted TJM that *"this form of trading is not allowed in certain jurisdictions and, in the future, the legal status of this business may change in the UK"*.

4.37.   The Compliance Consultant informed the Authority that their review was extremely high-level and did not consider the adequacy of the Firm's policies and procedures, systems and controls on onboarding, the Solo Clients or the Solo Trading specifically, but pointed out a range of factors TJM needed to consider. The warning that certain jurisdictions did not allow similar type of trading, together with the news article mentioned in paragraph 4.34 above, ought to have prompted TJM to consider whether its policies and procedures and systems and controls were adequate to conduct the Solo Project, and also to consider potential financial crime risks posed to the Firm.

**Onboarding of the Solo Clients**

*Introduction to Onboarding requirements*

4.38.   The 2007 Regulations required authorised firms to use their onboarding process to obtain and review information about a potential customer to satisfy their KYC obligations.

4.39.   As set out in Regulation 7 of the 2007 Regulations, a firm must conduct Customer Due Diligence ("CDD") when it establishes a business relationship or carries out an occasional transaction.

4.40.   As part of the CDD process, a firm must first identify the customer and verify their identity. Second, a firm must identify the beneficial owner, if relevant, and verify

their identity. Finally, a firm must obtain information on the purpose and intended nature of the business relationship.

4.41.   To confirm the appropriate level of CDD that a firm must apply, a firm must perform a risk assessment, taking into account the type of customer, business relationship, product and/or transaction. The firm must also document its risk assessments and keep its risk assessments up to date.

4.42.   If the firm determines through its risk assessment that the customer poses a higher risk of money laundering or terrorist financing, then it must apply Enhanced Due Diligence ("EDD"). This may mean that the firm should obtain additional information regarding the customer, the beneficial owner to the extent there is one, and the purpose and intended nature of the business relationship. Additional information gathered during EDD should then be used to inform its risk assessment process in order to manage its money laundering/terrorist financing risks effectively. The information firms are required to obtain about the circumstances and business of their customers is necessary to provide a basis for monitoring customer activity and transactions, so firms can effectively detect the use of their products for money laundering and/or terrorist financing.

*Chronology of the onboarding*

4.43.   On 29 January 2014, the onboarding process commenced for the Solo Clients. This involved the Solo Group providing KYC documents to TJM. None of the Solo Clients had any prior business relationship with TJM,

4.44.   TJM had understood that the Solo Clients would be institutional clients but the Firm was unaware of the Solo Clients' intended trading strategy at the point they onboarded them.

4.45.   During the Relevant Period, TJM onboarded a total of 311 Solo Clients, out of which at least 91 clients requested onboarding using the exact same wording. Throughout the process, TJM maintained a list of Solo Clients who had requested to be onboarded, which it sent to the Solo Group periodically. Not all of the 311 Solo Clients onboarded were active and participated in the Solo Trading.

4.46.   The Solo Clients represented a dramatic increase in the number of clients TJM typically onboarded, which was in the region of three or four a month. It also

22

represented a deviation from the typical way in which they interacted with clients. TJM explained that they considered the trading was institutional in the sense that the Solo group set the investment strategy and TJM acted on an execution only basis, rather than providing advisory services.

4.47.  However, the Solo Clients were not institutional clients. They consisted of approximately 255 401(k) Pension Plans, 23 entities incorporated in Labuan (Malaysia) and the remaining entities incorporated in the British Virgin Islands, the Cayman Islands, the UAE, Gibraltar, Seychelles and the UK. At least 45 of these 401(k) Pension Plans/entities had been incorporated or set up in 2013 and 174 in 2014, the value of the purported trades far exceeded the investment amounts which could reasonably have accrued given the annual contribution limits, number of ultimate beneficial owners and short period of incorporation, which should have alerted TJM as to the unrealistic nature of the trades and warranted closer monitoring of their trading activities.

4.48.  A number of the Solo Clients TJM onboarded had only one UBO and many of them were owned and controlled by the same individuals; one individual owned nine clients, two individuals each owned seven clients, seven individuals each owned six clients, 19 individuals each owned five clients. Three single individuals managed a total of over 140 of these clients.

4.49.  There is no evidence that TJM reassessed the Solo Project despite being presented with and onboarding clients which were fundamentally different to their understanding prior to the start of the Solo Trading (i.e. that such clients would be regulated institutional clients).

*CDD*

4.50.  CDD is an essential part of the onboarding process, which must be conducted when onboarding a new client. Firms must obtain and hold sufficient information about their clients to inform the risk assessment process and manage the money laundering risks effectively.

4.51.  The CDD process has three parts. Under Regulation 5 of the Money Laundering Regulations:

(a)    First, a firm must identify the customer and verify their identity.

23